## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **MARC E. SMITH,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 12-227 (LPS)** |
| **PERDUE FARMS INCORPORATED,** | |
| **Defendant.** | |

## DEFENDANT'S MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

*OF COUNSEL*:

Brooks R. Amiot (*pro hac vice*)
JACKSON LEWIS LLP
2800 Quarry Lake Dr., Ste. 200
Baltimore, Maryland  21209
(410) 415-2004

Kristina H. Vaquera (*pro hac vice*)
JACKSON LEWIS LLP
500 E. Main Street, Ste. 800
Norfolk, Virginia  23510
(757) 648-1445

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Lori A. Brewington (#4522)
brewington@rlf.com
RICHARDS, LAYTON, & FINGER, P.A.
One Rodney Square
920 N. King St.
Wilmington, Delaware  19801
(302) 651-7700

*Counsel for Defendant,*
*Perdue Farms Incorporated*

Dated:  February 28, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.    SUMMARY OF ARGUMENT AND STAGE OF PROCEEDINGS..................................... 1

II.   STATEMENT OF UNDISPUTED FACTS........................................................................... 1

      A.   Plaintiff Was Hired, Promoted, And Treated Fairly By Management. .......................... 1

      B.   Plaintiff Alleges Misconduct Beginning In February 2009. ......................................... 2

      C.   Perdue Investigates And Finds No Evidence Of Discrimination. .................................. 5

      D.   Jones Discharges Plaintiff For Walking Off The Job Without Permission.................... 6

      E.   Plaintiff's Newfound Allegations Of Harassment.......................................................... 8

III.  ARGUMENT ......................................................................................................................... 9

      A.   Standard Of Review. ...................................................................................................... 9

      B.   Plaintiff Alleges Only Instances Of Misconduct That Are Neither "Severe Or
           Pervasive" Nor Based On His Sex. .............................................................................. 10

           1.   There are no allegations *or* evidence of discrimination because of gender. .......... 10

           2.   Plaintiff's allegations do not establish severe or pervasive conduct. .................... 15

      C.   There Is No Evidence Of Retaliation. .......................................................................... 18

IV.   CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................... 10

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*,
  825 F. Supp. 65 (D. Del. 1993) .......................................................................................... 10

*Baker v. Wilmington Trust Co.*,
  320 F. Supp. 2d 196 (D. Del. 2004) ................................................................................... 20

*Bibby v. Philadelphia Coca Cola Bottling Co.*,
  260 F.3d 257 (3d Cir. 2001) ................................................................................... 11, 12, 14

*Bowman v. Shawnee State Univ.*,
  220 F.3d 456 (6th Cir. 2000) ......................................................................................... 16, 17

*Collins v. TRL, Inc.*,
  263 F. Supp. 2d 913 (M.D. Pa. 2003) ................................................................................ 14

*Davis v. Costal Int'l Sec., Inc.*,
  275 F.3d 1119 (D.C. Cir. 2002) ......................................................................................... 15

*Dingle v. Centimark Corp.*,
  No. 00-6418, 2002 WL 1200944 (E.D. Pa. June 3, 2002) ................................................. 20

*Donaldson v. Norfolk S. Ry., Co.*,
  No. 10-CV-1556, 2011 WL 3568843 (M.D. Pa. Aug. 15, 2011) ....................................... 18

*Estate of Smith v. Marasco*,
  318 F.3d 497 (3d Cir. 2003) ............................................................................................... 18

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ........................................................................................................... 16

*Fogleman v. Mercy Hosp., Inc.*,
  283 F.3d 561 (3d Cir. 2002) ............................................................................................... 10

*Grassmyer v. Shred-IT USA, Inc.*,
  No. 07-98, 2009 WL 2900303 (W.D. Pa. Sept. 9, 2009), *aff'd in relevant part*, 392 F.
  App'x 18 (3d Cir. 2010) ...................................................................................................... 16

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ........................................................................................................ 15, 17

*Hockman v. Westward Commc'ns, LLC,*
　　407 F.3d 317 (5th Cir. 2004) ............................................................................. 16, 17

*Jalil v. Avdel Corp.,*
　　873 F.2d 701 (3d Cir. 1989) ............................................................................... 18

*Jensen v. Potter,*
　　435 F.3d 444 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. &*
　　*Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) ................................................10, 17

*Johnson v. E.I. DuPont de Nemours & Co.,*
　　60 F. Supp. 2d 289 (D. Del. 1999) ...................................................................... 20

*Johnson v. Hondo, Inc.,*
　　125 F.3d 408 (7th Cir. 1997) .............................................................................. 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
　　475 U.S. 574 (1986).............................................................................................. 10

*Mellor v. Atkinson Freight Lines Corporation,*
　　No. 11-5468, 2012 WL 1231845 (E.D. Pa. Apr. 12, 2012)....................................14

*Moser v. Indiana Dep't of Corr.,*
　　406 F.3d 895 (7th Cir. 2005) ................................................................................16

*Oncale v. Sundowner Offshore Servs., Inc.,*
　　523 U.S. 75 (1998)...............................................................................10, 11, 14

*Shellenberger v. Summit Bancorp, Inc.,*
　　318 F.3d 183 (3d Cir. 2003) ............................................................................... 18

*Thomas v. Town of Hammonton,*
　　351 F.3d 108 (3d Cir. 2003) ............................................................................... 19

*Vandeventer v. Wabash Nat'l Corp.,*
　　887 F. Supp. 1178 (N.D. Ind. 1995) ................................................................... 15

*Wasek v. Arrow Energy Servs. Inc.,*
　　682 F.3d 463 (6th Cir. 2012) .............................................................................. 14

*Weston v. Commonwealth of Pa.,*
　　215 F.3d 430 (3d Cir. 2001) ............................................................................... 18

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) .............................................................................................. 10

Defendant, Perdue Farms Incorporated ("Perdue" or the "Company"), by its undersigned counsel, submits this Memorandum in Support of Motion for Summary Judgment and states as follows:

## I.     SUMMARY OF ARGUMENT AND STAGE OF PROCEEDINGS

Plaintiff, Marc E. Smith ("Plaintiff" or "Smith"), filed an Amended Complaint against Perdue seeking relief under Title VII for same sex harassment and retaliation.  Plaintiff is not entitled to any relief.  Plaintiff has failed to establish that any incidental and seemingly random misconduct he alleges was directed at him *on the basis of his sex (i.e., because he is male)*; he cannot establish that the misconduct he alleges, in its totality, was severe or pervasive; and he cannot establish a claim for retaliation, as he admits he was discharged for walking off the job without permission.  For these reasons, Perdue is entitled to summary judgment as a matter of law.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Plaintiff Was Hired, Promoted, And Treated Fairly By Management.

In November 2005, Perdue re-hired Plaintiff to serve as a Panel Operator at the Company's Bridgeville, Delaware grain processing facility.  Pl. Dep. 87;[1] Am. Compl. ¶ 10.  Tyson Jefferson, Assistant Mill Manager, made the hiring decision and became Plaintiff's direct supervisor.  Pl. Dep. 88.  Chuck Broderick, Mill Manager, supervised Jefferson and the operations of the processing facility.  Pl. Dep. 95-96; Am. Compl. ¶ 12.  In 2008, Jefferson and Broderick promoted Plaintiff to Utility Operator and gave him a raise.  Pl. Dep. 94-95, 98.  Plaintiff believes that, "overall," the Bridgeville facility was "a good place," and "the job got done."   Pl. Dep. 103.  He admits that Jefferson and Broderick treated

---

[1] Plaintiff first worked for Perdue in 1997 in the Company's chicken processing facility in Georgetown, Delaware.  Pl. Dep. 81. His employment ended when he "walked off the job" for unknown reasons.  *Id.* (All cited pages from Plaintiff's deposition are attached hereto sequentially as Ex. 1.  Cited exhibits from Plaintiff's deposition are attached as individual exhibits hereto and identified accordingly.)

him fairly in his annual evaluations; that he did not have any issues with or complaints about anyone in management, including Broderick or Jefferson, from 2005 through 2008; and at no time during that period did he ever complain to management or human resources.  Pl. Dep. 100-01, 106.

### B.   Plaintiff Alleges Misconduct Beginning In February 2009.

After more than three uneventful years of employment at the Bridgeville facility, Plaintiff claims he suddenly was subjected to inappropriate behavior, when, in February 2009, "Broderick came up behind Plaintiff, touched Plaintiff's hips, wiggled his (Broderick's) hips, and made grinding and humping motions."  Am. Compl. ¶ 14(a).  In his deposition, however, Plaintiff admitted that Broderick never touched him.  Pl. Dep. 190.  Plaintiff admits that the incident merely made him "mad," but even as of his deposition, he was not sure if it constituted discrimination.  Pl. Dep. 141.  At the time of the incident, Plaintiff made no complaint to human resources or anyone else at Perdue.  Am. Compl. ¶ 15.

Inexplicably, and notwithstanding this sudden alleged encounter between Plaintiff and Broderick, two weeks later, on February 24, 2009, Plaintiff requested from Broderick a letter of recommendation for a supervisory position, which Broderick agreed to write.   Pl. Dep. 97; Letter of Recommendation, Ex. 2.  Broderick gave Plaintiff nothing but positive reviews.  *Id.*

On Friday, March 13, 2009, Plaintiff claims that a coworker informed him that certain tests Plaintiff had been performing since 2005 (Pellet Durability Index or "PDI" tests) should instead be the responsibility of a Quality Control employee.  Pl. Dep. 92-93, 114-15.  Plaintiff was "upset," and he went to Broderick's office to "voice [his] opinion" about why he should not have to perform the PDI testing.  Pl. Dep. 118, 122-23.  This had been a long-running and heated topic of discussion between Plaintiff and Broderick.  Brod. Dep. 15-20;[2] Brod. Aff. ¶ 6, attached as Ex. 4; Jeff. Dep. 20-25.[3]  While Plaintiff generally denies engaging in an argument with Broderick, he nevertheless admits that he

---

[2]  All cited pages from Broderick's deposition are attached hereto sequentially as Ex. 3.

[3]  All cited pages from Jefferson's deposition are attached hereto sequentially as Ex. 5.

"cussed" Broderick, that Broderick "cussed me," and that Broderick apparently "didn't have time to argue with me."  Pl. Dep. 126; 136-37.   Their discussion became "heated," and Plaintiff told Broderick to "get a set of balls" and to tell the Quality Assurance employee to take over the testing work.  *See* Memo to File dated March 13, 2009, signed by Plaintiff, Ex. 6.[4]  Broderick ultimately said he would investigate the PDI testing issue.  Pl. Dep. 122, 125; Brod. Dep. 18; Ex. 6.   Broderick then followed Plaintiff out of his office.  Brod. Dep.  18; Ex. 6.  Broderick told him to calm down and to go back to his workstation upstairs, at which time Plaintiff screamed "you're a worthless piece of shit" and stormed off.  Brod. Dep. 18-19; Ex. 6.

According to Plaintiff, after he left Broderick's office, and after having questioned Broderick about having to perform PDI testing, he for some reason turned and asked Broderick if he was buying him lunch.  Pl. Dep. 137-38.   Plaintiff admits, however, that at no time had he ever eaten with Broderick.  Pl. Dep. 129.[5]  Broderick allegedly responded by saying, "I got a tube steak smothered in drawers for you" and grabbed his crotch.  *Id.*  Plaintiff contends he then called Broderick a "worthless piece of shit."  Pl. Dep. 128.  Plaintiff claims that he was merely "mad, frustrated, whatever" by the comment but does not know if it was discriminatory.  Pl. Dep. 130-31.[6]  Plaintiff contends that Broderick made this comment, because "he likes men *maybe*."  Pl. Dep. 183 (emphasis added).  He

---

[4]  Plaintiff reviewed and signed the Memo to File on March 13, 2009.   Had he disagreed with any of the contents, he surely could have refused to execute the document or could have submitted his own rendition of the events that day.  For that reason, any effort on the part of Plaintiff subsequently to change his story should be discredited.

[5]   During his deposition, Plaintiff initially was unsure whether he asked Broderick "what is for lunch," "are you buying lunch," or "what is being served for lunch."  Pl. Dep. 184.  He concluded that the statement "are you buying lunch" was the "most exact."  Pl. Dep. 138, *see also id.* at 184.  Plaintiff ultimately had no explanation for his odd request. Pl. Dep. 139.

[6]  Plaintiff's deposition testimony about the supposed "tube steak" comment is wholly inconsistent.  He first testified that he had never heard Broderick use the term "tube steak" prior to March 13, 2009.  Pl. Dep. 130.  He later testified that Broderick made the "tube steak" comment on both March 12 and March 13 but then admitted he could be mistaken.  Pl. Dep. 184-86.   Broderick denies any version of the "tube steak" event.   Brod. Aff. ¶ 6; Brod. Dep. 21.

otherwise admitted to not knowing whether anyone at Bridgeville is gay, *id.* at 219, or, specifically, having any evidence or facts to show that Broderick is gay other otherwise desired him, other than the "grinding" and the "tube steak" comment alleged against him.   Pl. Dep. 220, 221-22, 245.

Following the altercation, Jefferson met with Plaintiff and told him to go home "to clear the air."   Jeff. Dep. 27-28; 31-32.   Broderick then prepared the Memo to File.   Brod. Dep. 35.   On Tuesday, March 17, 2009, Plaintiff returned to work and received and signed the Memo to File for his insubordination and inappropriate language towards Broderick on the previous Friday as well as a Disciplinary Record noting his discipline.   Pl. Dep. 133; Exs. 6 & 7.[7]   Thereafter, Broderick allowed Plaintiff to prepare and send by facsimile from his workstation at the Bridgeville facility a letter to Jim Perdue, the Chairman of the Company.   Pl. Dep. 133-34; Brod. Dep. 32-33; Ex. 9.   Plaintiff understood at the time with whom he was communicating, and his stated intention was to memorialize his complaints to management.   Pl. Dep. 134-35.   In his letter to Mr. Perdue, Plaintiff admitted to "cussing" Broderick.   Ex. 9.   Notably, he complained only of Broderick's "tube steak" comment and "hip hop" dancing and stated that he would "seek outside assistant [sic]" if human resources did not resolve the problem.   *Id.*   He stated nothing else about any other alleged misconduct or inappropriate behavior at the Bridgeville site, whether directed at him or otherwise.   As Plaintiff later confirmed, there was "[n]othing [else] directed at me," and had there been, he would have put it in his communication to Mr. Perdue.   Pl. Dep. 153.   He also was silent as to whether the conduct was directed at him *because he is male*.   Plaintiff's letter to Mr. Perdue promptly was forwarded for investigation to David Jones, Corporate Live Production HR Manager.   Jones Dep. 31-33.   Mr. Jones promptly called Plaintiff to set up a time to meet to discuss his complaints.   Jones Dep. 34-35.

---

[7]   On the disciplinary notice, Plaintiff began to write: "I turn in Chuck Broderick for sexual har[assment]."   Pl. Dep. 112-13; Ex. 7.   Broderick crossed out Plaintiff's entry, because he had written it in a space designated for manager comments.   Brod. Dep. 31-32; Jones Dep. 23 (all cited pages from Jones' deposition are attached sequentially hereto as Ex. 8).

### C.      Perdue Investigates And Finds No Evidence Of Discrimination.

On Monday, March 23, 2009, Jones traveled from his office in Salisbury, Maryland to the Bridgeville facility to investigate Plaintiff's allegations.   Jones Dep. 3; Pl. Dep. 142-43.   Mr. Jones attempted to interview Plaintiff, but after only a few minutes, Plaintiff stated:   "I have a lawyer and I was told not to talk to you."   Jones Dep. 38-39; *see also* Pl. Dep. 144.   The only allegations Plaintiff recalls describing for Jones prior to ending the meeting were the "tube steak" and the "hip hop" dancing allegations.   *Id.* at 144-45.   Plaintiff also identified two coworkers as witnesses, Erwin Hall and George Williams.   Jones Dep. 39-40.   Plaintiff said nothing to Jones about any conduct being directed at him because of his sex – in fact, he would not tell Jones "any particulars about any incidents."   Jones Dep. 37.   Following his meeting with Jones, Plaintiff prepared a typewritten communication to Mr. Perdue thanking him for looking into his complaint.   Pl. Dep. 148.

As part of Perdue's investigation, immediately following his conversation with Plaintiff, Jones interviewed Hall, Williams, and Broderick.   Jones Dep. 44.   Hall informed Jones that "the guys always tease each other with comments such as 'sweet cheeks' and 'hey baby,'" but he explained that he had never heard any comments about a "tube steak."   *Id.* at 39-40.   Hall also reported that he had never witnessed anything inappropriate between Broderick and Plaintiff and, specifically, had never witnessed Broderick or anyone grinding against anyone else.   *Id.*   Jones also interviewed Williams (now deceased), who reported that he had not witnessed anything inappropriate.   *Id.* at 40-41.

Broderick absolutely denied dancing or grinding behind Plaintiff when he met with Jones.   *Id.* at 43.   He also denied making any comment about a "tube steak smothered in drawers."   *Id.* at 41-42. Broderick did explain to Jones the altercation he had had with Plaintiff, how Plaintiff had argued with him about having to perform PDI tests, and that Plaintiff left his office angry and ultimately was sent home and disciplined for insubordination.   *Id.* at 12.

Based on his investigation, Jones concluded that there was no evidence of discrimination. Memo to Jim Perdue, Ex. 10; Jones Dep. 46, 51-52.  To be prudent, Jones did schedule facility-wide sexual harassment training for April 29, 2009, however, in view of the nature of Plaintiff's allegations. Pl. Dep. 154; Memo to Mill Associates, Ex. 11.

At some point following Jones' investigation, Plaintiff alleges that Jefferson sent to Harry Vannicola, a driver, by text message a picture of a donkey and a women having sex.[8]  According to Plaintiff, Vannicola showed him the text and then, without more, told him to give oral sex to Hall.  Pl. Dep. 158-59,176.  Plaintiff could not explain Vannicola's intentions for the exchange but believes that he was only "trying to start trouble."  Pl. Dep. 159-60, 163, 183.[9]  Plaintiff does not have reason to believe that Vannicola or Hall is homosexual.  Pl. Dep. 226.  Plaintiff reported Jefferson's text, and Perdue disciplined Jefferson for this conduct.  Pl. Dep. 183; 246-47; Jeff. Dep. 44-46.

### D.      Jones Discharges Plaintiff For Walking Off The Job Without Permission.

Early in the morning on Saturday, May 9, 2009, Plaintiff reported to work as scheduled.  Pl. Dep. 191-92, 195.   Broderick and Jones were both out of state attending their respective children's college graduations and Jefferson was off from work.  Pl. Dep. 193; Jones Dep. 55.

At some point in the morning, mill machinery malfunctioned, and Plaintiff asked two maintenance workers, Keith Hudson and Craig Dohner, to assist him.  Pl. Dep. 192-93, 234.  Hudson and Dohner refused to assist and instead gave Plaintiff a "hard time," and they "had some comments back and forth" over the walkie-talkies.  Pl. Dep. 196.  Hudson said he was going to show Plaintiff

---

[8]  Here again, Plaintiff has several renditions of this event.  He first testified that the text was of a "donkey and a woman having sex."  Pl. Dep. 158.  He later testified that the text was of "a donkey and a woman making out."  *Id.* at 173.  When questioned about the inconsistency, Plaintiff incredulously responded that he considered "making out" and "having sex" to be the same thing.  *Id.*  Vannicola and Jefferson state that the picture was of Bart and Homer Simpson and a donkey with a caption that read: "Get your ass back to work," which Jefferson sent to Vannicola while he was performing light duty work in the office due to an injury.  Vann. Aff. ¶ 5, attached as Ex. 12; Jeff. Aff. ¶ 6, attached as Ex. 13.

[9]  Vannicola states that Plaintiff asked him to show Plaintiff the text from Jefferson.  Vann. Aff. ¶ 5.

what a "real man was," and Plaintiff thought Hudson might "beat [him] up."  *Id.*  Plaintiff was "stressed out" and "didn't think he should be at work."  Pl. Dep. 195-96.

Around 10 or 11 am, Plaintiff started calling Jefferson and another panel operator to see if he could leave early.  *Id.*  He eventually reached Jefferson, who specifically told Plaintiff <u>not</u> to leave work.  *Id.*; Jeff. Dep. 56-60.  Plaintiff also called Broderick and complained that maintenance was not helping him with an equipment problem.   Brod. Dep. 55-56.   Broderick called the maintenance supervisor, Hurdle Mitchell, who was off from work at the time, and asked him to go to the facility to address the problem.  *Id.*  Like Jefferson, Broderick instructed Plaintiff <u>not</u> to leave work.  *Id.* at 57; Pl. Dep. 197-98.  Despite specific instructions to remain at work, Plaintiff clocked out and left anyway.

> A:  I ended up shutting the machines down, clearing them out, and then leaving.  I
>      couldn't get ahold of no one.  I left messages.
> Q:  You admit you were not given permission to leave for the day, right?
> A:  Yes.

Pl. Dep. 196-97.  *See also id.* at 9 (agreeing he "did not have permission to leave the job.").  When Mitchell arrived per Broderick's instructions, he found that Plaintiff was gone and the machines were running.   Brod. Dep. 59-60.   When Mitchell notified Broderick of this development, Broderick instructed Jefferson to go to the facility and complete Plaintiff's responsibilities to prevent even further loss of production for the day.   *Id.*   When Jefferson arrived, he turned off the machines and spent several hours cleaning up the mess that Plaintiff had left behind.  Jeff. Dep. 61; Jones Dep. 61-62.

That weekend, Broderick informed Jones by telephone that Plaintiff had walked off the job against management orders.  Brod. Dep. 60-66; Jones Dep. 56-57.  Jones determined that a three-day suspension pending termination should be issued on Monday, May 11, 2009, consistent with standard Company protocol.  Jones Dep. 58-60.  Broderick, Jefferson, and Jones all communicated to confirm that Jefferson would administer the suspension on Monday, because Broderick would not be back at work until Tuesday.  *Id.*; Jeff. Dep. 63-65; Brod. Dep. 61-64.  When Plaintiff reported to work on

Monday morning, he claimed to be having "a panic attack or something along the line," and he asked one of the managers (whom he could not recall specifically) if he could go to Perdue's Wellness Center, Pl. Dep. 199-200, which is an onsite medical facility at the nearby Georgetown plant.  Plaintiff then called an ambulance for himself.  *Id.*  Mitchell and Jefferson informed Plaintiff that he was suspended pending termination as previously planned, and Plaintiff left the facility by ambulance shortly thereafter.  Pl. Dep. 204.

Jones confirmed the facts surrounding Plaintiff's job abandonment by speaking with Broderick and Jefferson and reviewing Plaintiff's time card.  Jones Dep. 61-63.  He then made the decision to discharge Plaintiff.  *Id.* at 68.  Plaintiff does not contest that Jones made the discharge decision.  Pl. Dep. 204.  Jones informed Plaintiff by telephone later that week that he was discharged for walking off the job.  Pl. Dep. 205; Jones Dep. 63.

### E.      Plaintiff's Newfound Allegations Of Harassment.

On April 22, 2009, Plaintiff filed a complaint with the Delaware Department of Labor ("DDOL").  Pl. Dep. 174-79, Charge, Ex. 14.  At that time, Plaintiff alleged only four instances of misconduct:  Broderick's "grinding" and "tube steak" comment; the text from Jefferson to Vannicola; and Vannicola's comment to Plaintiff that he should give Hall oral sex.  Ex. 14; Pl. Dep. 177.  Much like the Amended Complaint, notably absent from the Charge was any factual allegation establishing that any of the alleged conduct occurred because of Plaintiff's sex.  Plaintiff admits that the Charge was reviewed with his then-lawyer, Barbara Stratton, and that it was complete at the time he signed it.  Pl. Dep. 177-78.  Plaintiff admits that he does not know when Perdue received the Charge.  Pl. Dep. 190.

Months later, Ms. Stratton prepared a chronology for Plaintiff, her client, which included numerous newfound allegations of comments and other conduct not otherwise reported by Plaintiff, whether to Perdue or the DDOL, some of which were directed at Plaintiff, and some of which were

merely comments he allegedly overheard or behavior he allegedly witnessed unrelated to himself.  Pl.

Dep. 212-14; Plaintiff's Chronology, Ex. 15.  The Chronology sets forth the following additional

allegations related to Plaintiff's discrimination claim:

- On unspecified dates, coworker Clint Lewis went with coworker Vernon Russell into the office, closed the door, turned the lights off, and "dry humped."  Pl. Chron. p. 3.[10]

- On March 17, 2009, the same day Plaintiff received his written warning for his altercation with Broderick, Plaintiff contends that Russell told Plaintiff to get his knee pads ready. Coworker Kenny Ross then yelled Plaintiff's name and said, "Blow me."  *Id.* at 4.

- On March 18, 2009, coworker Louis Hudson asked Plaintiff, "What's up girlfriend?" and asked him if he was sore, supposedly (according to Plaintiff) referring to soreness from anal sex.  Hudson then said, "Don't worry, I still love you."  *Id.*; Pl. Dep. 165.[11]

As discussed in detail below, even accepting these new allegations as true, Plaintiff remains far

from establishing that he was subjected to actionable sexual harassment because of his sex or retaliated

against for engaging in any protected conduct.  What Plaintiff alleges, at best, is the existence of

occasional vulgar conduct, akin to "locker room banter," unrelated to the fact that he is male, and in

many instances, unrelated to him at all.

### III.    ARGUMENT

#### A.    Standard Of Review.

A district court should grant summary judgment where the pleadings and evidence before the

court "show[] that there is no genuine dispute as to any material fact and the movant is entitled to

---

[10]   Plaintiff testified that this behavior was never directed at him, but that he could see it through a window in the door. Pl. Dep. 167-69.  Plaintiff never reported this and just "shook [his] head."  *Id.* Plaintiff notably characterized Lewis as the only "tough guy" at the facility and a "[b]ig, tough old man." Pl. Dep. 104-05.  Lewis and Russell deny this outrageous allegation.  Lewis Aff. ¶ 5, attached as Ex. 16; Russell Aff. ¶ 5, attached here at Ex. 17.

[11]   During his deposition, Plaintiff could only recall from memory his two allegations involving Broderick, the text from Vannicola, and the comment by Hudson, although without looking at his chronology or notes, he could not even explain the context of Hudson's comment.   Plaintiff otherwise had to look at the chronology his lawyer prepared for him in order to discuss his remaining claims against Perdue. Pl. Dep. 166-67, 70-71, 215-216.

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 566 n.3 (3d Cir. 2002). By its very terms, this standard requires the party opposing summary judgment to set forth specific, material facts indicating that there is a genuine issue for trial – that is, evidence such that a reasonable fact finder could return a verdict for the nonmoving party. *See B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 825 F. Supp. 65, 68 (D. Del. 1993). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986). "If the evidence [submitted by a party opposing summary judgment] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. Here, there is no sufficiently probative evidence to support Plaintiff's claims as a matter of law, and therefore summary judgment is proper.

**B.     Plaintiff Alleges Only Instances Of Misconduct That Are Neither "Severe Or Pervasive" Nor Based On His Sex.**

In order to establish a claim of sexual harassment, Plaintiff must show that: 1) he suffered intentional discrimination *because of his gender*; 2) the discrimination was severe or pervasive; 3) it detrimentally affected him; 4) it would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for employer liability. *See, e.g.*, *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In the allegations of his Amended Complaint and the record evidence established through discovery, Plaintiff fails to satisfy the first four elements of the *prima facie* case.

**1.     There are no allegations *or* evidence of discrimination because of gender.**

With respect to the first element of the prima facie case, the requirement that the objectionable conduct or treatment be based upon Plaintiff's sex is just as fundamental in cases involving same-sex harassment as in more traditional male-female harassment cases. *Oncale v. Sundowner Offshore*

*Servs., Inc.*, 523 U.S. 75, 79-80 (1998).  The Third Circuit has articulated three possible ways in which a plaintiff can establish intentional discrimination because of gender in same-sex harassment cases. First, same-sex harassment can constitute discrimination because of sex "where there is evidence that the **harasser sexually desires the victim**;" second, "where there is no sexual attraction but where the **harasser displays hostility to the presence of a particular sex** in the workplace;" or third, "a plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the **victim did not conform to the stereotypes of his or her gender**." *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262-63 (3d Cir. 2001) (emphasis added).  Significantly, whichever theory is asserted, the plaintiff "must always prove that the conduct . . . was not merely tinged with offensive sexual connotations, but . . . constituted 'discrimination . . . because of . . . sex.'" *Id.* at 264 (quoting *Oncale*, 523 U.S. at 81).

Plaintiff fails in all respects to establish that any conduct in this case occurred based on his sex. There exists no record evidence, *nor is there even a single allegation in Plaintiff's Amended Complaint*, to establish or even suggest that Plaintiff's claims of same-sex harassment meet any of the three criteria set forth in *Bibby v. Philadelphia Coca Cola Bottling Co.*[12]  Given that the work environment was almost exclusively male, with only one or two female employees at the entire Bridgeville facility, Plaintiff cannot (and has not attempted to) establish that he was harassed due to hostility towards men in the workplace.  Plaintiff specifically admits, as he must, that no one at the Bridgeville facility had a work preference for female over male employees.  Pl. Dep. 101-03.  Likewise, Plaintiff has not presented any facts, testimony, or other evidence to suggest that the alleged harassers were motivated

---

[12] It is telling that Plaintiff does not set forth in the Amended Complaint <u>a single alleged fact to establish discrimination on the basis of his sex</u>. He does not even attempt to make conclusory allegations that the supposed harassers were homosexual or otherwise motivated by sexual desire; that the supposed harassers were expressing a general hostility to Plaintiff's presence in the workplace because he is male; or that he did not conform to the stereotypes of his gender or was harassed as a result of such non-conformity.

by a belief that Plaintiff did not conform to male stereotypes.  Indeed, Plaintiff agreed that the male

employees all seemed to "fit" in at the Bridgeville facility, and Plaintiff made clear he is not gay, was

never questioned about being gay, nor was he accused of acting in an effeminate manner.  Pl. Dep. 74,

103-04, 221.  Instead, Plaintiff appears to contend, at least as of his deposition, that certain of his male

coworkers did not conform to male stereotypes and speculates that they could be homosexual.

Plaintiff's summary conjecture, however, is far from the evidence required by the Third Circuit "that

the harasser sexually desires the victim."  *Bibby*, 260 F.3d at 262.  Plaintiff presents only conclusory

assertions and guesswork on this point:

> Q:  Looking at the chronology and based on what we have talked about today, are there any
>      allegations of harassment that you contend occurred because you are a man?
> A:  Yes, *if* they like men.
>
> *          *          *
>
> Q:  I thought you told me at the beginning of the deposition no one ever told you you were
>      gay?
> A:  They are gay and assuming – they are gay and what they do, their actions towards me.
> Q:  How do you know they are gay?
> A:  ***I don't know***.  The way they act.  How do you know they are not?

Pl. Dep. 218 – 19 (emphasis added).

When questioned, it became clear that Plaintiff merely summarily alleges that his supposed

harassers might be or could be or may be gay, simply based solely on the single comment or conduct

alleged against each, Pl. Dep. 242-45, and that Plaintiff otherwise agrees he has "no evidence, no facts,

nothing to show that anybody at the plant was gay."  *Id.* at 243.  This is wholly insufficient under well-

established case law.  When asked who ultimately harassed him because he is a man, Plaintiff

identified five individuals: Broderick and four coworkers – Russell, Ross, Hudson, and Vannicola.

There is no evidence establishing that anyone of them is gay and/or desired Plaintiff.

First, each of these individuals specifically denies being gay or desiring Plaintiff, which is the *only record evidence* before the Court. *See* Brod. Aff. ¶ 4; Russell ¶ 3; Hudson Aff. ¶ 3, attached as Ex. 18; Vann. Aff. ¶ 3.[13]   Second, even Plaintiff admits he cannot support his conclusory claim:

- Plaintiff admits that **Vannicola** is not gay, Pl. Dep. 246;

- He does not know if **Hudson** is gay, *id.* at 164, 244;

- Plaintiff states that neither **Russell** nor **Ross** admitted to being gay or accused Plaintiff of being gay; he has no evidence or facts that either is gay, other than the alleged comment made by each; and Plaintiff amazingly identifies Russell in response to a question about "womanizers" at the plant, *id.* at 104; 222-23; 242-45; and

- With respect to **Broderick**, Plaintiff states only that "[h]e likes men *maybe*," making clear that, at best, Plaintiff has no evidence of Broderick's sexual preference, other that conclusory assertions.  Pl. Dep. 183 (emphasis added).  This is confirmed by Plaintiff's admission that the "tube steak" comment and the "hip-hop" grinding are his sole evidence that Broderick harassed him because he is a man.  Pl. Dep. 105-06, 220-21, 245.

Finally, Plaintiff's attempted to assert at his deposition that any comment made by one male to another male that references engaging in sexual activity with a man constitutes evidence of homosexuality and/or discrimination based on sex, Pl. Dep. 243, is nothing short of absurd and has been plainly rejected by the courts:

> Most unfortunately, expressions such as "fuck me," "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference – even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expression of animosity or juvenile provocation.

*Johnson v. Hondo, Inc.*, 125 F.3d 408, 410-13 (7th Cir. 1997) (the plaintiff's assertion that the harasser made "homosexual advances" and was "very possibly" homosexual by repeatedly telling plaintiff to "suck [his] dick" was "not showing at all" to indicate that the conduct was based on plaintiff's gender).

---

[13] Perdue was unable to obtain an affidavit from Ross prior to his passing.  Nevertheless, Russell makes clear in his affidavit that Plaintiff's allegation involving them both is untrue.  Russell Aff. ¶ 5.

In *Mellor v. Atkinson Freight Lines Corporation*, No. 11-5468, 2012 WL 1231845 (E.D. Pa. Apr. 12, 2012), the plaintiff argued that harassing conduct had been directed at him because of his sex. He alleged that his manager, also male, consistently referred to him as "midget" and made sexual comments about his height, including "'while Plaintiff was working in the men's restroom, [the manager] walked in and told Plaintiff to "stand over here so I can rest my balls on your head and you can hold it (referring to his penis) until it needs me to shake it,'" and "[the manager] told a truck driver, who wanted to pay for a shower, that 'if you ask nicely, we will send in the midget [i.e., Plaintiff] to wash your back, too.'" *Id.* at *1. Citing *Bibby*, the court held that the conduct alleged, "while vulgar, is not sufficient to set forth a plausible claim that [Plaintiff] was discriminated against <u>because of his gender</u>." *Id.* at *3 (emphasis added). In *Collins v. TRL, Inc.*, the plaintiff, much like Plaintiff here, attempted to support his sex discrimination claim by asserting that the alleged harasser was gay, because he reached for plaintiff's groin and said "got wood?" on three separate occasions and told plaintiff, who was whistling at the time, to "put them lips where they belong" while grabbing his crotch. 263 F. Supp. 2d 913, 916 (M.D. Pa. 2003). Referring to the Supreme Court's recognition in *Oncale* that "simple teasing or roughhousing among members of the same sex" is distinguishable from actionable same-sex harassment, the *Collins* court determined that the alleged comments were not evidence of homosexuality but were meant as jokes in a work environment where lewd comments and gestures were commonplace. *Id.* at 920 (citing *Oncale*, 523 U.S. at 81). The court also found it significant that, like here, the plaintiff admittedly did not know if the alleged harasser was homosexual. *Id. See also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 465, 468 (6th Cir. 2012) (holding that where the male harasser grabbed the male plaintiff's buttocks, poked him in the rear with a long rod, and made comments such as, "you know you like it, sweetheart," plaintiff's "speculative statement" that the harasser was "possibly bisexual" was "pure conjecture" and

14

did not provide the requisite "credible evidence" of homosexuality); *Davis v. Costal Int'l Sec., Inc.*, 275 F.3d 1119, 1121, 1126 (D.C. Cir. 2002) ("[H]owever vulgar [Mr.] Smith's and [Mr.] Allen's behavior [when they grabbed Mr. Davis' crotch, made kissing gestures, and used a phrase describing oral sex], no reasonable jury could believe that it constitutes discrimination [against Mr. Davis] because of sex."); *Vandeventer v. Wabash Nat'l Corp.*, 887 F. Supp. 1178, 1181 n.2 (N.D. Ind. 1995) ("while the epithet used [dick sucker] and the taunting had a 'sexual' component, as do most expletives, the crucial point is that the 'harasser' was not aiming expletives at the victim because of the victim's maleness.").

Nothing in the record distinguishes this case from those cited above. Here, Plaintiff has failed to identify any conduct that indicates sex-based harassment based on Plaintiff's "maleness" or homosexual attraction. Indeed, Plaintiff admits that, in general, sexual joking among the "guys" was in the workplace. Pl. Dep. 165. Plaintiff's former supervisor and coworkers agree that sexual and other inappropriate language, including lewd stories and profanity, were "not uncommon." Jeff. Aff. ¶ 7; Vann. Aff. ¶ 6; Russell Aff. ¶ 5; Hudson Aff. ¶ 5; Lewis Aff. ¶ 7; Hall Aff. ¶ 6, attached as Ex. 19. As in the above cases, all of the "locker room" communications and actions on which Plaintiff attempts to rely in this case, although unquestionably vulgar, juvenile, and inappropriate in the workplace, when assumed true, <u>simply do not provide any evidence, credible or otherwise, that the actors are homosexual or desired Plaintiff</u>.

### 2.    Plaintiff's allegations do not establish severe or pervasive conduct.

A court determines whether alleged discrimination was "severe or pervasive" by examining all of the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To be actionable under Title VII, the alleged harassment must be so severe or pervasive as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S.

775, 786 (1998). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious)" will not suffice to alter the "terms and conditions of employment." *Id.* at 788.

In evaluating sexual harassment claims, the Supreme Court and numerous lower courts have "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. Vulgar or sexual comments and occasional touching simply are not extreme enough. *See, e.g., Grassmyer v. Shred-IT USA, Inc.*, No. 07-98, 2009 WL 2900303, at *4, 10 (W.D. Pa. Sept. 9, 2009) (supervisor's regular use of profanity and sexually explicit/inappropriate comments, including crude jokes, discussion of sexual relationships and genitalia size, regular reference to women as "bitches," and playing of a sexually explicit song at the office, was merely "locker room talk" that did not constitute severe or pervasive conduct), *aff'd in relevant part*, 392 F. App'x 18 (3d Cir. 2010); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-64 (6th Cir. 2000) (supervisor rubbing employee's shoulders, grabbing employee's buttocks, and sexually suggestive comments not severe enough); *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (coworker making reference to plaintiff's "tits;" saying female coworker "just needed a good fuck;" making an innuendo about penis size and joking about male anatomy; and use of profanity insufficient); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328-29 (5th Cir. 2004) (not severe or pervasive where a coworker brushed up against plaintiff's breasts and behind; commented to plaintiff about a coworker's behind and body; slapped plaintiff on the behind with a newspaper; and held plaintiff's cheeks and tried to kiss her).

Even considering the sum total of Plaintiff's allegations, including those from the chronology created by Plaintiff's counsel well after Plaintiff's termination of employment and after the filing of his first charge of discrimination, they still fall far short of establishing severe or pervasive conduct. None of it, when assumed true, can be considered severe, physically threatening, or humiliating, especially

when considered in the context of the all-male work environment at Bridgeville.  Indeed, only one of

the incidents *may* have involved actual touching (depending on which version of Plaintiff's testimony

is credited) and, at worst, only incidentally.[14]   Moreover, when asked how this incident affected him,

Plaintiff said that it "upset" him and made him "mad," but nothing else.  Pl. Dep. 141.   The other

alleged incidents were merely immature, lewd comments made in an almost exclusively male

environment where "locker room" talk was commonplace.   While not appropriate, these comments

cannot be considered the type of severe, humiliating, or physically threatening comments that create an

abusive environment, a fact that is evidenced by Plaintiff's mild testimony about how these comments

impacted him.  For example, Plaintiff testified that Broderick's alleged "tube steak" comment merely

made him "mad, frustrated, whatever;" the donkey text "offended" him, because "you shouldn't be

showing naked pictures of anybody or anything at work," although he noted "it is okay at home;" and

the alleged comment by Hudson about his sore "butt" "just offended" Plaintiff.  Pl. Dep. 130-31, 161-

62, 165.  Even in response to the alleged "dry humping," Plaintiff simply "shook my head."  *Id.* at 168.

Clearly, none of the conduct Plaintiff alleges interfered with his work performance, and he is silent on

that point.[15]

---

[14]   Plaintiff inconsistently testified that, on the one hand, Broderick never touched him, and the other
hand, he did touch him on an occasion unrelated to his initial complaint. Pl. Dep. 190, 218-19. As noted
above, regardless, even physical contact with far more "private" body parts has been found insufficient
to constitute severe or pervasive harassment.  *See, e.g., Bowman*, 220 F.3d at 463-64 (grabbing
buttocks and attempted kissing); *Hockman*, 407 F.3d at 328-29 (touching breasts and behind).

[15] For similar reasons, Plaintiff cannot meet the third and fourth prongs of the prima facie case. "[I]f the
victim does not subjectively perceive the environment to be abusive, the conduct has not actually
altered the conditions of the victim's employment, and there is no Title VII violation." *Harris,* 510
U.S. at 21-22.  Not only has Plaintiff testified to the minimal nature of the impact the alleged
misconduct had on him, any argument by Plaintiff to the contrary should be discredited by the Court, in
view of certain aspects of his personal life that make clear that none of it could have *detrimentally
affected him*. *Jenson,* 435 F.3d at 449.  He admitted to cheating on his wife on at least two occasions,
which resulted in his divorce; he first watched pornography at age six; in October 2010, Plaintiff
admitted himself for treatment for a number of issues, and reported that he was "masturbating several
times a day and always looking at pornography" and had done so for "[p]robably years."  Pl. Dep. 25,

### C.      There Is No Evidence Of Retaliation.

In order to prove unlawful retaliation, Plaintiff must show: (i) that he engaged in a protected activity; (ii) that he suffered an adverse employment action; and (iii) that there was a causal connection between the protected activity and the adverse employment action. *Weston v. Commonwealth of Pa.*, 215 F.3d 420, 430 (3d Cir. 2001).  Plaintiff cannot show any causal connection between any protected activity and his discharge months later, particularly because he admits to engaging in the misconduct that Perdue maintains is the sole reason for his discharge, namely, walking off the job.

First, while Plaintiff admits that he committed a terminable offense when he walked off the job, he summarily maintains that his termination was nevertheless retaliatory, based solely on the timing of events and "nothing else."  Pl. Dep. 205-07.  Significantly, the Third Circuit has recognized that in order for temporal proximity, alone, to establish causation, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003).  While the Third Circuit has found a temporal proximity of two days sufficient to establish causation without more, *see Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989), a temporal proximity of ten days is not sufficient unless accompanied by other evidence of wrongdoing.  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003). Here, Plaintiff complained to Human Resources on March 13 and 17, 2009, following the alleged "tube steak" comment.  While Broderick could have discharged Plaintiff for his insubordination and conduct

---

70-71, 73.  Plaintiff at one time characterized himself as a "sex addict" involving only heterosexual sex.  *Id.* at 71, 74.  Moreover, the prevalence of locker room banter among and about workers at Bridgeville provides further evidence that a *reasonable person* in Plaintiff's position would not have been detrimentally affected, even when it concerned him specifically.  *See Donaldson v. Norfolk S. Ry., Co.*, No. 10-CV-1556, 2011 WL 3568843, at *12 (M.D. Pa. Aug. 15, 2011) (holding that the facts that vulgar graffiti about employees had long been prevalent as a form of "teasing" and referred to many different people, not just plaintiff, illustrate that a reasonable person in plaintiff's position would not have been detrimentally affected by the sexually explicit graffiti about him and his wife, a co-plaintiff).

on March 13, he did not.   Plaintiff instead remained employed for the next two months, during which time Perdue investigated his allegations, found no evidence to support his claims, but conducted mandatory harassment training for the entire Bridgeville facility.   Given the extended length of time between Plaintiff's complaints and his termination, there is no reason whatsoever to suggest that the timing of the alleged retaliatory action, alone, was "unusually suggestive of retaliatory motive."   *See, e.g., Thomas v. Town of Hammonton*, 351 F.3d 108, 114-16 (3d Cir. 2003) (affirming summary judgment for employer where temporal proximity of 3 weeks was "not so close as to be unduly suggestive").

Second, on May 14, 2009, *Jones* made the decision to discharge Plaintiff, because Plaintiff had committed the terminable offense of walking off the job, even though two managers specifically instructed him not leave.   Plaintiff admits he has no evidence to support a claim of retaliation against Jones, the sole decision-maker, Pl. Dep. 206-07, 249-50, and in fact, when asked about being disciplined by Jefferson for a performance issue after lodging his complaints, Plaintiff testified that Jones actually assisted him and "got rid of it."   *Id.* at 247.

Third, Plaintiff cannot identify any similarly situated employee to show that he was treated differently.   While he alleges in his Amended Complaint that a driver left early without permission on May 9, 2009, Am. Compl. 32, Plaintiff admits that the employee had a completely different job, a different supervisor, and different responsibilities.   Pl. Dep. 208.   Plaintiff did not "know exactly when he left," and while Plaintiff claimed to know some details about whether he had permission, Plaintiff ultimately admitted "I don't know," and he could not identify the hours the driver should have been working.   *Id.* at 209-10.   Plaintiff later admitted that he could not identify a single employee "who walked off the job without permission," like he did.   *Id.* at 251-52.

19

Finally, Plaintiff does not dispute that he walked off the job without permission. Courts readily recognize job abandonment as a legitimate, non-discriminatory basis for discharging an employee. *See, e.g., Dingle v. Centimark Corp.*, No. 00-6418, 2002 WL 1200944, at *6 (E.D. Pa. June 3, 2002) (job abandonment is a legitimate, non-discriminatory reason for discharge). Plaintiff cannot simply invoke his own conclusory and subjective beliefs that he was a victim of retaliation to overcome Perdue's supported reason for the discharge. *Baker v. Wilmington Trust Co.*, 320 F. Supp. 2d 196, 202 (D. Del. 2004) (conclusory allegations insufficient); *Johnson v. E.I. DuPont de Nemours & Co.*, 60 F. Supp. 2d 289, 297 (D. Del. 1999) (same). Here, Plaintiff admits that he engaged in the "terminable offense" of walking off the job, which gave Perdue "grounds to terminate me." Pl. Dep. 205-06. Accordingly, Plaintiff cannot sustain a claim for retaliation.

## IV.    CONCLUSION

For the foregoing reasons, Perdue respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's sexual harassment and retaliation claims in their entirety, with prejudice.

|  |  |
|---|---|
|  | */s/ Jennifer C. Jauffret* |
| *OF COUNSEL*: | Jennifer C. Jauffret (#3689) |
|  | jauffret@rlf.com |
| Brooks R. Amiot (*pro hac vice*) | Lori A. Brewington (#4522) |
| JACKSON LEWIS LLP | brewington@rlf.com |
| 2800 Quarry Lake Dr., Ste. 200 | RICHARDS, LAYTON, & FINGER, P.A. |
| Baltimore, Maryland  21209 | One Rodney Square |
| (410) 415-2004 | 920 N. King St. |
|  | Wilmington, Delaware  19801 |
| Kristina H. Vaquera (*pro hac vice*) | (302) 651-7700 |
| JACKSON LEWIS LLP |  |
| 500 E. Main Street, Ste. 800 |  |
| Norfolk, Virginia  23510 | *Counsel for Defendant,* |
| (757) 648-1445 | *Perdue Farms Incorporated* |

Dated:  February 28, 2013