# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARC SMITH,                          )
                                     )
            Plaintiff,               )
                                     )      Civil Action No.
v.                                   )      1-27-LPS-SRF
                                     )
PERDUE FARMS INCORPORATED,           )
                                     )
            Defendant.               )

        Deposition of MARC SMITH taken pursuant
to notice at the law offices of Richards, Layton
& Finger, One Rodney Square, Wilmington,
Delaware, beginning at 9:15 a.m., on Tuesday,
November 27, 2012, before Eleanor J. Schwandt,
Registered Merit Reporter and Notary Public.


APPEARANCES:

        NOEL E. PRIMOS, ESQ.
        SCHMITTINGER & RODRIGUEZ, P.A.
          404 South State Street
          P. O. Box 497
          Dover, Delaware  19903-0497
          for the Plaintiff

        BROOKS R. AMIOT, ESQ.
        JACKSON LEWIS LLP
          2800 Quarry Lake Drive - Suite 200
          Baltimore, Maryland  21209
          for the Defendant


 ALSO PRESENT:  CHARLES BRODERICK,
                Perdue Farms Incorporated


              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477

ORIGINAL

2

```
 1                    MARC SMITH,
 2        the witness herein, having first been
 3        duly sworn on oath, was examined and
 4        testified as follows:
 5                    EXAMINATION
 6  BY MR. AMIOT:
 7      Q.  Mr. Smith, my name is Brooks Amiot.  I'm
 8  a lawyer for Perdue Farms.  I'm going to be
 9  referring to Perdue Farms as Perdue today if
10  that's all right with you.
11      A.  Yes.
12      Q.  I understand you were employed at
13  Perdue's Bridgeville facility; is that right?
14      A.  Yes.
15      Q.  Which is a feed plant?
16      A.  Yes.
17      Q.  I'll just be referring to that as either
18  Perdue or Bridgeville today just to avoid a lot
19  of confusion.
20      A.  Okay.
21      Q.  The purpose of this deposition is to
22  inquire about the facts alleged in connection
23  with your lawsuit against Perdue.
24      A.  Okay.
```




**Marc Smith**

9

1   Q.   Okay.   And in fact, you admit in the

2   filings you made with the Department of Labor

3   that you didn't have permission to leave your job

4   that day?

5   A.   I guess, but I called and they wouldn't

6   answer the phone.   They wouldn't respond to me.

7   So when you are sick, what are you supposed to

8   do?

9   Q.   So you did not have permission to leave

10   the job?

11   A.   No, I didn't.

12   Q.   Okay.   You filed for unemployment after

13   your discharge in May 2009; is that right?

14   A.   Yes.

15   Q.   And did you receive unemployment?

16   A.   Yes.

17   Q.   Do you recall how much unemployment you

18   received in 2009?

19   A.   Not the total, but it was 355 a week.

20   Q.   Okay.   Do you remember the total for the

21   year?

22   A.   Not right offhand, no.

23   Q.   Did you receive any other moneys in 2009

24   that you recall?

**Marc Smith**

25

1    A.  I mean, it makes no concern about what

2  this is.

3    Q.  I understand that, but you have to answer

4  the question.

5    A.  All right.  Unfaithful.

6    Q.  That you were unfaithful?

7    A.  Yes.

8    Q.  With other women?

9    A.  Yes.

10    Q.  Besides the $55 a week child support were

11  there any other settlement terms?

12    A.  No.

13    Q.  Did you fight the petition?

14    A.  No.

15    Q.  Was it more than one woman, when you say

16  you were unfaithful?  I'm not going to ask you to

17  identify.

18    A.  Yes.

19    Q.  How many?

20    A.  Two.

21    Q.  Over what period of time?

22    A.  Two years.

23    Q.  The last two years of your marriage?

24    A.  Yes.



70                           **Marc Smith**

1        A.   Yes.

2        Q.   What were the family issues you addressed

3    while you were at Rockford?

4        A.   That my wife left me and I was really

5    depressed over it.

6        Q.   And she left you because of infidelity

7    and that you had been physically abusive to her?

8        A.   No.   Infidelity.

9        Q.   Were you physically abusive to her on two

10   occasions?

11       A.   I pushed her, yes.

12       Q.   Is that something you discussed at

13   Rockford?

14       A.   Possibly, yes.

15       Q.   And you started telling me a little bit

16   about a traumatic childhood where you were abused

17   by your father?

18       A.   Yes.

19       Q.   Did anything else happen during your

20   childhood that you recall talking about at

21   Rockford?

22       A.   Mainly about my father and issues.   I'm

23   not sure exactly what issues.

24       Q.   Did you ever watch pornography at age



**Marc Smith**

1   six?

2       A.   Yes.

3       Q.   And did you ever see your parents have

4   orgies at their house?

5       A.   Yes.

6       Q.   Were your parents swingers?

7       A.   Yes.

8       Q.   And you witnessed some of this, I take

9   it, as a child?

10      A.   Yes.

11      Q.   Did you characterize yourself as a sex

12  addict?

13      A.   Yes.

14      Q.   And is that heterosexual sex?

15      A.   Man/woman, yes.

16      Q.   Were you attracted to men?

17      A.   No.

18      Q.   Have you ever been attracted to men?

19      A.   No.

20      Q.   Have you ever been accused of being

21  attracted to men?

22      A.   No.

23      Q.   Did you overdose on any medications prior

24  to Rockford?

Marc Smith                              73

1    A.  I'm not sure.  I don't remember writing

2  about a car crash.  I'm not saying it didn't

3  happen, but I don't remember it.

4    Q.  Okay.  You also reported that you were

5  throwing and breaking things at night, punching

6  holes in walls?

7    A.  Yes.

8    Q.  Was this at your house?

9    A.  Yes.

10    Q.  Was this before your wife left?

11    A.  After.

12    Q.  Did your children ever witness any of

13  that?

14    A.  No.

15    Q.  Did your children ever witness any abuse,

16  any altercation between you and your wife?

17    A.  No.

18    Q.  Did you report that prior to taking

19  Vyvanse you were masturbating several times a day

20  and always looking at pornography?

21    A.  Yes.

22    Q.  And for how long had you done that?

23    A.  Probably years.

24    Q.  Years?



74                        **Marc Smith**

1      A.   Yes.   A year or two.

2      Q.   You reported that you are heterosexual

3   and you always want sex.   Do you remember saying

4   that?

5      A.   I like sex, yes.

6      Q.   I mean, do you remember reporting that to

7   the Rockford Center?

8      A.   I don't remember reporting it, but...

9      Q.   Is that accurate?

10     A.   It should be, yes.

11     Q.   What do you mean, "It should be"?

12     A.   Yes.

13     Q.   Do you still suffer from sex addiction?

14     A.   Nope.

15     Q.   Are you still attracted to women?

16     A.   Yes.

17     Q.   Are you attracted to men?

18     A.   Nope.

19     Q.   And have you been accused of being

20  attracted to men?

21     A.   No.

22     Q.   All right.   Do you recall when your last

23  visit was to a health provider for any depression

24  or anxiety?



Marc Smith                                    81

1     A.   No, not really.

2     Q.   Do you still take martial arts?

3     A.   No.

4     Q.   When did you quit?

5     A.   I was still working at Perdue when I

6  quit.  So 2008, 2009, somewhere around, one of

7  them years.

8     Q.   Based on Perdue paperwork, you actually

9  worked for the company back in 1997, right?

10    A.   I think for a short period when I was 18,

11 yes.

12    Q.   Do you remember where you worked?

13    A.   In Georgetown.

14    Q.   What did you do?

15    A.   Paws.

16    Q.   What happened?  How long were you there?

17    A.   Not long.

18    Q.   Were you terminated or did you quit?

19    A.   I quit.

20    Q.   Do you remember why?

21    A.   No.  I just walked off the job, I

22 believe.

23    Q.   Do you remember working at Wal-Mart?

24    A.   Yes.



86                         **Marc Smith**

1      A.   Yeah, it was the hours went back and you

2  get partial unemployment, so...

3      Q.   So you were permanently employed, then

4  you went directly from Grotto Pizza to Perdue?

5      A.   No, I went from Grotto Pizza -- wait a

6  minute.   Grotto Pizza to Food Lion.

7      Q.   What did you do at Food Lion?

8      A.   I was a stocker/meat cutter.

9      Q.   How long were you at Food Lion?

10     A.   Just like a couple months, then I went to

11  Mountaire, which is where my father-in-law

12  worked.

13     Q.   Before we do that, you said something

14  after you were a meat cutter?

15     A.   Meat cutter/stocker.   Stocker/meat

16  cutter.

17     Q.   So you worked at Mountaire prior to going

18  to Perdue?

19     A.   Yes.

20     Q.   What did you do at Mountaire?

21     A.   Grain operator.

22     Q.   How long were you there?

23     A.   Three months, three or four months.   It

24  was a seasonal job.   And then I went -- then I



### Marc Smith

1  started at Perdue.

2            (Smith Deposition Exhibit 5 was

3  marked for identification.)

4  BY MR. AMIOT:

5     Q.  Do you recognize this employment

6  application?

7     A.  I guess it is the one I turned in to work

8  for Perdue.

9     Q.  That's your signature on the second page?

10    A.  Yes.

11    Q.  Take a look at the employment record that

12  you have completed on that second page.  Is that

13  correct, given what you told me today?

14    A.  Grotto's to Food Lion, to Mountaire, and

15  then to Perdue, yes.

16    Q.  Are the dates correct?

17    A.  They seem to be correct, yes.

18    Q.  You received training, I take it, while

19  you were at Perdue?

20    A.  Yes.

21    Q.  What type of training did you receive?

22    A.  I was trained from a panel operator to

23  running the Beta Raven system.

24    Q.  Do you remember who trained you?

88                              **Marc Smith**

1      A.  Bart.  Was it Tucker?

2      Q.  He can't answer.

3      A.  I'm sorry.  Bart Tucker I believe.

4      Q.  What was his position?

5      A.  He was a panel operator.  No, actually I

6  believe he was a utility operator.

7      Q.  What was your first position at

8  Bridgeville?

9      A.  A panel operator.

10     Q.  A panel operator.  Who did you report to?

11     A.  Tyson Jefferson was the direct

12  supervisor.

13     Q.  Tyson Jefferson?

14     A.  Yes.

15     Q.  Did he hire you?

16     A.  Yes.

17     Q.  Did anyone else hire you?

18     A.  I had to go through the interview

19  process, I guess first Georgetown through their

20  HR.  And I don't know if I talked to him or not.

21     Q.  When you say "him" who do you mean?

22     A.  Chuck Broderick.

23     Q.  But you do recall talking to Tyson

24  Jefferson?



**Marc Smith**

1    A.   Yes, he brought me over and showed me the

2  facility.

3    Q.   What was his title at the time?

4    A.   Assistant mill manager, I believe.

5    Q.   Do you know whether he is still at

6  Bridgeville?

7    A.   As far as I know, yes.

8    Q.   Do you know what his position is today?

9    A.   No, I don't.

10    Q.   Tell me what your duties were as a panel

11  operator.

12    A.   I oversee the Beta Raven system that ran

13  the pelleting operation.   I also dumped

14  chemicals, the drugs into the bins that were

15  pulled through the system to make the feed.

16    Q.   What is a Beta Raven?

17    A.   It is a computer program that Perdue uses

18  to I guess control the machines, the lifts, the

19  pellet mills, the coolers and conditioners.

20    Q.   Okay.

21    A.   So it hooks them all together so they all

22  operate together, I believe.

23    Q.   Were you working at a panel?

24    A.   Yeah.   I would sit down, there is three



92                    **Marc Smith**

1  time you were at Bridgeville?

2      A.  No.  I stayed there for a year and -- I'm

3  not sure exactly what the time is but I became a

4  utility operator.

5      Q.  That was a promotion, right?

6      A.  Yes.

7      Q.  That's the position you held through your

8  termination of employment?

9      A.  Yes.

10     Q.  Utility operator.  How was that different

11 than a panel operator?

12     A.  Well, mainly, I would help train the new

13 guys that came in.  The new employees that would

14 come in, I would train them.  They would work

15 with me through the day shift.

16     Q.  On what jobs?

17     A.  The panel operating job.

18     Q.  But were you also responsible for doing

19 other jobs besides panel operator?

20     A.  Yeah, I would do the -- is it PDIs?  The

21 -- we would go get corn samples.

22     Q.  Is that pellet durability index?  Is it

23 index or indexing?

24     A.  I'm not sure.



**Marc Smith**                                    93

1              MR. BRODERICK:   Index.

2      Q.   Just index.   Pellet durability index,

3   that's PDI?

4      A.   Yeah.

5      Q.   Why did you have to do that?

6      A.   It was just part of the job.

7      Q.   What was it you were doing?

8      A.   You would take the pellet, the durability

9   of it, and you would tumble it.   And I'm not sure

10  exactly how the process.   You tumble it, and then

11  you would sift it, and then you would weigh it.

12  Or you may have weighed it first.   It was

13  something along the lines, you would weigh it,

14  sift it, weigh it again, and you would divide it

15  into it, and you get a durability test or the

16  average.

17     Q.   How often did you do that?

18     A.   We had to do three samples a day, every

19  day.

20     Q.   So when you weren't training new

21  employees what would you be doing as a utility

22  operator?

23     A.   I would train them to do what the panel

24  operator did.

94                          **Marc Smith**

1      Q.  But if you weren't training somebody what

2  would you be doing?

3      A.  I would just be the panel operator.

4      Q.  Would you also do dispatch?

5      A.  Yes, I would help out in dispatch too,

6  yes.

7      Q.  Is that because you had become a utility

8  operator so you were working in other different

9  locations at the Bridgeville plant?

10     A.  No.  It was to learn the position, so I

11  could, you know, if they needed help on dispatch

12  and I could jump into there.

13     Q.  Prior to becoming a utility operator, do

14  you recall that Tyson Jefferson approved a move,

15  approved you for a move from second shift to day

16  shift?

17     A.  Yes.  Bart Tucker became quality control,

18  and I became the first shift guy because I had

19  seniority.

20     Q.  Is that something you wanted?

21     A.  Yeah.

22     Q.  Why?

23     A.  Day shift.

24     Q.  And you recall that Tyson Jefferson



**Marc Smith**

1  approved that?

2      A.  Yes, I believe he submitted an approval.

3      Q.  Do you recall who recommended you for the

4  promotion to utility operator?

5      A.  I believe Tyson was the one.

6      Q.  Do you remember if Mr. Broderick was

7  involved in that?

8      A.  I am not sure.  He may have been.

9              Is there any way I can use the

10  bathroom?

11     Q.  Absolutely.  We will take a five-minute

12  break.

13             (Recess taken.)

14  BY MR. AMIOT:

15     Q.  Mr. Smith, we were talking about your

16  promotion to utility operator, and I think the

17  question was if you remember whether Mr.

18  Broderick was involved in that promotion.

19     A.  I'm not sure, but I'm pretty sure he had

20  something to say about it.

21     Q.  What was his position at the time, Mr.

22  Broderick's?

23     A.  He was the mill manager.

24     Q.  And is that who Tyson reported to



96                          **Marc Smith**

1    directly?

2         A.   Yes.

3         Q.   Was there a time in early 2009 when you

4    sought a promotion outside the Bridgeville

5    operation?

6         A.   Yeah.   Yeah, I had several times, yeah.

7    One was down in the Salisbury.   It was -- give me

8    a second.   I'm not sure exactly what the

9    position's name was, but it was in Salisbury.

10   Then there was another one in Seaford, and Chuck

11   give me a little letter of recommendation.

12        Q.   Do you remember when that was?

13        A.   It is 2009, I believe.

14                  (Smith Deposition Exhibit 6 was

15   marked for identification.)

16        Q.   Take a look at that, Mr. Smith.   This is

17   a memo to Carol Phillips from Chuck Broderick,

18   dated February 24th, 2009.

19        A.   Yes.

20        Q.   Is this the letter of recommendation from

21   2009 you were talking about?

22        A.   I believe it is the one, yes.

23        Q.   Did you see this letter at the time it

24   was transmitted to Carol Phillips?



**Marc Smith**

1    A.   I'm not too sure.   I believe that -- I

2    can't say yes or no.   I'm not sure.

3    Q.   Do you know how it is that Mr. Broderick

4    came to write this letter of recommendation?

5    A.   I believe I asked him to write me a

6    letter of recommendation for that position.

7    Q.   Is this a position you were talking about

8    in Salisbury or Seaford?

9    A.   I believe this is the one in Seaford.

10   Q.   Do you agree with what Mr. Broderick says

11   in the letter of recommendation?

12   A.   Yes.

13   Q.   Did he write this on his own, do you

14   know?

15              Let me ask it differently.   Did you

16   have any input in the preparation of this letter

17   of recommendation?

18   A.   No.   I just asked him to write it.

19   Q.   And Mr. Broderick just prepared this

20   document?

21   A.   Yes.

22   Q.   So do you recall when you first saw it?

23              MR. PRIMOS:   I'm just going to object

24   to the form.   You can answer.

98                          **Marc Smith**

1        A.   I believe it was about the same time she

2    got it.   I believe he gave me a copy of it also.

3        Q.   So some time in February of 2009?

4        A.   Yes.

5        Q.   Did you get any salary increases while

6    you were at Perdue, from 2005 on?

7        A.   You get a yearly raise.   I'm not too

8    sure, I think 5 percent.   It varies each year.

9    And then when I became a utility operator I got a

10   50 cent raise, I believe.

11       Q.   In addition to the annual raises?

12       A.   Yes.

13       Q.   Do you know who approved that raise?

14       A.   I believe Tyson.   It had to go through

15   the management, and with HR.

16       Q.   When you say "management" --

17       A.   Tyson and Chuck, and I believe the HR

18   system, however they --

19       Q.   When you say "Chuck" we are talking about

20   Chuck Broderick?

21       A.   Chuck Broderick, yes.

22       Q.   I may have asked you this already, Mr.

23   Smith.   Do you recall who made the decision to

24   hire you at Bridgeville?



100                    **Marc Smith**

1   about some of the stuff.

2       Q.   Do you remember some time in possibly

3   February or beginning of March 2009 trying to run

4   Tyson off the road?

5       A.   No.

6       Q.   Do you remember trying to run anybody off

7   the road?

8       A.   No.

9       Q.   Ever?

10      A.   No.

11      Q.   Did you have any performance evaluations

12  during your employment with Perdue?

13      A.   Yes, I did.

14      Q.   Who conducted those?

15      A.   Tyson and I believe Chuck.

16      Q.   Do you remember what years you had

17  evaluations?

18      A.   We had one every year, I believe.

19      Q.   Do you remember what your ratings were?

20      A.   Good or above.

21      Q.   Did you agree with the evaluations?

22      A.   Yes.

23      Q.   Would you say you were treated fairly

24  with respect to your evaluations?



**Marc Smith**

101

1    A.   Yeah, with the evaluations, yes.

2    Q.   How many employees were at the

3  Bridgeville plant at the time of your discharge?

4    A.   The day that I was there or the entire

5  overall plant?

6    Q.   Well, how many employees worked at the

7  plant the day you were discharged?

8    A.   The day I was discharged there was Gene--

9    Q.   I'm sorry.   How many employees were

10 employed by Perdue at the plant?

11   A.   At the plant?

12   Q.   At the time of your discharge, not how

13 many people were working there.

14   A.   That day, okay.   I'm not sure how many

15 truck drivers.   I know there was at least six,

16 six trucks on the day, six on the nights.   That's

17 12.   There was dispatcher, panel operator,

18 receiving operator, maintenance man.

19              Did I say maintenance man?   20 plus.

20   Q.   Okay.   Were there any women at the

21 Bridgeville facility?

22   A.   Yeah, they hired a female in -- I don't

23 remember her name.   Shakira.   I don't remember

24 her...

102                          **Marc Smith**

1      Q.   What was her job?

2      A.   She was a -- she was a temp at first and

3   then they hired her in as -- I can't remember the

4   exact job, it was -- what it was.

5      Q.   Do you remember where she worked

6   physically?

7      A.   She had her own office.

8      Q.   Was it near the panel operation?

9      A.   Yeah, the panel operator, then you had

10  the dispatch, and then you had the panel over

11  here in the back.

12     Q.   Was he she the only female then at

13  Bridgeville?

14     A.   Donna Brown, she was a quality control,

15  and she worked there also.

16     Q.   Did she also work at other facilities for

17  Perdue?

18     A.   Donna?  I think she filled in every now

19  and then for other people, yes.

20     Q.   All right.  So did you ever sense that

21  there was a perception by anyone at Bridgeville

22  that either of those two women did better work

23  because they were women?  In other words, did

24  anyone ever say they did better work because they

Marc Smith                                  103

1    were female?

2        A.   No.

3        Q.   Did you ever have that perception?

4        A.   No.

5        Q.   Do you know if anybody had that

6    perception?

7        A.   I can't make the -- no, no, I can't make

8    that call.  I don't know what they were thinking.

9        Q.   This is an open-ended question, but see

10   where we can go with it.  How would you describe

11   the workforce at Bridgeville?

12       A.   It was, you know, overall it was --

13   besides some of the activities, I mean, we got

14   work done at the plant, I mean, together, you

15   know, everybody -- it was a good place.  I mean

16   we -- the job got done, believe it or not.

17       Q.   Were you social with anyone at work

18   outside of work?

19       A.   I seen Tyson a couple times outside of

20   work.

21       Q.   Were there any employees at Bridgeville,

22   any of the male employees who stood out as being

23   different?

24              MR. PRIMOS:  Objection to form.  You

104                          **Marc Smith**

1   can answer.

2       A.   What do you mean by standing out?   Like

3   appearance?

4       Q.   Is there anyone you can think of who

5   didn't seem to fit into the workforce at

6   Bridgeville?

7       A.   No, not really.

8       Q.   Any womanizers?

9       A.   People would say stuff, yes.

10      Q.   Like what?

11      A.   Well, Vern Russell, he would say stuff

12  to -- inappropriate stuff to the -- I don't

13  remember her name, the temp.

14      Q.   The female employee --

15      A.   Yes.

16      Q.   -- who worked in her own office?

17      A.   Yes.

18      Q.   And you considered that inappropriate

19  comments, to be womanizing?

20      A.   Yes.   He shouldn't be saying stuff,

21  certain stuff to women.

22      Q.   Anybody, any guys you would characterize

23  as tough guys?

24      A.   Clint Lewis, I guess.



**Marc Smith**

1    Q.   Why is that?

2    A.   Big, tough old man.

3    Q.   Anyone else?

4    A.   No, just really him.

5    Q.   Any of the male employees at Bridgeville

6    gay?

7    A.   By some of their actions I would believe,

8    yes.

9    Q.   Who?

10   A.   Mr. Broderick, Clinton Lewis, Vern, Vern

11   Russell.

12           Some of the other truck drivers, they

13   would make comments that kind of led me to

14   believe they kind of -- you know, if they were

15   playing, it was the wrong way to play.

16   Q.   And we will get into these comments, but

17   you are basing your answer on comments that you

18   allege were made to you or in your presence at

19   the facility?

20   A.   In my -- in the overall facility.  Stuff

21   they have said and stuff that was actually

22   directed to me at some point in time.

23   Q.   Other than that, other than the comments

24   or the things that were directed at you, which we

106                              **Marc Smith**

1   will get into, do you have any basis to say that

2   any of these people were gay or are gay?

3        A.   Just off of what I have seen.  Nothing,

4   you know, no outside activity.

5        Q.   Did you have any issues or disputes with

6   management in 2005?

7        A.   Not that I can recall.  There may have

8   been.

9        Q.   What about 2006?

10       A.   No, no.

11       Q.   2007?

12       A.   No, I don't believe so.

13       Q.   2008?

14       A.   Nothing I can recall really offhand.

15       Q.   So I take it you didn't make any

16   complaints to management or HR during any of

17   those years?

18       A.   No.

19       Q.   Now, I know you had an argument with Mr.

20   Broderick in March of 2009, and I know you

21   ultimately were discharged in May 2009, and we

22   will talk about that.  Other than those two

23   issues, do you recall any discipline you received

24   or any write-ups?



**Marc Smith**

111

1    Q.   Other than your discharge and the issue

2  with Mr. Broderick in March?

3    A.   No.

4              (Smith Deposition Exhibit 8 was

5  marked for identification.)

6    Q.   Can you identify this document for me,

7  Mr. Smith?

8    A.   It says it is a disciplinary action from

9  March 13, associate argued repeatedly with regard

10 to --

11   Q.   You don't have to read the whole thing to

12 me.  Do you remember what this document is?

13   A.   I can see what the document is, yes.

14   Q.   What is it?

15   A.   Evidently for not doing PDI tests.

16   Q.   What was the disciplinary action listed

17 at the top?

18   A.   Insubordination and inappropriate

19 language.

20   Q.   Did you sign this document at the bottom?

21   A.   Yes.

22   Q.   Let me show you one other document.

23             (Smith Deposition Exhibit 9 was

24 marked for identification.)



112                          **Marc Smith**

1      Q.  You also signed Smith No. 9; is that

2  right --

3      A.  Yes.

4      Q.  -- there at the bottom above associate's

5  signature?

6      A.  Yes.

7      Q.  Whose signature is above yours?

8      A.  Mr. Broderick.

9      Q.  If you look at Exhibit No. 8, the

10  disciplinary action, dated March 13th, 2009,

11  whose signature is above yours?

12      A.  Chuck Broderick's.

13      Q.  Looking at Exhibit No. 9, the

14  disciplinary record, whose writing is crossed

15  out?

16      A.  That's my writing.

17      Q.  Who crossed it out?

18      A.  I did.

19      Q.  Why?

20      A.  No, no, I didn't cross it out.  He, Mr.

21  Broderick crossed it out.

22      Q.  Do you remember why?

23      A.  It was after I signed it, he crossed it

24  out, and I was turning it in for harassment or he



Marc Smith                                    113

1    took it and -- I'm not sure actually.  But I

2    believe he took it from me and then crossed it

3    out.

4        Q.  Did he explain why?

5        A.  No.

6        Q.  Do you recall him explaining that the

7    comments section was for management, and that you

8    could write something out, up separately and

9    submit it?

10       A.  No, it was never discussed that I

11   recollect.

12       Q.  Did you see him cross this out?

13       A.  Yes.

14       Q.  And you had no conversation about why he

15   was crossing it out?

16       A.  I just assumed he was crossing it out

17   because it wasn't true from his point of view.

18       Q.  You did file a separate complaint on the

19   same day, right, alleging sexual harassment?

20       A.  In March, yes, I did.

21       Q.  This same day, March 17?

22       A.  Yes.

23       Q.  Wasn't it after this disciplinary record?

24       A.  No, this was before.  They got the call,



114                          **Marc Smith**

1  and after they got the call they rushed to get

2  all this stuff together.

3       Q.   Let me show you -- actually, before we do

4  that, let's go back to Exhibit No. 8.   Now,

5  according to Exhibit No. 8 you got into an

6  argument with Mr. Broderick; is that right?

7       A.   Yes, he had some comment about the --

8  yes, there was an argument.

9       Q.   What was it about?

10      A.   Over the tube steak smothered in drawers

11  comment.

12      Q.   Didn't you have an argument about PDI?

13      A.   We discussed that.

14      Q.   About the PDI?

15      A.   We discussed that.

16      Q.   Didn't you have an argument about it?

17      A.   We discussed it.

18      Q.   My question is:   Did you have an argument

19  about it?

20      A.   It was a discussion.

21      Q.   What does that mean?

22      A.   We talked about it.   And he said he would

23  get -- look into it.

24      Q.   What were you talking to him about?



Marc Smith                                    115

1     A.   PDIs.

2     Q.   What were you talking to him about with

3  respect to PDIs?

4     A.   That it was, Bart Tucker had told me that

5  it was the QC --

6     Q.   Quality control?

7     A.   -- control's job to do it, because he had

8  to do it.

9     Q.   Who is Bart Tucker?

10    A.   He was the former panel operator, utility

11 operator.

12    Q.   Where was he at the time?

13    A.   He had called me.  I'm not sure what he

14 called me for.  I don't know if he was filling in

15 for Donna.  I'm not exactly sure.  But he called

16 me and he told me that, and I discussed it with

17 Chuck.

18    Q.   Isn't it true that you called Chuck in

19 the morning first to discuss PDI and the fact

20 that you didn't want to do it?

21    A.   No, I didn't talk to him.

22    Q.   Didn't Bart tell you you didn't have to

23 do PDI and you shouldn't have to do it?

24    A.   He didn't tell me I didn't have to do it.

**Marc Smith**                              117

1     · Q.   I'm sorry, March 13th, 2009?

2      A.   No.   Just when they wrote me up for it, I

3    believe we were also working long shifts and I

4    forgot a couple times about doing it, and I

5    believe that's why I got written up for these, is

6    because it -- just lack of -- just forgetting.

7      Q.   Why don't you tell me what happened on

8    March 13th, 2009.

9      A.   I went downstairs.   We had a -- I had a

10   conversation with Bart Tucker, went downstairs,

11   had a discussion with him.   He said he would

12   check.

13     Q.   With "him" being?

14     A.   Chuck Broderick.

15     Q.   Okay.

16     A.   And then on the way back upstairs, there

17   is -- I asked him what was for lunch, or

18   something along those lines, and he said he had a

19   tube steak smothered in drawers for me, and he

20   grabbed his midsection.

21     Q.   Why did you ask him what was for lunch?

22   Why would you ask the mill manager what is for

23   lunch?

24     A.   What he was having for lunch.

118                          **Marc Smith**

1      Q.   Why would you ask him what he was having

2   for lunch?

3      A.   Because he eats like really -- like

4   sardines and crazy stuff, health food stuff.

5      Q.   Tell me about the conversation regarding

6   PDI.

7      A.   I told him that the other managers and

8   the other QCs they all did it, in the other

9   mills, and I was wondering why we had to do it

10  through her.

11     Q.   Through Donna Brown?

12     A.   Or why we had to do it and Donna didn't

13  have to do it.

14     Q.   Weren't you upset about it?

15     A.   Yeah.

16     Q.   Did you have an altercation, did you have

17  an argument with Mr. Broderick about having to do

18  PDI?

19     A.   No.  I mean, that's what he wants to call

20  it, he can call it what he wants.

21     Q.   Take a look at Exhibit 8.  It is the

22  memo, the disciplinary memo.

23     A.   Oh, okay.

24     Q.   Why don't you read, not out loud, read to



122                          **Marc Smith**

1   Broderick's office?

2       A.   Yes.

3       Q.   And your testimony is that you had

4   learned that quality control person, Donna Brown

5   should be doing those functions, not you?

6       A.   Yes.

7       Q.   Right?  And you asked Mr. Broderick about

8   that.  What did he say?

9       A.   He said he would investigate it and look

10  into it.  But I never stopped doing the PDI

11  testing or nothing like that.

12      Q.   I didn't say that.  And you are saying

13  you didn't exchange any words over PDI?

14      A.   What we discussed, yes.

15      Q.   You had a simple discussion where you

16  said, I don't think I should have to do PDI, and

17  he said, I'll look into it, and you walked away?

18      A.   Almost in that fashion, yes.

19      Q.   What is not correct about what I just

20  said?

21      A.   I mean, it was a little longer discussion

22  than that.

23      Q.   Tell me about the discussion.  What was

24  the discussion?



**Marc Smith**                                    123

1      A.   We talked about -- voiced my opinion on

2  what, what Bart had told me.

3      Q.   What do you mean you "voiced" your

4  opinion?

5      A.   I told him.

6      Q.   Told him what?

7      A.   About Bart, what Bart had told me about

8  the PDIs, that it was QC's job to do it.

9      Q.   What was your opinion that you voiced?

10     A.   That if everybody else is doing it, you

11  know what I mean, if the other managers, QC

12  managers I guess were doing it then why isn't

13  Donna doing it.

14     Q.   Isn't it true that he said, "No, it is

15  your job"?

16     A.   I don't remember that comment.

17     Q.   You don't remember him telling you that

18  it was your job?

19           MR. PRIMOS:   Objection to form.   You

20  can answer.

21     Q.   Why did you keep doing it then?

22     A.   He may have said it, but I continued to

23  do the job.  Until he looked into it and found

24  that it was wrong, I was going to continue to do

**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477

1   statement to him again that you are asking him.

2   It is a lot.

3      Q.  Sure.  The second line it says, "I told

4   him that he was wrong," meaning that PDI tests

5   were not your job, "and he would have to continue

6   to do them."

7      A.  Oh.  He said he would look into it.  So

8   he didn't say it was wrong.

9      Q.  What about, "He began raising his voice

10  and saying he was calling HR," did you ever say

11  that?

12     A.  No.

13     Q.  "I told him to go ahead, but that at

14  Bridgeville they had always been the operators'

15  responsibility," did he say that?

16     A.  I don't remember that.

17     Q.  Did he say it?

18     A.  I don't know.

19     Q.  Is it that you don't recall him saying

20  it, or --

21     A.  I don't remember him saying.  I don't

22  know he said it.

23     Q.  "I had to ask him to get off the phone

24  because I had other things to do besides to argue

126                              **Marc Smith**

1    with him."  What does that mean?

2                   MR. PRIMOS:  Objection to form and

3    foundation.  You can answer.

4        Q.  Let me ask this:  Did you try to make a

5    phone call to HR in Mr. Broderick's office?

6        A.  No.

7        Q.  Did you pick up a phone for any reason?

8        A.  No.  Maybe he meant he was on the phone

9    and didn't have time to argue with me.

10       Q.  Okay.  Next paragraph, "Less than five

11   minutes later Marc left his workstation and came

12   into my office still agitated."

13                  Do you remember that, coming back?

14       A.  I don't remember the phone call.  I

15   remember being downstairs talking to him about

16   it, yes.

17       Q.  So this is less than five minutes later,

18   this is the first time you remember coming in to

19   talk to him, to Mr. Broderick?

20       A.  Yes.

21       Q.  Do you remember him asking you to leave?

22       A.  No.

23       Q.  Do you remember things becoming more

24   heated, "and he finally told me that I needed to



**Marc Smith**

128

1   had already called HR and you weren't going to do

2   the PDIs?

3       A.   No.

4       Q.   Do you recall Mr. Broderick telling you

5   to calm down and go back upstairs?

6       A.   No.

7       Q.   Did you ever scream, "You're a worthless

8   piece of shit" and storm off?

9       A.   No.

10      Q.   You deny saying "you're a worthless piece

11  of shit"?

12      A.   Yep.  Let me take that back.  After the

13  comment, yes.

14      Q.   After what comment?

15      A.   The "tube steak smothered in drawers"

16  comment.

17      Q.   Let's talk about that.  So as I

18  understand it, you have gone down to talk about

19  PDIs and whether you are supposed to perform this

20  function.  He walks out, out of his office after

21  you've had this conversation.  Is that when you

22  ask him about what is for lunch?

23      A.   Yeah.

24      Q.   Why did you ask him what is for lunch?

**Marc Smith**

1    A.   Just because he has exotic things for

2  lunch.

3    Q.   Were you going to eat with him?

4    A.   No.

5    Q.   Did you ever eat with him?

6    A.   No.  He would just -- he would eat, like

7  I said, sardines and stuff like that, like

8  healthy stuff, and I always just kind of played

9  with him about it.

10    Q.   Have you had any other conversations with

11  him where you are playing with him about what he

12  eats?

13    A.   I probably have said something in the

14  past, yes.

15    Q.   Like what?

16    A.   Smelling like sardines, you are going to

17  become a sardine, or something along them lines.

18    Q.   What was his exact comment to you coming

19  out of his office?

20    A.   He said something, "I got a tube steak

21  smothered in drawers for you."

22    Q.   What does that mean?

23    A.   He has got a -- he grabbed his crotch,

24  his drawers, his underwear, said, "I got a tube

130                          **Marc Smith**

```
1   steak" for me.

2       Q.  Did you ever hear him use the word "tube

3   steak" before?

4       A.  I can't recollect, no.

5       Q.  Don't you think you would remember if you

6   had heard it?

7       A.  I mean he says so much stuff, so much

8   crazy stuff.

9       Q.  My question, though, have you ever heard

10  him say "tube steak" --

11      A.  No.

12      Q.  -- at the facility until that incident?

13      A.  No, not that I can recall.

14      Q.  Did he explain what he meant?

15      A.  No.

16      Q.  How did it affect you?

17      A.  I had warned him before about his

18  conduct, in February, and when he grinded --

19      Q.  My question is:  How did that comment

20  affect you?

21      A.  It upset me because I had warned him

22  before about it.

23      Q.  Okay.  What do you mean by upset?

24      A.  He sexually harassed me.
```



**Marc Smith**                                                       131

1     Q.   Tell me how it impacted you.

2     A.   It made me mad.

3     Q.   Anything else?

4     A.   Mad, frustrated, whatever.

5     Q.   Okay.  Did you consider that harassment?

6     A.   Yes, and I went upstairs and called HR.

7     Q.   Did you consider that discriminatory?

8     A.   Yes, he discriminated against me.

9     Q.   Why?  Why is it discriminatory?

10    A.   I don't know.  Because he is a -- it was

11 against me, sexual discrimination.

12    Q.   Why did you think it was discrimination?

13    A.   I'm not sure.

14    Q.   Do you know what I mean?

15    A.   No, I don't.

16    Q.   Well, how was his comment about tube

17 steak and drawers discriminatory against you?

18    A.   Because he was going to use it, he had

19 something for me.

20    Q.   How is that discriminatory?

21    A.   Maybe I'm wrong.  Maybe no.

22    Q.   But you considered it harassment?

23    A.   Yes.

24    Q.   But you are not sure where whether it is

**Marc Smith**

1  believe after he tried to write me up or write me

2  up.

3      Q.  So after you were issued discipline?

4      A.  Yeah.  But I already complained to HR.

5      Q.  I understand that.  I'm just trying to

6  get a timeframe for this.

7      A.  Yes.

8      Q.  So you received your discipline on the

9  17th and then you prepared this document?

10     A.  Yes.

11     Q.  And it references the fact that he had

12  made a "tube steak" comment?

13     A.  Yes.

14     Q.  But that was four days earlier, right?

15     A.  Yes.

16     Q.  Why did you wait?

17     A.  I hadn't waited.  I called and they

18  weren't doing nothing.

19     Q.  My question is --

20     A.  Then I wrote it up and sent it to someone

21  who would actually be doing something, someone

22  higher up in the company.

23     Q.  I understand.  How did you know how to

24  send this by fax to Mr. Perdue?

134                          **Marc Smith**

1    A.   I got the number off of -- we have our

2   own webpage, Perdue webpage, and I think it had

3   the number to his secretary, the fax number on

4   it.

5    Q.   So you sent it to Mr. Perdue's secretary?

6    A.   Yes.

7    Q.   From where were you sending it?

8    A.   From my workstation.

9    Q.   The panel operator position?

10    A.   Yes, I believe.  Yes.

11    Q.   Was there a fax machine there?

12    A.   Yes, I believe in Vernon's office there

13   was a fax machine.

14    Q.   So you wanted to memorialize your

15   complaints to management, right?

16    A.   Yes.

17    Q.   You are going to the top person at Perdue

18   Farms?

19    A.   Yes.

20    Q.   Right?  You understood what you were

21   doing?

22    A.   Yes.

23    Q.   And you understood who Mr. Perdue is?

24    A.   Yes.



Marc Smith                                    135

1    Q.   What was your intention?

2    A.   To get someone's attention, for them

3  writing me up and...

4    Q.   Okay.  Well, let's look at the statement.

5  It says, "I cussed Chuck...I'm guilty for this

6  but he cussed me first," what does that mean?

7    A.   His statement he made.

8    Q.   The "tube steak" comment?

9    A.   Yes.

10   Q.   That's what you mean by cussed?

11   A.   Yeah.

12   Q.   So what did you say to him if you cussed

13 him?  Did you make a similar inappropriate

14 comment?

15   A.   I told him he was "a worthless piece

16 of..."

17   Q.   Go ahead.

18   A.   You can see it, it was crap.

19   Q.   Oh, you are referring to something that's

20 in here?

21   A.   Yeah.

22   Q.   All right.  Again, the purpose of this

23 was to communicate with management what your

24 concerns were; is that right?

**Marc Smith**

136

1    A.  Yes.

2    Q.  And what instance did you identify in

3 this March 17th communication to Mr. Perdue?

4    A.  What is that?

5    Q.  What did you tell Mr. Perdue in this

6 communication?

7    A.  I never got to talk to him.

8    Q.  I'm sorry.  What were you communicating

9 to Mr. Perdue in this statement?  Take a look at

10 it.

11    A.  That I needed help, I needed help because

12 they, they were writing me up for this situation,

13 when -- I was wrong for cussing, but it was after

14 the fact, and that I needed help because no one

15 was doing anything, and that I knew it had

16 further -- further retaliation would happen.

17    Q.  I thought you told me earlier you didn't

18 know why you were written up.

19    A.  Insubordination.

20    Q.  What was the insubordination?

21    A.  The cussing him.

22    Q.  All right.  So you understand that you

23 were written up because you cussed Mr. Broderick?

24    A.  Yes.  It was after the fact.



**Marc Smith**

1    Q.  But you admit that?

2    A.  Yes.

3    Q.  What incidents did you identify in the

4  March 17 communication to Mr. Perdue?  You can

5  look at it.

6    A.  It is right there.

7    Q.  Tell me what they are.

8    A.  It only says one.  It doesn't say which

9  one, what it was.  It says I cussed Chuck because

10  he cussed me first, and harassed me, and he was

11  buying lunch and he said, "tube steak smothered

12  in drawers."

13    Q.  That's a little different than what you

14  told me earlier.  What you told me earlier was

15  you asked him what was for lunch.  Here you say

16  you asked if he was buying you lunch.  And in

17  fact, you also told me that you never ate with

18  him.  So what does that mean?

19    A.  Yeah, we ate together on Christmas

20  dinners and the Thanksgiving.  So, yeah, that was

21  not true.

22    And I'm sorry for not getting the

23  "buying lunch" and "what was for lunch" straight,

24  so...

**W&F**

WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477

138                    **Marc Smith**

1      Q.   Which version is the truth?

2      A.   Well, evidently since this was written

3  down at the time, this is the most exact because

4  it was not too long afterwards.

5      Q.   But it is significantly different than

6  what are you having for lunch, when you are

7  asking someone if they are going to buy you

8  lunch, right?

9           MR. PRIMOS:   Objection to form.   And

10  it doesn't say if he was going to buy him lunch.

11  He just said "if he is buying lunch."

12      Q.   Okay.   But that's different than "what

13  are you having for lunch," right?

14      A.   I guess, yes.

15      Q.   What did you mean by that, are you buying

16  lunch?

17      A.   Are you buying lunch, I guess.

18      Q.   Why would you ask him if he is buying

19  lunch?

20      A.   What does it sound like?   Buying lunch.

21  Buying --

22      Q.   This is your writing.   I don't know what

23  you mean by it, so you tell me what you meant by

24  it.



**Marc Smith**                                    139

1    A.  I guess you buying lunch.

2    Q.  What does that mean?

3    A.  Are you buying lunch.

4    Q.  For you?  For him?  For the plant?

5    A.  I guess that's what I meant.

6    Q.  Do you remember?

7    A.  No, not really.

8    Q.  You don't remember what you meant?

9    A.  I guess it was for me.

10   Q.  You asked him if he was buying lunch for

11 you?

12   A.  I guess, yes.

13        MR. PRIMOS:  Don't answer if you are

14 not sure.

15        THE WITNESS:  Okay, I won't.

16 BY MR. AMIOT:

17   Q.  Well, so is your answer you were asking

18 if he was buying lunch for you, or you don't

19 remember?

20   A.  I don't remember.

21   Q.  Do you have any idea what you meant by,

22 "Are you buying lunch?"

23   A.  No.

24   Q.  Let me go back.  I want to talk about



140                                        **Marc Smith**

1    again, "I cussed Chuck because of this," meaning

2    the sexual harassment, "Yes, I am guilty for

3    this," meaning the cussing, "but he cussed me

4    first."

5            When you say you "cussed Chuck" you

6    are talking about calling him "a worthless piece

7    of shit"?

8        A.   Yes.

9        Q.   What did he say to you that you

10   characterize as cussing?

11       A.   When he disrespected me and told me he

12   had tube steak smothered for his drawers and

13   grabbed his crotch.

14       Q.   You characterize that as cussing?

15       A.   Yeah, as offensive to me.

16       Q.   So you mean if somebody cusses you they

17   are being offensive?

18       A.   Yes.

19       Q.   It has nothing to do with profanity?

20       A.   I mean, yeah, you can use profanity too.

21       Q.   Did he use any profanity?

22       A.   Yeah.  I don't know.  I'm not sure.

23       Q.   You don't remember?  You are not sure?

24       A.   I don't remember.



**Marc Smith**                                     141

1    Q.  All right.  You identified an incident a

2  few weeks ago where "he grinded up behind me like

3  a man would dance with a woman in a hip hop

4  club."

5    A.  Yes.

6    Q.  How did that affect you, when he grinded

7  up behind you?

8    A.  It upset me and made me mad.

9    Q.  Anything else?

10    A.  No.

11    Q.  All right.  Did you consider that

12  discrimination or harassment?

13    A.  Harassment.

14    Q.  Was it discrimination?

15    A.  I'm not sure.

16    Q.  So those are the only two things that you

17  communicated to Mr. Perdue, right, the tube steak

18  comment and that he was grinding up behind you?

19    A.  Yes.

20          (Smith Deposition Exhibit 11 was

21  marked for identification.)

22    Q.  Is this your handwriting, Mr. Smith?

23    A.  Yes.  That was sent too.

24    Q.  Was that a cover to your memo, the March

142                              **Marc Smith**

1   17 memo to Mr. Perdue?

2       A.   I am not sure.

3       Q.   Do you remember what this is?

4       A.   Yeah, it was trying to get him to, to

5   talk to me.

6       Q.   When did you send it?

7       A.   I'm not sure.  Probably -- maybe the same

8   time.

9       Q.   Could it have been the cover to the memo

10  you sent?

11      A.   Possibly, yes.

12      Q.   But you don't remember?

13      A.   No.

14      Q.   All right.  Did Mr. Perdue return your

15  call?

16      A.   No.

17      Q.   Did anyone?

18      A.   No.

19      Q.   Did Mr. Jones call you?

20      A.   I don't think he called me.  I think he

21  came to see me.

22      Q.   All right.  What is his full name; do you

23  remember?

24      A.   David Jones.

**Marc Smith**                                  143

1     Q.  Who is he?

2     A.  He is the human resource, I guess,

3  manager.

4     Q.  Human resources manager?

5     A.  Yes.

6     Q.  And he had supervision over the

7  Bridgeville facility?

8     A.  Yes.

9     Q.  When did he call you?

10          I'm sorry.  You said you don't

11  remember if he called.  When did he come see you?

12    A.  It was days later.  I'm not sure of the

13  exact date.

14    Q.  Okay.

15    A.  When it was.

16    Q.  How many days later do you think?

17    A.  I'm not sure.

18    Q.  Two?

19    A.  A couple.

20    Q.  A couple.  Okay.  And where did he meet

21  you?

22    A.  We were downstairs in the -- it was a

23  room behind Chuck's office.

24    Q.  So at the plant?

144

**Marc Smith**

1    A.   Yes.

2    Q.   At the Bridgeville facility?

3    A.   Yes.

4    Q.   What happened during that conversation?

5    A.   Basically, he belittled me, like talked

6    down to me, you know what I mean, instead of

7    talking to me.  I was like, look, I'm done with

8    the conversation and I left.

9    Q.   Didn't you tell him you had a lawyer?

10   A.   Yeah, I went to a -- I talked to a lawyer

11   in Georgetown.

12   Q.   I'm not asking that.

13   A.   Yes, yes.

14   Q.   Didn't you tell Mr. Jones you had a

15   lawyer?

16   A.   Yes.

17   Q.   Isn't that when the conversation ended?

18   A.   Yes.

19   Q.   Did you communicate anything to him

20   during that conversation?

21   A.   Not much.  I'm not sure exactly what I

22   communicated to him.

23   Q.   Any of the allegations that you have in

24   this case, did you tell him anything?

**Marc Smith**                    145

1    A.   Yes.

2    Q.   What did you tell him?

3    A.   I told him about the incident.

4    Q.   The tube steak comment?

5    A.   Yes.

6    Q.   And the grinding?

7    A.   Yes.

8    Q.   Anything else?

9    A.   I am not sure.

10   Q.   Did you identify any witnesses?

11   A.   I'm not sure at that time.

12   Q.   Do you remember whether he spoke with

13   anybody else at the plant?

14   A.   I am not, not sure.

15   Q.   Even as you sit here today you are not

16   sure?

17   A.   I'm pretty sure he did.  I'm not sure,

18   you know what I mean, everyone he talked to.  I'm

19   pretty sure he talked to Chuck and Tyson and

20   other people there.

21   Q.   Who else?

22   A.   Probably, when the grinding on the hips

23   happened, Erwin Hall, he may have talked to him.

24   I don't know if he I gave him his name or that

146                              **Marc Smith**

1    came up.

2        Q.   Anyone else?

3        A.   I'm not sure.

4        Q.   How long would you say the conversation

5    lasted with Mr. Jones?

6        A.   A couple minutes, if that.

7        Q.   Why did you tell him you had a lawyer?

8        A.   Because I had talked to a lawyer and

9    that, you know what I mean, he, he just wouldn't

10   -- he was trying to make me look like I was

11   wrong, but I came to you guys for help and no one

12   seemed to help.  All they wanted to point, you

13   know what I mean.

14       Q.   Why did you tell him you had a lawyer?

15       A.   He told me -- I said, "I have a lawyer

16   and I was told not to talk to you."  And the way

17   he was talking to me offended me, and that's

18   probably why the lawyer -- I was advised I

19   shouldn't really give, give any information to

20   him.

21       Q.   Oh, your lawyer told you before your

22   meeting with Mr. Jones not to give him any

23   information?

24       A.   Yeah.



**Marc Smith**                                    147

1              MR. PRIMOS:  I'm just going to object

2  to any discussions about confidential

3  communications with an attorney.

4     Q.  Okay.  Who was the lawyer?

5     A.  I forgot her name.  It has been about

6  three years ago, so...

7     Q.  So I take it you don't consider that a

8  very productive meeting?

9     A.  No.

10             (Smith Deposition Exhibit 12 was

11  marked for identification.)

12     Q.  Take a look at this, Mr. Smith.  This is

13  Smith 12.  Is that your writing at the bottom?

14     A.  Yes.

15     Q.  All right.  Is this a document you

16  prepared?

17     A.  Yes.

18     Q.  What was the purpose of this

19  communication to Mr. Perdue?  I mean, do you

20  remember without reading it?

21     A.  No, I don't.  It has been years ago.  I

22  don't remember exactly everything that, you know

23  what I mean, I did.

24     Q.  Well, it starts out, "I'd like to thank

148                              **Marc Smith**

1    you for looking into the matter," do you remember

2    writing that?

3        A.  Yes.

4        Q.  What did you mean --

5        A.  I mean, I wrote this, I wrote every bit

6    of this so that's -- so we can skip that.  But,

7    yeah, I wrote it, evidently I did, and I -- so...

8        Q.  Do you remember what you meant by "I

9    would like to thank you for looking into the

10   matter"?

11       A.  I'm not sure exactly.  I guess they

12   didn't interview anyone at the mill, didn't do

13   anything.  Talk about...

14                 Maybe he sent David Jones in after,

15   days later, and I just thanked him for doing

16   that.  But it wasn't really productive.

17       Q.  This is March 23rd, so it couldn't have

18   been too long after you complained, right?

19       A.  Ten days.

20       Q.  Well, you received your discipline on the

21   17th, correct?

22       A.  Yeah, but I turned it in on the 13th.

23       Q.  I understand.  I understand.

24       A.  And it took him ten days to get to me.



**Marc Smith**

1    Q.  You wrote your memo, the first memo on

2  March 17th, right?

3    A.  Yes.

4    Q.  So within six days you have already met

5  with Mr. Jones and you are thanking Mr. Perdue

6  for that inquiry?

7    A.  Yes.

8    Q.  Okay.  And you don't think that's timely

9  for a big company?

10           MR. PRIMOS:  Objection.  You can

11  answer.

12    A.  No, I think it should have been more

13  urgent.

14    Q.  But you didn't tell Mr. Jones anything,

15  right?

16    A.  I told him everything, I believe, on the

17  phone, or HR.  I'm not sure of the exact

18  conversations, but he was aware of the situation.

19    Q.  Wait.  Had you spoken to Mr. Jones before

20  you saw him?  I thought you said you hadn't.

21    A.  I'm not sure of the exact timeframe.

22    Q.  I mean, didn't you tell me that the first

23  time you talked to Mr. Jones was when you met him

24  at the mill?

**Marc Smith**                                        153

1           MR. PRIMOS:  Objection.  You mean

2    misconduct toward Mr. Smith or toward anyone at

3    the mill?

4           MR. AMIOT:  Toward Mr. Smith.

5           THE WITNESS:  I'm not sure, but I

6    know it intensified after that.

7    BY MR. AMIOT:

8      Q.  After March 23rd?

9      A.  Yes.

10     Q.  Do you remember saying, other than the

11   grinding or the tube sock --

12     A.  Tube steak.

13     Q.  -- tube steak comment prior to March

14   23rd?

15     A.  Nothing directed at me.

16     Q.  Nothing directed at you.  And you are

17   sure about that?

18     A.  I'm pretty sure.

19     Q.  You probably would have put it in your

20   communication to Mr. Perdue?

21     A.  I believe so.

22     Q.  Okay.  What did Mr. Jones do in response

23   to your meeting?

24     A.  Really nothing.  I know he actually got

**Marc Smith**

154

1    rid of one of the write-ups. Actually, it is not

2    in there, so it doesn't matter. Nothing. I know

3    we had a sexual harassment meeting, they actually

4    had a, conducted a class. That's all.

5        Q. A sexual harassment training session?

6        A. Yes.

7        Q. Do you remember when that was?

8        A. No, I'm not sure of the date.

9                (Smith Deposition Exhibit 13 was

10   marked for identification.)

11       Q. Do you remember seeing this memo, Mr.

12   Smith?

13       A. Yeah.

14       Q. So this is a memo from Chuck Broderick,

15   dated April 9, announcing sexual harassment

16   training?

17       A. Yes.

18       Q. Do you remember where you saw this?

19       A. It may have been taped up by the time

20   clock, I believe.

21       Q. Do you remember having any conversations

22   about the training with anyone?

23       A. No.

24       Q. Nobody said anything about the training?



**Marc Smith**                                    155

1      A.   They just told us we had to pick one of

2  these times to be at it, like they provided.

3      Q.   Did you have any conversations with any

4  co-workers about it?

5      A.   Not that I can recall.

6      Q.   I take it they conducted sexual

7  harassment training, meaning Perdue?

8      A.   Yeah, they had three of them, I believe.

9      Q.   Did you attend the training?

10     A.   Yes, I did.

11              (Smith Deposition Exhibit 14 was

12  marked for identification.)

13     Q.   Do you remember who else attended the

14  training?

15     A.   I believe everybody at the mill attended

16  one of the three sessions.

17     Q.   Take a look at Exhibit 14.   This says you

18  received a copy of the Perdue Harassment

19  Prevention Policy and you attended training; is

20  that right?

21     A.   Yes.

22     Q.   Did you receive materials at the training

23  session?

24     A.   I can't recall exactly.

156                              **Marc Smith**

1      Q.   Do you remember the training session?

2      A.   Yes, I remember being there.  I believe

3  they showed a video or she went over some stuff.

4      Q.   Do you remember who was in your session?

5      A.   I believe Chuck was.  He may have been at

6  all of them.

7      Q.   Anybody else that you remember?

8      A.   A couple of them, I think the maintenance

9  men, some of the truck drivers I believe were

10 there too.

11     Q.   Did anybody talk about the training

12 afterwards?

13     A.   I'm not sure exactly.

14     Q.   How was it received?  How was the

15 training received by the employees?

16     A.   Not too well.

17     Q.   Okay.  How do you know that if there

18 weren't any communications or conversations?

19     A.   Well, I mean, the way they stopped doing

20 things around me for like that day, you know,

21 kind of looked at me and gave me that...

22     Q.   What do you mean?

23     A.   Like, look what you caused kind of deal.

24     Q.   Meaning that we had to have sexual



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

**Marc Smith**          157

1   harassment training?

2       A.   Yeah.

3       Q.   Who did that?

4       A.   Just, my perception could be off, just

5   some of the truck drivers.

6       Q.   I mean, did you have any communications

7   or conversations with anybody specifically about

8   the training?

9       A.   No, not really, no.

10      Q.   So it is more of how you saw people?

11      A.   Yeah, my perspective, yes.

12      Q.   How they were looking at you?

13      A.   Yes.

14      Q.   What were they doing?

15      A.   I can give you an instance of, I walked

16  by a truck driver and they were I guess looking

17  at the pictures, at the phone and, oh, look, it

18  is Marc, watch out, Marc.

19              I guess something on the phone or

20  something along them lines, and they were kind

21  of, don't let Marc see it, he will turn you in,

22  is how I took it.

23      Q.   Did you think that was harassing?

24      A.   I think it was common, ignorant of them.

158                              **Marc Smith**

1      Q.   Rude?

2      A.   Yes.

3      Q.   Did you think it was harassing, sexually

4    harassing?

5      A.   No, I didn't see them make any statements

6    to me, really.

7      Q.   Do you recall any other incidents of

8    sexual harassment after that training?

9      A.   I have them all written down.   Yes.

10     Q.   What can you tell me?

11     A.   Not really from Mr. Broderick.   From some

12   of the other guys, pictures and stuff that were

13   shown to me.

14     Q.   Like what?

15     A.   Harry Vanicoli.   I don't know exactly how

16   you spell his last name.   V-A-N-I-C-O-L-A.   A

17   picture of a donkey and a woman.

18     Q.   What do you mean, a picture?

19     A.   Of a donkey and a woman having sex.

20     Q.   What was the picture?   Was he holding a

21   photograph?

22     A.   He had a phone and intentionally showing

23   me the picture.

24     Q.   Was it directed to you?

**Marc Smith**                    159

1      A.   With everything going on, I don't know

2   why he would show it to me unless he was trying

3   to get something started.

4      Q.   What do you mean by that?   What was he

5   trying to get started?

6      A.   I guess he knows the situation that was

7   going on.

8      Q.   Which was what?

9      A.   Between me and Chuck, the harassment and

10  all that.

11     Q.   So what do you mean by if he showed you a

12  picture on his phone he was trying to get

13  something started?

14     A.   He tried to get something started

15  between -- something going, and he told me, I

16  believe, it was from Tyson Jefferson.

17     Q.   I still don't understand what you mean by

18  "trying to get something going."

19     A.   Trying to start trouble.

20     Q.   What would the trouble be if he shows you

21  a picture on a cell phone?

22     A.   Conflict.

23     Q.   What would the conflict be?

24     A.   I guess by, I know now, he would turn it

160                          **Marc Smith**

1  in.

2      Q.  Knowing you would turn it in?

3      A.  Yes, and tell what he did.

4      Q.  Why would he want to start that kind of

5  problem for himself?

6      A.  I have no idea.  Some people like misery.

7      Q.  But your testimony is he showed you this

8  picture because he wanted you to turn him in?

9      A.  Not him in.  He was telling me who sent

10 it to him.  I don't know what his intentions

11 were.  I believe that his intentions were that he

12 was trying to get something riled up.  Why would

13 he --

14     Q.  Well, I mean, you have already told me

15 you have seen a lot of pornography in your life?

16     A.  Yes.

17     Q.  How did seeing that picture affect you?

18     A.  Animal and a woman having sex.

19     Q.  How did it affect you?

20     A.  It is horrifying.

21     Q.  You were horrified?

22     A.  Yeah.

23     Q.  How did that play out the rest of your

24 day?



**Marc Smith**                                161

1      A.   It is disgusting.

2           Well, I turned it in, I believe, and

3    it I guess caused a little havoc, I believe, that

4    day.

5      Q.   Do you think that was sexually harassing?

6      A.   In some form, yes.

7      Q.   In what form?

8      A.   Well, he shouldn't be showing pictures

9    like that at the workplace.

10     Q.   Why is that sexually harassing?

11          MR. PRIMOS:  Objection to the form.

12   You can answer.

13     A.   I think it is sexual -- you shouldn't be

14   showing naked pictures of anybody or anything at

15   work, in a work environment.

16     Q.   Okay.  But for you it is okay at home,

17   right?

18     A.   Yeah, what I do in the privacy of my home

19   is my own.

20     Q.   Do you think that was discriminatory?

21     A.   I'm not sure.

22     Q.   Well, listen, Mr. Smith, your claim is

23   that you were discriminated against, so I need to

24   understand what you found to be discriminating.

162                          **Marc Smith**

1    Is that --

2        A.  I was offended by it, yes.

3        Q.  Did you feel discriminated against?

4        A.  At that point they were making -- I don't

5    want to say this.  They were intentionally trying

6    to -- I'm not sure.

7        Q.  I understand you are saying you felt it

8    was harassing.

9        A.  Yeah.

10       Q.  I understand that.  How was it

11   discriminatory?

12               MR. PRIMOS:  I'm just going to object

13   because the legal definition of sexual

14   discrimination --

15               MR. AMIOT:  Don't educate him.  Don't

16   educate him.

17               MR. PRIMOS:  I just don't understand

18   the point of your asking him a legal context.

19               MR. AMIOT:  If you have an objection,

20   that's fine, to a legal question, that's fine.

21   BY MR. AMIOT:

22       Q.  But I'm still allowed to understand why

23   you brought your case and on what basis.  Right.

24   Do you understand what claims you brought against

**Marc Smith**                    163

1  Perdue?

2      A.   Yes, sexual harassment and retaliation.

3      Q.   Do you believe you were discriminated

4  against as a man?

5      A.   I was offended by another man, yes.

6      Q.   I understand you believe you were

7  offended, and I understand you believe you were

8  sexually harassed.

9      A.   What is your call, what is your

10  definition of discrimination?

11      Q.   Not my job.

12      A.   Okay.

13      Q.   My question to you is, let me ask it this

14  way:  Do you believe that he showed you that

15  picture because you are a man?

16      A.   I'm not sure why he showed me the

17  picture.  I'm not -- I believe he was just trying

18  to get something started.

19      Q.   What do you understand the word

20  "discrimination" to mean?

21              MR. PRIMOS:  Objection, foundation.

22  You can answer.

23      A.   Causing offense to someone.

24      Q.   Is that it?



164                          **Marc Smith**

1      A.   I guess that's what I have.

2      Q.   Okay.  Any other incidents you can think

3   of?

4      A.   There was a whole slew of incidents that

5   I wrote down.

6      Q.   Anything you remember?  I mean, I'm

7   entitled to know what you know, not what your

8   lawyer prepared for you.

9      A.   Well, I know what I wrote down.  I can't

10  recall every little detail of everything.

11     Q.   Can you give me anything?

12     A.   One of the truck drivers telling me that

13  he loved me and all that crazy stuff.

14     Q.   Who did that?

15     A.   Louis Hudson.

16     Q.   Tell me about that.

17     A.   I'm not sure exactly what the -- just

18  exactly what he actually said.  I don't remember

19  all the little details.  But he was being -- how

20  I felt, it was like a man loving another man and

21  homosexual lifestyle.

22     Q.   Do you think he is gay?

23     A.   Actions speak louder than words

24  sometimes.  I don't know.



**Marc Smith**

1    Q.  Did you ever joke with guys sexually?

2    A.  No.

3    Q.  It sounds like you had seen that at the

4  workplace?

5    A.  Oh, it was there.  It was just never

6  pointed at me until the end.

7    Q.  What do you mean?

8    A.  Until the latter part of my employment

9  there.

10    Q.  Okay.  So he said, "I love you"?  What

11  did he mean by that?

12            MR. PRIMOS:  You have to answer.

13    A.  I'm sorry.  Yes.

14    Q.  What was the context of the conversation?

15  What were you doing?

16    A.  I was doing my job.

17    Q.  How did that affect you?

18    A.  Well, it just offended me.  Why would he

19  want to tell me something like that.

20    Q.  Were you otherwise friends with this guy?

21    A.  I thought we were friends.

22    Q.  So if he said that to you, you instantly

23  took offense?

24    A.  By the way he said it.  I'm not sure

166                        **Marc Smith**

1   exactly, into detail what he exactly said.

2       Q.   What do you mean by that?

3       A.   Well, I didn't have -- I didn't have all

4   the papers that I had.  So I don't know exactly

5   what he said.  I have it written down.

6       Q.   You don't remember what he said unless

7   you look at --

8       A.   Not exactly what he said, no.

9       Q.   -- a document?

10      A.   I know about what, you know what I mean,

11  what it pertained to, a man messing with another

12  man.

13      Q.   That's how you took his response, this

14  guy you thought was a friend, or his comment?

15      A.   Yeah.  It was, it was wrong.

16      Q.   All right.  Anything else you can

17  remember?

18      A.   Not right offhand.

19      Q.   I'll give you as much time as you want to

20  think about because now is your time to tell me

21  everything that happened that you consider

22  offensive.

23      A.   I can't -- I'm just drawing a blank.

24      Q.   So while we are sitting here you have

**Marc Smith**                    167

1   told me everything you can remember that you

2   found offensive while you were employed at

3   Perdue?

4       A.   Yeah.  I can't remember every little

5   detail so I don't want to go into it.

6           MR. PRIMOS:  Just to clarify for the

7   record, were you referring to the period between

8   March and May?

9           MR. AMIOT:  Any period.  Any period.

10          MR. PRIMOS:  So you are referring to

11  incidents even directed at other people?

12          MR. AMIOT:  I'm sorry, just incidents

13  directed at you.

14          MR. PRIMOS:  Okay.

15          THE WITNESS:  I just can't recall

16  every incident.

17  BY MR. AMIOT:

18      Q.   Okay.  And now to Mr. Primos' point, do

19  you have any recollection of incidents not

20  involving you, that were directed to somebody

21  else?

22      A.   I watched guys dry hump each other.

23      Q.   What do you mean by that?

24      A.   They hump with their clothes on, they

168                          **Marc Smith**

1   would hump, humping motions.  I watched Vern and

2   Clint Lewis, Vernon Russell and Clint Lewis in

3   the office, they shut the light out and they

4   would do it.  He would act like he was humping

5   him.

6       Q.  When did that happen?

7       A.  It happened actually a lot.

8       Q.  Were they directing that at you?

9       A.  No.  They were just doing it.

10      Q.  How did you see it?

11      A.  They would start off, and then they would

12  shut the light off and shut the door.  The door

13  had a window on it, though, and light could get

14  in.

15      Q.  So they would turn the light off, shut

16  the door.  There is glass in the door?

17      A.  You can see right through the glass.

18      Q.  There is light outside and it is dark

19  inside, and you can still see inside?

20      A.  Vaguely, yeah.

21      Q.  Did you walk up to the door?

22      A.  No.

23      Q.  Did you laugh about it?

24      A.  I shook my head.



**Marc Smith**

1   Q.  How did that impact you?

2   A.  Crazy way men are acting against men.

3   You know what I mean, like they should be -- what

4   they should be doing with a woman.

5   Q.  Do you think that was discriminatory

6   against you?

7   A.  It should be against everyone that was

8   there.

9   Q.  Why?

10   A.  Because it is --

11   Q.  Well, I understand you found it

12   offensive.  Okay.  We've had that conversation.

13   Did you think they were directing it at you for

14   any reason?

15   A.  No.

16   Q.  Did you ever report that to anyone?

17   A.  No.

18   Q.  Why not?

19   A.  Because he was involved with the stuff

20   too.

21   MR. PRIMOS:  What do you mean?

22   A.  Chuck Broderick was involved with the

23   activity, some of the craziness that went on.

24   Q.  What do you mean?

170                                     **Marc Smith**

1        A.   Some of the man-on-man comments, the

2   man-on-man action, action that was going on, that

3   you would lead to believe that they were

4   homosexual in the way they acted and conducted

5   themselves.

6        Q.   Tell me about Chuck Broderick.

7        A.   Doing the same thing kind of.

8        Q.   What do you mean?

9        A.   Holding, humping and gyrating their hips.

10  Insane stuff.

11       Q.   Well, give me a specific detail.   When

12  did that happen with Chuck Broderick?   I mean you

13  told me about the bumping and grinding in

14  February.   Did it happen again?

15       A.   No.   He never did it to me again, no.

16       Q.   Okay.

17       A.   But to other people.   He would gyrate

18  behind them as you are standing there, and I

19  would be, like, that's crazy.

20       Q.   Is there anything else you can remember

21  that was inappropriate, whether it was directed

22  at you or anyone else?

23       A.   There was other stuff, but I just can't

24  remember it off the top of my head.

**Marc Smith**                    171

1   Q. Do you remember who would have been

2   involved in the other stuff?

3   A. Like Keith Hudson. I don't know the

4   other guy's name anymore. Some of the comments

5   they would say.

6   Q. Well, if you remember Keith Hudson, what

7   do you remember him saying?

8   A. I remember actually his comments about

9   women, always knocking women and stuff like that,

10  and calling them names and stuff like that.

11  Q. Was that directed at you?

12  A. I think it is being said in general.

13  Q. Did you consider that harassing toward

14  you?

15  A. To an extent. I believe I had turned

16  them in for some of their actions. I don't know

17  if anything was ever done.

18  Q. Did you think that was sexually harassing

19  towards you?

20  A. No, not really.

21  Q. Anything else you can think of?

22  A. Not right off the top of my head.

23  Q. Okay. As I said at the beginning, if you

24  think of something --

172                          **Marc Smith**

1    A.   Just come out with it.

2    Q.   -- just let me know and we will unpack

3    it.

4             (Smith Deposition Exhibit 15 was

5    marked for identification.)

6    Q.   Do you recognize this document, Mr.

7    Smith?

8    A.   Yeah, we just recently -- yeah, we

9    discussed some of it.

10   Q.   So this is an intake questionnaire dated

11   3/17/2009; is that right?

12   A.   3/17, yes.

13   Q.   Do you remember what you did with this

14   document?

15   A.   This right here, no.   I don't remember

16   exactly what I did.

17   Q.   Well, do you remember going to the

18   Department of Labor?

19   A.   Yes, I remember that, yes.

20   Q.   Does that help you?

21   A.   Yes, a little bit, yes.

22   Q.   Was it on the 17th of March that you went

23   to the Department of Labor?

24   A.   Yes.



**Marc Smith**

1    Q.  Is that your signature at the bottom?

2    A.  Yes.

3    Q.  Is this your writing?  Did you fill out

4  this form?

5    A.  Yes.

6    Q.  You were given an opportunity to describe

7  your complaint in item No. 4, do you see that?

8    A.  Yes.

9    Q.  What did you identify?

10   A.  I identified the tube steak smothered in

11  drawers.

12   Q.  What else?

13   A.  And others that would harass me.  And

14  Tyson Jefferson and Harry Vanicoli sent a text, a

15  text message at work, had a donkey and a woman

16  making out.  Harry said it was Tyson and it had

17  Tyson Jefferson's cell number.

18   Q.  I thought you said earlier it was a

19  donkey and a woman having sex.

20   A.  Making out, having sex.

21   Q.  You consider them the same thing?

22   A.  Yes.

23   Q.  You consider making out to be the same as

24  having sex?

174                          **Marc Smith**

1      A.   Yes.

2      Q.   All right.   Keep that in front of you,

3   please.

4              (Smith Deposition Exhibit 16 was

5   marked for identification.)

6      Q.   There you go, Noel.

7              Do you recognize this document?

8      A.   Department of Labor document.

9      Q.   This is your charge of discrimination,

10  right?

11     A.   Yes.

12     Q.   It is dated what?

13     A.   Oh.   The 22nd.

14     Q.   Of April?

15     A.   Yes.

16     Q.   So this is more than a month after

17  Exhibit No. 15, which was the intake

18  questionnaire; is that right?

19     A.   Yes.

20     Q.   Is there a reason why you went back to

21  the Department of Labor on April 22nd?

22     A.   I believe the -- I went back with a

23  lawyer at that time.   I can't recall exactly, but

24  I believe I went back with Miss Stratton at the

**Marc Smith**                                        175

```
1   time.
2       Q.  So the lawyer is Barbara Stratton?
3       A.  Barbara Stratton, yes.
4       Q.  Who prepared the charge of
5   discrimination, who prepared the typewritten part
6   of it?
7       A.  I am not sure if they had it prepared
8   there at the Department of Labor or if she did.
9   I believe it was the Department of Labor.
10      Q.  "She" being?
11      A.  Miss Stratton.
12      Q.  I take it you reviewed the document and
13  then signed it?
14      A.  Yes.
15      Q.  What are the allegations you raise in
16  this charge as of April 22nd, 2009?
17      A.  The grinding behind me, tube steak
18  smothered in drawers, the piece of crap comment,
19  reporting offensive behavior to Adrianna Mason
20  and David Jones, both human resources.
21      Q.  Stop right there.  Didn't you tell me
22  earlier that you didn't talk to David Jones?
23      A.  Yeah, but I told you also that I couldn't
24  recollect exactly what time I did talk to him.
```

176                                   **Marc Smith**

1      Q.  So you have identified what we will call

2  the grinding, humping, using your words, the tube

3  steak smothered in drawers, again your words.

4  What else?

5      A.  And the Tyson and the sexual act.

6      Q.  Donkey and a woman in a sexual act?

7      A.  Yes, yes.  And then, well, that brings to

8  mind the next one.  But Harry saying something

9  about Erwin Hall -- I'll just read it.

10      Q.  Go ahead and read it.  You can read it.

11      A.  Vanicoli --

12      Q.  Vanicoli, V-A-N-I-C-O-L-I looks like.

13      A.  -- said he gave Erwin Hall, dispatcher,

14  oral sex.

15             MR. PRIMOS:  Okay.  I don't think

16  that's -- read exactly what it says.

17             THE WITNESS:  "Vanicoli then told

18  Charging Party" --

19  BY MR. AMIOT:

20      Q.  Slow down so she can --

21      A.  I'm sorry.

22             "Vanicoli then told Charging Party

23  that he should give oral sex to Erwin Hall,

24  Dispatcher," in charge --

**Marc Smith**                                                177

1    Q.   "And Charging Party."

2    A.   -- "again complained of harassment.

3    Respondent failed to take action on Charging

4    Party's harassment complaints until 4/09/09 when

5    it finally announced that it would provide sexual

6    harassment training for all employees."

7    Q.   Okay.  So as of April 22nd, 2009, you

8    have identified grinding and humping, tube steak

9    smothered in drawers, the photo that came from

10   Tyson to Mr. Vanicoli on his cell phone, and a

11   comment that you should give oral sex to Erwin

12   Hall?

13   A.   Yes.

14   Q.   Was there anything else that you left

15   out?

16   A.   Again, I can't remember everything.

17   Q.   Well, sir, at the time, though, April

18   22nd, 2009, this was probably pretty fresh in

19   your mind, right?

20   A.   Yes.

21   Q.   And you reviewed the document.  You were

22   with your lawyer.  You reviewed the document and

23   you signed it?

24   A.   Yes.

178                              **Marc Smith**

1      Q.   I mean, don't you think it was complete

2  at the time you signed it?

3      A.   Yeah, it should, yes.

4      Q.   And the purpose of identifying your

5  allegations was to inform the Department of Labor

6  what your complaints were; is that right?

7      A.   Yes.

8      Q.   And your intent was for the Department of

9  Labor to conduct an investigation?

10     A.   Yes.

11     Q.   You wanted the Department of Labor to

12  know what was going on?

13     A.   Yeah, I wanted them to correct the

14  problem.

15     Q.   Your lawyer, Barbara Stratton, was with

16  you at the time?

17     A.   Yeah, I believe she was.

18     Q.   Look at Exhibit No. 15, if you will.  Did

19  anyone assist you in filling out this document?

20     A.   I don't believe so.  I think I just did

21  it when I went there.

22     Q.   What did you mean that Mr. Broderick made

23  his tube steak comment and Mr. Vanicoli showed

24  you a text was meant to discredit your sexual

**Marc Smith**                                    179

1   harassment complaint, what does that mean?

2       A.  Actually, I believe that I was meaning

3   that the reason, along the lines of them writing

4   me up, but I guess maybe I wrote it in wrong.

5   Because of the write-up, they, they wrote me up

6   to try to get rid of the sexual harassment.

7       Q.  But you told me you made your complaint

8   after you were written up.

9       A.  That's why they --

10              MR. PRIMOS:  That's not accurate.

11  But you can answer.

12      A.  They wrote me up because of the

13  complaint, that I went to the Department of Labor

14  to file the complaint because they wrote me up

15  because of these actions.

16      Q.  Say that again.

17      A.  All right.  I turned them in for these

18  actions.

19      Q.  On what day?  Was that your memo, the

20  March 17 memo?

21      A.  I believe that, I believe that was the

22  one.  I turned them in.  They wrote me up for

23  the -- for turning him in for sexual harassment,

24  and then I went there to file a report and gave

182                              **Marc Smith**

1  Department of Labor.

2     Q.  I understand that.  When was the

3  complaint to HR?

4     A.  I guess on the 13th is when I called them

5  and told them about the incident between me and

6  Chuck Broderick, and the other incidents happened

7  between I guess the days, 13th and 17th.

8     Q.  You are saying Vanicoli showed you a text

9  of a donkey and a woman --

10    A.  Yes.

11    Q.  -- to discredit your complaint?

12    A.  Not to discredit it, just -- that's not

13  why.  Okay.  Maybe this was written wrong and it

14  was signed wrong or it was wrong.

15    Q.  Okay.

16    A.  All right.  No one helped me fill it out

17  so it may have been wrong, how it is written

18  down.

19    Q.  All right.  Do you think Mr. Broderick

20  made the tube steak covered in drawers comment

21  because you are a man or because he was harassing

22  you?

23    A.  He said -- harassing me, I guess.  He had

24  something for me and it was a tube steak

**Marc Smith**                                    183

1    smothered in drawers.

2        Q.  I'm asking you, do you think he did that

3    to harass you or because you are a man?

4        A.  I don't know.  Both.  He likes men maybe.

5    And he'd like to get me a tube steak smothered in

6    drawers.

7        Q.  What about the Vanicoli text, do you

8    think he showed you that because you are a man?

9        A.  I think he just showed it to get

10   something started, and he knew that would -- with

11   my -- everything that was going on between the

12   management and me, it would get it going, and it

13   did get it going.

14       Q.  What happened?

15       A.  Well, I turned -- I turned him in for it,

16   turned Tyson in for it.

17       Q.  Do you know what happened with that?

18       A.  I have no idea.  I heard at one time he

19   got written up.

20       Q.  How did you hear that?

21       A.  Just through the grapevine, I guess.

22       Q.  While you were employed at Perdue?

23       A.  Yes.

24       Q.  Looking at Exhibit No. 16, which is the

184                              **Marc Smith**

1   charge, now, with respect to the tube steak

2   comment, you have told me the first time that it

3   was "what is for lunch," then "are you buying

4   lunch," and here it says "what was being served

5   for lunch."  Do you see that?

6       A.   Mm-hmm.

7       Q.   So now we have three versions.  Which one

8   is correct?

9       A.   I guess the buying one.  Maybe it is the

10  lady, when she wrote it up, wrote it up and wrote

11  it wrong.

12      Q.   But you reviewed this with your lawyer

13  and signed it, right?

14      A.   Yes.

15      Q.   But you are sticking with buying, "are

16  you buying lunch"?

17      A.   Yeah.

18      Q.   Take a look, we are still on

19  Exhibit Number 16, three pages in there is a

20  harassment questionnaire attached.  Is that your

21  handwriting?

22      A.   Yes.

23      Q.   And it is dated 3/17/09?

24      A.   Yes.



**Marc Smith**                                    185

1      Q.   1a, do you see that?

2      A.   Yes.

3      Q.   Here you are saying that the tube steak

4  comment was made twice.   That's new to me.   Was

5  it made once or twice?

6      A.   Evidently twice.

7      Q.   Evidently twice?

8      A.   Yeah, it says it right here.   That's a

9  fact.

10     Q.   What about the other three times you told

11 me about it, it was only once?

12     A.   I can't remember everything, buddy.

13     Q.   You can't what?

14     A.   I can't remember everything.

15     Q.   Well, tell me how this comment was made

16 twice then.   Because I asked you specifically if

17 you remember if he had ever said the words "tube

18 steak" before and you said no.   So how did this

19 happen twice?

20     A.   I guess two days in a row.

21     Q.   You guess two days in a row?

22     A.   Two days in a row.   Not guess.   Two days

23 in a row.

24     Q.   Do you remember?   Or are you telling me

186                         **Marc Smith**

1    that because you are reading it?

2        A.   Well, it was refreshed in my mind.   No,

3    I'm telling you because I read it.

4        Q.   What was the second incident?

5        A.   The second incident was the 13th.

6        Q.   What was the first incident?

7        A.   I guess the 12th.

8        Q.   What was it?

9        A.   The tube steak smothered in drawers.

10       Q.   What happened on the 12?

11       A.   I can't recall.

12       Q.   Where were you?   Remember, you are under

13   oath.

14       A.   Yeah, I know.   I'm not sure exactly what

15   I was doing.

16       Q.   But you put it down here that he said

17   this to you on --

18       A.   Yes.

19       Q.   -- the 12th.   Why is that not in any

20   other documents you submitted to the Department

21   of Labor or in your complaint that you filed in

22   court?

23       A.   I don't know.

24       Q.   Could this be a mistake?

190                           **Marc Smith**

1       A.   Was it the date?

2       Q.   Well, this is signed on March 17, so I'm

3   not sure that makes sense.

4       A.   I have no idea why.

5       Q.   The third page, the next page.   At the

6   top you admit that Chuck never touched you, just

7   that he was really close?

8       A.   Mm-hmm.

9       Q.   Is that right?

10      A.   Yes.

11      Q.   There is no physical touching?

12      A.   Yes.

13      Q.   Do you know when Perdue received the

14  charge of discrimination?

15      A.   I'm not really sure.   Just by what she

16  told me about the date it was sent out.

17      Q.   Who is "she"?

18      A.   Miss Stratton, sorry, told me that they

19  received it probably in early May.

20      Q.   But you have no evidence to show when

21  Perdue received it?

22      A.   No.

23      Q.   Just what your lawyer suggested may have

24  happened?

**Marc Smith**                    191

1        A.   Yeah, yeah.   Yes.

2                 MR. AMIOT:   Why don't we take a lunch

3    break.

4                 MR. PRIMOS:   Sure.

5                 (Lunch recess taken.)

6    BY MR. AMIOT:

7        Q.   Mr. Smith, let's talk about May 9th,

8    2009.   Do you remember that day?

9        A.   Yes.

10       Q.   Do you recall that Tyson assigned you to

11   work that day?

12       A.   Yes, I do.

13       Q.   That it was a Saturday?

14       A.   Yes.

15       Q.   And do you recall that you weren't happy

16   about working that Saturday?

17       A.   No, that's not the cause.   The cause was

18   Keith Hudson, and I forgot the other maintenance

19   guy, they were harassing me, messing, and I got

20   upset, like really upset, and I couldn't think

21   straight.   I was a little flustered, so I called

22   and tried to --

23       Q.   Let's slow down here.   My question was

24   just when you got assigned to work Saturday, in

192                          **Marc Smith**

1   other words, when you were told you had to work

2   Saturday as utility operator, which was I

3   understand part of your job, you were upset about

4   it, weren't you?

5       A.   No.

6       Q.   You had to work on a Saturday?

7       A.   No.

8       Q.   During your shift was there a time when

9   the elevator got plugged and you had to ask the

10  maintenance guys to help you unplug it?

11      A.   I can't recall that.  I don't -- I'm not

12  sure.

13      Q.   You don't recall there being a machinery

14  malfunction on that day?

15      A.   No.  There is a lot of stuff that goes

16  wrong, lights and stuff.  I'm not sure.  It is

17  possible that, yes, it could have happened.

18      Q.   And the two maintenance employees you

19  just identified, who were they?

20      A.   Keith Hudson.  I forgot the other

21  gentleman's name.

22      Q.   You don't recall asking them to help you

23  unplug an elevator?

24      A.   No, I don't recall that.

**Marc Smith**                          193

1     Q.   Could it have happened?

2     A.   Yes, it could have.

3     Q.   Was Chuck Broderick working that day?

4     A.   No.

5     Q.   Do you know where he was?

6     A.   Probably home.

7     Q.   What is that?

8     A.   Probably home.

9     Q.   Do you recall that he was out of state at

10    his daughter's graduation?

11    A.   Yeah, North Carolina or South Carolina,

12    something along that lines.

13    Q.   So you recall that?

14    A.   Yes.

15    Q.   What about Tyson?

16    A.   Home.

17    Q.   Who else was working that day?

18    A.   Gene Wilder, I think that's his name.

19    Q.   Probably not Gene Wilder.

20             (Discussion off the record.)

21    Q.   Eugene Wilder?

22    A.   Yes.

23    Q.   Who else?

24    A.   Joe Malone.  Alex Quebral.  Starts with a

194                              **Marc Smith**

1    Q, Quebral.

2              MR. BRODERICK:   Q-U-E-B-R-A-L.

3    Q-U-E-B-R-A-L.

4        A.   And Keith Hudson, along with, I don't

5    know why -- I can't remember, a young guy.

6        Q.   Another maintenance employee?

7        A.   Yeah.

8        Q.   Keith Hudson and this other gentleman

9    were the maintenance employees.   What did Alex

10   do?

11       A.   Alex was a -- him and Joe Malone were in

12   receiving.

13       Q.   In receiving?

14       A.   Yes.

15       Q.   Joe Malone was in receiving.   Where was

16   receiving compared to where you were in the panel

17   operator position?

18       A.   It is in the back of the mill.

19       Q.   Different part of the mill?

20       A.   Different part, yeah.

21       Q.   Eugene Wilder, what did he do?

22       A.   Dispatcher.

23       Q.   Dispatch.   Can you see him from the panel

24   operation area?



**Marc Smith**                                   195

1      A.   Yeah, I do if I turn my head, yeah.

2      Q.   What time did you start your shift?

3      A.   6:00 or 7:00, I believe.

4      Q.   In the morning?

5      A.   Yes.

6      Q.   I take it at some point you started

7   placing calls to Chuck and to Tyson?

8      A.   Tyson, and to one of the other panel

9   operators, see if they would come in early.

10     Q.   See if they would come in early?

11     A.   Yeah.

12     Q.   Who was the other panel operator you

13  called?

14     A.   I can't remember his name.  Chuck

15  Broderick might know.

16     Q.   Do you remember what time this was when

17  you started making these phone calls?

18     A.   10'ish, between 10:00, 11:00.  I'm not

19  sure exactly, the exact time.

20     Q.   10:00 or 11:00.  Tell me what happened.

21     A.   I was making calls to see if I could go

22  home.  I just -- I was stressed out.

23     Q.   You were stressed out?

24     A.   Stressed out, and I was just, was upset

196                              **Marc Smith**

1    and I just didn't think I should be at work.   I

2    felt bad.

3        Q.   Go ahead.

4        A.   Oh.   And then I was calling to try to go

5    home.   I didn't feel well.   So I got ahold of I

6    believe Tyson.   And they said I couldn't leave.

7    But I felt I wasn't in a position to run the

8    machines.

9        Q.   Okay.   When you say you were stressed

10   out, what were you stressed out about?

11       A.   Keith and the other guy were harassing

12   me.

13       Q.   What do you mean by harassing you?

14       A.   Giving me a hard time, and, about like

15   some of the stuff that was going on in the mill.

16       Q.   What were they saying?

17       A.   Actually, they were basically saying that

18   I was -- we had some comments back and forth.

19   I'm not sure exactly.   He said he was going to

20   come down and show me a real man, what a real man

21   was, I guess beat me up or something.   I never

22   seen him.

23       Q.   Okay.

24       A.   I ended up shutting the machines down,



**Marc Smith**                                    197

1   clearing them out, and then leaving.  I couldn't

2   get ahold of no one.  I left messages.

3        Q.  You admit you were not given permission

4   to leave for the day, right?

5        A.  Yes.

6        Q.  And isn't it actually true that you left

7   the machine running, some of the machinery

8   running?

9        A.  No.

10       Q.  You just left the site?

11       A.  No, that's not true.

12       Q.  Well, if other employees like Tyson and a

13  couple other employees say they had to come in

14  and shut the machinery down, would they be lying?

15       A.  Yes, they would be lying.

16       Q.  What time did you clock out?

17       A.  Noon, somewhere around noon.

18       Q.  Noon.  How much more time did you have

19  left on your shift?

20       A.  I want to say 3:00 o'clock is when I was

21  supposed to be -- to leave.  Somewhere around

22  that.

23       Q.  Did you have any other communications

24  with -- go ahead.

198                          **Marc Smith**

1     A.   I'll turn it off.   Go ahead.

2     Q.   Well, tell me what your first

3   communication was with Chuck Broderick.

4     A.   I don't know if I talked to him, if I did

5   talk to him or not.   I left a message or

6   something along the lines that I needed to go

7   home.   I don't know if he referred me to Tyson or

8   something along them lines.   Basically said I

9   couldn't leave.

10             So, and I tried to get ahold of the

11  other panel operator.   I couldn't get ahold of

12  him, so...

13    Q.   So you just decided to leave?

14    A.   Yes.

15    Q.   Did you speak with David Jones?

16    A.   I may have called his number.   I don't

17  know if I spoke with him or left a message.   I

18  can't be too sure.

19    Q.   After you left where did you go?

20    A.   I sat out in the parking lot for a little

21  bit before I left, and then I left and went home.

22    Q.   Did you talk with anybody in Perdue

23  management after you left?

24    A.   No.



**Marc Smith**

1    Q.  When was the next time you had a

2  communication with somebody from Perdue?

3    A.  When I came in Monday morning.

4    Q.  So that was May 11th?

5    A.  May 11th, yes.  Keith and them got there,

6  and I started explaining what happened, and I

7  guess went into a panic attack or something along

8  the line.  I was, like -- I called.  I was, like,

9  can you guys take me to the wellness center, and

10 before they took me to the wellness center,

11 eventually.

12    They called me back, and they were

13 suspending me, told me to leave.  I was, like, I

14 need to go to the wellness center, and I called

15 the HR, and they told me to call the ambulance to

16 come get me.  And so I called the ambulance.

17 They came and got me.

18    Actually, Chuck -- not Chuck.  Hurdle

19 Mitchell and Tyson were trying to get me to leave

20 the property.

21    Q.  Is he the other maintenance employee?

22    A.  He is the manager, yes.  I was, like, the

23 ambulance is on the way to come get me.  Valerie

24 and them -- I think Valerie told me to stay there

200                            **Marc Smith**

1   until the ambulance got there and then leave with

2   them and go with the ambulance.

3              And then Hurdle and them were telling

4   me that you got an hour to get your vehicle off

5   the property or we are going to have it towed.

6        Q.   Let's back up to when you first came in.

7   You talked to Tyson Jefferson?

8        A.   No, I didn't talk to Tyson.

9        Q.   Who did you talk to?

10       A.   I called --

11       Q.   When you first came in that morning on

12  the 11th?

13       A.   I forgot which manager I called first.   I

14  may have mentioned something to Hurdle and told

15  him that I needed to go to the wellness center.

16       Q.   Didn't you come into work, though?

17       A.   Yeah.

18       Q.   So who did you talk to when you came into

19  work?

20       A.   I believe it was Hurdle Mitchell.

21       Q.   Did you ever talk to Tyson?

22       A.   Yeah, I believe I called Tyson too and

23  talked to him, and then they all --

24       Q.   Because you knew you were being



202                              **Marc Smith**

1      Q.  And you were coming back to work on

2   Monday morning.  Didn't you think something was

3   going to happen?

4      A.  Nothing was going to happen.  They only

5   -- because I wanted to go to the wellness center.

6   They had no intentions of suspending me.

7      Q.  How do you know that?

8      A.  Because why would they wait until after

9   -- why would they wait and not call me on Sunday

10  and tell me not to come in?

11     Q.  Well, it sounds to me like you didn't

12  talk to anybody.

13     A.  Well, why wouldn't they call me?

14     Q.  Let me ask you the questions, okay?  Did

15  you talk to anybody at Perdue on Monday morning

16  other than Hurdle Mitchell?

17     A.  No.

18     Q.  Did you see anybody?

19     A.  No.

20     Q.  What evidence or facts do you have to say

21  that no one was going to suspend you after

22  walking off the job on Saturday without

23  permission?

24     A.  Well, I don't have any evidence.  But why

**Marc Smith**                                    203

1   would they -- it doesn't matter.

2       Q.  All right.

3       A.  Go ahead.

4              (Smith Deposition Exhibit 17 was

5   marked for identification.)

6       Q.  I take it you have seen this document?

7       A.  No.

8       Q.  You have never seen this document?

9       A.  No.

10      Q.  Until I just handed it to you right now?

11      A.  I, I...

12             MR. PRIMOS:  You have to answer.

13      A.  No.  I'm sorry.

14      Q.  Did you ever meet with Tyson Jefferson on

15  the 11th?

16      A.  No.

17      Q.  Do you remember meeting with Hurdle

18  Mitchell?

19      A.  I remember him being there and saying

20  they were going to take me to the wellness

21  center.

22      Q.  Do you recognize Hurdle Mitchell's

23  signature there at the bottom, says "refuse to

24  sign"?

204                        **Marc Smith**

1     A.   Yes.

2     Q.   Is that his signature?

3     A.   It says "Hurdle Mitchell."

4     Q.   Okay.  What do the comments say?

5     A.   "On May 9, 2009 Marc was schedule to work

6   from 7 a.m. to 3 p.m.  Marc walked off the job at

7   12:13 p.m."

8     Q.   Do you know who made the termination

9   decision?

10    A.   Probably David Jones.

11    Q.   When did you learn of the discharge then?

12    A.   Actually, they told me as I was,

13  somewhere as I was being loaded into the

14  ambulance or somewhere around there, they were

15  trying to make me leave the property.

16    Q.   Who told you?

17    A.   Tyson and Hurdle.

18    Q.   What did they say?

19    A.   They told me I was suspended.  But I

20  never seen this.

21    Q.   Were you ever --

22         MR. PRIMOS:  Just for the record,

23  when you say "this" you mean Exhibit 17?

24         THE WITNESS:  Exhibit 17.

**Marc Smith**                                                    205

1    BY MR. AMIOT:

2        Q.  At some point were you told you were

3    terminated?

4        A.  Three-day suspension, and then supposed

5    to meet with David Jones over in Georgetown, but

6    he -- he never had me meet -- he never had a

7    meeting.  He called me and told me I was no

8    longer employed with Perdue Farms.

9        Q.  Did he tell you why?

10       A.  Because I walked off the job.

11       Q.  What facts or evidence do you have to

12   establish that you were terminated for

13   complaining to human resources about sexual

14   harassment?

15       A.  All I have is what I have written down.

16       Q.  Tell me now, what do you have?

17       A.  Just what I've written down.  The order

18   of things that happened.  I complained, they

19   wrote me up.  I kept complaining, and they

20   finally, one thing led to another, and finally

21   they had grounds to terminate me.

22       Q.  And finally they had grounds to terminate

23   you?

24       A.  Yeah, or --

206                         **Marc Smith**

1      Q.   You admit you walked off the job, right?

2      A.   Yes.

3      Q.   And that's a terminable offense?

4      A.   Yes.

5      Q.   Other than the timing, which is really

6   what you are saying, the timing of events, do you

7   have any facts or evidence to establish that you

8   were discharged because you complained to human

9   resources?

10     A.   No.

11     Q.   Do you contend that Mr. Jones, human

12  resources manager for that facility, and others,

13  retaliated against you for complaining to him in

14  his capacity as a human resources manager?

15     A.   Somewhere along the line of that, yes.

16     Q.   What evidence or facts do you have to

17  establish that?

18     A.   Just the order of events.

19     Q.   That's all you have?

20     A.   Yes.

21     Q.   No comments?  No statements?  No written

22  communications?

23     A.   There is what I have written and the

24  letters that you've had and all that stuff.

**Marc Smith**                                    207

1     Q.   Meaning the sequence of events?

2     A.   Yes.

3     Q.   The timing of events?

4     A.   Yes.

5     Q.   But nothing else?

6     A.   Nothing else.

7              (Smith Deposition Exhibit 18 was

8     marked for identification.)

9     Q.   Do you recognize this document, Mr.

10    Smith?

11    A.   Yes.

12    Q.   It looks like you signed the document in

13    two places at the bottom; is that right?

14    A.   Yes.

15    Q.   And the date of that signature was August

16    3rd, 2009?

17    A.   Yes.

18    Q.   I think we have talked about this.  Just

19    to make sure I'm clear, it says, "The charge was

20    served on Respondent on approximately May 6,

21    2009."  Do you see that in the middle of the

22    paragraph, "Brief statement of allegations"?

23    A.   Where is that?

24    Q.   Second line under "Brief statement of

208                         **Marc Smith**

1  allegations," I'm sorry, third line.

2      A.  May 6.

3      Q.  Right.  Didn't you tell me that you came

4  up with that date because your lawyer told you

5  she thought that's when it would have been

6  served, in the mail?

7      A.  Yeah.  Yes.

8      Q.  Further down you identify an individual

9  by the name of Richie Oliphant?

10     A.  Yes.

11     Q.  Do you see that?  He was a driver, right?

12     A.  Yes.

13     Q.  He had a completely different job than

14  you?

15     A.  Yes.

16     Q.  Different supervisor?

17     A.  Yes.

18     Q.  Different hours?

19     A.  Yes.

20     Q.  Different responsibilities?

21     A.  Yes.

22     Q.  When did he leave the site?

23     A.  I don't know exactly when.

24     Q.  You say he left the site without



**Marc Smith**                    209

1   permission and without recourse.   When did that

2   happen?

3       A.   A little before 10:00 I believe,

4   somewhere around there.

5       Q.   On what day?

6       A.   May 9th.

7       Q.   The same way you walked off the job?

8       A.   Yes.

9       Q.   How do you know it was without

10  permission?

11      A.   He didn't call no one, do any of that.

12      Q.   How do you know?

13      A.   He just didn't.

14      Q.   How do you know?

15      A.   I, I don't know.

16      Q.   Okay.   How did you come up with this name

17  to make this allegation?

18      A.   Because I know Richie.

19      Q.   Well, you saw him leave?

20      A.   Yeah.

21      Q.   Do you know his hours?

22      A.   Well, at that time, yeah, their hours,

23  they had to come in and work -- well, it was a

24  Saturday.   They have a certain amount of hours

210                        **Marc Smith**

1    they are supposed to work each day.  But he

2    didn't meet them hours.

3        Q.  You don't know whether he had permission

4    to leave?

5        A.  From what he said, no, he didn't.

6        Q.  When you say "without recourse," what

7    does that mean?

8        A.  I didn't use that word.  Where is that?

9        Q.  It says he "left the site without

10   permission and without recourse."

11       A.  I -- they typed that up.  I didn't.

12       Q.  Who prepared this document?

13       A.  Department of Labor or Miss Stratton.

14       Q.  Why did you file this charge of

15   discrimination?

16       A.  Retaliation.

17       Q.  What does that mean?  What did you mean

18   by that?

19       A.  Retaliation.  They retaliated for the

20   sequence of events that happened.

21       Q.  The timing of your discharge?

22       A.  Yes.

23       Q.  Compared to the timing of your

24   complaints?



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

**Marc Smith**                                    211

1     A.   Yes.

2     Q.   Any other reason?

3     A.   No.

4     Q.   Do you recall if you went into the

5  Department of Labor twice to file this charge or

6  just once?

7     A.   I went in on the 17th and then I came

8  back again with Miss Stratton.

9     Q.   With Miss Stratton?

10    A.   Yes.

11             MR. PRIMOS:  When you say "this

12  charge" you are referring to Exhibit 17?

13             THE WITNESS:  18.

14             MR. PRIMOS:  I mean 18.

15             MR. AMIOT:  18, yes.

16             THE WITNESS:  Miss Stratton was with

17  me on this one.

18  BY MR. AMIOT:

19    Q.   What happened on your first visit to the

20  Department of Labor in connection with this

21  retaliation charge?

22    A.   What do you mean?

23    Q.   What did you do on your first visit

24  there?

212                                **Marc Smith**

1      A.  I told them I was there.  They gave me
2   the forms to fill out and I filled them out.
3      Q.  Did you fill them out or did your lawyer?
4      A.  I filled them out the first time.  I
5   believe she did the second time.
6      Q.  Okay.
7      A.  I believe.
8              (Smith Deposition Exhibit 19 was
9   marked for identification.)
10     Q.  Have you seen this document, Mr. Smith?
11     A.  Yes.
12     Q.  Who prepared this chronology for you?
13     A.  Miss Stratton.
14     Q.  That's your lawyer?
15     A.  Yes.
16     Q.  She is your lawyer, rather.  When did
17  that occur?
18     A.  I'm not sure of the exact date.
19     Q.  Were you involved in the preparation of
20  this document?
21     A.  I gave her the documents that I had,
22  everything that I had, and she prepared it
23  herself.
24     Q.  Did you review it before it was



**Marc Smith**                              213

1    finalized?

2       A.   Yes.

3       Q.   Did you make any revisions to it?

4       A.   I believe I did here and there.  I'm not

5    sure exactly what they were at the time.

6       Q.   When did you first see it?

7       A.   It has been a long time.  Way over --

8       Q.   Well, if you went to the Department of

9    Labor to file a charge in August of 2009, does

10   that help you?

11      A.   Maybe the first of the year, maybe,

12   somewhere.  I'm not exactly sure what time she

13   sent the paper to me.

14      Q.   Wasn't this prepared in connection with

15   the filing of a retaliation charge?

16      A.   Yes.

17      Q.   Which was not until August, right?

18      A.   Yes.

19      Q.   Are you familiar with the contents?

20      A.   Not all of the -- I mean, I'm pretty sure

21   I know them if I read them and, you know what I

22   mean.

23      Q.   When was the last time you saw this

24   document?

214                          **Marc Smith**

1      A.   I skimmed through it not too long ago.

2      Q.   In preparation for the deposition?

3      A.   Yes.

4      Q.   You admit as you are sitting here that it

5   has much more detail in it than anything else you

6   submitted to the Department of Labor, right?

7      A.   Yes.

8      Q.   Do you also admit that it contains

9   allegations of misconduct that were not before

10   raised before the Department of Labor?

11      A.   Yes, it has allegations that weren't

12   raised, yes.

13      Q.   Well, you told me earlier you wanted the

14   Department of Labor to investigate your concerns?

15      A.   Yes.

16      Q.   And that you wanted to tell them

17   everything you knew to investigate, and that you

18   did that, right?

19      A.   Yes.

20      Q.   Well, why is it that the Smith chronology

21   finally comes out in July or August of 2009 with

22   a lot more information in it?

23      A.   When I submitted it I thought that the

24   lawyer would, you know what I mean, since they

**Marc Smith**                                                 215

1    were working together they would see that.  It

2    was all together.

3        Q.  See what?

4        A.  See the stuff, the other evidence or the

5    other written documents would be added to it.

6        Q.  You read the forms and signed them,

7    right?

8        A.  Yes.

9        Q.  And you saw what was in there and what

10   wasn't in there?

11       A.  Yes.

12       Q.  And you admit that this chronology

13   contains a lot more information than any of those

14   prior documents that you submitted to the

15   Department of Labor?

16       A.  Yes.

17       Q.  Well, go ahead and look at the document.

18            Actually, before you look at that, we

19   took a break, we took a lunch break.  Have you

20   thought of any other incidents, whether directed

21   at you or anyone else, while you are sitting

22   here, before you start reading the words on these

23   pages?

24       A.  No, I haven't.

216                              **Marc Smith**

1      Q.   So the only way you will remember is by

2    looking at a chronology that your lawyer

3    prepared; is that right?

4      A.   Yes.

5      Q.   That's the only way you will remember

6    those other incidents?

7      A.   Yes, the exact incidents, yes.

8      Q.   And absent this chronology that your

9    lawyer prepared you wouldn't have any other way

10   of coming up with those incidents?

11     A.   I have stuff written at home, my own

12   documents of the stuff that I wrote down, stuff

13   that she used to put into this.

14     Q.   So you would either have to look at those

15   notes or this chronology?

16     A.   Yes.

17     Q.   Well, before we get into this, then, let

18   me, might as well get those into play.

19               (Smith Deposition Exhibit 20 was

20   marked for identification.)

21     Q.   Are these the notes and pieces of paper

22   you referenced earlier you submitted --

23     A.   Yeah.

24     Q.   -- to have your lawyer prepare the



**Marc Smith**

1    chronology?

2       A.   Yes.

3       Q.   And the words of the pages on the

4    chronology are your lawyer's words, right?

5       A.   Yes.

6       Q.   Do these notes, and this is Exhibit 20,

7    and the chronology which is Exhibit 19, do those

8    two exhibits collectively capture all of the

9    misconduct you allege in this case?

10      A.   Yes.

11      Q.   There is nothing else out there other

12   than what is on these pages?

13      A.   Yes.   I mean, there is too many events to

14   actually -- yes, yes.

15      Q.   Is there anything that you know of in

16   these notes that is not in the chronology?

17      A.   No.

18      Q.   So everything that's in this Exhibit 20

19   should be in the chronology?

20      A.   Everything in here is in here.

21      Q.   Okay.

22      A.   Yes.

23      Q.   Let's go back to the chronology.   I

24   understand the chronology contains various

218                              **Marc Smith**

1   instances of misconduct, some directed at you and

2   some occurring, you know, just in your presence;

3   is that right?

4       A.  Yes.

5       Q.  Looking at the chronology and based on

6   what we have talked about today, are there any

7   allegations of harassment that you contend

8   occurred because you are a man?

9       A.  Yes, if they like men.

10      Q.  What do you mean "if they like men"?

11      A.  Well, because I'm a man, if they -- say

12  it again, I'm sorry.

13      Q.  Which instances of misconduct in this

14  chronology or in this case do you contend

15  occurred solely because you are a man?

16      A.  All right.  Well, if, if they are

17  interested in homosexual lifestyle and when they

18  came on to me or did things to me.

19      Q.  Who came on to you?

20      A.  Touching me is coming on to me.

21      Q.  You just pointed to Mr. Broderick.  I

22  thought you said he never touched you.

23      A.  He has touched me.

24      Q.  I thought you said he never touched you.

Marc Smith                                                        219

1      A.   Never said that.  You read that earlier.

2      Q.   So what you wrote was not correct, that

3  he never touched you?

4      A.   He has touched -- he has touched me

5  before.

6      Q.   All right.  Take me through the

7  allegations you contend, tell me what instances

8  of misconduct occurred because you are a man.

9  You can use your chronology.  You can look

10  through it.

11      A.   Thinking I'm gay, he is thinking that I'm

12  gay, and he could do things like that.  Because

13  he, I guess --

14      Q.   I thought you told me at the beginning of

15  the deposition no one ever told you you were gay?

16      A.   They are gay and assuming -- they are gay

17  and what they do, their actions towards me.

18      Q.   How do you know they are gay?

19      A.   I don't know.  The way they act.  How do

20  you know they are not?

21      Q.   How do you know they are gay?  What facts

22  or evidence do you have to establish that any

23  person at your plant is gay?

24      A.   The way they talk.  The way they carry

**Marc Smith**

220

1   themselves.

2       Q.   I need to know exactly what you are

3   talking about.

4       A.   The dry humping each other.

5       Q.   Was that directed at you?

6       A.   No.

7       Q.   What else?

8       A.   The grinding up behind me.  The telling

9   me that I need to give someone else oral sex.

10      Q.   Does that mean somebody is gay?

11      A.   Yeah.

12      Q.   So if somebody makes a comment that's

13  sexual, right, and it is directed at you, if a

14  male makes a comment that's sexual and it is

15  directed at you as a male, that means that the

16  person who is making the statement is gay?

17      A.   They have some kind of -- yes.

18      Q.   Other than the fact of the statements

19  that you allege in this case, do you have any

20  evidence that anyone at the facility is gay?

21      A.   No.

22      Q.   Other than the fact of the statements

23  that you allege in this case, do you have any

24  evidence that anyone was trying to come on to

**Marc Smith**                                                        221

1   you?

2       A.   No, just what I have admitted.

3       Q.   Just the statements?

4       A.   Yes.   Submitted.

5       Q.   All right.   Continue telling me which of

6   these allegations of misconduct occurred because

7   you are a man.   Go through the chronology.

8       A.   The bumping and grinding.

9       Q.   Was there any more to that event, any

10  conversation, other than the occurrence of the

11  bumping and grinding?

12      A.   No.   I turned around and pushed him back

13  and told him that was it, basically.

14      Q.   Did he ever say, "I'm gay"?

15      A.   No.

16      Q.   Did Mr. Broderick ever say, "I'm gay"?

17      A.   No.

18      Q.   Did he ever ask you if you are gay?

19      A.   No.

20      Q.   Did anyone ever accuse you of acting

21  effeminately?

22      A.   No.

23      Q.   Did you ever accuse anyone at the plant

24  of being effeminant?

222                              **Marc Smith**

1      A.   No.

2      Q.   Did you ever accuse anyone at the plant

3   of being gay?

4      A.   No.

5      Q.   Did you ever say it to anybody, that you

6   thought somebody was gay?

7      A.   No.

8      Q.   All right.   Go ahead.   Tell me what next

9   allegation of misconduct occurred because you are

10   a man.

11      A.   Well, Kenny Ross yelled Smith's --

12      Q.   What page are you on?

13      A.   4.

14      Q.   Page 4 of the chronology which is Bates

15   stamped P000193.   Which paragraph?

16      A.   23.  No.  Yeah, it is in 23.  This is,

17   "Sexual harassment continued.  On March 17th,

18   2009 Vernon Russell, a co-worker, told Smith to

19   get his knee pads on.  Kenny Ross" --

20      Q.   "To get his knee pad ready"?

21      A.   I'm sorry, ready.

22           -- "another co-worker, yelled

23   Smith's," my name, and said," blow him, "'blow

24   me.'"

**Marc Smith**                                         223

1      Q.  You didn't remember that until you saw it

2   on this page, right?

3      A.  Yeah.

4      Q.  Why is that?

5      A.  There is just so much stuff here to take

6   in.

7      Q.  We will go through it all.  Was there any

8   other conversation related to that communication

9   where he yelled "blow me"?

10     A.  What is that?

11     Q.  Was there any other discussion?

12     A.  No.

13     Q.  Any other context you can give me for

14  what happened when you had communication?

15     A.  No.

16     Q.  Did he say, "I'm gay"?

17     A.  No.

18     Q.  Did he say, "You are gay"?

19     A.  No.

20     Q.  All right.  What is the next allegation?

21     A.  I guess the Louis Hudson one.  "What's up

22  girlfriend?"

23             And asked if it is sore, referring to

24  his butt being sore, saying to Smith, "Don't

224                         **Marc Smith**

1   worry, I still love you."

2       Q.   What does that mean?

3       A.   My butt is still sore?

4       Q.   What does that entry mean, paragraph 24?

5       A.   Referring to his butt being sore.

6       Q.   Right.

7       A.   I guess anal sex.

8       Q.   Did you have anal sex with him?

9       A.   No.

10      Q.   Did he ever ask you to have anal sex with

11  him?

12      A.   No.

13      Q.   Did you ever ask him if you could have

14  anal sex with him?

15      A.   No.

16      Q.   Did it ever come up?

17      A.   No.

18      Q.   It was just the single comment, right?

19      A.   Yes.

20      Q.   What is the next allegation that you

21  allege occurred because you are a man?

22      A.   Well, 36, on page 6.  We have already

23  discussed that.

24      Q.   This is the --



**Marc Smith**

1    A.   Oral sex.

2    Q.   -- donkey and a woman?

3    A.   Down lower.

4    Q.   Well, let's look at that.   This entry

5  says something a little slightly different, says

6  "a donkey and a woman making out," right?

7    A.   Yes.

8    Q.   Isn't that different than what you told

9  me earlier?

10   A.   No.   I said it is having sex.

11   Q.   Oh, right.

12   A.   You said it was different.

13   Q.   So you still maintain that kissing is

14  having sex?

15          MR. PRIMOS:   He said making out, not

16  kissing.

17   Q.   Making out is having sex?

18   A.   Yes.

19   Q.   So when you make out with somebody you

20  are having sex with them?

21   A.   Yes.

22   Q.   So when --

23   A.   Your definition of it and mine are two

24  different things.

226                                    **Marc Smith**

1      Q.   They very much are.

2              And looking at paragraph 36, let's

3   break it down, the fact Vanicoli showed you a

4   picture on a cell phone, how was that harassment

5   because you are a man?

6      A.   Well, I was actually pointing out the

7   bottom half.

8      Q.   So that first part is not because you are

9   a man?

10     A.   No, it was just to get things stirred up.

11     Q.   Okay.  Vanicoli told you to get on your

12  knees and give some other guy oral sex?

13     A.   Yes.

14     Q.   So who is gay in that scenario?

15     A.   I guess it would be me.

16     Q.   You are gay?

17     A.   Yes.

18     Q.   So now they are saying you are gay?

19     A.   Yes.

20     Q.   But Vanicoli is not gay and Hall is not

21  gay?

22     A.   Not that I know of.

23     Q.   And you are not gay?  You know you are

24  not gay?

**Marc Smith**

1    A.   Yes.

2    Q.   Right?

3    A.   Yes.

4    Q.   Okay.   What is the next allegation that

5    you think was inflicted on you because you are a

6    man?

7    A.   That was it.

8    Q.   So you reviewed all of Exhibit No. 20 and

9    there are no other incidents of misconduct that

10   you can identify other than what we have already

11   talked about?

12   A.   Yeah.

13   Q.   Why don't you go ahead and look at the

14   handwritten notes then and tell me if there is

15   anything in there, go ahead, that you may have

16   missed in the chronology.   Any incidents of

17   misconduct that you believe were directed at you

18   because you are a man.

19   A.   I'm finished.

20   Q.   All right.   Is there anything we have not

21   otherwise identified in this deposition in your

22   written notes that involves an allegation of

23   misconduct that you believe was directed at you

24   because you are a man?

**Marc Smith**

228

1      A.   No.

2      Q.   Now, with respect to these notes, this

3  collection of notes, did someone tell you to

4  start writing notes?

5      A.   No.  I did it on my own.

6      Q.   When did you make that decision?

7      A.   I believe I made it -- I'm not even sure.

8  I started writing them because -- to protect

9  myself, everything that was going on, and just

10  document what was going on.  They would say one

11  thing to one set of panel operators, they

12  wouldn't do something, and then they would say

13  something to me.

14      Q.   Why is it these notes never came to life,

15  though, until you filed your second charge in

16  August of 2009?

17      A.   They were -- she had the notes.

18      Q.   Who is "she"?

19      A.   Miss Stratton.

20      Q.   Do you know why these were never provided

21  to the Department of Labor until August of 2009?

22           MR. PRIMOS:  Objection, foundation.

23  You can answer.

24      A.   I'm not sure why.



232                              **Marc Smith**

1    the -- to go see the Department of Labor, I told

2    her about them, and I believe I gave her some,

3    and then I gave the rest of them after I got

4    fired.

5         Q.   In May?

6         A.   Yes.   I believe she had them all in May.

7         Q.   Well, how is it you were talking to your

8    lawyer about the retaliation charge before you

9    got fired?

10        A.   I had called and got her number.

11        Q.   Well, no.   Did you mean to say that you

12   were talking to your lawyer about a retaliation

13   charge before you got fired?   Or did you talk to

14   her about retaliation after you got fired?

15        A.   I think it was afterwards, when I filed

16   it.

17        Q.   So that information with the notes would

18   have been after you were discharged?

19        A.   Yeah, yeah.

20        Q.   Let's go back to your chronology for a

21   moment.   I think I asked you on the day of May 9,

22   I think I asked you if the elevator had gotten

23   plugged or some kind of machinery had --

24        A.   You said elevator.



**Marc Smith**                                      233

1      Q.  Okay.  Maybe I didn't ask it right.  Did

2  any machinery break down?

3      A.  Possible, yeah.

4      Q.  Do you recall if something broke down?

5      A.  I don't really recall.  I mean, what I

6  read in the notes.  But I guess it is, yes.

7      Q.  But you don't remember other than seeing

8  the chronology?

9      A.  Exactly what it is.  I don't even know

10  what equipment failed.

11     Q.  Are you saying that equipment did fail?

12     A.  Yeah.

13     Q.  Would you agree with me that you had

14  asked both the maintenance guys to help you with

15  that broken equipment and they wouldn't?

16     A.  No, I -- they would come down and help.

17     Q.  They would?

18     A.  They would, yeah.

19     Q.  Do you remember them doing that?

20     A.  No.

21     Q.  All right.  Maybe you didn't understand

22  my question.  Would you agree with me --

23     A.  I'm not mad because they didn't come down

24  and help.

234                        **Marc Smith**

1      Q.   I'm not saying that.   I just want to

2   understand the story.   You agree with me that on

3   May 9th some machinery broke down, and that you

4   asked the two maintenance guys to help you out,

5   and they wouldn't; is that right?

6      A.   I guess, yes.

7      Q.   And then they started harassing you over

8   the walkie-talkie?

9      A.   That was before that they were harassing

10  me, I believe.

11     Q.   Did they give you a hard time about

12  asking them for your help?

13     A.   Yeah, what was going on, yeah.

14     Q.   Did you get the machinery fixed?

15     A.   Yes.

16     Q.   How do you remember that, but you don't

17  remember what machinery was broken?

18     A.   Because when I -- when I left I had to

19  turn everything off that was on.

20     Q.   But you don't remember what was broken?

21     A.   No, I couldn't say.   It could have been

22  the elevator.   It could have been --

23     Q.   But you do remember going to shut

24  everything off?

**Marc Smith**                    239

1    you press a little button, and it pulls the

2    rollers away from the dye.

3        Q.  I understand, okay.  Then how do you shut

4    down the conveyers and how many are there?

5        A.  When you shut the leg down they shut off.

6             No.  They go from the cooler to the

7    pellet legs, which are little things.  They shut

8    off when you shut -- I believe when the cooler

9    goes off, they shut off, and then the leg will

10   clear out.

11       Q.  Then you said what about the fans on the

12   roof?

13       A.  You click the little button right on the

14   computer, click on the fan, click it off.

15       Q.  So let's look at the chronology again.

16   Starting at page 12.

17            I'm sorry, wrong page.  Page 11,

18   starting at paragraph 68, you are talking about

19   at some point you are trying to make feed and

20   there was an equipment breakdown.  You called

21   Keith and Dohner, those are the two maintenance

22   employees, on the walkie-talkie and they would

23   not respond.  They continued not to respond.

24   Ultimately, Hudson contacted you and said, these

**Marc Smith**

240

1    are your words, it is a quote, "I'm going to come

2    down and see if you're a man or not."

3              And I think you said earlier you

4    thought he meant he was going to come down and

5    beat you up, right?

6        A.   Yes.

7        Q.   At this point you are very upset.   You

8    called Chuck Broderick again and told him you

9    needed to go home, that you were tired of these

10   guys; is that right?

11       A.   Yes.

12       Q.   Broderick said that you can't go home,

13   correct?

14       A.   Yes.

15       Q.   Then you called Jefferson, this is Tyson,

16   Tyson Jefferson.   You told him you were not

17   feeling well and you needed to go home.   At this

18   point you are having a panic attack?

19       A.   Yes.

20       Q.   Is that right?   You felt light-headed,

21   you were dizzy, you were afraid to operate heavy

22   equipment, etcetera?

23       A.   Yes.

24       Q.   Correct?   What did Jefferson tell you?

**Marc Smith**                                    241

1    A.   No.

2    Q.   Couldn't go home.   Then you say in

3  paragraph 75 that you tried to continue but you

4  couldn't.   You called Broderick and Jefferson

5  again.   They didn't answer your calls.   You left

6  messages saying you were leaving, right?

7    A.   Yes.

8    Q.   And you clocked out at 12:13 to 12:18?

9    A.   Yes.

10   Q.   Is your testimony today that after you

11 started having this panic attack and you called

12 these guys and told them that you were leaving

13 that you went out and shut down three pellet

14 mills, three conditioners, a cooler, three

15 conveyers, three legs and fans, and then left?

16   A.   All I do is press buttons, chh-chh.

17   Q.   Is that your testimony, though?

18   A.   Yes.

19   Q.   You were having a panic attack and you

20 are telling these guys you have to leave, and you

21 spent the time to shut down all these machines?

22   A.   Yes.

23   Q.   And your testimony also is that if Tyson

24 says he had to come in and do this for you he is

242                                          **Marc Smith**

1   a liar?

2       A.   Yes.

3       Q.   Who do you contend discriminated against

4   you because you are a man?

5       A.   There is Chuck and Tyson.

6       Q.   How did Tyson discriminate against you

7   because you are a man?   I haven't heard him yet.

8       A.   Maybe it wasn't Tyson.   It wasn't Tyson.

9   It was just Chuck and some of the guys that told

10  me, Vanicoli about the blow job thing, the "blow

11  me" statement.   And...

12      Q.   Anybody else?

13      A.   It was either Vernon Russell or Kenny

14  Hudson told me to get my knee pads ready.

15      Q.   Why don't you look so you can tell me

16  specifically, look in your chronology.

17      A.   Vernon Russell, a co-worker, told Marc

18  Smith, or told me, to get his knee pads ready.

19  Kenny Ross, another one, said Marc's name and

20  said "blow me."

21      Q.   And you contend that the knee pad and

22  "blow me" comment is discrimination because you

23  are a man?

24      A.   Yeah.



**Marc Smith**

243

1    Q.   In other words, two men making a comment

2    to you, a man, you contend that's discriminatory?

3    A.   Yeah, when they are telling me to do

4    something with other men.

5    Q.   And I think we have already talked about

6    the fact that other than the comment "blow me" or

7    knee pads, you have no evidence, no facts,

8    nothing to show that anybody at that plant was

9    gay?

10    A.   No.

11    Q.   Okay.   So we have Vernon Russell, we have

12    Chuck Broderick.   Anybody else?

13    A.   No.

14    Q.   That's it, Vernon Russell and Chuck

15    Broderick?

16    A.   Oh, the Louis Hudson.

17    Q.   What was that again?

18    A.   When he said he loved me, he still loved

19    me, girlfriend, and something about my butt being

20    sore.

21    Q.   And your allegation is he said that to

22    you because you're not gay?

23    A.   He said it to me because he presumed my

24    butt hole was sore because of having anal sex.

244                                    **Marc Smith**

1        Q.  Why did he say it to you then?

2        A.  Ask him.  I don't know.

3        Q.  You are making the allegation.

4        A.  I don't know why he would say that.

5        Q.  You raised it in this case.  Why would he

6   say that to you?

7                MR. PRIMOS:  Objection, foundation.

8   You can answer if you are able to.

9        A.  I'm just going on...

10       Q.  Why is that comment, "I love you" or "is

11  your butt sore," why is that, when it is coming

12  from a man and being said to a man, why is that

13  discriminatory?

14       A.  Because they talked about the homosexual

15  stuff.  It is stuff that I have seen them do and

16  act and talk in front of each other.

17       Q.  So, in other words, he is gay?

18       A.  He acted -- the way he talks.

19       Q.  Meaning the comment that he made to you?

20       A.  Yes.

21       Q.  But other than that, you have no evidence

22  or facts whatsoever to establish this guy is gay?

23       A.  No.

24       Q.  Other than that single comment?



**Marc Smith**

245

1      A.  No.

2      Q.  And for Vernon Russell, nothing other

3  than that single comment about "blow me" and

4  "knee pads"?

5      A.  No.

6      Q.  And Chuck Broderick, nothing other than

7  the "tube steak" comment and the bump and grind?

8      A.  No.

9      Q.  That's the only evidence you have in this

10  case to establish that you were subjected to

11  misconduct because you are a man?

12     A.  Yes.

13     Q.  And that's the only evidence you have in

14  this case to establish that any of these three

15  individuals is gay?

16     A.  That's what I've written down, yes.

17     Q.  That's everything?

18     A.  Yes.

19     Q.  You mentioned Vanicoli when we first

20  started talking about those who discriminated

21  against you.  Did you mean to say Vanicoli?

22     A.  Yes.

23     Q.  How did he discriminate against you?

24     A.  Oh, he told me to give oral sex to Erwin

246                           **Marc Smith**

1    Hall.

2        Q.   So who is gay in that scenario?

3        A.   I guess I would be gay.

4        Q.   So they are saying you are gay?

5        A.   Yes.

6        Q.   But you know you are not?

7        A.   Yes.

8        Q.   And it had nothing to do with Vanicoli

9    being gay?

10       A.   No.

11       Q.   Right?  And since he said it about Erwin

12   Hall, it has nothing to do with Erwin Hall being

13   gay?

14       A.   No.

15       Q.   Just you?

16       A.   Yes.

17       Q.   All right.  Anybody else you want to

18   identify?

19       A.   No.

20       Q.   Can you identify everyone who retaliated

21   against you?

22       A.   Tyson Jefferson.

23       Q.   How was that?

24       A.   After I had turned him in for the picture



**Marc Smith**

1  of a woman and a donkey, he would come behind me

2  and check, he was in my area at all times trying

3  to find things wrong.

4      Q.  Like what?

5      A.  If the area wasn't swept up, if the bags

6  weren't counted.

7      Q.  Did he ever find a time when things

8  weren't done correctly?

9      A.  Not really.

10     Q.  So when would this have occurred?

11     A.  After I -- the picture, I turned him in.

12     Q.  Do you have any specific examples,

13 anything in the chronology, anything in your

14 notes?

15     A.  There are some bags that when you write

16 them, after you dump them, you write them down,

17 and they weren't written down.

18     Q.  And you got disciplined for that, right?

19     A.  Well, they tried to.  But David Jones got

20 rid of it.

21     Q.  But you didn't do the job you were

22 supposed to do?

23     A.  Yes.

24     Q.  Any other examples?

1    Q.   These sexual comments?

2    A.   Yes.

3    Q.   That was their retaliation?

4    A.   Yes.

5    Q.   Did they ever tell you they were making

6    those comments because they were retaliating

7    against you?

8    A.   No.

9    Q.   All right.   Anybody else?

10   A.   No.

11   Q.   Nobody else retaliated against you in

12   this case?

13   A.   I guess because I wrote -- they sent the

14   paper to the Department of Labor, and they sent

15   it to them, I guess David Jones and them too, and

16   Chuck.

17   Q.   When you say "them," sent it to them,

18   what do you mean?

19   A.   To Perdue, to David Jones and Chuck and

20   all them, when they finally got wind of it, I'm

21   pretty sure they were mad.   They were on top of

22   me so they can control, control me to an extent.

23   Q.   Do you have any facts or evidence to

24   support what you just said?

**Marc Smith**

250

1    A.  No.

2    Q.  No.  That's your belief?

3    A.  Right.

4    Q.  Any statements that David Jones ever made

5    to suggest that that is what he was doing?

6    A.  No.

7    Q.  And you acknowledge that he is the human

8    resources manager, right?

9    A.  Yes.

10   Q.  Do you think he is going to discriminate

11   against you as a human resources manager?

12   A.  Yeah.

13   Q.  Why?

14   A.  Because an internal -- does this matter?

15   Just yes or no?

16   Q.  I would like to know why you think that.

17   A.  Because an internal -- I believe an

18   internal company, an internal HR system doesn't

19   work.  They are not going to find real fault in

20   someone and cost the company millions and

21   millions of dollars so --

22   Q.  Do you think that's what this case is

23   worth, millions and millions of dollars?

24   A.  No.  I'm just saying in general.



**Marc Smith**

1    Q.  Do you have any facts or evidence,

2  though, to support that?

3    A.  No.

4    Q.  Anybody else?

5    A.  No.

6    Q.  Nobody else retaliated against you?

7    A.  No.

8    Q.  Have you ever seen anyone's personnel

9  file other than your own?

10    A.  No.

11    Q.  At any time in this litigation?

12    A.  No.

13    Q.  At any time before the Department of

14  Labor?

15    A.  No.

16    Q.  Do you know of any other employees, other

17  than Richie Oliphant, we have already talked

18  about him, Richie Oliphant, do you know of any

19  other employees who walked off the job who were

20  not terminated?

21    A.  Some of them make their own schedule, I

22  mean come in around --

23    Q.  Let me say it differently.  Who walked

24  off the job without permission, like you did?

**Marc Smith**

252

1      A.   I can't recall one.

2      Q.   Do you know of any other employees who

3  were terminated for any reason at Bridgeville

4  while you were there?

5      A.   Yeah, there was people terminated, but I

6  don't know if it was for anything else.

7      Q.   Who?

8      A.   No.

9      Q.   No?   No one was terminated that you know

10  for any reason at Bridgeville?

11     A.   Just drinking and stuff like that.

12     Q.   So the answer is yes?

13     A.   Yes.

14     Q.   Who was terminated?

15     A.   A gentleman named Milian.   I don't

16  remember his last name.

17     Q.   Is that the first name?

18     A.   Yes.

19     Q.   Why was he terminated?

20     A.   Drinking on the job.

21     Q.   Anyone else?

22     A.   Danny.   I don't know Danny's last name.

23     Q.   Why was he terminated?

24     A.   He came in drunk.



**Marc Smith**

274

1  complaint.

2     Q.  After what?

3     A.  After I turned him in, they retaliated

4  against me.  I believe they retaliated against me

5  and wrote me up because I went to HR, and I

6  believe if I didn't go to HR nothing would have

7  even happened.

8     Q.  Are you referring to the disciplinary

9  document that was issued?

10    A.  On March 17th.

11    Q.  On March 17th?

12    A.  Yes.

13          MR. PRIMOS:  I have no further

14  questions.

15              RE-EXAMINATION

16  BY MR. AMIOT:

17    Q.  I think you told me, Mr. Smith, that Mr.

18  Lewis and Mr. Russell and your allegations about

19  them dry humping, that was not directed at you;

20  is that right?

21    A.  No, that wasn't directed at me.

22    Q.  Let me ask you this:  On the day of March

23  9, when you allege you were not feeling well and

24  needed to go home --



**Marc Smith**                                    275

1      A.   May 9.

2      Q.   -- on May 9, you told me that you called

3  to see if you could get anyone in to cover for

4  you, right?

5      A.   Yes.

6      Q.   And no one was available?

7      A.   He never picked up the phone.

8      Q.   Right.   So at the time that you requested

9  permission to leave, there was no one to cover

10 for your position, right?

11     A.   Yes.

12     Q.   And when you left, you left your position

13 unattended?

14     A.   Yes.

15     Q.   Is that right?

16     A.   Yes.

17     Q.   Do you remember the prior occasions when

18 you left when you were ill?

19     A.   No.

20     Q.   What days they were?

21     A.   No, I don't remember what days they were.

22     Q.   Can you give me an estimate of when they

23 might have occurred?

24     A.   Months before that, probably.

276                        **Marc Smith**

```
 1      Q.  Months before what?

 2      A.  Actually, I got -- I don't know the

 3 dates, but we had this young man that we were

 4 trying to train, and he frustrated me, and I kind

 5 of got a little -- didn't know how -- I was like

 6 really upset and kind of got me -- like this guy,

 7 it will take me all day to train him, and the

 8 next day he would come in and I would have to

 9 train him again.  He just wasn't picking the

10 stuff up.

11           By the end of the week, I was like,

12 Tyson, you know what I mean, I'm not feeling

13 good, I'm not -- not into -- you know what I

14 mean, I can't deal with him.  He stressed me out.

15 And he is, like, go home, and Tyson took the

16 shift over.

17      Q.  So Tyson took it over?

18      A.  Yes.

19      Q.  So you had coverage for that departure?

20      A.  Yes.  It was in the middle of the day.

21      Q.  Any other examples that you can remember?

22      A.  Not right offhand.

23      Q.  Well, you said that there were a couple

24 of incidents.
```



**Marc Smith**                                      277

1    A.  Yes.

2    Q.  So what were you thinking of in your head

3    when you answered that question, a couple of

4    times that you left because you were ill?

5    A.  I mean, I'm just saying I was sick a

6    couple times.  I can't give exact dates.  I went

7    home and there was coverage for the shift.

8    Q.  There was coverage?

9    A.  Yes.  I've called people in and they have

10   came in.  When I was working third shift, I

11   believe, big guy, his name was Jason, and I

12   called him because I needed to leave, and he came

13   in early.

14   Q.  All right.  So for those other instances

15   that you remember you had coverage?

16   A.  Yes.

17          MR. AMIOT:  All right.  I don't have

18   anything further.

19               RE-EXAMINATION

20   BY MR. PRIMOS:

21   Q.  Just one more thing.  That day, May 9th,

22   when you left, could Mr. Jefferson have come in

23   and covered for you?

24   A.  Yes.



# EXHIBIT 2



PERDUE FARMS, INCORPORATED
16447 Adams Road
Bridgeville, DE  19933
Office: 302-337-3985
Fax: 302-337-2219

**To:**   Carol Phillips
        H/R Perdue Agribusiness
**From:** Chuck Broderick
        Bridgeville Feed Mill
**Date:** February 24, 2009

**RE:**   Marc Smith

Marc Smith has been an associate in good standing at the Bridgeville Mill. He started as a panel operator on second shift and eventually moved to first. He continues to operate the panel for us yet has trained in all areas and has advanced to Utility Operator. He is capable of, and interested in advancement. He has progressed as far as he can here unless a supervisory position was to open up. We currently have no open slots for him to advance into at this time.

Marc is highly trainable and has trained a number of associates himself. He is self-motivated; he has on his own initiative taken classes at Delaware Tech in Georgetown. He is very comfortable around a computer, and has some level of exposure to Microsoft Office, although that was not a requirement of his current position. He is familiar with the safety requirements around the mill, and many of these would translate into the grain operations. I feel that with the right training and leadership he would be able to advance into a supervisory position.

If you would like to discuss Marc's abilities and / or work habits in further detail, please feel free to call me at 302-855-5654.

EXHIBIT

Smith 6

AP 11/23/14

# EXHIBIT 3

COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARC E. SMITH,                    )
        Plaintiff,               )
                                 )
            v.                   ) C.A. No.
                                 ) 12-227-LPS-SRF
PERDUE FARMS INCORPORATED,       )
        Defendant.               )


              Deposition of **CHARLES W. BRODERICK**,
taken pursuant to notice, on Tuesday, July 24, 2012,
beginning at 2:20 p.m., in the law offices of
Schmittinger & Rodriguez, 54 The Green, Dover,
Delaware, reported by Cheryl A. Anthony, Court
Reporter.

APPEARANCES:

        NOEL E. PRIMOS, ESQUIRE
        SCHMITTINGER & RODRIGUEZ
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BROOKS R. AMIOT, ESQUIRE
        JACKSON LEWIS, LLP
        2800 Quarry Lake Drive
        Suite 200
        Baltimore, Maryland  21209
        Attorney for Defendant.

ALSO PRESENT:

        MR. DAVID JONES


---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

2

| | |
|---|---|
| 1 | CHARLES W. BRODERICK, |
| 2 | the witness herein, having first been |
| 3 | duly sworn on oath, was examined and |
| 14:20:09  4 | testified as follows: |
| 14:20:09  5 | BY MR. PRIMOS: |
| 14:20:09  6 | Q.    Mr. Broderick, have you ever had your |
| 14:20:12  7 | deposition taken before? |
| 14:20:12  8 | A.    Once. |
| 14:20:14  9 | Q.    Let me just sort of remind you of some |
| 14:20:16  10 | ground rules to keep in mind.  By the way, I'm Noel |
| 14:20:20  11 | Primos, and I'm representing Marc Smith in this lawsuit. |
| 20:22  12 | A.    Okay. |
| 14:20:23  13 | Q.    Please try to keep in mind that everything |
| 14:20:25  14 | we say is being taken down by Mrs. Anthony, so it's very |
| 14:20:30  15 | important to make all of your responses verbal.  If it's |
| 14:20:33  16 | a yes or no answer, actually use those words. |
| 14:20:37  17 | A.    Yeah. |
| 14:20:38  18 | Q.    Even uh-huh or unh-unh, it is difficult to |
| 14:20:41  19 | make out, so no nodding of the head or shaking of the |
| 14:20:44  20 | head. |
| 14:20:44  21 | A.    Okay. |
| 14:20:45  22 | Q.    Also, it's very important to let me finish |
| 14:20:47  23 | my question completely before you start to answer so we |
| 30:50  24 | can make a record.  Sometimes in a regular conversation, |

| | | |
|---|---|---|
| 0:54 | 1 | you might know what I'm asking you and then just start |
| 14:20:57 | 2 | answering.  It is very important to let me finish before |
| 14:21:01 | 3 | you start answering.  If Mr. Amiot wants to put |
| 14:21:05 | 4 | something on the record, let him state it.  Stop |
| 14:21:08 | 5 | speaking, and then you would be able to go ahead and |
| 14:21:11 | 6 | finish what you were saying. |
| 14:21:12 | 7 | If at any time you do not understand a |
| 14:21:13 | 8 | question that I'm asking you, please let me know.  If |
| 14:21:16 | 9 | you go ahead and answer, I'll assume that you do |
| 14:21:19 | 10 | understand me. |
| 14:21:19 | 11 | If at any time you need to take a break, |
| 14:21:22 | 12 | that's fine.  We can do that.  You are just not |
| 14:21:25 | 13 | permitted to talk to your attorney during the break |
| 14:21:28 | 14 | about the deposition. |
| 14:21:30 | 15 | Is there any type of medication that you are |
| 14:21:33 | 16 | taking today that would prevent you from answering my |
| 14:21:36 | 17 | questions accurately? |
| 14:21:36 | 18 | A.    No. |
| 14:21:37 | 19 | Q.    Okay.  Mr. Broderick, what is your current |
| 14:21:42 | 20 | employment position? |
| 14:21:43 | 21 | A.    Feed mill manager at Bridgeville, Delaware |
| 14:21:46 | 22 | for Perdue Farms. |
| 14:21:48 | 23 | Q.    Okay.  And how long have you held that |
| :51 | 24 | position? |

Charles Broderick - Primos                          6

| | | |
|---|---|---|
| 14:05 | 1 | A.    Yes. |
| 14:24:13 | 2 | Q.    Are you familiar with a former employer |
| 14:24:17 | 3 | named Marc Smith? |
| 14:24:18 | 4 | A.    Yes. |
| 14:24:18 | 5 | Q.    Were you responsible for him being hired at |
| 14:24:21 | 6 | the feed mill? |
| 14:24:21 | 7 | A.    Not directly. |
| 14:24:23 | 8 | Q.    Who was responsible for hiring him? |
| 14:24:24 | 9 | A.    Tyson Jefferson. |
| 14:24:26 | 10 | Q.    Did you participate in any way in that |
| 14:24:29 | 11 | decision? |
| 14:24:29 | 12 | A.    I met him and briefly talked with him |
| 14:24:34 | 13 | initially.  I'm sure of that. |
| 14:24:37 | 14 | Q.    Is it normal for Mr. Jefferson to hire |
| 14:24:41 | 15 | people under his direct supervision? |
| 14:24:42 | 16 | A.    Yes. |
| 14:24:50 | 17 | Q.    Were you responsible for Mr. Smith, Marc |
| 14:24:56 | 18 | Smith, receiving a promotion in 2008? |
| 14:24:58 | 19 | A.    I believe Tyson Jefferson was.  I'm pretty |
| 14:25:06 | 20 | sure that's it, yes.  I would have had to have approved |
| 14:25:16 | 21 | it, I guess I should say. |
| 14:25:18 | 22 | Q.    Can you describe what was involved in |
| 14:25:20 | 23 | Mr. Smith being promoted to a position called feed mill |
| 1   :26 | 24 | utility in 2008?  I mean what changes came about as a |

Charles Broderick - Primos                            7

| | | |
|---|---|---|
| 5:31 | 1 | result of that? |
| 14:25:31 | 2 | A. The utility operator has to be capable of |
| 14:25:36 | 3 | operating or performing all functions in the mill from |
| 14:25:41 | 4 | utility receiving to dispatching. |
| 14:25:46 | 5 | Q. And he was not responsible for performing |
| 14:25:48 | 6 | all of those duties before the promotion? |
| 14:25:51 | 7 | A. No. |
| 14:25:52 | 8 | Q. What was he responsible for before the |
| 14:25:54 | 9 | promotion? |
| 14:25:54 | 10 | A. Mainly pallet and pellet operations. |
| 14:25:58 | 11 | Q. How would you describe Marc Smith's |
| 26:03 | 12 | performance during the period that he was in the feed |
| 14:26:07 | 13 | mill utility position? |
| 14:26:08 | 14 | A. Generally, he was okay. |
| 14:26:10 | 15 | Q. You would say just okay? |
| 14:26:11 | 16 | A. Okay, good, okay to good. |
| 14:26:14 | 17 | Q. Would you say it was very good? |
| 14:26:17 | 18 | A. I would say it was okay to good. I wouldn't |
| 14:26:20 | 19 | say it was very good. |
| 14:26:21 | 20 | Q. Were there any problems with his |
| 14:26:31 | 21 | performance? |
| 14:26:31 | 22 | A. Not particularly, not to that -- |
| 14:26:39 | 23 | Q. Is there a reason you say he was only okay |
| 6:41 | 24 | to good then? Was there anything negative about his |

Charles Broderick - Primos                                    8

```
 5:49      1    performance?

14:26:49    2         A.    Negative about his performance?  No, not

14:26:51    3    that I'm aware of, other than, you know, basic

14:26:55    4    day-to-day stuff; I mean he doesn't break any records

14:26:59    5    every day.  I mean he did his job.  He came to work.  He

14:27:03    6    was there and, you know, performed reasonably well.

14:27:11    7         Q.    Are you familiar with something called a

14:27:16    8    pellet durability index test?

14:27:18    9         A.    Yes, I am.

14:27:19   10         Q.    Can you tell me what that is?

14:27:20   11         A.    It's a test that we run to determine the

  27:25   12    durability of our pellets that we manufacture at the

14:27:28   13    plant.

14:27:29   14         Q.    And those are feed pellets?

14:27:30   15         A.    Yes.

14:27:31   16         Q.    That's the feed that the chickens actually

14:27:34   17    eat?

14:27:34   18         A.    Yes, it is.

14:27:41   19         Q.    Was it part of Marc's responsibilities as

14:27:45   20    feed mill utility to perform these PDI tests?

14:27:49   21         A.    Yes.  It always has been.

14:27:52   22         Q.    It always has been?

14:27:53   23         A.    Uh-huh.

  :54      24         Q.    Even before he was feed mill utility, when
```

Charles Broderick - Primos                    9

| | | |
|---|---|---|
| 7:58 | 1 | he was just a panel operator? |
| 14:27:59 | 2 | A.    Yes.   Can I expand on the operator? |
| 14:27:59 | 3 | Q.    Sure. |
| 14:28:01 | 4 | A.    Utility versus operator? |
| 14:28:03 | 5 | Q.    Sure. |
| 14:28:03 | 6 | A.    Essentially, he has to be able to perform |
| 14:28:05 | 7 | the other job functions, but he continued to maintain |
| 14:28:08 | 8 | the existing job function in his daily routine.  If we |
| 14:28:13 | 9 | needed somebody in another area, we require that as part |
| 14:28:18 | 10 | of his promotion, he was required to fill that if we |
| 14:28:21 | 11 | needed him there. |
| 28:21 | 12 | Q.    So he continued to primarily do the same |
| 14:28:25 | 13 | duties -- |
| 14:28:25 | 14 | A.    Uh-huh. |
| 14:28:29 | 15 | Q.    -- after the promotion? |
| 14:28:29 | 16 | A.    Yes. |
| 14:28:30 | 17 | Q.    It was just basically more flexibility? |
| 14:28:32 | 18 | A.    More flexibility and more flexibility for |
| 14:28:36 | 19 | us. |
| 14:28:37 | 20 | Q.    Right.   Whether it was in the panel operator |
| 14:28:40 | 21 | position before or the feed mill utility, during his |
| 14:28:43 | 22 | employment, how often was Marc required to perform these |
| 14:28:48 | 23 | PDI tests? |
| 28:49 | 24 | A.    Daily, and I think at least once on each |

Charles Broderick - Primos                                    10

| | | |
|---|---|---|
| 3:53 | 1 | pellet line. |
| 14:28:55 | 2 | Q.   So would that be once per day? |
| 14:28:56 | 3 | A.   That would be three, at least three per day. |
| 14:29:00 | 4 | Q.   Three per day? |
| 14:29:01 | 5 | A.   Yes. |
| 14:29:02 | 6 | Q.   Because he was responsible for three lines |
| 14:29:04 | 7 | at one time? |
| 14:29:05 | 8 | A.   Yes, uh-huh. |
| 14:29:08 | 9 | Q.   Did Marc ever complain about performing the |
| 14:29:12 | 10 | PDI tests? |
| 14:29:12 | 11 | A.   Yes, he did. |
| 29:13 | 12 | Q.   And when was the first time that you heard |
| 14:29:18 | 13 | him complain about that? |
| 14:29:19 | 14 | A.   I don't really know, but he did complain |
| 14:29:22 | 15 | about it. |
| 14:29:22 | 16 | Q.   Would you say during the period of time |
| 14:29:27 | 17 | before his promotion, that he complained about it? |
| 14:29:29 | 18 | A.   I would say, yes. |
| 14:29:31 | 19 | Q.   How often did he complain about it? |
| 14:29:33 | 20 | A.   That's hard to say.  I don't really know.  I |
| 14:29:40 | 21 | mean I know he complained about it. |
| 14:29:43 | 22 | Q.   Would it be more than once a week? |
| 14:29:44 | 23 | A.   Don't know. |
| 29:47 | 24 | Q.   Who did he complain to? |

Anthony Reporting
(302) 674-8884

Charles Broderick - Primos                              11

9:49    1      A.    He would complain to Tyson or myself.

14:29:54    2      Q.    Did he pretty much evenly distribute his

14:29:58    3  complaints between the two of you about this particular

14:30:00    4  test?

14:30:01    5      A.    He would -- If he didn't get satisfaction

14:30:04    6  one place, he would try to get another ear, and he would

14:30:07    7  go to me.  Generally, he would start with Tyson, and

14:30:10    8  then he would go to me.

14:30:14    9      Q.    What was his particular complaint about it?

14:30:16    10      A.    He felt it wasn't his particular job, that

14:30:18    11  it was the QA associate's job.

30:21    12      Q.    So consistently throughout the period that

14:30:23    13  he was employed there, that was his complaint?  That it

14:30:26    14  was the QA's job?

14:30:27    15      A.    I would say consistently later in his

14:30:30    16  employment, he complained about it.  I wouldn't say in

14:30:33    17  the first year or necessarily the second year, but it

14:30:36    18  was later on.

14:30:37    19      Q.    So my understanding is he was employed there

14:30:40    20  approximately four years?

14:30:41    21      A.    Uh-huh.

14:30:42    22      Q.    So you would say during the last two years,

14:30:45    23  he was more consistent with his complaints?

30:49    24      A.    You know, to put a date on it is going to be

Charles Broderick - Primos                        12

| | | |
|---|---|---|
| 0:54 | 1 | hard for me to do that.  I mean there's a million things |
| 14:30:57 | 2 | that go on. |
| 14:30:58 | 3 | Q.    Would you say that it was at least |
| 14:31:00 | 4 | throughout the last year -- |
| 14:31:01 | 5 | A.    I would say probably at least throughout the |
| 14:31:02 | 6 | last year that he complained more than once or twice, |
| 14:31:05 | 7 | yes. |
| 14:31:05 | 8 | Q.    Okay.  And when he would make this |
| 14:31:11 | 9 | complaint, how would you respond to him? |
| 14:31:13 | 10 | A.    That it was his job. |
| 14:31:15 | 11 | Q.    And what was his response? |
| 31:18 | 12 | A.    He didn't think so. |
| 14:31:20 | 13 | Q.    But did he keep arguing about it? |
| 14:31:22 | 14 | A.    He let it go until, you know, a later date |
| 14:31:26 | 15 | when we had a little heated discussion. |
| 14:31:31 | 16 | Q.    So you and he had a heated discussion on a |
| 14:31:34 | 17 | certain day -- |
| 14:31:34 | 18 | A.    Uh-huh. |
| 14:31:35 | 19 | Q.    -- about this issue? |
| 14:31:36 | 20 | A.    Yes, we did. |
| 14:31:38 | 21 | Q.    Prior to that date, had you ever had any |
| 14:31:40 | 22 | heated discussions about it? |
| 14:31:41 | 23 | A.    I wouldn't say to that level, no. |
| :44 | 24 | Q.    Had he ever had any heated discussions with |

Charles Broderick - Primos                              13

| | | |
|---|---|---|
| 1:47 | 1 | Tyson about it prior to that date? |
| 14:31:49 | 2 | A.    I don't know. |
| 14:32:31 | 3 | (Following a brief recess:) |
| 14:32:31 | 4 | (Broderick Exhibit Number 1 was marked for |
| 14:32:31 | 5 | identification and attached to the record.) |
| 14:32:31 | 6 | BY MR. PRIMOS: |
| 14:33:21 | 7 | Q.    Mr. Broderick, I'm showing you a document |
| 14:33:23 | 8 | that has been marked as Broderick Exhibit 1.  Have you |
| 14:33:28 | 9 | seen this before? |
| 14:33:28 | 10 | A.    Yes, I have. |
| 14:33:30 | 11 | Q.    Did you write it on about February 24, 2009? |
| 33:35 | 12 | A.    I'm sorry.  I'm just reading it, just to |
| 14:33:39 | 13 | refresh. |
| 14:33:40 | 14 | Q.    That's fine.  You can read it. |
| 14:33:42 | 15 | A.    Yes, I did.  I wrote this letter on or |
| 14:33:45 | 16 | about, I am certain, the 24th. |
| 14:33:49 | 17 | Q.    Why did you write it? |
| 14:33:51 | 18 | A.    Because at the time I felt that Marc was |
| 14:33:55 | 19 | capable of advancing himself; he was smart enough.  And |
| 14:33:59 | 20 | he could have performed the function that I thought he |
| 14:34:03 | 21 | should have the opportunity to apply for this job and he |
| 14:34:07 | 22 | could possibly perform the function. |
| 14:34:09 | 23 | Q.    So there was a particular job that you were |
| 4:10 | 24 | writing this in reference to? |

Charles Broderick - Primos                    14

4:12      1        A.    Yes.   There was -- he had applied for I

14:34:17  2   guess it's an internal position with our sister company,

14:34:21  3   Perdue Agribusiness.   And it was a first level

14:34:26  4   supervisory position with the grain and oilseed, one of

14:34:31  5   the grain operations.   I don't know which one.   I can't

14:34:33  6   recall that.   But that's what that was about.

14:34:38  7        Q.    And do you know if a decision was made about

14:34:42  8   that position at some point?

14:34:44  9        A.    I'm sure there was a decision made.   I don't

14:34:48  10  know what it was.   I would expect it was filled.

14:34:52  11       Q.    Do you know when that was?

3'34:53   12       A.    No.

14:34:53  13       Q.    Where was Carol Phillips located at the

14:35:03  14  time?

14:35:03  15       A.    I believe she's at Zion Church Road in

14:35:06  16  Salisbury, the Perdue facility there.

14:35:12  17       Q.    Now, it says HR Perdue Agribusiness.   So

14:35:16  18  Perdue Agribusiness was a separate entity from Perdue

14:35:21  19  Farms?

14:35:21  20       A.    Yes.   It's a sister company.

14:35:24  21       Q.    But were the corporate offices of both

14:35:26  22  companies located in close proximity to each other?

14:35:31  23       A.    Yes.

3:33      24       Q.    Now, we were talking about your discussions

Charles Broderick - Primos                    15

| | | |
|---|---|---|
| 5:36 | 1 | or remarks in his complaints about the PDI test.  You |
| 14:35:43 | 2 | said there was a particular date when the conversation |
| 14:35:46 | 3 | between you and him became heated, correct? |
| 14:35:50 | 4 | A.   Yes. |
| 14:35:51 | 5 | Q.   Now, before we get to that, had his |
| 14:35:58 | 6 | complaint been more frequent about this test, or had it |
| 14:36:04 | 7 | been a while since he had complained about it? |
| 14:36:07 | 8 | A.   I would say it was probably more frequent. |
| 14:36:11 | 9 | But -- |
| 14:36:12 | 10 | Q.   How frequent? |
| 14:36:13 | 11 | A.   You know, I can't really say.  I don't know. |
| 36:17 | 12 | I just feel, you know, remembering conversations, he |
| 14:36:23 | 13 | would sometimes throw it out, you know.  And it was |
| 14:36:25 | 14 | either -- and he was told to do it.  Basically, it was |
| 14:36:32 | 15 | his job. |
| 14:36:32 | 16 | Q.   Leading up to that particular date when this |
| 14:36:37 | 17 | conversation was heated, conversation had never been |
| 14:36:43 | 18 | heated before about this issue, correct? |
| 14:36:43 | 19 | A.   No. |
| 14:36:44 | 20 | Q.   Was there anything else that Marc was |
| 14:36:46 | 21 | complaining about at the time, other than the PDI test? |
| 14:36:48 | 22 | A.   I don't recall. |
| 14:36:50 | 23 | Q.   Now, one of the things he was complaining |
| 5:53 | 24 | about was that he felt there was another person that |

Charles Broderick - Primos                                16

```
 5:58      1   should be performing this test, correct?
14:37:00   2        A.    Yeah, I guess, more or less the same.
14:37:04   3        Q.    And who, in particular, was it that he was
14:37:06   4   saying should be performing this?
14:37:07   5        A.    He's talking about Donna Brown, our QA
14:37:11   6   associate.
14:37:11   7        Q.    And what was his basis for saying that?
14:37:14   8        A.    Because he had called some other operation
14:37:17   9   and somebody had told him there that the QA there did
14:37:20  10   it.
14:37:21  11        Q.    Was it a Perdue operation that he called?
 37:23  12        A.    Yes, it was.
14:37:25  13        Q.    Do you know what operation it was?
14:37:26  14        A.    No, I don't.  But I would guess -- I'm not
14:37:29  15   going to guess, because I don't know.  But he said he
14:37:34  16   had called somewhere else.
14:37:35  17        Q.    Do you know if other Perdue operations at
14:37:38  18   the time had this function performed by QA?
14:37:40  19        A.    I don't know that for a fact.  But I can
14:37:42  20   tell you, just to elaborate a little, every Perdue feed
14:37:48  21   mill is different.  And we all do some different things.
14:37:54  22   And we all have some different operations and different
14:37:58  23   control systems.  And therein lies the difference.
  3:04  24        Q.    So tell me about this particular day when
```

Charles Broderick - Primos                    17

3:06      1   the conversation became heated.

14:38:09   2       A.    I arrived at work at approximately seven

14:38:15   3   a.m., just about immediately got a phone call from Marc

14:38:18   4   complaining about the PDIs; that it wasn't his job, it

14:38:22   5   was her job.  Basically, I told him:  It is your job.

14:38:26   6            He started telling me the same song and

14:38:29   7   dance about it was -- you know, it was -- other QA's

14:38:38   8   were doing it at other mills.  I said:  Well, I'll look

14:38:41   9   into it, but you're going to have to continue to do it

14:38:44  10   here.  And that was that.  I got off the phone with him.

14:38:46  11   I said:  I've got work to do it, and you have to do it,

38:53     12   end of story.

14:38:54  13       Q.    So would you consider that conversation to

14:38:57  14   be heated?

14:38:57  15       A.    It wasn't particularly heated.  But he was,

14:39:00  16   you know, a little more adamant.

14:39:02  17       Q.    And what happened then?

14:39:03  18       A.    Well, he came down to my office, and it got

14:39:13  19   more heated.  He wouldn't let go of it.  He wouldn't let

14:39:16  20   up.  I told him to go down and do his job, that it was

14:39:20  21   part of his job, that if he didn't want to do his job,

14:39:24  22   he could leave.

14:39:25  23            And he continued to argue with me.  Pretty

:27       24   much he wanted -- One of the first things he said was I

Charles Broderick - Primos                           18

| | | |
|---|---|---|
| 9:32 | 1 | needed to get a pair of balls and tell Donna Brown to do |
| 14:39:36 | 2 | her job.  And he continued to go on.  I told him to go |
| 14:39:40 | 3 | back upstairs and do his job, you know, that it was not |
| 14:39:43 | 4 | going to change.  I'll look into it, but it's not going |
| 14:39:46 | 5 | to change.  I won't guarantee it will change.  I'll have |
| 14:39:50 | 6 | some discussion about it, but that's about it. |
| 14:39:53 | 7 | And then he continued to go off.  And he |
| 14:39:58 | 8 | basically went out of the office and screaming and |
| 14:40:01 | 9 | yelling a whole can of worms. |
| 14:40:02 | 10 | I went out after him.  I said:  Marc, you |
| 14:40:05 | 11 | need to calm down.  Go back and do your job.  At this |
| 10:06 | 12 | time he called me a worthless piece of shit. |
| 14:40:10 | 13 | Q.     And where did that particular statement |
| 14:40:13 | 14 | occur? |
| 14:40:13 | 15 | A.     I believe that one occurred in the break |
| 14:40:16 | 16 | room, which is just out my door, right through there. |
| 14:40:20 | 17 | Q.     So it's your testimony that he left your |
| 14:40:23 | 18 | office after making this statement about getting a pair |
| 14:40:26 | 19 | of balls? |
| 14:40:27 | 20 | A.     Yeah. |
| 14:40:27 | 21 | Q.     And went into the break room? |
| 14:40:29 | 22 | A.     He was hollering at us as he went into the |
| 14:40:33 | 23 | break room.  I went into the break room.  And I asked |
| 0:37 | 24 | him to come back in, and he continued to walk away.  I |

Charles Broderick - Primos                    19

| | |
|---|---|
| 0:41 | 1 |

asked him to -- you know, that he needed to calm down,

that he just needed to go back upstairs and do his job.

I got the whole piece of worthless -- you

know, at the top of his lungs. Everybody in the office

down there could hear it.

Q.    What did he do then?

A.    I turned around and went back to my office,

because I was getting to that point where I didn't want

to escalate it any further. And he went back upstairs,

to my knowledge.

Q.    Do you know what he was doing in the break

room or why he was going into the break room?

A.    I'm assuming he was heading back to do his

job or whatever.

Q.    Well, he wouldn't go through the break room

to get to where his job was?

A.    Yes, he would.

Q.    He would?

A.    Yes.

Q.    Now, why is that?

A.    Because that's the way the place is laid

out.

Q.    You are saying there is a staircase leading

from the break room?

Charles Broderick - Primos                    20

| 1:36 | 1 | A.     No.   The office -- There's a separate office |
| 14:41:41 | 2 | building, and that's where my office is.   And it's |
| 14:41:44 | 3 | detached from the mill tower.   He has to leave his work |
| 14:41:50 | 4 | station, come down the steps, go out the door, go |
| 14:41:53 | 5 | through the door to the break room, and then turn left |
| 14:41:57 | 6 | and go right into my office. |
| 14:41:58 | 7 | Q.     Isn't there another door besides the one |
| 14:42:01 | 8 | that leads out of the break room? |
| 14:42:02 | 9 | A.     Yeah.   There's another door, but that's not |
| 14:42:06 | 10 | the way he went. |
| 14:42:07 | 11 | Q.     Could he have gone that other way? |
| 42:09 | 12 | A.     If he had wanted to.   Did he?   No. |
| 14:42:13 | 13 | Q.     So there is a door leading from the break |
| 14:42:16 | 14 | room outside? |
| 14:42:16 | 15 | A.     Yes. |
| 14:42:17 | 16 | Q.     And then once a person went through the |
| 14:42:20 | 17 | break room and went outside, where would they go then? |
| 14:42:22 | 18 | A.     They would have to cross through there. |
| 14:42:25 | 19 | There is an open area, and he has to cross over and go |
| 14:42:29 | 20 | into the feed mill. |
| 14:42:30 | 21 | Q.     So he would actually go outside -- |
| 14:42:33 | 22 | A.     Yes. |
| 14:42:33 | 23 | Q.     -- cross an open area -- |
| 2:35 | 24 | A.     Uh-huh. |

Charles Broderick - Primos                    21

| 2:35 | 1 | Q.     -- and then go into the feed mill? |
| 14:42:37 | 2 | A.     That's correct. |
| 14:42:39 | 3 | Q.     So when you are saying that he went back up |
| 14:42:41 | 4 | to his work or back up to do his work -- |
| 14:42:43 | 5 | A.     I'm assuming that's what he did, yes. |
| 14:42:45 | 6 | Q.     -- you are saying he actually entered |
| 14:42:48 | 7 | another building and went up to an upper level in that |
| 14:42:53 | 8 | building? |
| 14:42:53 | 9 | A.     That's what he would have to do, yes. |
| 14:42:56 | 10 | Q.     During this conversation that you described |
| 14:43:15 | 11 | where he first came into your office and you had a |
| 43:17 | 12 | conversation there and then continued into the break |
| 14:43:20 | 13 | room, was anything said about the term, tube steak? |
| 14:43:25 | 14 | A.     No. |
| 14:43:25 | 15 | Q.     That was never mentioned? |
| 14:43:27 | 16 | A.     No. |
| 14:43:32 | 17 | Q.     When Marc was in your office, was the door |
| 14:43:35 | 18 | closed? |
| 14:43:35 | 19 | A.     No. |
| 14:43:36 | 20 | Q.     It was open? |
| 14:43:37 | 21 | A.     Yes.  I was at my desk.  He came in.  It was |
| 14:43:41 | 22 | open.  I didn't get up and close it. |
| 14:43:43 | 23 | Q.     My understanding is the door opens into sort |
| 3:48 | 24 | of a larger room? |

Charles Broderick - Primos                            31

| | | |
|---|---|---|
| 3:54 | 1 | Tuesday, the 17th, when Marc did? |
| 14:53:56 | 2 | A.    We gave him the written discipline. |
| 14:54:02 | 3 | Q.    When you say we, who is we? |
| 14:54:04 | 4 | A.    Myself and Tyson Jefferson; I had him there |
| 14:54:07 | 5 | as a witness.  I wrote that document, and there was an |
| 14:54:10 | 6 | attachment to it with my comments describing the |
| 14:54:15 | 7 | incident and why he was being disciplined.  And we gave |
| 14:54:18 | 8 | that to him. |
| 14:54:20 | 9 | Q.    Did Marc say anything at the time? |
| 14:54:21 | 10 | A.    Not that I'm aware of; I can't recall |
| 14:54:28 | 11 | anything specifically about what he would have said. |
| 54:32 | 12 | Q.    Do you remember Marc trying to write |
| 14:54:34 | 13 | something on the disciplinary form? |
| 14:54:36 | 14 | A.    Yes, I do. |
| 14:54:36 | 15 | Q.    Do you remember what it was that he tried to |
| 14:54:39 | 16 | write? |
| 14:54:39 | 17 | A.    He was trying to write:  I turned Chuck |
| 14:54:43 | 18 | Broderick in for sexual harassment.  And I scratched |
| 14:54:47 | 19 | through it, because that wasn't his form.  That wasn't |
| 14:54:49 | 20 | for him to be writing on.  That was management's |
| 14:54:53 | 21 | comments, not Marc Smith's comments. |
| 14:54:53 | 22 | Q.    Did that -- |
| 14:54:56 | 23 | A.    That was -- Go ahead. |
| :57 | 24 | Q.    Did that surprise you that he wrote that |

Charles Broderick - Primos                                    32

5:01      1      down?

14:55:01  2              A.      Yes.

14:55:03  3              Q.      Did you ask him why he wrote down sexual

14:55:07  4      harassment?

14:55:07  5              A.      I was like:  Are you out of your mind?

14:55:09  6              Q.      What did he say?

14:55:10  7              A.      That's what he was doing.  You know, I don't

14:55:14  8      know.  I don't know what he was doing.

14:55:16  9              Q.      What do you mean that's what he was doing?

14:55:18  10             A.      He was going to turn me in for sexual

14:55:21  11     harassment.

55:21     12             Q.      Was he saying, I already turned him in, or

14:55:25  13     I'm going to turn him in?

14:55:26  14             A.      I don't know.  I can't remember exactly what

14:55:30  15     he said.  But --

14:55:39  16             Q.      And so you scratched it out?

14:55:41  17             A.      That's correct.

14:55:42  18             Q.      And was he going to have an opportunity to

14:55:44  19     write it somewhere else?

14:55:45  20             A.      I gave him the opportunity to type it up on

14:55:48  21     one of our work stations upstairs, which he did, and I

14:55:51  22     sent it to David Jones.

14:55:54  23             Q.      You sent it directly to David Jones?

5:56      24             A.      I'm pretty certain it was faxed to him from

Anthony Reporting
(302) 674-8884

Charles Broderick - Primos                    33

| | | |
|---|---|---|
| 14:56:01 | 1 | Hurdle Mitchell's fax machine. |
| 14:56:05 | 2 | Q. Okay. Did Mr. Jones participate in this |
| 14:56:19 | 3 | meeting that you and Tyson had by telephone?  This |
| 14:56:24 | 4 | meeting that you and Tyson had on the 13th, did |
| 14:56:27 | 5 | Mr. Jones participate in it by telephone? |
| 14:56:29 | 6 | A. You know, I don't recall. |
| 14:56:30 | 7 | Q. Mr. Broderick I'm going to show you a |
| 14:56:45 | 8 | document that has previously been marked as Exhibit 3. |
| 14:56:50 | 9 | A. Uh-huh. |
| 14:56:51 | 10 | Q. Is that your handwriting at the top? |
| 14:56:51 | 11 | A. That's correct. |
| 14:56:51 | 12 | Q. And did you also make the Xs there to |
| 14:56:51 | 13 | indicate -- |
| 14:56:54 | 14 | A. Yes, uh-huh. |
| 14:56:55 | 15 | Q. Did you also write those words, see |
| 14:56:57 | 16 | attached? |
| 14:56:57 | 17 | A. Yes, I did. |
| 14:56:59 | 18 | Q. Why did you mark out the line next to, |
| 14:57:03 | 19 | extraordinary offense warranting a need for immediate |
| 14:57:07 | 20 | and serious disciplinary action? |
| 14:57:10 | 21 | A. Because I was instructed to. |
| 14:57:12 | 22 | Q. By whom? |
| 14:57:12 | 23 | A. By David that I couldn't terminate him; that |
| 14:57:19 | 24 | probably was -- The date on it is 3/13.  So it's likely |

Charles Broderick - Primos                    34

| | | |
|---|---|---|
| 7:23 | 1 | that I started to write this on 3/13, and that's the way |
| 14:57:27 | 2 | I saw it on 3/13. |
| 14:57:33 | 3 | Q.    Did you begin to write this after Marc had |
| 14:57:35 | 4 | been sent home? |
| 14:57:36 | 5 | A.    Yes. |
| 14:57:39 | 6 | Q.    What is the meaning of the line that has |
| 14:57:41 | 7 | first offense, second offense, third offense, fourth |
| 14:57:44 | 8 | offense?  What does that mean? |
| 14:57:47 | 9 | A.    That's just how many times it occurred. |
| 14:57:50 | 10 | Q.    How many times what had occurred? |
| 14:57:51 | 11 | A.    Insubordination, inappropriate language in |
| 1 :57:54 | 12 | the context that it was in. |
| 14:57:56 | 13 | Q.    So this is the first time this had ever |
| 14:58:00 | 14 | occurred with Marc? |
| 14:58:01 | 15 | A.    Yes. |
| 14:58:02 | 16 | Q.    He had never used inappropriate language in |
| 14:58:04 | 17 | the workplace before? |
| 14:58:05 | 18 | A.    I don't want to say never, no, but not in |
| 14:58:08 | 19 | the context that it was in on that day. |
| 14:58:10 | 20 | Q.    And he had never been insubordinate before? |
| 14:58:12 | 21 | A.    Not that I'm aware of, no. |
| 14:58:14 | 22 | Q.    Was anybody else present at the meeting with |
| 14:58:22 | 23 | Marc other than you and Tyson? |
| 1  :24 | 24 | A.    I believe it was just myself and Tyson. |

Anthony Reporting
(302) 674-8884

Charles Broderick - Primos                          35

8:26      1        Q.     Where did the meeting take place?

14:58:31  2        A.     In my office.

14:58:31  3        Q.     I'm going to show you Jones Exhibit 4.

14:58:39  4        A.     Okay.

14:58:39  5        Q.     Is this the attached statement or the

14:58:44  6    statement that was attached to the disciplinary form?

14:58:46  7        A.     Yes, it is.

14:58:58  8        Q.     Did you actually type this up yourself?

14:58:59  9        A.     Yes, I did.

14:59:00  10       Q.     When did you type it up?

14:59:02  11       A.     I am not sure, but sometime between the 13th

59:05     12   and the 17th.  It's likely it was on the 13th.  But I

14:59:14  13   would have to try to find the original document and see

14:59:16  14   the date on it.

14:59:17  15       Q.     Now, the first paragraph of your memo here

14:59:26  16   indicates that Marc had actually argued with regard to

14:59:30  17   some of duties over the course of several days.  So it

14:59:37  18   wasn't just March 13th that he had been arguing; is that

14:59:40  19   correct?

14:59:40  20       A.     That's what it says, yes.

14:59:41  21       Q.     What was this about arguing about recording

14:59:44  22   drug and other micro-ingredient lot numbers each time

14:59:50  23   bags are dumped?

9:51      24       A.     We have to track FDA-regulated product.

Charles Broderick - Primos                    40

| 4:56 | 1 | it up and I guess that's when I signed it; then he |

15:04:59   2   wasn't available to sign it that day, so I changed my

15:05:02   3   date to 3/17.  I might possibly have signed it as 3/13,

15:05:08   4   because that's when it occurred.  It's just a little --

15:05:11   5        Q.    When did you change it to 3/17?

15:05:13   6        A.    I don't know.  I have no idea.  It was

15:05:15   7   either the day I gave it to him or the day I wrote it.

15:05:22   8   I don't know.  I'm not sure why it was changed, quite

15:05:24   9   frankly.  I don't see it as a large issue, because quite

15:05:28   10  frankly, I might have wrote 3/13 by mistake and wrote

15:05:31   11  over it.  But I don't know.

3  5:38    12        Q.    Let me show you Jones 5.

15:05:45   13        A.    Okay.

15:05:46   14        Q.    Is that the statement that you allowed Marc

15:05:47   15  to go upstairs and type on the computer?

15:05:54   16        A.    Yes, I believe it is.  Yes, it is.

15:05:56   17        Q.    So that's the one that you faxed to David

15:05:59   18  Jones?

15:05:59   19        A.    Uh-huh.  Yes, it is.  I'm sorry.  I did it

15:06:03   20  again.

15:06:04   21        Q.    Now, if we look at that statement, Marc

15:06:09   22  claimed that on March 13th, he had asked you if you were

15:06:15   23  buying lunch.  And you said, I have a tube steak

1   :19    24  smothered in draws, it says.

Charles Broderick - Primos                          41

| | | |
|---|---|---|
| 15:22 | 1 | A.     Okay.  I mean -- |
| 15:06:23 | 2 | MR. AMIOT:  Wait for the question. |
| 15:06:25 | 3 | THE WITNESS:  Okay.  I thought that was the |
| 15:06:26 | 4 | question.  Okay. |
| 15:06:26 | 5 | BY MR. PRIMOS: |
| 15:06:28 | 6 | Q.     Had you ever had a conversation with Marc |
| 15:06:30 | 7 | about tube steak? |
| 15:06:31 | 8 | A.     Wait.  Had I ever had a conversation -- |
| 15:06:36 | 9 | Q.     With Marc about tube steak? |
| 15:06:38 | 10 | A.     Not on this occasion that he's referring to; |
| 15:06:41 | 11 | but Marc would routinely ask me to buy him lunch and |
| 16:47 | 12 | sometimes, in particular, steak.  And the only reason we |
| 15:06:51 | 13 | buy lunches or anything of that nature and provide it is |
| 15:06:55 | 14 | if we achieve a production goal, a safety goal, or |
| 15:07:00 | 15 | possibly if we are in there working on a holiday.  And |
| 15:07:03 | 16 | then I would buy lunch. |
| 15:07:07 | 17 | That's the reason why.  He would routinely |
| 15:07:09 | 18 | ask me, just in passing, are you going to buy lunch |
| 15:07:13 | 19 | today, just because he thought I could throw my card |
| 15:07:15 | 20 | down and buy lunch.  My answer is:  Tube steak, that's |
| 15:07:20 | 21 | what you earned today.  That's hot dogs to me.  That's |
| 15:07:24 | 22 | what I grew up with.  That's the way we referred to it, |
| 15:07:28 | 23 | is tube steak. |
| 7:28 | 24 | Q.     Did you frequently make that comment to him? |

Charles Broderick - Primos                    42

| | | |
|---|---|---|
| 7:31 | 1 | When he would ask you, are you going to buy lunch, did |
| 15:07:32 | 2 | you frequently say:  All you deserve is a tube steak? |
| 15:07:35 | 3 | A.    I would just say tube steak and blow him |
| 15:07:39 | 4 | off.  But frequently?  Not every day, no; once in a blue |
| 15:07:44 | 5 | moon, yes. |
| 15:07:45 | 6 | Q.    Would you say that comment was made at least |
| 15:07:47 | 7 | once a month? |
| 15:07:48 | 8 | A.    No. |
| 15:07:48 | 9 | Q.    Did you ever couple that reference to tube |
| 15:07:53 | 10 | steak with the phrase, smothered in draws? |
| 15:07:56 | 11 | A.    No. |
| 7:56 | 12 | Q.    Do you know what that means? |
| 15:07:58 | 13 | A.    Well, I can infer what it means, but -- |
| 15:08:02 | 14 | Q.    You never said that? |
| 15:08:05 | 15 | A.    No, I never said that.  I never said that, |
| 15:08:07 | 16 | not to him.  In particular, I can't understand why he |
| 15:08:10 | 17 | would be asking me for lunch after he just told me that |
| 15:08:16 | 18 | I was a worthless piece of shit and that I should get |
| 15:08:19 | 19 | some balls and tell the QA what to do.  It doesn't make |
| 15:08:23 | 20 | a hell of a lot of sense to me. |
| 15:08:25 | 21 | Q.    It also says that you grinded up behind him |
| 15:08:30 | 22 | like a man would dance with a woman at a hip hop club. |
| 15:08:34 | 23 | He said that had happened a few weeks before. |
| 8:35 | 24 | Did that ever happen? |

Charles Broderick - Primos                    43

| | | | |
|---|---|---|---|
| ⸱ ⸱:36 | 1 | A. | No. |
| 15:08:37 | 2 | Q. | Did Mr. Smith sign this statement in your |
| 15:08:48 | 3 | presence? | |
| 15:08:48 | 4 | A. | No, I don't think so, no. |
| 15:08:52 | 5 | Q. | When he gave it to you -- |
| 15:08:53 | 6 | A. | It was signed. |
| 15:08:55 | 7 | Q. | -- it was already signed? |
| 15:08:56 | 8 | A. | Yes. |
| 15:08:57 | 9 | Q. | Okay. I'm going to show you that document, |
| 15:09:02 | 10 | Jones 6. Have you ever seen that before today? | |
| 15:09:04 | 11 | A. | No, I don't think so, no. |
| ⸱ ⸱9:52 | 12 | | I would like to change that. I may have |
| 15:09:54 | 13 | seen this through the attorney, our attorney. | |
| 15:09:55 | 14 | Q. | Okay. I don't want to ask you about that. |
| 15:09:58 | 15 | But as far as you know, you never saw this before this | |
| 15:10:01 | 16 | lawsuit was filed? | |
| 15:10:02 | 17 | A. | No. |
| 15:10:02 | 18 | Q. | So after the 17th, when you issued the |
| 15:10:19 | 19 | disciplinary document to Marc and then he gave you his | |
| 15:10:24 | 20 | statement and you faxed it to David Jones, what happened | |
| 15:10:27 | 21 | next? | |
| 15:10:28 | 22 | A. | I went back to work. |
| 15:10:32 | 23 | Q. | You went back to work? |
| .0:33 | 24 | A. | You know, after the write-up and what have |

Charles Broderick - Primos                    47

| | | |
|---|---|---|
| 4:00 | 1 | A.    It may have, yes.  I don't -- I'm sorry. |
| 15:14:05 | 2 | It's been water -- a lot of water under the bridge.  But |
| 15:14:11 | 3 | I don't recall the details.  I didn't take notes. |
| 15:14:14 | 4 | Q.    Did Mr. Jones ask you about, just in |
| 15:14:17 | 5 | general, comments being made around the feed mill?  Any |
| 15:14:22 | 6 | inappropriate comments? |
| 15:14:23 | 7 | A.    He may have.  I don't remember the exact |
| 15:14:25 | 8 | conversation again, but he may have. |
| 15:14:28 | 9 | Q.    Were comments sometimes made around the |
| 15:14:32 | 10 | mill? |
| 15:14:33 | 11 | A.    People would talk and, you know, just |
| 4:37 | 12 | regular workplace conversation, you know. |
| 15:14:43 | 13 | Q.    What kinds of things? |
| 15:14:44 | 14 | A.    Well, I'm just saying I'm sure people would |
| 15:14:47 | 15 | talk in workplaces, and they would talk.  And you would |
| 15:14:51 | 16 | hear a cuss here and a cuss there, but it wasn't |
| 15:14:55 | 17 | anything personal. |
| 15:14:55 | 18 | Q.    Did you join in on some of those? |
| 15:14:58 | 19 | A.    No. |
| 15:15:01 | 20 | Q.    You never said any kind of cuss words |
| 15:15:03 | 21 | around -- |
| 15:15:04 | 22 | A.    Oh, I've cussed.  Situationally, yes, I have |
| 15:15:08 | 23 | cussed.  I have dropped the F bomb, you know.  I have |
| 5:11 | 24 | said that myself when something wasn't working right and |

Charles Broderick - Primos                                    48

| | | |
|---|---|---|
| 5:13 | 1 | we burnt up a 500-horsepower motor.  It was a good time |
| 15:15:19 | 2 | to drop the F bomb.  I was just venting, that kind of |
| 15:15:23 | 3 | thing. |
| 15:15:23 | 4 | Q.    Have you ever participated in any banter |
| 15:15:29 | 5 | that might be termed gay remarks? |
| 15:15:31 | 6 | A.    Banner? |
| 15:15:31 | 7 | Q.    Banter, like -- |
| 15:15:31 | 8 | A.    Oh, banter. |
| 15:15:33 | 9 | Q.    -- discussion or joking? |
| 15:15:34 | 10 | A.    No, not really.  I didn't discuss that.  I |
| 15:15:37 | 11 | didn't get into that kind of conversation.  I can tell |
| 5:40 | 12 | you that Mr. Smith liked to get into that type of |
| 15:15:43 | 13 | conversation. |
| 15:15:44 | 14 | Q.    Tell me about that. |
| 15:15:45 | 15 | A.    Okay.  I'm not from this area.  I grew up in |
| 15:15:49 | 16 | New York.  And I've been to North Carolina and Virginia. |
| 15:15:52 | 17 | But I didn't know anything about the gay area of |
| 15:15:54 | 18 | Rehoboth and such.  And he was very in tune that and |
| 15:16:01 | 19 | referred to the term homo to me.  And he would talk |
| 15:16:05 | 20 | about going down there and harassing people and that |
| 15:16:07 | 21 | kind of thing. |
| 15:16:08 | 22 | Q.    What would he do? |
| 15:16:09 | 23 | A.    Oh, he just, generally speaking, would go |
| 5:13 | 24 | down there and give them a hard time, whatever.  It was |

Charles Broderick - Primos                    49

15:16     1    nothing specific, just that kind of thing.  But he was

15:16:19  2    very aware of where they were and, you know, he's the

15:16:23  3    one that let me know.

15:16:27  4         Q.    So he would talk about harassing them.  But

15:16:29  5    would he ever make any like joking gay remarks himself?

15:16:36  6         A.    I can't remember specifics, but yes, I know

15:16:39  7    he had.

15:16:40  8         Q.    And who did he make those remarks with?

15:16:42  9         A.    He would remark to anybody in the area.  I

15:16:45  10   mean basically, he would remark to me.

15:16:48  11        Q.    What would he say?

'6:48     12        A.    I don't remember.  I don't recall the exact

15:16:51  13   details.  But I know he made the comments.  So it's a

15:16:56  14   little fuzzy, but I know he had discussions with me and

15:17:03  15   others around us.

15:17:04  16        Q.    Would you respond back to him?

15:17:06  17        A.    I'd pretty much blow him off.  I would laugh

15:17:08  18   maybe, but not get into any big discussion about gays.

15:17:18  19   You know, it wasn't a big deal.

15:17:35  20        Q.    Do you ever remember the term sweet cheeks

15:17:39  21   being used around the workplace?

15:17:40  22        A.    No.

15:17:47  23        Q.    Do you ever remember some of the coworkers

.7:49     24   or some of the employees in the mill using the term hey

Charles Broderick - Primos                55

| | | |
|---|---|---|
|:6:01|1|cleaning?|
|15:26:01|2|A.    I don't recall specifics, no.|

Q.    Do you remember an occasion -- this was in
May of 2009 -- where you were out of town, and Marc
called you from the mill and told you he was having
trouble with another employee named Hudson?

A.    I remember him calling me from the mill,
telling me that he was having trouble with equipment,
and he had specifically -- He didn't specifically say he
was having trouble with Hudson, but he was saying
maintenance wasn't helping him.

Q.    Do you know who the maintenance employees
were?

A.    The maintenance would have been Craig Dohner
and Keith Hudson there at the time.

Q.    If I told you that was May 9th, does that
sound familiar?

A.    Yes.

Q.    And why were you out of town?

A.    I was at my daughter's graduation in North
Carolina.

Q.    And this was a Saturday?

A.    Yes.

Q.    Okay.  So Marc told you he was having

Charles Broderick - Primos                          56

| | | |
|---|---|---|
| :7:20 | 1 | trouble with equipment, and maintenance wouldn't help |
| 15:27:24 | 2 | him? |
| 15:27:25 | 3 | A.    Yes. |
| 15:27:25 | 4 | Q.    So how did you respond to that? |
| 15:27:27 | 5 | A.    Well, I called the maintenance supervisor, |
| 15:27:32 | 6 | Hurdle, and asked him to go back and find out what was |
| 15:27:35 | 7 | going on, because I didn't have all the details and, you |
| 15:27:39 | 8 | know, make sure that they got things going, because we |
| 15:27:42 | 9 | needed that to continue to run. |
| 15:27:43 | 10 | Q.    Was Hurdle present at the mill that day? |
| 15:27:46 | 11 | A.    No.  He was not at the mill.  He possibly |
| 27:49 | 12 | could have been there earlier.  But he had left and he |
| 15:27:51 | 13 | was either -- I don't know where he was exactly, but he |
| 15:27:56 | 14 | went back to the mill. |
| 15:27:58 | 15 | Q.    So you instructed Hurdle to go back to the |
| 15:28:03 | 16 | mill? |
| 15:28:04 | 17 | A.    Yes.  I asked him to do that. |
| 15:28:10 | 18 | Q.    And what did you hear next? |
| 15:28:12 | 19 | A.    There was -- Again, there were several |
| 15:28:18 | 20 | back-and-forths in either texts or phone calls with |
| 15:28:22 | 21 | Marc.  What I found out from Hurdle when he got back |
| 15:28:31 | 22 | there, though, was Marc had left and left the equipment |
| 15:28:35 | 23 | running. |
| .8:35 | 24 | Q.    Well, before you heard that from Hurdle, did |

Charles Broderick - Primos                              57

15:28:39   1   Marc call you again and told you he needed to go home?

15:28:42   2        A.    He wanted to go home, and I told him he

15:28:45   3   needed to stay and finish his shift.

15:28:48   4        Q.    Did he tell you wasn't feeling well?  That

15:28:51   5   he was ill?

15:28:52   6        A.    No.

15:28:53   7        Q.    Did he tell you why he needed to go home?

15:28:56   8        A.    He just wanted to leave.

15:28:58   9        Q.    He just told you:  I want to leave?

15:29:01  10        A.    Yeah.

15:29:01  11        Q.    He didn't give you any reason?

15:29:04  12        A.    I guess he was frustrated with things not

15:29:08  13   working well and going according to plan.

15:29:09  14        Q.    Yes or no?  Did he give any reason for

15:29:11  15   wanting to go home?

15:29:12  16        A.    No.

15:29:12  17        Q.    He just said:  I want to go home?

15:29:15  18        A.    Yes.

15:29:16  19        Q.    So then later, you got a call from Hurdle

15:29:19  20   who said that he was gone and he left the equipment

15:29:21  21   running?

15:29:21  22        A.    Yes.

15:29:21  23        Q.    So what did you do then?

15:29:23  24        A.    I asked Tyson -- I believe I asked Tyson to

Anthony Reporting
(302) 674-8884

Charles Broderick - Primos                    58

| | | |
|---|---|---|
| 19:27 | 1 | come in and shut it down.  And I think that's who -- |
| 15:29:33 | 2 | Tyson did go back to the mill or go to the mill and shut |
| 15:29:36 | 3 | the equipment down that was left running. |
| 15:29:39 | 4 | Q.    How many calls did you get from Marc that |
| 15:29:41 | 5 | day? |
| 15:29:42 | 6 | A.    I don't recall, but it was quite a few; |
| 15:29:43 | 7 | several, at least. |
| 15:29:44 | 8 | Q.    Well, there was the one call about |
| 15:29:47 | 9 | maintenance not helping him.  There was another call |
| 15:29:50 | 10 | where he said he needed to go home.  What other reasons |
| 15:29:53 | 11 | did he call you? |
| 29:56 | 12 | A.    Well, he continued to call for the same |
| 15:29:58 | 13 | reasons.  To sit here and tell you how many he had, I |
| 15:30:00 | 14 | don't know.  I know there were several.  I was in the |
| 15:30:03 | 15 | middle of, you know, preparing -- we had a celebration |
| 15:30:07 | 16 | going on, because graduation was Sunday and we were |
| 15:30:10 | 17 | having a pre graduation party for my daughter. |
| 15:30:16 | 18 | And quite frankly, I didn't keep count.  I |
| 15:30:19 | 19 | know there were several calls, but I couldn't tell you |
| 15:30:22 | 20 | whether it was three or six or two.  It was several. |
| 15:30:24 | 21 | Q.    So did Marc make more than one call to you |
| 15:30:27 | 22 | about needing to go home? |
| 15:30:28 | 23 | A.    One call. |
| 0:30 | 24 | Q.    Only one call about needing to go home? |

Charles Broderick - Primos                    59

```
0:32        1         A.     Yes.

15:30:33    2         Q.     And all the other calls were about the

15:30:35    3   maintenance issue?

15:30:36    4         A.     I would guess, yes, that's it.  And he

15:30:40    5   sent -- The last thing I got was a text, spelled wrong;

15:30:44    6   but basically:  I'm going home.

15:30:46    7         Q.     What do you mean spelled wrong?

15:30:47    8         A.     Well, going, g-o -- I can remember that.  It

15:30:54    9   was that he was going home.  I'm going home.

15:30:55   10         Q.     And how did he spell it?

15:30:56   11         A.     He misspelled going.  I can't remember

30:59      12   exactly.

15:31:06   13         Q.     So you knew before Hurdle called you that

15:31:09   14   Marc had gone home?

15:31:10   15         A.     I knew by looking at my text that he had

15:31:14   16   left, yes.  I don't know that -- Before I called Hurdle?

15:31:19   17   No, no.  Hurdle, I had already called and asked Hurdle

15:31:25   18   to go back to the mill and get the maintenance guys to

15:31:28   19   see what was going on so that maintenance could help

15:31:31   20   them out or to see what was going on, to make sure that

15:31:33   21   we got going in manufacturing feed again.

15:31:35   22         Q.     And then Hurdle called you and said that

15:31:37   23   Marc had left and had left the mill running?

1:40       24         A.     Yes.
```

Charles Broderick - Primos                    60

| | | |
|---|---|---|
| 15:31:40 | 1 | Q.    And what did you do at that point?  Well, I |
| 15:31:43 | 2 | think you said you called Tyson and got him to come? |
| 15:31:46 | 3 | A.    Yes. |
| 15:31:46 | 4 | Q.    And then did you take any other steps about |
| 15:31:48 | 5 | the situation? |
| 15:31:49 | 6 | A.    Not at that point; I may have contacted |
| 15:31:52 | 7 | David Jones, but I don't remember.  I know I contacted |
| 15:31:55 | 8 | David.  Whether it was that day or the next, I don't |
| 15:31:59 | 9 | remember, because there were several other calls on |
| 15:32:03 | 10 | Sunday that I was getting from him while I was at my |
| 15:32:06 | 11 | daughter's graduation. |
| 15:32:07 | 12 | Q.    That you were getting from whom? |
| 15:32:09 | 13 | A.    Marc.  There were several calls that I just |
| 15:32:12 | 14 | ignored.  And there were some texts that came across, |
| 15:32:14 | 15 | and I don't even remember what they were exactly. |
| 15:32:17 | 16 | Q.    So the calls that you got from Marc on |
| 15:32:19 | 17 | Sunday, did he leave any messages? |
| 15:32:21 | 18 | A.    I don't recall. |
| 15:32:23 | 19 | Q.    Did you actually speak to him -- |
| 15:32:24 | 20 | A.    No. |
| 15:32:25 | 21 | Q.    -- on Sunday? |
| 15:32:25 | 22 | A.    No. |
| 15:32:26 | 23 | Q.    And why didn't you answer when he called? |
| 15:32:27 | 24 | A.    Because I was in the middle of my daughter's |

Charles Broderick - Primos                                          61

```
 :30    1    graduation, and I'll be damned if I was going to answer

15:32:32    2    it.

15:32:32    3         Q.    What did the text say?

15:32:34    4         A.    I don't recall.  You know, I'm sorry.  But I

15:32:37    5    don't recall what the text said Sunday.

15:32:40    6         Q.    Did you have any conversations with David

15:32:42    7    Jones on Sunday?

15:32:43    8         A.    I don't recall.  I did have conversations

15:32:45    9    with David Jones either Saturday or Sunday and possibly

15:32:49   10    Monday morning.  But I don't recall exactly when and how

15:32:51   11    many.

  2:53    12         Q.    Well, without then determining when exactly

15:32:55   13    they were, tell me about your conversations with David

15:32:58   14    Jones.

15:32:58   15         A.    Well, I let him know that Marc walked off

15:33:02   16    the job.

15:33:02   17         Q.    What did David say?

15:33:03   18         A.    I'm assuming that David said:  When he comes

15:33:05   19    in, suspend him and we will take the appropriate action.

15:33:10   20         Q.    You are assuming he said that?

15:33:11   21         A.    I don't know what he said then, I guess.  I

15:33:14   22    know he said to suspend him, and he'll contact him when

15:33:19   23    he's to return.  Whether that was Monday morning or

  :27      24    Sunday afternoon, I would probably guess it was Monday.
```

Charles Broderick - Primos                    62

33:30        1    But I don't want to guess here.  But I didn't document

15:33:37     2    all of this, these conversations.

15:33:40     3           Q.    When did you return to Delaware?

15:33:41     4           A.    I returned to Delaware to work in Delaware

15:33:46     5    on Tuesday the -- it would have been the following day.

15:33:52     6           Q.    So you were not in Delaware on Monday when

15:33:54     7    Marc came back to work?

15:33:56     8           A.    No.  I was traveling back from North

15:33:58     9    Carolina.

15:33:59    10           Q.    Did you have any phone conversations with

15:34:01    11    anyone on Monday back at the mill?

.34:06      12           A.    Yes, I did.

15:34:06    13           Q.    In particular, about Marc?

15:34:07    14           A.    Yes.

15:34:08    15           Q.    Did Marc himself call you from the mill?

15:34:11    16           A.    No.

15:34:14    17           Q.    So you don't recall Marc calling you and

15:34:16    18    asking you if he could go to the wellness center?

15:34:18    19           A.    No, I don't recall.

15:34:19    20           Q.    Who did you talk to?

15:34:27    21           A.    I talked to Tyson Jefferson and Hurdle

15:34:29    22    Mitchell.

15:34:29    23           Q.    Tell me about those conversations.

34:31       24           A.    After they suspended him and he was to leave

Charles Broderick - Primos                63

| | | |
|---|---|---|
| 4:35 | 1 | the property, he didn't leave.  He went out to his car, |
| 15:34:38 | 2 | and he was sitting in the back of his car.  And I |
| 15:34:41 | 3 | instructed them to go out and tell him to leave, that he |
| 15:34:45 | 4 | had to leave the property. |
| 15:34:47 | 5 | And they called me back.  And I'm not sure |
| 15:34:50 | 6 | if it was Hurdle or Tyson that called me back.  But he |
| 15:34:54 | 7 | said that he was having some chest pains, couldn't |
| 15:34:57 | 8 | breathe, or something to that effect, and he needed an |
| 15:35:00 | 9 | ambulance. |
| 15:35:02 | 10 | And basically, I told him to give him the |
| 15:35:06 | 11 | phone and let him call the ambulance if he wants. |
| 35:09 | 12 | Q.    So did they give him a phone? |
| 15:35:11 | 13 | A.    I think he used his own phone, and he called |
| 15:35:16 | 14 | the ambulance. |
| 15:35:17 | 15 | Q.    And as far as you know, the ambulance came |
| 15:35:18 | 16 | to get him? |
| 15:35:19 | 17 | A.    Yes, they did. |
| 15:35:21 | 18 | Q.    So what was your understanding of what was |
| 15:35:24 | 19 | going to happen to Marc, as far as discipline? |
| 15:35:27 | 20 | A.    At that point, my understanding was he was |
| 15:35:29 | 21 | going to be terminated. |
| 15:35:31 | 22 | Q.    But he wasn't terminated.  He was suspended, |
| 15:35:34 | 23 | correct? |
| 5:34 | 24 | A.    Suspended pending termination, but pretty |

Charles Broderick - Primos                    64

| | | |
|---|---|---|
| 5:38 | 1 | much I felt like he would be terminated, yes. |
| 15:35:40 | 2 | Q.    But did anyone actually tell you that he was |
| 15:35:44 | 3 | going to be terminated? |
| 15:35:46 | 4 | A.    I don't recall. |
| 15:35:46 | 5 | Q.    Why did you have that feeling?  Why did you |
| 15:35:49 | 6 | feel -- |
| 15:35:49 | 7 | A.    Well, because -- |
| 15:35:50 | 8 | Q.    Well, let me finish.  Let me finish.  Why |
| 15:35:52 | 9 | did you feel that he was going to be terminated? |
| 15:35:54 | 10 | A.    Because that would have been standard |
| 15:35:55 | 11 | procedure for somebody walking off of the job. |
| 35:58 | 12 | Q.    Do you know who ultimately made the decision |
| 15:36:04 | 13 | to terminate him? |
| 15:36:05 | 14 | A.    That would be David Jones, HR. |
| 15:36:08 | 15 | Q.    Did you have any input into that? |
| 15:36:11 | 16 | A.    I may have talked to him.  But the decision |
| 15:36:15 | 17 | was -- The final decision remains with human resources. |
| 15:36:19 | 18 | Q.    Did you tell David Jones that you agreed |
| 15:36:22 | 19 | with that decision? |
| 15:36:22 | 20 | A.    Yes. |
| 15:36:22 | 21 | Q.    I'll show you a document that has been |
| 15:36:47 | 22 | marked as Jefferson Exhibit 3. |
| 15:36:49 | 23 | A.    Okay.  Thank you. |
| 16:54 | 24 | Q.    Have you seen this document before?  Before |

Charles Broderick - Primos                    65

15:36:56  1    today?

15:36:56  2        A.    Yes, I have.

15:37:00  3        Q.    When did you first see it?

15:37:01  4        A.    I believe I saw it when I returned to work.

15:37:03  5    Tyson showed it to me.

15:37:04  6        Q.    Tyson showed it to you?

15:37:06  7        A.    Yes.

15:37:07  8        Q.    Now, do you know what the notation on the

15:37:09  9    third line means, D20?

15:37:12  10       A.    I'm sorry.  The third line?

15:37:15  11             MR. AMIOT:  Up at the top.

15:37:17  12             THE WITNESS:  D20?  No, I do not.

15:37:17  13   BY MR. PRIMOS:

15:37:22  14       Q.    Now, this indicates that Marc was suspended

15:37:27  15   for three days, correct, starting May 11th?

15:37:31  16       A.    Uh-huh.  Yes; I'm sorry.

15:37:33  17       Q.    And he was to turn on May 14th?

15:37:36  18       A.    Return to HR.

15:37:37  19       Q.    Okay.  Did Marc return to HR on the 14th?

15:38:01  20       A.    I do not know.

15:38:08  21       Q.    Why was he to return to HR?

15:38:10  22       A.    To determine whether he was to return to

15:38:14  23   work or to be terminated.

15:38:31  24       Q.    And what ultimately happened to Marc?

Charles Broderick - Primos                    66

18:33      1        A.    He was terminated.

15:38:35   2        Q.    And how did you find that out?

15:38:38   3        A.    I don't want to guess, but I would believe

15:38:45   4    David told me that.  But I had assumed -- Well, I don't

15:38:53   5    want to assume.  I don't know.  I don't recall who told

15:38:57   6    me he was terminated.  But David Jones would have been

15:39:00   7    the one to tell me.

15:39:02   8        Q.    He would have been the one to tell you.  And

15:39:02   9    why is that?

15:39:02   10       A.    Because he's the HR that is over the live

15:39:08   11   production group.

39:08      12       Q.    Do you know how that termination happened?

15:39:10   13       A.    I think it was by phone, but I'm not 100

15:39:14   14   percent sure.

15:39:14   15       Q.    Why was it by phone instead of at the HR

15:39:23   16   office, as the disciplinary document had indicated?

15:39:27   17       A.    I don't know.

15:39:41   18       Q.    I'll show you a document that has been

15:39:43   19   marked as Jones Exhibit 10.

15:39:46   20       A.    Uh-huh.

15:39:47   21       Q.    Is that your signature on this document?

15:39:49   22       A.    That's correct.

15:39:51   23       Q.    Can you tell me what this document is?

39:52      24       A.    This is a form that we use so that we can

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARC E. SMITH,

      **Plaintiff,**

    **v.**

PERDUE FARMS INCORPORATED,

      **Defendant.**

Civil Action No. 12-227 (LPS)

## <u>DECLARATION OF CHUCK BRODERICK</u>

I, Chuck Broderick, declare:

    1.    I am over the age of 21 years and have personal knowledge of, and am competent to testify to, the facts stated below. I am submitting this Declaration voluntarily and of my own free will, without fear or threat of reprisal or promise of any benefit.

    2.    I am currently employed by Perdue Farms Incorporated ("Perdue" or the "Company") as the Mill Manager of the Company's Bridgeville, Delaware grain facility ("Bridgeville facility"). I have worked in this role for more than eight years. The employees at the Bridgeville facility are almost entirely male, as is common at many grain mills.

    3.    I am familiar with the Plaintiff, Marc Smith. Smith was employed at the Bridgeville facility from November 2005 through May 2009. I was involved in the decision to hire Smith to serve as a Panel Operator and to promote him to a Utility Operator. I was his second-level supervisor in both of these positions. Tyson Jefferson, Mill Supervisor, was Smith's first-level supervisor.

    4.    I am not gay. I am a heterosexual male, and I am only attracted to women. I have been married for 31 years and have two children. I have never said that I am gay and I have never engaged in any behavior that would suggest that I am gay.

    5.    I have never said, done, or suggested anything to Smith that could imply that I am gay, and I have never come on to him in any fashion or otherwise suggested that I desire him. I have never been sexually attracted to Smith (or any other man) in any way or at any time.

6.     I understand that Smith claims that I grinded or bumped up behind him the way a man would dance with a woman at a "hip hop club." This is absolutely not true and did not happen. I have never done anything like that to Smith or any man. I also understand that Smith claims that, during a verbal altercation about a long-standing disagreement we had about his job duties (having to perform Pellet Durability Index testing), he asked me whether I was going to buy him lunch, and that he further claims that I told him that I had a "tube steak smothered in drawers" for him. Again, this is false. Smith asked me about buying him lunch with some frequency, and a few times I jokingly told him that all he was getting was "tube steak," which is a common slang reference for a hot dog. .

7.     I did not sexually harass Smith, and I never witnessed anyone else sexually harass Smith. I have no reason whatsoever to believe that Smith was subjected to sexual harassment. After Smith complained of sexual harassment, Human Resources investigated his claims and could find no evidence to support them. Nevertheless, the entire Bridgeville facility, including myself, attended mandatory sexual harassment training.

8.     I did not retaliate against Smith in any way. His employment continued without change following both his verbal altercation with me on March 13, 2009, for which he received written discipline, and his sexual harassment complaint. Smith was discharged only because he abandoned his job without permission, even after Jefferson and I both instructed him to stay. David Jones, Human Resources Director, made the decision to discharge Smith and communicated that decision to Smith directly.

I solemnly affirm and declare under the penalty of perjury and upon personal knowledge that the foregoing is true and correct.

_Chuck W. Broderick_                         _2-27-13_
Chuck Broderick                              Date

2

# EXHIBIT 5

COPY [1]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARC E. SMITH,                          )
        Plaintiff,                      )
                                        )
                v.                      )  C.A. No.
                                        )  12-227-LPS-SRF
PERDUE FARMS INCORPORATED,              )
        Defendant.                      )


         Deposition of **TYSON JEFFERSON,** taken
pursuant to notice, on Tuesday, July 24, 2012,
beginning at 12:05 p.m., in the law offices of
Schmittinger & Rodriguez, 54 The Green, Dover,
Delaware, reported by Cheryl A. Anthony, Court
Reporter.

APPEARANCES:

        NOEL E. PRIMOS, ESQUIRE
        SCHMITTINGER & RODRIGUEZ
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BROOKS R. AMIOT, ESQUIRE
        JACKSON LEWIS, LLP
        2800 Quarry Lake Drive
        Suite 200
        Baltimore, Maryland  21209
        Attorney for Defendant.

ALSO PRESENT:

        MR. DAVID JONES

_____

2

```
        1              TYSON JERROD JEFFERSON,
        2         the witness herein, having first been
        3         duly sworn on oath, was examined and
        4         testified as follows:
        5    BY MR. PRIMOS:
12:01:29  6         Q.    Mr. Jefferson, have you ever had your
12:01:31  7    deposition taken before?
12:01:32  8         A.    No, I have not.
12:01:33  9         Q.    Okay.  Let me give you some ground rules to
12:01:35 10    keep in mind that will help things go more smoothly.
12:01:39 11    Try to keep in mind that anything anybody is saying is
12:01:45 12    being taken down.  So as a result of that, you need to
12:01:48 13    make all of your responses verbal.
12:01:51 14              For example, if I ask you a question that
12:01:53 15    calls for a yes or no answer, you can't just nod your
12:01:57 16    head or shake your head like you might do in a normal
12:02:00 17    conversation.  Make sure you actually make a verbal
12:02:02 18    answer.
12:02:03 19         A.    Okay.
12:02:04 20         Q.    Also, try to make sure that you are never
12:02:07 21    speaking when somebody else is speaking.  So if I'm
12:02:10 22    asking a question, let me finish the question
12:02:14 23    completely, even though you may know the answer already.
   2:17 24    In a normal conversation, you might just go ahead and
```

Tyson Jefferson - Primos                          3

| | | |
|---|---|---|
| 2:21 | 1 | answer.  But it is important for me to get the whole |
| 12:02:24 | 2 | question out and finished before you start talking. |
| 12:02:27 | 3 | Similarly, if Mr. Amiot wants to put |
| 12:02:31 | 4 | something on the record and he starts talking, you would |
| 12:02:33 | 5 | stop speaking and then go ahead and finish once he puts |
| 12:02:36 | 6 | that on the record. |
| 12:02:37 | 7 | A.   I understand. |
| 12:02:38 | 8 | Q.   If at any time you don't understand |
| 12:02:40 | 9 | something that I'm asking you, please let me know and |
| 12:02:42 | 10 | I'll rephrase it.  If you answer, I'll assume that you |
| 12:02:45 | 11 | understand me. |
| 12:02:46 | 12 | If at any time you need to take a break, |
| 12:02:48 | 13 | that's fine.  Just let me know.  I would just remind you |
| 12:02:52 | 14 | that you are not permitted to speak to your attorney |
| 12:02:55 | 15 | during the break about the deposition. |
| 12:02:58 | 16 | Is there any reason today, such as |
| 12:03:01 | 17 | medication you might be taking, that you wouldn't be |
| 12:03:03 | 18 | able to answer my questions accurately or wouldn't be |
| 12:03:05 | 19 | able to understand them? |
| 12:03:06 | 20 | A.   No. |
| 12:03:07 | 21 | Q.   Okay.  What is your current position, |
| 12:03:14 | 22 | Mr. Jefferson? |
| 12:03:14 | 23 | A.   I'm mill supervisor. |
| 3:16 | 24 | Q.   For Perdue Farms? |

Tyson Jefferson - Primos                    4

12:03:17  1        A.    Yes.

12:03:19  2        Q.    And what particular mill are we talking

12:03:22  3    about?

12:03:22  4        A.    The Bridgeville facility.

12:03:24  5        Q.    How long have you been in that position?

12:03:26  6        A.    For seven years.

12:03:29  7        Q.    So can you give me a month and year when you

12:03:31  8    started as mill supervisor?

12:03:33  9        A.    I couldn't rightly -- I can't actually --

12:03:41 10    that's all I know is seven years.  I can't give you a

12:03:44 11    specific date or time.

12:03:45 12        Q.    Would it be 2005?  Sometime in 2005?

12:03:49 13        A.    I don't know.

12:03:56 14        Q.    Do you remember when Marc Smith started at

12:03:57 15    the Bridgeville mill?

12:03:58 16        A.    Yes, I do.

12:03:59 17        Q.    Were you already working there when he

12:04:01 18    started there?

12:04:01 19        A.    Yes.

12:04:04 20        Q.    And have you been working continuously in

12:04:07 21    that position since you started?  In other words, have

12:04:11 22    there been any breaks in your employment?

12:04:13 23        A.    No.

1  1:13  24        Q.    Okay.  And who is your immediate supervisor?

Tyson Jefferson - Primos                              5

4:19    1     A.    Charles Broderick.

12:04:21    2     Q.    How long has he been your immediate

12:04:23    3   supervisor?

12:04:23    4     A.    About the same time; we started at the same

12:04:27    5   time.

12:04:28    6     Q.    You started at the same time?

12:04:29    7     A.    Yes.

12:04:30    8     Q.    Now, prior to when you started as the mill

12:04:34    9   supervisor at the Bridgeville mill, were you working for

12:04:37   10   Perdue?

12:04:37   11     A.    Yes.

12:04:38   12     Q.    And how long have you been a Perdue

12:04:41   13   employee?

12:04:41   14     A.    19 years.

12:04:42   15     Q.    Were you at the Bridgeville mill before you

12:04:49   16   became mill supervisor there?

12:04:50   17     A.    Yes.

12:04:51   18     Q.    How long have you been at the Bridgeville

12:04:54   19   mill?

12:04:54   20     A.    19 years.

12:04:55   21     Q.    19 years.  And what was your position before

12:04:57   22   you became mill supervisor?

12:05:02   23     A.    I was in maintenance, I was in maintenance

:06   24   at that time before I moved over.

Tyson Jefferson - Primos                                    6

| | | |
|---|---|---|
| 5:07 | 1 | Q.    Do you remember what your title was? |
| 12:05:08 | 2 | A.    I was a maintenance guy. |
| 12:05:13 | 3 | Q.    Maintenance guy? |
| 12:05:13 | 4 | A.    Okay.  I worked every position there. |
| 12:05:17 | 5 | Q.    Your current position, mill supervisor, is |
| 12:05:22 | 6 | that a salaried position? |
| 12:05:23 | 7 | A.    Yes. |
| 12:05:23 | 8 | Q.    And how many people do you have under your |
| 12:05:27 | 9 | immediate supervision as mill supervisor? |
| 12:05:33 | 10 | A.    About eight people. |
| 12:05:39 | 11 | Q.    And was one of those people Marc Smith while |
| 12:05:42 | 12 | he was employed there? |
| 12:05:43 | 13 | A.    Yes. |
| 12:05:43 | 14 | Q.    Were you his immediate supervisor the whole |
| 12:05:46 | 15 | time that he was employed there? |
| 12:05:47 | 16 | A.    Yes. |
| 12:06:03 | 17 | Q.    What are your duties as mill supervisor? |
| 12:06:07 | 18 | A.    Could you be more specific?  What type? |
| 12:06:10 | 19 | What are you looking for? |
| 12:06:11 | 20 | Q.    What are your responsibilities? |
| 12:06:13 | 21 | A.    My responsibilities is to run -- to ensure |
| 12:06:17 | 22 | that we have adequate staff in the mill and to run it, |
| 12:06:23 | 23 | as far as receiving, unloading, and making feed. |
| 06:30 | 24 | Q.    When Marc Smith was hired, did you have any |

Tyson Jefferson - Primos                    7

| | | |
|---|---|---|
| 5:33 | 1 | involvement in hiring him?  Making that hiring decision? |
| 12:06:37 | 2 | A.    Yes. |
| 12:06:42 | 3 | Q.    Did you interview him? |
| 12:06:42 | 4 | A.    Yes, we interviewed him. |
| 12:06:47 | 5 | Q.    When you say we, who is we? |
| 12:06:49 | 6 | A.    Myself and Charles Broderick. |
| 12:06:51 | 7 | Q.    Did you jointly make the decision to hire |
| 12:06:53 | 8 | him?  You and Mr. Broderick? |
| 12:06:55 | 9 | A.    Yes.  We make all of our decisions jointly. |
| 12:06:57 | 10 | Q.    Was anybody else involved in the hiring |
| 12:06:59 | 11 | decision? |
| 12:07:00 | 12 | A.    Of course, you know, human resources and |
| 12:07:03 | 13 | everybody else that has to do the paperwork to get him |
| 12:07:06 | 14 | in the line. |
| 12:07:11 | 15 | Q.    When Marc Smith started at the Bridgeville |
| 12:07:13 | 16 | mill, what was his job position? |
| 12:07:15 | 17 | A.    He was a panel operator.  That's what he was |
| 12:07:18 | 18 | hired for. |
| 12:07:19 | 19 | Q.    At some point was he promoted? |
| 12:07:21 | 20 | A.    I want to say we made him a utility later |
| 12:07:31 | 21 | on, I believe.  I'm not for sure, though. |
| 12:07:33 | 22 | Q.    Okay.  I'm going to show you -- |
| 12:07:35 | 23 | A.    But that's the same position, primarily. |
| : 7:37 | 24 | But he has an open shift where he has to, you know, work |

Tyson Jefferson - Primos                                20

| | |
|---|---|
| 1:47 | 1 |

control would have taken care of?

A.    Again, I can't answer that question, because that is what we did at Bridgeville.  The panel operator did the PDI tests at Bridgeville.

Q.    Did Marc ever complain about doing pellet durability index tests?

A.    Yes.

Q.    When did he complain about --

A.    All the time.  He didn't like to do them.

Q.    So from the time he first started, he complained about doing those tests?

A.    Yes, but he did them.  He complained about it, but he did them.

Q.    And yet, in your evaluation of him, under the subject cooperation, which is willingly does the job asked, you put as standard, correct?

A.    Right, yes, exactly, yes.

Q.    So for seven years, he constantly complained about doing PDI tests?

A.    Could you be more specific?

Q.    Well, you said he complained about these from the time he first started at the feed mill.

A.    Correct.

Q.    Was it a constant situation?  Every day he

Tyson Jefferson - Primos                           21

1   would complain?

2        A.   No.   Like one day, he would say:   I'm tired

3   of doing these.   Why do we have to do these?   You know,

4   he would just do it.

5        Q.   Did he indicate why he had a problem doing

6   them?

7        A.   No, he never did.   He just didn't like doing

8   them.   Some people just don't like doing stuff, you

9   know.

10       Q.   Who did he complain to about it?

11       A.   He complained to myself, to Chuck.   He just

12  complained.

13       Q.   How often would you say he complained about

14  it?   Once a week?

15       A.   I wouldn't say it was that frequent, no.

16       Q.   Maybe once a month?

17       A.   I couldn't tell you.

18       Q.   When he would complain about doing the PDI

19  test, how did you respond to him?

20       A.   I told him that was part of his position and

21  that's what he had to do.

22       Q.   Did you tell him that he needed to stop

23  complaining about it?

24       A.   No.

Tyson Jefferson - Primos                     22

3:44      1        Q.    Why not?

12:23:45  2        A.    Because he wasn't really bothering me; I

12:23:50  3   knew he had to do the job.   Everybody had complaints.

12:23:54  4   We just moved on.

12:23:55  5        Q.    When you had conversation with him, when he

12:23:57  6   would come to you and complain about doing the tests and

12:24:02  7   you would say, you need to do it, did he continue to

12:24:03  8   argue with you?

12:24:05  9        A.    No, not me, no.

12:24:06  10       Q.    You said he would also complain to Chuck

12:24:10  11  Broderick about doing the test?

12:24:12  12       A.    Yes.

12:24:13  13       Q.    Is that from the time he started at the mill

12:24:16  14  that he complained to Chuck about it?

12:24:18  15       A.    I couldn't say at the time he actually

12:24:20  16  started at the mill, the whole time.   I'm just saying

12:24:24  17  that frequently, he would complain.

12:24:25  18       Q.    And frequently, he would complain to Chuck,

12:24:31  19  correct?

12:24:31  20       A.    I couldn't tell you that, you know.   I do

12:24:33  21  remember one incident that when he couldn't get it out

12:24:35  22  of me, he went to Chuck with it.

12:24:37  23       Q.    Okay.  But there were other occasions that

4:40      24  he complained to Chuck, as well, correct?

Tyson Jefferson - Primos                                    23

1   A.   Yes.

2        Q.   Let's talk about the other occasions first.

3   On these other occasions when he would complain to

4   Chuck, how did Chuck respond to him?

5        A.   The same way I did.  You know, it's part of

6   your job, and you have to do it.

7        Q.   And did Marc argue with him?

8        A.   I can remember one incident that he -- They

9   had a big argument about it.

10       Q.   Other than that one incident, did Marc ever

11  argue with Chuck?

12       A.   No.  I didn't witness it, no.

13       Q.   So tell me about this one incident where

14  Marc and Chuck had a big argument.

15       A.   What actually do you want to know about it?

16       Q.   Just tell me what happened from beginning to

17  end, everything that you remember.

18       A.   What I can remember, I was sitting in my

19  office.  And I heard Marc using profanity, you know,

20  fuck this, you know, get some balls, you're a worthless

21  piece of shit.  That's what I heard from Marc, talking

22  to Chuck, referring to -- about him doing PDIs.  You

23  know, he just exploded.

24       Q.   Well, how did you know that Marc was saying

Tyson Jefferson - Primos                    24

    5:05    1   those things about the PDI tests, as opposed to

 12:26:10    2   something else?

 12:26:12    3        A.    Because after all of this went down, that's

 12:26:15    4   what the conversation -- me and Chuck, we talked, and

 12:26:21    5   that's what it was about.

 12:26:22    6        Q.    So Chuck told you that is what it was about?

 12:26:24    7        A.    Exactly, because like I said, he was

 12:26:26    8   using -- he wasn't being professional at all.  He was

 12:26:29    9   really being disrespectful to be in a workplace.

 12:26:32   10        Q.    Now, you say you were sitting in your

 12:26:34   11   office?

 12:26:34   12        A.    In my office, yes.

 12:26:36   13        Q.    Where was your office located?

 12:26:37   14        A.    Right besides Chuck's.

 12:26:39   15        Q.    Right beside Chuck's.  So Chuck and Marc

 12:26:43   16   were in Chuck's office?

 12:26:44   17        A.    Exactly.

 12:26:44   18        Q.    Did they have the door closed, or was the

 12:26:48   19   door closed?

 12:26:48   20        A.    No.  The door was open a crack.  It was

 12:26:50   21   open.

 12:26:51   22        Q.    It was open a crack.  Was your door open?

 12:26:53   23        A.    Yes.  I always leave my door open.

    5:57   24        Q.    Okay.  So before Marc started saying F this

Tyson Jefferson - Primos                          25

7:02      1    and these other things, the profanity he was using, did

12:27:06  2    you hear any of the conversation before Marc started

12:27:09  3    saying that?

12:27:09  4         A.    No, no, I didn't.

12:27:11  5         Q.    Were they having a conversation before that?

12:27:13  6         A.    I couldn't tell you, because I didn't hear

12:27:15  7    it.  All I heard was the profanity.

12:27:17  8         Q.    Okay.  Was Marc yelling?

12:27:19  9         A.    Yes.

12:27:21  10        Q.    Was anybody else in Chuck's office other

12:27:25  11   than Chuck and Marc at the time?

12:27:26  12        A.    I couldn't tell you.

12:27:35  13        Q.    Prior to Marc using this profanity that you

12:27:37  14   described, was Chuck saying anything before that?

12:27:39  15        A.    I couldn't hear Chuck.  All I heard was

12:27:42  16   Marc.

12:27:42  17        Q.    All you heard was Marc?

12:27:43  18        A.    Yes.  That's what got my attention.

12:27:52  19        Q.    Okay.  When Marc used these or made these

12:27:54  20   statements of profanity, what happened then?  After he

12:27:58  21   used these statements of profanity, what happened then?

12:28:02  22        A.    Actually, I got up.  Marc, he went upstairs.

12:28:05  23   And I went into Chuck's office.

8:07      24        Q.    So you heard these statements of profanity,

8:10    1    F this, get some balls, you're a worthless piece of you

12:28:15    2    know what?

12:28:16    3        A.    Yes.

12:28:17    4        Q.    And then Marc just left the office?

12:28:19    5        A.    Just stormed upstairs.

12:28:21    6        Q.    So you didn't ask Marc:  What was that all

12:28:24    7    about?

12:28:24    8        A.    No.  I wasn't trying to get into it right

12:28:26    9    then.  I'm not that -- You know, it was a pretty heated

12:28:29    10    conversation.  And I was trying to see what was going

12:28:31    11    on, so I went to talk to my boss.

12:28:34    12        Q.    Okay.  When you went into Chuck's office,

12:28:37    13    where was Chuck?

12:28:38    14        A.    Sitting at his desk.

12:28:40    15        Q.    Did he seem upset?

12:28:42    16        A.    Yes.

12:28:44    17        Q.    How could you tell he was upset?

12:28:46    18        A.    The expression on his face.

12:28:48    19        Q.    Can you describe the expression to me?

12:28:50    20        A.    Just like your face right now; he got a

12:28:53    21    little thing going on.

12:28:54    22        Q.    Like he was frowning?

12:28:55    23        A.    Yes, trying to figure out what was going on,

3:57    24    yeah.

Tyson Jefferson - Primos                                27

| 8:57 | 1 | Q.   Okay.  Was his face red? |
| 12:28:58 | 2 | A.   Just like yours. |
| 12:29:00 | 3 | Q.   I didn't realize my face was red. |
| 12:29:02 | 4 | MR. AMIOT:  Simmer down, Noel.  Settle down. |
| 12:29:02 | 5 | MR. PRIMOS:  Yes. |
| 12:29:02 | 6 | BY MR. PRIMOS: |
| 12:29:05 | 7 | Q.   So his face was red.  He was frowning.  Did |
| 12:29:10 | 8 | he say anything to you?  Did Chuck say anything to you |
| 12:29:13 | 9 | when you walked into the office? |
| 12:29:14 | 10 | A.   No.  I was pretty much doing all the |
| 12:29:16 | 11 | talking.  I was asking him what was going on, and that's |
| 12:29:19 | 12 | when he told me about the PDI.  He was fussing about the |
| 12:29:23 | 13 | PDI, yes. |
| 12:29:24 | 14 | Q.   So Chuck told you that Marc was fussing |
| 12:29:27 | 15 | about the PDI? |
| 12:29:28 | 16 | A.   Yes. |
| 12:29:29 | 17 | Q.   And did Chuck share anything else with you |
| 12:29:35 | 18 | about the actual conversation that he had with Marc? |
| 12:29:37 | 19 | A.   No. |
| 12:29:38 | 20 | Q.   So what did you say in response, when Chuck |
| 12:29:40 | 21 | told you he was fussing about the PDI? |
| 12:29:42 | 22 | A.   Well, at that point, I was like:  He has to |
| 12:29:46 | 23 | go home to clear the air.  So at that point, I was |
| 9:49 | 24 | trying to get him out of the facility. |

Tyson Jefferson - Primos                    28

9:52      1          Q.     Why did you think that Marc needed to go

12:29:54  2     home?

12:29:54  3          A.     Because he was cussing, using profanity, and

12:29:58  4     wasn't professional; the atmosphere wasn't -- he

12:30:01  5     couldn't work the rest of the day like that.

12:30:06  6          Q.     Did anybody else overhear Marc's comments

12:30:09  7     other than you?

12:30:09  8          A.     I believe Hurdle Mitchell was there.  He was

12:30:13  9     the maintenance supervisor.  He was like in the break

12:30:15  10    room.  It was close quarters there, so everybody pretty

12:30:18  11    much heard what he had to say.

12:30:20  12         Q.     I'm going to ask you just to draw like a

12:30:26  13    little map of the area, if you wouldn't mind, just

12:30:36  14    showing --

12:30:39  15         A.     I'm not a Vincent Van Gogh or anything.

12:30:43  16         Q.     I don't expect you to be.  But as if you

12:30:44  17    were doing a blueprint, show your office and Chuck's

12:30:47  18    office and the break room where you think Mr. Mitchell

12:30:52  19    was.

12:31:04  20         A.     Okay.  This is the door here.  My office and

12:31:07  21    Chuck's offices are -- the only thing separating us is

12:31:11  22    drywall.

12:31:12  23         Q.     If you could, write door where you drew the

1:15      24    door.

Tyson Jefferson - Primos                                29

1:15      1          A.    Door.

12:31:16  2          Q.    Okay.  And that's the door to what?  The

12:31:17  3   office area?

12:31:18  4          A.    No.  That's the door that comes into the

12:31:20  5   office area.

12:31:21  6          Q.    Right, to the office area.

12:31:22  7          A.    And there is a door here.

12:31:25  8          Q.    What is in the blank space outside your

12:31:31  9   office and Chuck's office?

12:31:32  10         A.    You are talking about this space here?

12:31:35  11         Q.    Yes.

12:31:35  12         A.    That's just open space.  We use it for

12:31:38  13  files.  It's almost like -- It has a real echo, because

12:31:42  14  it's almost like a gymnasium in there.  It's almost like

12:31:47  15  an empty space.

12:31:48  16         Q.    If you could, just write the words empty

12:31:51  17  space there.

12:31:52  18         A.    (The witness complied.)

12:31:55  19         MR. PRIMOS:  Why don't have that marked as

12:32:17  20  Jefferson 2?

12:32:17  21         (Jefferson Exhibit Number 2 was marked for

12:32:17  22  identification and attached to the record.)

12:32:19  23  BY MR. PRIMOS:

2:19      24         Q.    So you decided that you needed to get Marc

Tyson Jefferson - Primos                    30

| | | |
|---|---|---|
| 2:23 | 1 | out of the facility.  So what did you do then? |
| 12:32:25 | 2 | A.    First, Chuck and I discussed what we were |
| 12:32:29 | 3 | going to do.  And then I went up to Marc and told him |
| 12:32:31 | 4 | that he would have to leave for the day. |
| 12:32:33 | 5 | Q.    So what did you and Chuck discuss that you |
| 12:32:36 | 6 | were going to do? |
| 12:32:37 | 7 | A.    We both agreed that, you know, Marc had to |
| 12:32:40 | 8 | go for a day; you know, that his actions weren't |
| 12:32:46 | 9 | professional and that he would have to leave for the |
| 12:32:48 | 10 | day. |
| 12:32:49 | 11 | Q.    And where was Marc at that time? |
| 12:32:51 | 12 | A.    Like I said, he was up in the panel room. |
| 12:32:53 | 13 | Q.    Okay.  So you went up there -- |
| 12:32:57 | 14 | A.    Yes. |
| 12:32:57 | 15 | Q.    -- and talked to him.  And when you went up |
| 12:32:59 | 16 | to the panel room, was anyone else in the panel room |
| 12:33:03 | 17 | besides Marc? |
| 12:33:04 | 18 | A.    Yes.  There was a dispatcher there. |
| 12:33:06 | 19 | Q.    Who was that? |
| 12:33:07 | 20 | A.    I can't remember. |
| 12:33:14 | 21 | Q.    Was it Alex Quebral? |
| 12:33:16 | 22 | A.    Like I said, I can't remember. |
| 12:33:18 | 23 | Q.    Was Alex Quebral a dispatcher? |
| 1 3:21 | 24 | A.    No, he wasn't. |

Tyson Jefferson - Primos                          31

3:21      1        Q.    Who were the dispatchers at that time?

12:33:24  2        A.    Clint Lewis, Erwin Hall.

12:33:29  3        Q.    Anyone else?

12:33:30  4        A.    Vernon Russell.

12:33:32  5        Q.    So would it have been one of those three

12:33:35  6    people who were in the panel room when you left it?

12:33:37  7        A.    Could have been, yes.

12:33:38  8        Q.    Well, was there anyone else who was a

12:33:40  9    dispatcher?

12:33:41  10       A.    No.

12:33:41  11       Q.    So it had to be one of those three people?

12:33:43  12       A.    Yes.

12:33:44  13       Q.    At some point did you see Marc on the phone?

12:33:49  14       A.    No.

12:33:51  15       Q.    At some point around that time did you ask

12:33:55  16   Marc to take a walk with you?

12:33:58  17       A.    No.  We went downstairs, Marc and I

12:34:02  18   together.  And I let him know -- I brought him down, so

12:34:07  19   it was just me and him.  And I told him he had to leave

12:34:10  20   today.

12:34:10  21       Q.    So when you went up to him, did you ask him

12:34:13  22   to take a walk with you?

12:34:14  23       A.    I directed him with me, yes.

1  4:16   24       Q.    Did you use the words, come take a walk with

4:19    1    me?

12:34:19    2          A.    I couldn't tell you the exact words that I

12:34:22    3    used.

12:34:22    4          Q.    Did you indicate to him anything along the

12:34:25    5    lines of, don't do something stupid?

12:34:27    6          A.    I have never said that, no.

12:34:35    7          Q.    So you asked Marc to come downstairs with

12:34:38    8    you?

12:34:38    9          A.    Exactly, yes.

12:34:39    10          Q.    And then where did you and Marc go?

12:34:42    11          A.    To my office.

12:34:42    12          Q.    And tell me about that conversation.

12:34:45    13          A.    I told him, like I said before:  You will

12:34:49    14    have to leave for today.  What happened, what transpired

12:34:52    15    between him and Charles wasn't professional, and you

12:34:55    16    just need to call it a day for today.

12:34:59    17          Q.    Did he say anything?

12:35:00    18          A.    Yes.  He said, fuck this shit, and he left.

12:35:06    19          Q.    In your mind, had Marc been suspended?

12:35:09    20          A.    At that point, I was just clearing the air,

12:35:13    21    getting him out of, you know, the hostile environment

12:35:16    22    that he started.

12:35:19    23          Q.    But in your mind, was he going to be paid

5:21    24    for that day?

Tyson Jefferson - Primos                    44

1:05    1   away from the computers, not to go back to them.

12:51:07    2       Q.    Where were the computers located?

12:51:13    3       A.    They are up in the panel room, upstairs.

12:51:15    4       Q.    Was it possible to type something on these

12:51:19    5   computers if you wanted to --

12:51:20    6       A.    Yes, you could -- I'm sorry.

12:51:22    7       Q.    Go ahead.

12:51:22    8       A.    It's Notepad, just like a computer has

12:51:28    9   Notepad.  We didn't have Excel back then.  It was just

12:51:30   10   Notepad.

12:51:30   11       Q.    And was there a printer up there where you

12:51:33   12   could print something out --

12:51:33   13       A.    Yes.

12:51:34   14       Q.    -- if you had typed it?

12:51:35   15       A.    Yes.

12:51:36   16       Q.    Did you ever send a picture of a donkey and

12:51:45   17   a woman to Harry Vannicola's cell phone?

12:51:48   18       A.    Yes.

12:51:48   19       Q.    When did that happen?

12:51:50   20       A.    I couldn't actually tell you the specific

12:51:52   21   times and dates of it.  I did send him a jackass with

12:51:54   22   Homer Simpson and Bart telling him to get back to work.

12:51:58   23       Q.    Was there also a woman in the picture?

2:00   24       A.    No.

Tyson Jefferson - Primos                45

12:01    1     Q.    So it is your testimony that the picture

12:52:09  2   only included a jackass and then Bart Simpson?

12:52:13  3     A.    And Homer.

12:52:14  4     Q.    And Homer?

12:52:14  5     A.    Yes.

12:52:15  6     Q.    Those were the only three figures in the

12:52:17  7   picture?

12:52:17  8     A.    Yes.

12:52:20  9     Q.    If I suggested that that happened in April

12:52:23  10  2009, would that be consistent with your recollection?

12:52:26  11    A.    I couldn't tell you exactly what the time

12:52:30  12  and date was.

12:52:31  13    Q.    And why were you sending that picture to

12:52:33  14  Harry Vannicola's cell phone?

12:52:35  15    A.    At the time I was under the -- Harry was on

12:52:39  16  light duty, and I thought he was over to the shop.  The

12:52:44  17  shop is located maybe a hundred yards away from our

12:52:49  18  facility.  And I sent it to him as a get-back-to-work,

12:52:52  19  because he was on light duty.

12:52:55  20    Q.    Was there anything sexual in nature about

12:52:57  21  this picture that you sent?

12:53:00  22    A.    Other than the jackass.

12:53:02  23    Q.    Why is that sexual?

3:03     24    A.    Well, you know, it's a donkey.  You know,

Tyson Jefferson - Primos                46

| | | |
|---|---|---|
| 3:07 | 1 | people call it a jackass. |
| 12:53:08 | 2 | Q.    In what way is that sexual? |
| 12:53:12 | 3 | A.    I don't know.  It's according to how you |
| 12:53:14 | 4 | take it. |
| 12:53:18 | 5 | Q.    Who was Harry Vannicola? |
| 12:53:19 | 6 | A.    He was a driver. |
| 12:53:20 | 7 | Q.    Did you send a text message along with the |
| 12:53:55 | 8 | picture? |
| 12:53:55 | 9 | A.    There was a caption, you know, on the |
| 12:54:02 | 10 | bottom:  Get back to work.  You know, it was the donkey, |
| 12:54:05 | 11 | the jackass, Homer Simpson, Bart Simpson, the text |
| 12:54:12 | 12 | message, get back to work. |
| 12:54:14 | 13 | Q.    Did you ever send text messages, other than |
| 12:54:16 | 14 | that one, to employees? |
| 12:54:19 | 15 | A.    After I got written up for that text |
| 12:54:24 | 16 | message, I didn't send anything to anybody. |
| 12:54:27 | 17 | Q.    What about before you got written up for |
| 12:54:29 | 18 | that text message?  Did you send other text messages to |
| 12:54:32 | 19 | other employees? |
| 12:54:33 | 20 | A.    Yes.  I could have, yes. |
| 12:54:34 | 21 | Q.    What did those text messages say? |
| 12:54:36 | 22 | A.    I couldn't tell you exactly.  They were |
| 12:54:40 | 23 | forwards.  I couldn't tell you exactly which one I sent |
| 1  1:43 | 24 | to which person. |

Tyson Jefferson - Primos                    55

3:33        1        Q.    A maintenance guy?  Did you ever send a

13:03:36    2    picture of a naked woman to his cell phone?

13:03:39    3        A.    No.

13:03:39    4        Q.    I'm going to ask you some questions about

13:03:56    5    incidents that occurred on May 9th of 2009.  Do you

13:04:05    6    recall?  Were you working that day?

13:04:09    7        A.    Like I said, specific times and dates, I

13:04:12    8    can't tell you, man.  It's been too long to remember.

13:04:14    9        Q.    Do you recall Marc calling you and telling

13:04:17   10    you that he needed to leave the workplace?  Do you

13:04:27   11    recall an incident when that happened?

13·04:28   12        A.    Was that on a Saturday?

13:04:30   13        Q.    Yes.  Do you recall that happening on a

13:04:32   14    Saturday?

13:04:32   15        A.    I wasn't working on a Saturday.

13:04:34   16        Q.    Do you recall him calling you and saying --

13:04:37   17        A.    Yes.  I remember him calling me, telling me

13:04:39   18    that he had a problem with the elevator, and the

13:04:41   19    maintenance guys wouldn't help him.

13:04:44   20        Q.    Do you recall him telling you that he had to

13:04:46   21    leave because he wasn't feeling well?

13:04:48   22        A.    No.  He never told me that.

13:04:50   23        Q.    Do you recall him telling you that he needed

: 4:52     24    to leave?

Tyson Jefferson - Primos                    56

| | | |
|---|---|---|
| 1:52 | 1 | A.   No.   He never told me that. |
| 13:04:53 | 2 | Q.   So you just recall him calling you and |
| 13:04:56 | 3 | saying that he was having a problem with the elevator? |
| 13:04:59 | 4 | A.   Right. |
| 13:04:59 | 5 | Q.   What was the specific problem he was having |
| 13:05:00 | 6 | with the elevator? |
| 13:05:00 | 7 | A.   The elevator was plugged.   Generally, it |
| 13:05:03 | 8 | happens at times when a bin fills up.   I believe it was |
| 13:05:06 | 9 | the soy elevator.   And he just needed to go down there |
| 13:05:10 | 10 | and dig it out and get it running again. |
| 13:05:13 | 11 | Q.   And he told you the guys wouldn't help him? |
| 13:05:16 | 12 | A.   Right. |
| 13:05:16 | 13 | Q.   What guys was he referring to? |
| 13:05:17 | 14 | A.   He was referring to Craig Dohner and Keith |
| 13:05:22 | 15 | Hudson. |
| 13:05:25 | 16 | Q.   And you were not working that day? |
| 13:05:26 | 17 | A.   No, I was off.   Actually, I was in Lowe's, |
| 13:05:28 | 18 | getting some lumber to build a doghouse. |
| 13:05:31 | 19 | Q.   And so what did you do in response to that |
| 13:05:33 | 20 | call from Marc? |
| 13:05:34 | 21 | A.   I told him to go ahead and don't let them |
| 13:05:38 | 22 | bother him, just get the job done, and I needed him to |
| 13:05:42 | 23 | continue working. |
| 5:43 | 24 | Q.   And what did he say in response to that? |

Tyson Jefferson - Primos                    57

5:45        1          A.     That's the first conversation.  He went on,

13:05:48    2    and I assume he did what he was supposed to do.

13:05:51    3          Q.     So what was the next conversation you had

13:05:53    4    with him that day?

13:05:54    5          A.     He called -- I don't know.  I couldn't tell

13:05:57    6    you if it was a call or a text.  But he called me and

13:05:59    7    said that -- he was aggravated, and he was talking about

13:06:03    8    he was leaving.  I said:  No, you need to stay for your

13:06:05    9    shift.  There was only a couple of more hours left that

13:06:13   10    he had, and we just needed that production out of him.

13:06:15   11          Q.     Do you remember what shift was that day?

13:06:18   12          A.     I believe it was seven to three.

13:06:20   13          Q.     Seven to three?  So you believe he called

13:06:22   14    you about 1:00 p.m. and said he was leaving?

13:06:24   15          A.     It may have been around noon.  I couldn't

13:06:26   16    tell you exactly what time it was.

13:06:28   17          Q.     But you don't remember if it was a text or

13:06:30   18    an actual call?

13:06:31   19          A.     No.  But he was telling me that he was

13:06:34   20    leaving.

13:06:34   21          Q.     And you remember responding back to him --

13:06:36   22          A.     Saying that he needed to stay.

13:06:38   23          Q.     And you either did that in a text or in a

5:41       24    call?

Tyson Jefferson - Primos                     58

```
16:41      1        A.      Right.

13:06:42   2        Q.      And did he tell you why he was leaving?

13:06:46   3        A.      No.

13:06:47   4        Q.      And did he respond when you said he needed

13:06:51   5    to stay?

13:06:52   6        A.      No.  He never responded.

13:06:54   7        Q.      He never responded?

13:06:54   8        A.      No.

13:06:55   9        Q.      Do you remember who was working that day

13:06:57  10    other than Dohner, Hudson, and Marc?

13:07:00  11        A.      I couldn't tell you who the dispatcher was

13:07:03  12    that was working.  Generally, we have a dispatcher

13:07:13  13    there, but I couldn't tell you who it was.

13:07:13  14        Q.      And what was Hudson's position?

13:07:14  15        A.      He was a maintenance guy.

13:07:16  16        Q.      So Dohner and Hudson were maintenance guys?

13:07:20  17        A.      Correct.

13:07:20  18        Q.      Marc was working as what?  A panel operator?

13:07:23  19        A.      Yes, that's correct.

13:07:23  20        Q.      And there was a dispatcher --

13:07:23  21        A.      Right.

13:07:24  22        Q.      -- who would have been -- and I think you

13:07:25  23    said there were three of them.  Was it Hall, Russell,

j7:28     24    and who was the other one?
```

Tyson Jefferson - Primos                                    59

07:30      1          A.    Hall, Russell, Clint Lewis, and Eugene

13:07:36   2    Lawter; there was four of them.

13:07:37   3          Q.    Okay.  So one of those four would have been

13:07:39   4    working?

13:07:40   5          A.    They could have been, yes.

13:07:41   6          Q.    Would anybody else have been working that

13:07:44   7    day?

13:07:44   8          A.    No, they wouldn't, no.

13:07:47   9          Q.    Nobody else would have been?

13:07:48   10         A.    No.

13:07:49   11         Q.    And what would happen if Marc just left?

13:07:53   12         A.    What do you mean?

13:07:54   13         Q.    What would happen to the operation if Marc

13:07:57   14   just left?

13:07:57   15         A.    A, we wouldn't have -- we wouldn't meet our

13:08:04   16   quota for the week.  B, we would just be behind, and we

13:08:08   17   didn't need to be behind at that time.  Once you get

13:08:11   18   behind in bulk feed, you never -- it's hard to continue

13:08:15   19   to get back on track.

13:08:18   20         Q.    But there wasn't any kind of safety issue

13:08:20   21   involved with him there?

13:08:21   22         A.    If he just up and left and left everything

13:08:25   23   running, from a safety aspect, the elevator was on

08:31      24   constantly.  It could have burnt the place down, burnt

Tyson Jefferson - Primos                    60

| | | |
|---|---|---|
| 8:33 | 1 | motors up, jammed screws.  He could have done numerous |
| 13:08:37 | 2 | things.  It could have been a catastrophe for the |
| 13:08:42 | 3 | company and cost the company money. |
| 13:08:43 | 4 | Q.    Now, you said he didn't respond to you when |
| 13:08:46 | 5 | you told him he couldn't leave? |
| 13:08:47 | 6 | A.    That's right. |
| 13:08:48 | 7 | Q.    So what happened next? |
| 13:08:49 | 8 | A.    I got a call from the maintenance guys |
| 13:08:52 | 9 | stating that he left.  And on my Saturday, my day off, I |
| 13:08:56 | 10 | had to come up and turn the equipment off. |
| 13:08:58 | 11 | Q.    So it's your testimony that he left the |
| 13:09:02 | 12 | equipment running? |
| 13:09:02 | 13 | A.    Yes.  He left everything running.  Job |
| 13:09:10 | 14 | abandonment, he just left. |
| 13:09:12 | 15 | Q.    When you got up to the plant or to the feed |
| 13:09:14 | 16 | mill, who was there? |
| 13:09:15 | 17 | A.    Well, the maintenance guys was there.  But |
| 13:09:20 | 18 | they can't operate the computers.  That's all they know |
| 13:09:23 | 19 | how to do, is turn wrenches.  They don't know how to |
| 13:09:27 | 20 | actually turn things off. |
| 13:09:29 | 21 | Q.    Was that Dohner and Hudson that were there? |
| 13:09:31 | 22 | A.    Yes. |
| 13:09:31 | 23 | Q.    Was the dispatcher there? |
| 9:33 | 24 | A.    Yes. |

Tyson Jefferson - Primos                    61

| 9:33 | 1 | Q. Why couldn't the dispatcher have operated |
| 13:09:33 | 2 | the equipment? |
| 13:09:34 | 3 | A. Because he's not trained to turn things off. |
| 13:09:37 | 4 | Q. What was the dispatcher doing? |
| 13:09:38 | 5 | A. Loading trucks. |
| 13:09:39 | 6 | Q. Loading trucks? |
| 13:09:40 | 7 | A. Yes. |
| 13:09:40 | 8 | Q. Do you recall what time it was that you got |
| 13:09:47 | 9 | the call that Marc had left? |
| 13:09:48 | 10 | A. I couldn't tell you the specific time. |
| 13:09:53 | 11 | That's all I know is I had to come out of Salisbury and |
| 13:09:55 | 12 | go to Bridgeville to turn the equipment off. |
| 13:09:57 | 13 | Q. Why did you have to come from Salisbury? |
| 13:10:00 | 14 | A. Because that's where Lowe's is, in |
| 13:10:03 | 15 | Salisbury. |
| 13:10:03 | 16 | Q. And so what did you do after you came and |
| 13:10:08 | 17 | turned the equipment off? |
| 13:10:09 | 18 | A. I went on and cleaned up his mess, because |
| 13:10:11 | 19 | he left everything, his bags out. I cleaned up the work |
| 13:10:15 | 20 | area to get it ready for Monday. So I spent |
| 13:10:19 | 21 | approximately two and a half, three hours there, getting |
| 13:10:24 | 22 | that stuff done. And then I went home. |
| 13:11:44 | 23 | Q. What happened when you went home or after |
| 1:46 | 24 | you went home? What happened next? |

Tyson Jefferson - Primos                                    62

11:47      1        A.    Do you mean what happened when I got to the

13:11:51   2   house?

13:11:52   3        Q.    Yes.

13:11:52   4        A.    To my home?

13:11:53   5        Q.    Yes.

13:11:53   6        A.    I continued to do what I was doing.   I

13:11:57   7   unloaded the lumber.   I didn't get to finish my

13:12:00   8   doghouse.

13:12:00   9        Q.    Did you contact anyone about what happened?

13:12:03  10   Anyone associated with Perdue?

13:12:06  11        A.    No.

13:12:07  12        Q.    You didn't try to contact Mr. Broderick?

13:12:10  13        A.    No.   I don't believe I called him.   I don't

13:12:12  14   believe I called him until that Monday, I don't believe.

13:12:15  15   He had a daughter going to a college graduation or

13:12:18  16   something.   I didn't want to bother him.

13:12:20  17        Q.    Assuming that was a Saturday when he left,

13:12:36  18   when Marc left the plant or left the mill, what was the

13:12:38  19   next workday?

13:12:40  20        A.    That Monday.

13:12:43  21        Q.    Okay.   Did you have any conversations with

13:12:45  22   anyone associated with Perdue on Sunday, the 10th?

13:12:51  23        A.    I couldn't recall.   I couldn't tell you.   I

12:56     24   don't remember.

Tyson Jefferson - Primos                    63

| | | |
|---|---|---|
| 2:57 | 1 | Q. Did you talk to Marc? |
| 13:12:59 | 2 | A. Like I said, I don't remember. |
| 13:13:01 | 3 | Q. Is it possible you did? |
| 13:13:02 | 4 | A. Like I said, again, I do not remember. |
| 13:13:06 | 5 | Q. Do you remember what happened on the next |
| 13:13:07 | 6 | workday, the 11th? |
| 13:13:08 | 7 | A. Yes, the 11th. That is that Monday? |
| 13:13:11 | 8 | Q. Yes. |
| 13:13:12 | 9 | A. I had a write-up. I was going to go ahead |
| 13:13:15 | 10 | and suspend Marc pending termination for job |
| 13:13:23 | 11 | abandonment. |
| 13:13:24 | 12 | Q. And did you consult with anybody? Did you |
| 13:13:27 | 13 | talk to anybody before you -- |
| 13:13:28 | 14 | A. Yes. At that time -- |
| 13:13:29 | 15 | Q. Let me finish -- before you issued that |
| 13:13:31 | 16 | write-up? |
| 13:13:32 | 17 | A. Not before; I talked to Broderick over the |
| 13:13:37 | 18 | phone to let him know what I was doing. |
| 13:13:40 | 19 | Q. You talked to him before you actually issued |
| 13:13:42 | 20 | the write-up to Marc? |
| 13:13:43 | 21 | A. Right. |
| 13:13:45 | 22 | Q. When did you first talk to Chuck Broderick |
| 13:13:48 | 23 | over the phone? |
| 3:49 | 24 | A. I couldn't tell you exactly what time. But |

Tyson Jefferson - Primos                          64

3:50    1    I know it was before I issued Marc the write-up.

13:13:55    2         Q.    Was it Monday morning before you talked to

13:13:57    3    Chuck Broderick on the phone?

13:13:59    4         A.    Yes.

13:13:59    5         Q.    Was Chuck Broderick at the plant or at the

13:14:03    6    mill that Monday morning?

13:14:04    7         A.    No.

13:14:04    8         Q.    Why wasn't he?

13:14:05    9         A.    He had some kind of a college thing with his

13:14:08    10    daughter, a graduation he was doing.  He was on that.

13:14:13    11         Q.    So you talked to Chuck over the phone

13:14:17    12    sometime on Monday morning and told him what you were

13:14:20    13    planning to do with the write-up?

13:14:21    14         A.    Exactly.

13:14:21    15         Q.    And you indicated that you were going to

13:14:24    16    suspend Marc?

13:14:25    17         A.    Yes.

13:14:25    18         Q.    And you also indicated something about

13:14:27    19    termination?

13:14:28    20         A.    Pending termination, because that was an

13:14:30    21    extraordinary offense.  He left the job.  He left

13:14:34    22    everything running.  You know, that's means of

13:14:39    23    termination.

1:39    24         Q.    Did you talk to Mr. Jones about it -- David

Tyson Jefferson - Primos                    65

| | | |
|---|---|---|
| 4:42 | 1 | Jones about it -- before you issued the disciplinary |
| 13:14:46 | 2 | documents? |
| 13:14:46 | 3 | A.    On Monday, I think we did have a |
| 13:14:49 | 4 | conversation concerning that issue. |
| 13:14:51 | 5 | Q.    Who?  You and David Jones? |
| 13:14:53 | 6 | A.    Yeah. |
| 13:14:54 | 7 | Q.    And what was that conversation? |
| 13:14:55 | 8 | A.    Just letting him know what I was doing. |
| 13:14:57 | 9 | Q.    Did he have any input about it? |
| 13:15:03 | 10 | A.    Overall, he had the last call on if he kept |
| 13:15:07 | 11 | his job or not. |
| 13:15:09 | 12 | Q.    Did he agree with what you were doing? |
| 13:15:12 | 13 | Mr. Jones? |
| 13:15:12 | 14 | A.    As far as job abandonment, yes. |
| 13:15:13 | 15 | Q.    As far as issuing this discipline? |
| 13:15:15 | 16 | A.    Right. |
| 13:15:16 | 17 | Q.    So tell me what happened on Monday morning |
| 13:15:19 | 18 | after you called Mr. Broderick and after you talked to |
| 13:15:22 | 19 | Mr. Jones. |
| 13:15:23 | 20 | A.    Well, coming to work, Marc Smith was already |
| 13:15:26 | 21 | there.  I called him down to my offers and let him know |
| 13:15:30 | 22 | what was going on.  I had Hurdle Mitchell as an |
| 13:15:34 | 23 | eyewitness. |
| 5:34 | 24 | Q.    When you say, I let him know what was going |

# EXHIBIT 6



PERDUE FARMS, INCORPORATED
16447 Adams Road
Bridgeville, DE  19933
Office: 302-855-
Fax: 302-337-2219

To:     Personnel File
        Marc Smith
RE:     Disciplinary Action March 13, 2009
        Insubordination, Inappropriate Language

Comments:

Associate has argued with management repeatedly in regard to some of his duties over the course of several days.

1.  Recording drug and other micro-ingredient lot numbers each time bags are dumped
    a.  FDA requirement
    b.  Food Safety requirement
    c.  Recall requirement
2.  Running PDI (Pellet Durability Index) tests

In particular, both management and Q/A explained the rationale for this being consistent and accurate. He was also told that if he came up with an easier, more accurate, "bullet proof" method, management would review it and consider its implementation.

On Friday, March 13, 2009 at around 7:15, Marc called me in my office and argued that PDI tests are not his job, that they were Q/A duties. I told him that he was wrong and he would have to continue to do them. He began raising his voice and saying he was calling H/R. I told him to go ahead, but that at Bridgeville they had always been the operators' responsibility, I had to ask him to get off the phone because I had other things to do besides to argue with him. I also told him I would check into what the other mills are doing, but would not necessarily change anything.

Less than five minutes later Marc left his workstation and came into my office still agitated. After repeated attempts of trying to explain to him that he would have to continue to do PDI tests, and that I would follow up on it, I asked him to leave. Things became more heated and he finally told me that I needed to "get a set of balls" and tell Donna to do her job. He stormed out before and I called after him to return. He yelled something from the break room and I went to talk to him. I told him that he should go home if he was going to continue to act this way or that he should just go back and do his job. He yelled he already called H/R and wasn't going to do PDI's. I then raised my voice and told him that if he didn't like working here that he should look for another job, but he needed to calm down and go back upstairs. He then screamed, "you're a worthless piece of shit", and stormed off. Both Tyson Jefferson and Hurdle Mitchell heard this.

At this point, I went back to my office and Tyson was already there. We discussed the matter and both of us agreed that he needed to be sent home and suspended. Tyson told Marc to go home and he left. This was incorrect procedure since Marc did not have opportunity to sign and receive a copy of the write up.

Marc must not continue this type of behavior and if it occurs again he will be suspend pending review and termination.

Supervisors Signature: _____     Date: __3-13-09__

Associate Signature: _____     Date: __3-17-09__

Witness Signature: _____     Date: _____

EXHIBIT
Smith 8
qp 11/27/18

PF 000063

# EXHIBIT 7

# DISCIPLINARY RECORD

Associate's Name _Marc Smith_      Date _3-13-09_

Department _Feed Mill_      Location _Bridgeville_

Reason for Discipline: _Insubordination, Inappropriate language_

## OFFENSE (Check One)

_X_ First Offense  ___ Second Offense  ___ Third Offense  ___ Fourth Offense

## DISCIPLINE

| | |
|---|---|
| ___ | Oral warning issued to associate. This report to Personnel File. |
| _X_ | Written notice issued to associate. This report to Personnel File. |
| ___ | Written notice issued to associate. _____ day(s) suspension given. |
| | From _____ To_____ Return _____ Time _____ |
| ~~___~~ | Extraordinary offense warranting a need for immediate and serious disciplinary action. This report to Personnel File. |
| ___ | Termination effective _____. Last day worked _____. |
| ___ | Original copy of this report to Personnel File. |

Comments: _See Attached_

_Associate Comments: I turn in Chuck Bradrick for Bertol Major_

_Supervisor's Signature_ _____      _3-12-09_
Date

_Associate's Signature_ _____      _3-17-09_
Date

_Human Resources Representative's Signature_ _____      _____
Date

EXHIBIT
Smith 9
ap 11/27/18
PENGAD 800-631-6989

☐ Check if comments are continued on reverse side.

You may appeal through Peer Review or Management Review, if applicable, within 5 days.

# EXHIBIT 8



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
MARC E. SMITH,                    )
      Plaintiff,                  )
                                  )
            v.                    ) C.A. No.
                                  ) 12-227-LPS-SRF
PERDUE FARMS INCORPORATED,        )
      Defendant.                  )
```

          Deposition of **DAVID JONES**, taken
pursuant to notice, on Tuesday, July 24, 2012,
beginning at 9:30 a.m., in the law offices of
Schmittinger & Rodriguez, 54 The Green, Dover,
Delaware, reported by Cheryl A. Anthony, Court
Reporter.

APPEARANCES:

          NOEL E. PRIMOS, ESQUIRE
          SCHMITTINGER & RODRIGUEZ
          414 South State Street
          Dover, Delaware  19901
          Attorney for Plaintiff.

          BROOKS R. AMIOT, ESQUIRE
          JACKSON LEWIS, LLP
          2800 Quarry Lake Drive
          Suite 200
          Baltimore, Maryland  21209
          Attorney for Defendant.

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

2

|  |  |  |
|---|---|---|
| | 1 | DAVID JONES, |
| | 2 | the witness herein, having first been |
| | 3 | duly sworn on oath, was examined and |
| | 4 | testified as follows: |
| | 5 | BY MR. PRIMOS: |
| 09:31:38 | 6 | Q.    Mr. Jones, my name is Noel Primos.  I |
| 09:31:41 | 7 | represent Marc Smith in this litigation. |
| 09:31:43 | 8 | A.    Okay. |
| 09:31:44 | 9 | Q.    Have you ever had your deposition taken |
| 09:31:45 | 10 | before? |
| 09:31:45 | 11 | A.    Yes, I have. |
| 09:31:47 | 12 | Q.    Okay.  Let me just remind you of some |
| 09:31:50 | 13 | things.  I'm sure you are familiar with these, but it |
| 09:31:53 | 14 | never hurts to just remind you.  Please make sure that |
| 09:31:57 | 15 | all of your responses today are verbal.  Ms. Anthony is |
| 09:32:01 | 16 | taking them down, so no nodding of the head or shaking |
| 09:32:05 | 17 | of the head.  For the same reasons, make sure you are |
| 09:32:07 | 18 | not speaking when I'm speaking or Mr. Amiot is speaking |
| 09:32:12 | 19 | so that she can take down everything that's being said. |
| 09:32:16 | 20 | If at any time you don't understand |
| 09:32:18 | 21 | something that I am asking you, please let me know and |
| 09:32:22 | 22 | I'll rephrase the question.  If you answer, I'll assume |
| 09:32:24 | 23 | that you do understand. |
| 2:26 | 24 | If at any time you need to take a break, let |

David Jones - Primos                                3

| | | |
|---|---|---|
| 2:28 | 1 | me know.  That is fine.  Just during a break, you are |
| 09:32:31 | 2 | not permitted to speak with your attorney about the |
| 09:32:34 | 3 | deposition. |
| 09:32:36 | 4 | Is there any reason today, such as |
| 09:32:38 | 5 | medication you might be taking, that you would not be |
| 09:32:41 | 6 | able to answer my questions accurately? |
| 09:32:43 | 7 | A.     No. |
| 09:32:44 | 8 | Q.     Okay.  Mr. Jones, what is your position with |
| 09:32:50 | 9 | Perdue? |
| 09:32:50 | 10 | A.     I'm the corporate live production HR manager |
| 09:32:55 | 11 | for Perdue. |
| 09:32:58 | 12 | Q.     Okay.  You say corporate live production HR |
| 09:33:03 | 13 | manager.  Are there other HR managers for Perdue in |
| 09:33:08 | 14 | addition to yourself? |
| 09:33:09 | 15 | A.     Yes, there is. |
| 09:33:09 | 16 | Q.     How many HR managers are there that work for |
| 09:33:14 | 17 | Perdue? |
| 09:33:14 | 18 | A.     Different HR managers; it could be anywhere |
| 09:33:20 | 19 | from -- Let's see.  We have 15 plants, so there's at |
| 09:33:22 | 20 | least 15 others. |
| 09:33:23 | 21 | Q.     At least 15 others? |
| 09:33:24 | 22 | A.     Right. |
| 09:33:24 | 23 | Q.     Okay.  So you're saying there is one for |
| 3:26 | 24 | each plant? |

David Jones - Primos                    4

09:33:27    1        A.    There is a complex HR manager for each

09:33:30    2    plant, yes.

09:33:30    3        Q.    Okay.  So which plant are you responsible

09:33:35    4    for?

09:33:35    5        A.    I'm responsible for what we call live

09:33:39    6    production.  The company is broken into operationals,

09:33:44    7    operation side, which are the plants, complex HR

09:33:48    8    individuals.  I have 67 sites in four states attached to

09:33:54    9    those different plants.

09:33:57   10        Q.    Okay.  You said you are responsible for 67

09:34:01   11    sites --

09:34:01   12        A.    That's correct.

09:34:02   13        Q.    -- in 14 states.  So for example, what would

09:34:09   14    the other HR managers be responsible for?  Would they

09:34:13   15    each have their own, roughly, 67 plants, or is that not

09:34:19   16    how it works?

09:34:19   17        A.    No.  Fifteen plants, complex HR individuals

09:34:23   18    at each one of those plants; live production consists

09:34:26   19    of, for example, feed mills and hatcheries.

09:34:29   20        Q.    Okay.  So those feed mills and hatcheries

09:34:41   21    would not be included in those 15 plants is what you're

09:34:43   22    saying?

09:34:43   23        A.    They are attached to those as business

09:34:46   24    units.

David Jones - Primos                                    5

4:47        1        Q.      Okay.  And you're saying that there are 67

09:34:49    2   of those --

09:34:49    3        A.      Yes.

09:34:50    4        Q.      -- feed mills and hatcheries?

09:34:51    5        A.      Yes.  There are 67 different sites.

09:34:56    6        Q.      You are saying 67, right?

09:34:57    7        A.      Yes.  Let me back up.  There are 67 sites

09:35:01    8   that I'm responsible for, which include live production,

09:35:06    9   Perdue Transportation, the breeder side of our business.

09:35:08   10   For the sake of just talking about feed mills that are

09:35:11   11   attached to these operational plants, there's only 11

09:35:15   12   feed mills, for example, that are attached to those 15

09:35:19   13   plants.

09:35:24   14        Q.      And how many of those feed mills are located

09:35:28   15   in Delaware?

09:35:28   16        A.      One.

09:35:29   17        Q.      Just one?  And that would be the Bridgeville

09:35:32   18   feed mill?

09:35:32   19        A.      That is correct.

09:35:36   20        Q.      How long have you served in that position of

09:35:38   21   corporate live production HR manager?

09:35:41   22        A.      September 10, 2007.

09:35:46   23        Q.      And have you been continuously in that

5:49       24   position since that time?

David Jones - Primos                                    6

| | | |
|---|---|---|
| 5:50 | 1 | A.    Yes. |
| 09:35:51 | 2 | Q.    And where are you located? |
| 09:35:53 | 3 | A.    I'm located in the corporate office in |
| 09:35:58 | 4 | Salisbury. |
| 09:35:59 | 5 | Q.    And how often do you travel off-site to |
| 09:36:08 | 6 | other locations? |
| 09:36:10 | 7 | A.    As needed, you know, so sometimes I may |
| 09:36:14 | 8 | visit sites two or three times a year.  Some sites are |
| 09:36:19 | 9 | close by.  Other sites I may only visit once a year. |
| 09:36:22 | 10 | Q.    How many employees do you serve as direct |
| 09:36:32 | 11 | supervisor for? |
| 09:36:33 | 12 | A.    Two. |
| 09:36:33 | 13 | Q.    And who would those be? |
| 09:36:35 | 14 | A.    They would be Maria Young. |
| 09:36:40 | 15 | Q.    And what is her position? |
| 09:36:41 | 16 | A.    She's the employment process coordinator. |
| 09:36:44 | 17 | Q.    And who is the other person? |
| 09:36:45 | 18 | A.    Maria Lockhart, same title. |
| 09:36:50 | 19 | Q.    And are they also located in the Salisbury |
| 09:36:53 | 20 | corporate office? |
| 09:36:53 | 21 | A.    No, sir. |
| 09:36:54 | 22 | Q.    Where are they located? |
| 09:36:56 | 23 | A.    Maria Young is located in Princess Anne, |
| .6:59 | 24 | Maryland.  And Ms. Lockhart is in Statesville, North |

David Jones - Primos                          7

| 7:05 | 1 | Carolina. |
|---|---|---|

09:37:05   2      Q.    During the course of your employment, have

09:37:23   3   you had any interaction with an employee named Marc

09:37:26   4   Smith?

09:37:26   5      A.    Yes.

09:37:26   6      Q.    What interaction has that been?

09:37:29   7      A.    The interaction has been, for example, when

09:37:34   8   he called me about a particular issue or a concern that

09:37:39   9   he had.

09:37:40   10      Q.    Can you remember any of those times,

09:37:42   11   specifically?

09:37:43   12      A.    Specifically, he called and said he was sent

09:37:52   13   home because of issues with job performance.

09:38:00   14      Q.    Do you remember the date of that incident?

09:38:03   15      A.    Somewhere around March 2009.

09:38:15   16      Q.    And how did he reach you?  How did he

09:38:21   17   communicate with you?

09:38:23   18      A.    I think Marc reached me on my cell number.

09:38:26   19      Q.    He has that or had that at the time?

09:38:28   20      A.    Oh, yes, he has that.

09:38:31   21      Q.    Do you remember?  Did he leave a message for

09:38:34   22   you and you called him back, or did he reach you right

09:38:40   23   away?

.8:40   24      A.    I can't recall if he got me right away or

David Jones - Primos                                8

| | | |
|---|---|---|
| 3:45 | 1 | got me later on in my office or on my cell phone number. |
| 09:38:49 | 2 | I can't remember. |
| 09:38:50 | 3 | Q.    But in other words, when you had this |
| 09:38:52 | 4 | conversation with him, were you calling him back after |
| 09:38:54 | 5 | he had left a message, or was he calling you? |
| 09:38:57 | 6 | A.    I can't recall whether he called me back or |
| 09:39:01 | 7 | whether he called me and I answered the phone.  I can't |
| 09:39:03 | 8 | remember.  We did have a conversation. |
| 09:39:07 | 9 | Q.    And can you tell me specifically what that |
| 09:39:10 | 10 | conversation was? |
| 09:39:11 | 11 | A.    I think Marc had an issue, a performance |
| 09:39:20 | 12 | issue inside the feed mill.  And the conversation |
| 09:39:24 | 13 | between he and his manager became heated, and he was |
| 09:39:29 | 14 | sent home. |
| 09:39:30 | 15 | Q.    And why was Marc calling you about this? |
| 09:39:33 | 16 | A.    I am the HR person for that feed mill. |
| 09:39:38 | 17 | Q.    But if he was sent home because of a |
| 09:39:42 | 18 | performance issue, why would he have been calling you |
| 09:39:44 | 19 | instead of his supervisor? |
| 09:39:45 | 20 | A.    Well, I never said his supervisor didn't |
| 09:39:49 | 21 | call me.  You asked me did Mr. Smith call me. |
| 09:39:52 | 22 | Q.    Did the supervisor call you before Mr. Smith |
| 09:39:55 | 23 | called you about this same incident? |
| 9:56 | 24 | A.    No. |

David Jones - Primos                        9

| | | |
|---|---|---|
| 9:57 | 1 | Q.    Okay.  But did the supervisor call you at a |
| 09:40:03 | 2 | later time -- |
| 09:40:03 | 3 | A.    Yes. |
| 09:40:04 | 4 | Q.    -- about that incident? |
| 09:40:05 | 5 | A.    Yes. |
| 09:40:06 | 6 | Q.    Was it that same day? |
| 09:40:07 | 7 | A.    It would have had to have been, yes. |
| 09:40:12 | 8 | Q.    It would have had to have been? |
| 09:40:13 | 9 | A.    Yes. |
| 09:40:13 | 10 | Q.    Who was the supervisor? |
| 09:40:14 | 11 | A.    His name is Chuck Broderick. |
| 09:40:17 | 12 | Q.    Chuck Broderick.  Do you know how long after |
| 09:40:18 | 13 | you spoke to Marc that you spoke to Chuck? |
| 09:40:21 | 14 | A.    I can't recall the specific time, sir. |
| 09:40:23 | 15 | Q.    Was it within an hour?  Less than an hour? |
| 09:40:27 | 16 | A.    I can't recall the specific time. |
| 09:40:33 | 17 | Q.    Okay.  So you said Marc indicated to you he |
| 09:40:37 | 18 | had had a performance issue.  There was a heated |
| 09:40:39 | 19 | conversation, and he had been sent home? |
| 09:40:41 | 20 | A.    That's right. |
| 09:40:41 | 21 | Q.    Again, why was Marc calling you?  Was he |
| 09:40:44 | 22 | complaining about something in relation to this, or was |
| 09:40:47 | 23 | he concerned about something? |
| 10:48 | 24 | A.    He, in essence, didn't think it was fair |

David Jones - Primos                                    10

| | | |
|---|---|---|
| 0:52 | 1 | that he was being judged on the performance requirements |
| 09:40:56 | 2 | at the mill.  And that is the reason for that, that's |
| 09:40:57 | 3 | why he called me.  He didn't think it was justified. |
| 09:41:00 | 4 | Q.    Why didn't he think it was justified? |
| 09:41:02 | 5 | A.    Because he was sent home. |
| 09:41:03 | 6 | Q.    What do you mean he didn't think it was fair |
| 09:41:07 | 7 | that he was being judged per the performance |
| 09:41:11 | 8 | requirements at the mill.  Can you explain? |
| 09:41:13 | 9 | A.    There are certain tasks that have to be |
| 09:41:16 | 10 | performed at the feed mill, certain tasks.  If one of |
| 09:41:19 | 11 | those tasks are not performed at the expectation from |
| 09:41:23 | 12 | what we call the SOPs, the standard operating |
| 09:41:28 | 13 | procedures, and that associate who is assigned to that |
| 09:41:31 | 14 | task is not performing at that level, that supervisor |
| 09:41:34 | 15 | can take action and say it's a performance issue. |
| 09:41:38 | 16 | Q.    But my question was:  Why did he think it |
| 09:41:42 | 17 | wasn't fair?  Why did Marc think it wasn't fair? |
| 09:41:45 | 18 | A.    If I remember correctly -- Mr. Primos, |
| 09:41:48 | 19 | right? |
| 09:41:49 | 20 | Q.    Yes, yes. |
| 09:41:49 | 21 | A.    If I remember correctly, Mr. Primos, because |
| 09:41:52 | 22 | he didn't feel that all the job tasks assigned was his |
| 09:41:58 | 23 | responsibility. |
| 1:58 | 24 | Q.    And do you remember specifically what job |

David Jones - Primos                    11

| | | |
|---|---|---|
| 2:01 | 1 | tasks he felt were not his responsibility? |
| 09:42:03 | 2 | A.    Not off the top of my head, sir. |
| 09:42:18 | 3 | Q.    Did he indicate to you any other concerns |
| 09:42:22 | 4 | that he had? |
| 09:42:22 | 5 | A.    No. |
| 09:42:24 | 6 | Q.    Did he mention the subject of sexual |
| 09:42:27 | 7 | harassment? |
| 09:42:27 | 8 | A.    No. |
| 09:42:28 | 9 | Q.    What was your response to him when he |
| 09:42:31 | 10 | brought these concerns to you? |
| 09:42:33 | 11 | A.    I told him that I would speak with his |
| 09:42:35 | 12 | supervisor, and I would follow back up with him. |
| 09:42:37 | 13 | Q.    And how did he respond to that? |
| 09:42:47 | 14 | A.    He was fine. |
| 09:42:48 | 15 | Q.    Okay.  How long would you estimate that your |
| 09:42:52 | 16 | telephone conversation with him took? |
| 09:42:54 | 17 | A.    Probably less than five minutes. |
| 09:42:56 | 18 | Q.    Less than five minutes? |
| 09:42:58 | 19 | A.    Uh-huh. |
| 09:43:01 | 20 | Q.    So you did speak with his supervisor, Chuck |
| 09:43:05 | 21 | Broderick, correct? |
| 09:43:07 | 22 | A.    At some point, yes. |
| 09:43:08 | 23 | Q.    Okay.  Now, isn't it true that at the time |
| 3:14 | 24 | Chuck was not Marc's immediate supervisor? |

David Jones - Primos                    12

3:16          1          A.      Well, that would be true.  His immediate

09:43:21      2     supervisor was Tyson Jefferson.

09:43:24      3          Q.      Okay.  Why didn't you speak to his immediate

09:43:27      4     supervisor about the situation?

09:43:28      5          A.      Because the heated conversation did not

09:43:32      6     happen between Mr. Jefferson and Mr. Smith.  It was with

09:43:37      7     Mr. Broderick, the main manager.  And sometimes I use

09:43:42      8     them interchangeably.  But both of them are managers at

09:43:46      9     the feed mill and can direct the activity of any

09:43:49      10    associate on that site.

09:43:50      11         Q.      Tell me about your conversation with Chuck

09:43:52      12    that day.

09:43:52      13         A.      Well, I'm going back three years.  I think

09:44:00      14    the conversation went -- you know, Marc Smith, he had a

09:44:04      15    performance issue.  He really got out of line when we

09:44:08      16    tried to address the situation with him.  And I sent him

09:44:12      17    home.  And I asked him about the particulars of what

09:44:12      18    happened.

09:44:15      19              And it had something to do with what we call

09:44:19      20    PDIs, or performance quality checks, that he didn't

09:44:24      21    adequately perform or didn't perform.  So actually, when

09:44:28      22    it was brought to his attention, when this was brought

09:44:31      23    to Marc's attention, that's when he became -- got a

1:35          24    little agitated.

David Jones - Primos                    13

4:36        1        Q.    Okay.  Anything else you recall about your

09:44:47     2    conversation with Chuck?

09:44:47     3        A.    No.  That's the specifics of that

09:44:55     4    conversation.

09:45:04     5        Q.    And what did you do in response, once you

09:45:06     6    had that information from Chuck?

09:45:07     7        A.    I think once I had that information from

09:45:11     8    Chuck, I think that when he was sent home, it was under

09:45:17     9    the impression that maybe he was suspended at that time.

09:45:23    10            So part of my conversation was:  Okay.  Did

09:45:28    11    Mr. Smith receive the suspension paperwork?  He said:

09:45:33    12    No, we have it here.  Did you send him home, or was he

09:45:40    13    suspended?  We sent him home.  Then it's not a

09:45:45    14    suspension.

09:45:46    15            So we had proper protocols.  So therefore,

09:45:49    16    if he was not given suspension paperwork when he was

09:45:53    17    sent home, then he was sent home, not suspended.

09:45:57    18        Q.    What is the difference between being sent

09:46:02    19    home and being suspended?

09:46:05    20        A.    The manager at the time has the instruction

09:46:11    21    to send the individual home to calm down, to get out of

09:46:14    22    the situation so that it doesn't get out of hand.  A

09:46:17    23    suspension is an associate is given a performance -- a

5:23       24    job performance coaching session that signs off on it,

David Jones - Primos                    14

| | | |
|---|---|---|
| 5:26 | 1 | and then that associate incurs -- our associate incurs a |
| 09:46:34 | 2 | three-day suspension.  That's the difference. |
| 09:46:36 | 3 | Q.    Is the suspension always for the period of |
| 09:46:39 | 4 | three days? |
| 09:46:40 | 5 | A.    For an hourly suspension, it could be up to |
| 09:46:43 | 6 | three days.  But usually, our protocol is three days. |
| 09:46:49 | 7 | Q.    So in your view, Mr. Smith had not been |
| 09:46:52 | 8 | suspended -- |
| 09:46:52 | 9 | A.    That's correct. |
| 09:46:53 | 10 | Q.    -- that day?  So what did you do next? |
| 09:47:03 | 11 | A.    Mr. Smith was allowed to come back to work. |
| 09:47:07 | 12 | He was given a disciplinary for the performance issues, |
| 09:47:14 | 13 | and he was paid for the balance of the day, which would |
| 09:47:18 | 14 | have been eight hours.  I can't remember.  I don't |
| 09:47:23 | 15 | remember if he went home four hours of the day or five |
| 09:47:27 | 16 | hours of the day.  But he was paid eight hours that |
| 09:47:29 | 17 | particular day.  But it was not a suspension, and he was |
| 09:47:32 | 18 | allowed to come back to work. |
| 09:47:33 | 19 | Q.    Do you remember at what point in the workday |
| 09:47:35 | 20 | he had been sent home? |
| 09:47:36 | 21 | A.    That's what I can't recall, sir. |
| 09:47:39 | 22 | Q.    Now, when you say he was allowed to come |
| 09:47:41 | 23 | back to work, do you mean that same day? |
| 7:44 | 24 | A.    No, the very next workday. |

David Jones - Primos                    23

1    section, there is an X next to extraordinary offense

2    that is crossed out?

3         A.    No.

4         Q.    Do you know why the language beginning,

5    associate comments, is crossed out?

6         A.    The associate took the paperwork and, I

7    understand, started writing.  And then the supervisor or

8    Mr. Broderick said:  That is for my comments from a

9    management standpoint.  And you would have to write your

10   comments somewhere else.

11        Q.    So do you know who crossed it out?

12        A.    No, I do not.

13        Q.    How do you know that?  Were you present when

14   Marc Smith was trying to write this information on the

15   form?

16        A.    No.

17        Q.    Well, how do you know that Mr. Broderick

18   told him that?  Did you overhear the conversation over a

19   telephone?

20        A.    Mr. Broderick assured me, sir.

21        Q.    So Mr. Broderick told you about this

22   interaction where Marc Smith tried to write on the

23   paper, and Mr. Broderick told him that was for his

24   comments and that he would have to write his comments on

David Jones - Primos                                31

| | | |
|---|---|---|
| 3:07 | 1 | 3/17/09? |
| 10:13:09 | 2 | A.    No, sir. |
| 10:13:09 | 3 | Q.    Is that what it looked like when you |
| 10:13:17 | 4 | received it?  In other words, was the seven scratched |
| 10:13:20 | 5 | over? |
| 10:13:20 | 6 | A.    That's correct. |
| 10:13:20 | 7 | (Jones Exhibit Number 5 was marked for |
| 10:13:20 | 8 | identification and attached to the record.) |
| 10:13:42 | 9 | BY MR. PRIMOS: |
| 10:13:42 | 10 | Q.    Mr. Jones, I'm showing you what has been |
| 10:13:45 | 11 | marked as Jones Exhibit 5.  Have you seen this document |
| 10:13:50 | 12 | before? |
| 10:13:51 | 13 | A.    Yes. |
| 10:14:01 | 14 | Q.    And when was the first time you saw it? |
| 10:14:02 | 15 | A.    On the date that is on the very top of the |
| 10:14:05 | 16 | page, sir. |
| 10:14:06 | 17 | Q.    And how did you receive it? |
| 10:14:07 | 18 | A.    Mr. Perdue's secretary. |
| 10:14:12 | 19 | Q.    What is Mr. Perdue's secretary's name? |
| 10:14:16 | 20 | A.    Excuse me.  Libby. |
| 10:14:18 | 21 | Q.    Okay.  You can review it before I ask you |
| 10:14:21 | 22 | any more questions. |
| 10:14:44 | 23 | A.    I believe that I -- I believe it was sent to |
| 4:58 | 24 | me by Mr. Perdue's secretary. |

David Jones - Primos                                    32

| | | |
|---|---|---|
| 5:02 | 1 | Q.    What was the name of Mr. Perdue's secretary |
| 10:15:05 | 2 | at the time? |
| 10:15:05 | 3 | A.    Sherry Michalik. |
| 10:15:10 | 4 | Q.    How do you spell that last name? |
| 10:15:12 | 5 | A.    I think it's M-i-c-h-a-l-i-k. |
| 10:15:27 | 6 | Q.    And she sent it to you on March 17th? |
| 10:15:31 | 7 | A.    I believe that's correct. |
| 10:15:36 | 8 | Q.    Do you see the stamp at the bottom?  Do you |
| 10:15:40 | 9 | see that it has the date March 17th and then the letters |
| 10:15:43 | 10 | AM?  And then it has the number nine, and the minutes |
| 10:15:49 | 11 | have apparently been cut off.  Do you recognize that |
| 10:15:53 | 12 | stamp or -- |
| 10:15:55 | 13 | A.    No. |
| 10:15:56 | 14 | Q.    Okay.  Why did Sherry Michalik send you that |
| 10:16:04 | 15 | document, Jones 5? |
| 10:16:05 | 16 | A.    If Mr. Perdue receives communication from |
| 10:16:11 | 17 | the field, she directs it to the HR person responsible |
| 10:16:17 | 18 | in that area to look into first. |
| 10:16:21 | 19 | Q.    So did you get a phone call from Sherry |
| 10:16:25 | 20 | before you received the document? |
| 10:16:27 | 21 | A.    It may have been an email or a phone call. |
| 10:16:31 | 22 | I can't recall. |
| 10:16:32 | 23 | Q.    So did you know the document was coming |
| 6:34 | 24 | before you actually received the document? |

David Jones - Primos                    33

| | | |
|---|---|---|
| 6:35 | 1 | A.    It may have been at the same time.  If it |
| 10:16:38 | 2 | was sent over or scanned in, I can't -- |
| 10:16:41 | 3 | MR. AMIOT:  Don't guess.  If you don't know, |
| 10:16:42 | 4 | you don't know. |
| 10:16:44 | 5 | THE WITNESS:  Don't know. |
| 10:16:44 | 6 | BY MR. PRIMOS: |
| 10:16:46 | 7 | Q.    Okay.  So what communication did you receive |
| 10:16:49 | 8 | from Sherry Michalik about this document? |
| 10:16:51 | 9 | A.    This came in to Mr. Perdue, and I wanted to |
| 10:16:58 | 10 | give it to you to follow up. |
| 10:17:00 | 11 | Q.    Do you know how it was sent to Mr. Perdue? |
| 10:17:03 | 12 | A.    No, I do not. |
| 10:17:05 | 13 | Q.    Do you know how Mr. Smith would have gotten |
| 10:17:08 | 14 | either Mr. Perdue's either fax or email? |
| 10:17:13 | 15 | A.    No, I do not. |
| 10:17:17 | 16 | Q.    Did you respond to Sherry in any way when |
| 10:17:20 | 17 | she asked you to follow up on this? |
| 10:17:23 | 18 | A.    No. |
| 10:17:26 | 19 | Q.    So what did you do to follow up on it? |
| 10:17:28 | 20 | A.    Well, if my memory serves me correctly, when |
| 10:17:35 | 21 | I got this, the first thing I thought about, in putting |
| 10:17:41 | 22 | this together, is the information that I received either |
| 10:17:45 | 23 | the same day or the day before in regard to his -- the |
| .7:52 | 24 | issues with Jones 4 or Jones 3.  And I believe I decided |

David Jones - Primos                                      34

8:01      1    to take some notes, and I know I needed to set up a

10:18:07  2    meeting to go and meet with Mr. Smith.

10:18:15  3         Q.    So did you talk to anyone about it or

10:18:20  4    communicate with anyone about it before you went to meet

10:18:22  5    with Mr. Smith?  And I mean about the information in

10:18:27  6    Jones 5.

10:18:28  7         A.    I can't recall if I did or not.

10:18:35  8         Q.    You don't remember if you spoke to or

10:18:38  9    communicated with Chuck Broderick about the information

10:18:41  10   in Jones 5?

10:18:43  11        A.    I can't remember if I spoke to him, because

10:18:45  12   usually, it's my protocol that if someone is alleged or

10:18:51  13   something was alleged against that person, I go speak to

10:18:53  14   that person first before I backtrack.

10:18:58  15        Q.    If something is alleged against a person,

10:19:01  16   you go speak to that person first?  In other words, the

10:19:04  17   person who has been accused?

10:19:06  18        A.    No, no.  The person that is making the

10:19:11  19   allegations, I speak to that person first.

10:19:13  20        Q.    So normally, you wouldn't have spoken to

10:19:16  21   Chuck Broderick first about it?

10:19:18  22        A.    No, no.

10:19:19  23        Q.    So tell me about communications that you had

9:23      24   about this document with Marc Smith.

David Jones - Primos                                    35

9:26        1        A.      I think after I received this particular

10:19:34    2    document, I set up a time to go to the feed mill to meet

10:19:38    3    with Mr. Smith in regard to this email or this note that

10:19:45    4    he sent.

10:19:50    5        Q.      Do you remember when that was that you met

10:19:52    6    with him?

10:19:52    7        A.      It was either --

10:20:03    8                MR. AMIOT:  Do you remember when is the

10:20:05    9    question?

10:20:07   10                THE WITNESS:  No.

10:20:07   11    BY MR. PRIMOS:

10:20:08   12        Q.      Was it on March 17th?

10:20:10   13        A.      No.

10:20:11   14        Q.      Now, before you met with Marc Smith, what

10:20:16   15    was your reaction to the first line of Jones 5, where he

10:20:23   16    says:  I, Marc Smith, turn Chuck Broderick in for sexual

10:20:27   17    harassment on March 13, 2009?

10:20:29   18        A.      Well, first of all, it always gets my

10:20:34   19    attention, the words sexual harassment.  Now to, say,

10:20:37   20    give a specific date that he turned the date that he is

10:20:41   21    stating, March 13, 2009, I spoke to Marc Smith on

10:20:49   22    2009.  This is the first I heard of sexual harassment,

10:20:55   23    when I received this.

0:57       24        Q.      So were you surprised to see his statement

David Jones - Primos                    36

| Time | Line | |
|---|---|---|
| 0:59 | 1 | that he turned Chuck Broderick in for sexual harassment |
| 10:21:04 | 2 | on March 13th? |
| 10:21:05 | 3 | A.    Very surprised. |
| 10:21:06 | 4 | Q.    So tell me about your meeting, your initial |
| 10:21:08 | 5 | meeting with Marc Smith at the feed mill regarding this |
| 10:21:11 | 6 | issue. |
| 10:21:11 | 7 | A.    I think Mr. Smith had given me a couple of |
| 10:21:15 | 8 | names that could substantiate his story.  I took those |
| 10:21:21 | 9 | names of those individuals.  And after I had that |
| 10:21:26 | 10 | conversation with Marc, I then addressed it with the two |
| 10:21:33 | 11 | individuals in a meeting. |
| 10:21:35 | 12 | Q.    Well, first of all, tell me about your |
| 10:21:37 | 13 | conversation with Marc. |
| 10:21:37 | 14 | A.    Well, my conversation with Marc, he really |
| 10:21:44 | 15 | wouldn't cooperate.  After he gave me the two names, he |
| 10:21:49 | 16 | shut down and said:  Hey, I have a lawyer. |
| 10:21:52 | 17 | Q.    So the very first thing you asked him for |
| 10:21:56 | 18 | was for the names of other people? |
| 10:21:57 | 19 | A.    No.  We talked about what he said and the |
| 10:22:00 | 20 | comments that he made here.  Tell me about this.  And at |
| 10:22:05 | 21 | this meeting, he said:  Well, I have witnesses.  Of |
| 10:22:09 | 22 | course, who are your witnesses?  He gave me the names of |
| 10:22:11 | 23 | those witnesses. |
| 2:12 | 24 | Q.    What were the names of those people? |

David Jones - Primos                    37

| | | |
|---|---|---|
| 2:14 | 1 | A.      I believe Erwin Hall and George Williams. |
| 10:22:25 | 2 | Q.      Okay.  So he gave you the names of the |
| 10:22:28 | 3 | witnesses.  And then what happened?  What was said? |
| 10:22:31 | 4 | A.      And then right after that, he said there |
| 10:22:35 | 5 | were several incidents.  And I asked him about the |
| 10:22:36 | 6 | incidents.  And he wouldn't tell me.  You know, he |
| 10:22:42 | 7 | wouldn't tell me any particulars about any incidents. |
| 10:22:44 | 8 | He just said there were other incidents, and he wouldn't |
| 10:22:47 | 9 | tell me the incidents.  And then he said:  Look, I have |
| 10:22:50 | 10 | a lawyer.  Once he said he had a lawyer, I ended the |
| 10:22:53 | 11 | conversation. |
| 10:22:53 | 12 | Q.      Why? |
| 10:22:54 | 13 | A.      It was no need to continue the conversation. |
| 10:22:58 | 14 | He said he had a lawyer.  So therefore, I don't continue |
| 10:23:02 | 15 | conversations with individuals if they just told me they |
| 10:23:06 | 16 | have a lawyer. |
| 10:23:06 | 17 | Q.      And why is that? |
| 10:23:07 | 18 | A.      In my past years in the HR business, when |
| 10:23:12 | 19 | someone says, I have a lawyer, you just need to cease |
| 10:23:15 | 20 | and end the conversation at that point in time. |
| 10:23:17 | 21 | Q.      So finding out that someone has a lawyer |
| 10:23:19 | 22 | would cause you to end an investigation of a sexual |
| 10:23:24 | 23 | harassment complaint? |
| 3:25 | 24 | A.      I didn't say I ended the investigation.  I |

David Jones - Primos                    38

| | | |
|---|---|---|
| 3:27 | 1 | didn't say I ended the investigation. |
| 10:23:29 | 2 | Q.    Did you ask Marc Smith who his lawyer was? |
| 10:23:32 | 3 | A.    No, sir, I did not. |
| 10:23:33 | 4 | Q.    Why?  Why didn't you? |
| 10:23:35 | 5 | A.    I have no need to know who his lawyer is. |
| 10:23:39 | 6 | That's not a question I thought I needed to ask. |
| 10:23:41 | 7 | Q.    Did you ask Marc Smith about this particular |
| 10:23:44 | 8 | incident on March 13th where Chuck Broderick said he had |
| 10:23:49 | 9 | a tube steak smothered in draws? |
| 10:23:56 | 10 | A.    No, I did not, because Mr. Smith would not |
| 10:23:59 | 11 | cooperate at that point.  He shut down and said:  I have |
| 10:24:02 | 12 | a lawyer.  So I ended the conversation, Mr. Primos. |
| 10:24:06 | 13 | Q.    And you didn't ask him about the incident a |
| 10:24:08 | 14 | few weeks before that, where Mr. Broderick came up |
| 10:24:12 | 15 | behind him, like a man would dance with a woman in a hip |
| 10:24:17 | 16 | hop club?  You didn't ask him about that incident |
| 10:24:20 | 17 | either? |
| 10:24:20 | 18 | A.    No. |
| 10:24:20 | 19 | Q.    Now, in his statement on March 17th, he says |
| 10:24:33 | 20 | in the very last sentence:  I will have no recourse but |
| 10:24:37 | 21 | to seek outside assistant. |
| 10:24:40 | 22 | But it is your testimony that he told you, |
| 10:24:42 | 23 | when you met with him, that he already had a lawyer? |
| 1:45 | 24 | A.    That's correct. |

David Jones - Primos                          39

| | | |
|---|---|---|
| 4:55 | 1 | Q. So was it your decision to end the |
| 10:24:57 | 2 | conversation when you found out that Mr. Smith had a |
| 10:24:59 | 3 | lawyer? |
| 10:25:00 | 4 | A. That's correct. |
| 10:25:04 | 5 | Q. So it wasn't really him not cooperating. It |
| 10:25:07 | 6 | was your decision to end the conversation, correct? |
| 10:25:09 | 7 | A. Well, he just said: I have a lawyer, and |
| 10:25:12 | 8 | that's all I'm saying. So we ended the conversation. |
| 10:25:18 | 9 | Q. So what did you do next in your |
| 10:25:19 | 10 | investigation? |
| 10:25:19 | 11 | A. Well, I met with the two individuals that he |
| 10:25:25 | 12 | named, Erwin Hall and George Williams. And I also met |
| 10:25:31 | 13 | with Chuck Broderick. |
| 10:25:32 | 14 | Q. Okay. Tell me about your conversation with |
| 10:25:34 | 15 | Erwin Hall. |
| 10:25:35 | 16 | A. Well, Erwin Hall, there was a lot of stray |
| 10:25:39 | 17 | comments, remarks that was made, such as: Hey, you |
| 10:25:42 | 18 | know, the guys always tease each other. |
| 10:25:45 | 19 | Q. This was Erwin Hall saying this? |
| 10:25:47 | 20 | A. This is Erwin Hall. The guys always tease |
| 10:25:50 | 21 | each other. He said they used the words, sweet cheeks, |
| 10:25:55 | 22 | hey baby, stray comments like that. But that was the |
| 10:26:01 | 23 | gist of his comments of it. |
| 5:03 | 24 | I did ask him, was he a witness to this -- I |

David Jones - Primos                    40

| | |
|---|---|
| 26:08 | 1 |
| 10:26:11 | 2 |
| 10:26:16 | 3 |
| 10:26:18 | 4 |
| 10:26:22 | 5 |
| 10:26:26 | 6 |
| 10:26:29 | 7 |

1  think the word is the bumping and the grinding like a

2  man dancing at a hip hop club? He said: Hey, I never

3  witnessed anything like that. But the guys there in the

4  shop would make comments or comments were made. But did

5  he say -- I asked him did he specifically see anything

6  that happened between Marc and Mr. Broderick, and the

7  answer was no.

8       Q.    Did you ask him about whether he heard the

9  tube stakes smothered in draws comment?

10      A.    I asked him about all of it. He didn't hear

11  any of those comments.

12      Q.    Anything else that Erwin Hall told you?

13      A.    No.  That was basically it. He said he

14  had -- Erwin had worked there for a number of years, and

15  that's all he could remember, but nothing out of line,

16  just stray comments.

17      Q.    Tell me about George Williams, your

18  conversation with George Williams.

19      A.    Very short; Mr. Williams said: I haven't

20  seen anything. I don't know anything.

21      Q.    Did you ask him specifically about the

22  grinding motions?

23      A.    He said: I haven't seen anything. There

24  was no comment. Mr. Williams was: Hey, I come here to

David Jones - Primos                41

| | | |
|---|---|---|
| 7:20 | 1 | do my job, and I go home.  I didn't see anything. |
| 10:27:24 | 2 | Q.    Tell me about your conversation with Chuck |
| 10:27:26 | 3 | Broderick. |
| 10:27:26 | 4 | A.    Mr. Broderick denied all the comments, all |
| 10:27:28 | 5 | the allegations.  I asked him specifically about the |
| 10:27:33 | 6 | tube steak.  He said:  Yeah, Marc always asked him to |
| 10:27:38 | 7 | buy him lunch.  He would say, look, I'll buy you a tube |
| 10:27:44 | 8 | steak, meaning a hot dog, because there is a -- I guess |
| 10:27:47 | 9 | there is a vending machine in the break room.  But other |
| 10:27:50 | 10 | than that, he said he always -- you know, Marc always |
| 10:27:54 | 11 | asked him to buy him lunch. |
| 10:27:57 | 12 | And part of this, in piecing this together, |
| 10:28:00 | 13 | looking at Jones Exhibit 3 and Jones Exhibit 4 and now |
| 10:28:04 | 14 | getting Jones Exhibit 5, going back and saying, okay, |
| 10:28:11 | 15 | something is not adding up here, because he's asking |
| 10:28:14 | 16 | about buying lunch in the middle -- after a heated |
| 10:28:19 | 17 | conversation.  So some things just didn't begin to add |
| 10:28:23 | 18 | up. |
| 10:28:23 | 19 | I have been in HR for a while.  You begin to |
| 10:28:26 | 20 | look at things.  And all of a sudden -- Marc had worked |
| 10:28:29 | 21 | there for three and a half years.  He worked there for |
| 10:28:32 | 22 | three and a half years, no issues at that feed mill |
| 10:28:35 | 23 | whatsoever.  And then all of a sudden, there's the |
| :8:40 | 24 | March 13th incident.  And then all of a sudden, four |

David Jones - Primos                                    42

8:43        1   days later, you get a communication.  So in HR, you have

10:28:47    2   to look at -- the timing was just questionable.  Why am

10:28:51    3   I getting it all at one time?

10:28:53    4        Q.    So Chuck Broderick did admit that he had

10:28:56    5   used the term tube steak during the conversation on

10:29:00    6   March 13th?

10:29:01    7        A.    No.  I don't know what the date was that he

10:29:04    8   used it specifically.  I can't tell you that

10:29:07    9   specifically.

10:29:08   10        Q.    So he admitted to using the term tube steak

10:29:11   11   in a conversation with Marc Smith?

10:29:15   12        A.    In regard to lunch, yes.

10:29:18   13        Q.    Did he say that he had used that term more

10:29:20   14   than once?

10:29:20   15        A.    No, he didn't.  He didn't say he used it

10:29:26   16   more than once.  We are just talking about one specific

10:29:28   17   time.

10:29:28   18        Q.    So he admitted that he used it one specific

10:29:30   19   time?

10:29:31   20        A.    The tube steak piece, meaning nothing --

10:29:34   21   nothing about smothered in draws; just tube steak,

10:29:39   22   meaning a hot dog from the vending machine.

10:29:40   23        Q.    Okay.  And when did Chuck Broderick make

:   ):45   24   that statement to Marc Smith?  When did he use the term

David Jones - Primos                                    43

| | | |
|---|---|---|
| 9:49 | 1 | tube steak to Marc Smith? |
| 10:29:50 | 2 | A.   I can't remember any specific date. |
| 10:29:53 | 3 | Q.   Is it possible it was March 13th? |
| 10:29:56 | 4 | A.   I can't say. |
| 10:30:01 | 5 | Q.   Okay.  And you specifically asked Chuck |
| 10:30:13 | 6 | Broderick whether he grinded up behind Marc Smith as if |
| 10:30:19 | 7 | he was dancing in a hip hop club? |
| 10:30:22 | 8 | A.   Yes. |
| 10:30:22 | 9 | Q.   And what was his response? |
| 10:30:23 | 10 | A.   Absolutely not. |
| 10:30:30 | 11 | Q.   Do you remember Marc Smith also mentioning |
| 10:30:34 | 12 | to you that some behavior of an employee named Clint |
| 10:30:43 | 13 | Lewis toward another employee, Vernon Russell? |
| 10:30:47 | 14 | A.   Never. |
| 10:30:48 | 15 | Q.   So it's your testimony that Marc Smith never |
| 10:30:52 | 16 | told you that Clint Lewis would take Vernon Russell into |
| 10:30:58 | 17 | an office or room and what Marc referred to as dry hump |
| 10:31:05 | 18 | him? |
| 10:31:05 | 19 | A.   No. |
| 10:31:05 | 20 | Q.   He never told you that? |
| 10:31:06 | 21 | A.   No. |
| 10:31:07 | 22 | Q.   Okay.  Anything else that you recall that |
| 10:31:31 | 23 | Chuck Broderick told you as part of this investigation? |
| 1:33 | 24 | A.   No. |

David Jones - Primos                                    44

1:49       1        Q.    These conversations that you had with Marc

10:31:52   2    and Erwin and George and Chuck Broderick, did they all

10:31:58   3    happen on the same day?

10:31:59   4        A.    Yes.

10:32:02   5        Q.    But you don't recall what day that was?

10:32:04   6        A.    If this was the 17th, it may have been -- it

10:32:15   7    may have been on the 23rd.

10:32:16   8        Q.    Why do you say that?

10:32:17   9        A.    I set up a time to go to the feed mill.  And

10:32:25   10   it may have been that following Monday or that Friday.

10:32:29   11   I can't remember the particular day.  But I went to the

10:32:32   12   feed mill.  My intent was to go to the feed mill, which

10:32:39   13   I did, and meet with Mr. Smith.

10:32:41   14       Q.    After you met with these three people --

10:32:45   15   Erwin Hall, George Williams, and Chuck Broderick -- did

10:32:50   16   you meet with Marc again about this issue, this

10:32:53   17   harassment complaint?

10:32:54   18            MR. AMIOT:  On this day or ever?

10:32:57   19            MR. PRIMOS:  At any time.

10:32:57   20   BY MR. PRIMOS:

10:32:58   21       Q.    Well, let me ask you this.  Did you meet

10:33:01   22   with Mr. Smith, with Marc Smith, to tell him the results

10:33:05   23   of your investigation?

3:06       24       A.    No.

David Jones - Primos                    46

```
 1:32     1   because the sexual harassment training was later on in

10:34:35   2   the month.

10:34:36   3              And that was the end of the conversation.

10:34:36   4        Q.    What would him having taking vacation have

10:34:39   5   to do with the sexual harassment training?

10:34:39   6        A.    I'm sorry.  It was right after he came back

10:34:42   7   from vacation, not to --

10:34:45   8        Q.    Now, you said if there was any doubt.  Did

10:34:48   9   you have some doubt after your investigation?

10:34:50  10        A.    No.  It was probably just locker room talk

10:34:54  11   at the meal.  I just wanted to make sure everyone

10:34:56  12   understood what was appropriate and what was not

10:34:58  13   appropriate.

10:35:00  14        Q.    Do you recall ever telling Marc that Chuck

10:35:07  15   Broderick had used the term tube steak or had admitted

10:35:10  16   using the term tube steak in conversations with him?

10:35:15  17        A.    Yes.  At some point in time, I did.

10:35:17  18        Q.    When was that conversation?

10:35:18  19        A.    I can't recall specifically when that

10:35:20  20   happened.

10:35:23  21        Q.    Do you remember what the context was that

10:35:24  22   you were telling him that?

10:35:25  23        A.    It was probably a follow-up.  And to answer

 5:29     24   your question, it was probably when I did go back and
```

David Jones - Primos                    51

| | | |
|---|---|---|
| 41:34 | 1 | (Jones Exhibit Number 7 was marked for |
| 10:41:34 | 2 | identification and attached to the record.) |
| 10:41:34 | 3 | BY MR. PRIMOS: |
| 10:41:36 | 4 | Q. Looking at what has been marked as Jones |
| 10:41:38 | 5 | Exhibit 7, did you draft this letter? |
| 10:41:44 | 6 | A. Yes, I did. |
| 10:41:45 | 7 | Q. And it was addressed to Mr. Perdue? |
| 10:41:47 | 8 | A. Correct. |
| 10:41:50 | 9 | Q. Do you know why the copy we have here isn't |
| 10:41:53 | 10 | signed? |
| 10:41:53 | 11 | A. No. I couldn't tell you. |
| 10:41:56 | 12 | Q. Would you normally have signed a letter like |
| 1ʋ:41:58 | 13 | this? |
| 10:41:59 | 14 | A. Sometimes I send letters out with my name, |
| 10:42:03 | 15 | and they may not be signed. |
| 10:42:06 | 16 | Q. Did you have any conversations with Jim |
| 10:42:10 | 17 | Perdue to go along with this letter? |
| 10:42:11 | 18 | A. No. |
| 10:42:13 | 19 | Q. How did you send it to him? |
| 10:42:14 | 20 | A. Email. |
| 10:42:18 | 21 | Q. Did you attach it to an email? We don't see |
| 10:42:24 | 22 | an email address at the top. |
| 10:42:26 | 23 | A. If this was printed out, you wouldn't. I |
| 2:29 | 24 | mean it just went in an email to him. It could have |

David Jones - Primos                                      52

| Time | Line | |
|---|---|---|
| 2:33 | 1 | been -- this was a Word document.  It could have been |
| 10:42:35 | 2 | that this was an attachment. |
| 10:42:37 | 3 | Q.     You say it could have been an attachment? |
| 10:42:39 | 4 | A.     A Word document. |
| 10:42:41 | 5 | Q.     So you say it could have been an attachment |
| 10:42:43 | 6 | to an email? |
| 10:42:44 | 7 | A.     It could have. |
| 10:42:51 | 8 | Q.     In the last line, you say:  Any questions, |
| 10:43:05 | 9 | Jim, please call me. |
| 10:43:06 | 10 | Did Jim Perdue call you? |
| 10:43:08 | 11 | A.     No, sir. |
| 10:43:09 | 12 | Q.     To your knowledge, did he have any |
| 10:43:10 | 13 | questions? |
| 10:43:11 | 14 | A.     No, sir. |
| 10:43:11 | 15 | Q.     Did Marc Smith call you again in April with |
| 10:43:31 | 16 | some additional complaints about sexual harassment? |
| 10:43:37 | 17 | A.     No. |
| 10:43:40 | 18 | Q.     Do you remember Marc Smith calling you about |
| 10:43:42 | 19 | someone sending a picture of a donkey and a woman having |
| 10:43:48 | 20 | some kind of sexual relations on a cell phone? |
| 10:43:51 | 21 | A.     No. |
| 10:43:55 | 22 | Q.     Do you remember Marc Smith complaining to |
| 10:43:57 | 23 | you about a coworker telling him to give oral sex to |
| 4:02 | 24 | another coworker? |

David Jones - Primos                                    53

14:04       1          A.     No.

10:44:04    2          Q.     Do you remember Marc Smith calling you on

10:44:17    3    April 9th to complain about his immediate supervisor

10:44:21    4    writing him up?

10:44:21    5          A.     No.

10:44:21    6          (Jones Exhibit Number 8 was marked for

10:44:21    7    identification and attached to the record.)

10:44:21    8    BY MR. PRIMOS:

10:44:43    9          Q.     I'm showing you what has been marked as

10:44:45    10   Jones 8.  Is this the sexual harassment training you

10:44:54    11   were referring to, or is this a reference to the sexual

10:44:57    12   harassment training you were referring to?

10:44:58    13         A.     A reference to.

10:44:58    14         Q.     I'm sorry?

10:44:59    15         A.     A reference to.

10:45:03    16         Q.     Was the training, in fact, held on

10:45:06    17   April 29th?

10:45:07    18         A.     Yes, it was.

10:45:11    19         Q.     Were you present?

10:45:13    20         A.     No, I was not.

10:45:14    21         Q.     Who is Tabitha Newton?

10:45:16    22         A.     She's in our training department.

10:45:19    23         Q.     So she works out of Salisbury?

.5:20       24         A.     Out of our corporate office.

David Jones - Primos                    54

| | | |
|---|---|---|
| 5:23 | 1 | Q.    What experience does she have with sexual |
| 10:45:26 | 2 | harassment training? |
| 10:45:27 | 3 | A.    She has been in organizational training |
| 10:45:30 | 4 | development for a number of years.  She's certified to |
| 10:45:32 | 5 | do sexual harassment training inside our corporation, so |
| 10:45:34 | 6 | I take it that she has the credentials to do so. |
| 10:45:39 | 7 | Q.    Do you know what the training involved? |
| 10:45:44 | 8 | A.    There are films.  There are films.  There |
| 10:45:51 | 9 | are scenarios, an array of things.  It's about an hour, |
| 10:45:58 | 10 | hour and a half presentation. |
| 10:45:59 | 11 | Q.    Is there any written material that goes with |
| 10:46:02 | 12 | that training? |
| 10:46:02 | 13 | A.    I'm quite sure there is. |
| 10:46:05 | 14 | MR. PRIMOS:  Okay.  Do you know if that was |
| 10:46:07 | 15 | produced, Brooks? |
| 10:46:08 | 16 | MR. AMIOT:  Yes. |
| 10:46:09 | 17 | MR. PRIMOS:  It was produced? |
| 10:46:11 | 18 | MR. AMIOT:  It should have been.  I believe |
| 10:46:14 | 19 | it was.  I'll check on the break, if you want. |
| 10:46:18 | 20 | MR. PRIMOS:  Okay.  Sure. |
| 10:46:18 | 21 | BY MR. PRIMOS: |
| 10:46:29 | 22 | Q.    Did anyone else lead the training sessions |
| 10:46:32 | 23 | other than Tabitha Newton? |
| 5:35 | 24 | A.    No. |

David Jones - Primos                    55

6:46    1        Q.    Do you recall Marc calling you on May 8th of

10:46:49   2    2009 and telling you that there was still stuff going on

10:46:56   3    at the feed mill, and he would have to take it to the

10:47:00   4    Delaware Department of Labor?

10:47:02   5        A.    No.

10:47:14   6        Q.    Do you recall ever making the statement to

10:47:16   7    him:  Do what you have to do?

10:47:17   8        A.    No.

10:47:18   9        Q.    Are you aware of the circumstances

10:47:20  10    surrounding Marc leaving the feed mill during his shift

10:47:25  11    on May 9th of 2009?

10:47:28  12        A.    Yes.

10:47:30  13        Q.    Can you tell me about that?  Well, first of

10:47:36  14    all, who informed you about that, about those

10:47:38  15    circumstances?

10:47:38  16        A.    He did.

10:47:42  17        Q.    Marc Smith did?

10:47:43  18        A.    Right.

10:47:44  19        Q.    So tell me about that situation.

10:47:45  20        A.    I was away for my son's college graduation.

10:47:52  21    I received a phone call.  There was a message that was

10:47:54  22    left.  I did not pick the message up until later on that

10:47:57  23    evening.

7:59     24            The message was, in essence:  I was ill and

David Jones - Primos                                    56

| | | |
|---|---|---|
| .8:06 | 1 | couldn't go home.  I'm at the feed mill.  And then that |
| 10:48:12 | 2 | was -- It must have been on a Saturday, because my son's |
| 10:48:15 | 3 | graduation was on a Saturday. |
| 10:48:17 | 4 | Then I received another call from Marc the |
| 10:48:19 | 5 | very next day, on a Sunday afternoon.  And he made |
| 10:48:24 | 6 | reference to he was sick, he couldn't get any relief, |
| 10:48:33 | 7 | and he needed to have a mental evaluation.  I stopped |
| 10:48:36 | 8 | him at that time and said:  Marc, you need to go to the |
| 10:48:41 | 9 | wellness center or your own private physician.  I said: |
| 10:48:44 | 10 | I will be traveling back this evening, and I will see |
| 10:48:46 | 11 | you tomorrow.  That would have been a Monday, because I |
| 10:48:51 | 12 | was in North Carolina that weekend. |
| 10:48:53 | 13 | Q.    So when you listened to his message on |
| 10:48:56 | 14 | Saturday, you actually listened to the message several |
| 10:49:00 | 15 | hours after he had left it? |
| 10:49:01 | 16 | A.    That's correct. |
| 10:49:06 | 17 | Q.    And did you get any communications from |
| 10:49:08 | 18 | anybody else other than Marc Smith on that Saturday |
| 10:49:13 | 19 | about him leaving the workplace? |
| 10:49:15 | 20 | A.    No. |
| 10:49:16 | 21 | Q.    Did you get any communications from anyone |
| 10:49:19 | 22 | else on Sunday, other than Marc, about him leaving the |
| 10:49:22 | 23 | workplace? |
| 9:23 | 24 | A.    I believe I spoke to Mr. Broderick.  I guess |

David Jones - Primos                    57

| | | |
|---|---|---|
| 9:26 | 1 | Mr. Jefferson had called him.  Mr. Broderick was also in |
| 10:49:31 | 2 | North Carolina that weekend. |
| 10:49:32 | 3 | Q.    Who was in -- |
| 10:49:33 | 4 | A.    Mr. Broderick. |
| 10:49:34 | 5 | Q.    He was also in North Carolina? |
| 10:49:35 | 6 | A.    That weekend.  And he called and gave |
| 10:49:39 | 7 | reference.  And I said:  Well, we will deal with it |
| 10:49:42 | 8 | tomorrow.  We will deal with it tomorrow. |
| 10:49:44 | 9 | Q.    What specifically did Chuck Broderick say? |
| 10:49:49 | 10 | A.    He left the mill unattended.  He just left |
| 10:49:54 | 11 | without any coverage at the mill. |
| 10:49:58 | 12 | Q.    Chuck Broderick told you that? |
| 10:50:00 | 13 | A.    Right. |
| 10:50:00 | 14 | Q.    Did he say anything else about it? |
| 10:50:07 | 15 | A.    No, because I think we both were traveling |
| 10:50:12 | 16 | back. |
| 10:50:13 | 17 | Q.    So it is your testimony that Chuck Broderick |
| 10:50:15 | 18 | was not there on Saturday, May 9th?  He was not at the |
| 10:50:20 | 19 | mill, the feed mill, on Saturday, May 9th? |
| 10:50:24 | 20 | A.    Yes. |
| 10:50:25 | 21 | Q.    Yes, he was not there? |
| 10:50:27 | 22 | A.    Yes, he was not there. |
| 10:50:28 | 23 | Q.    Okay.  Was there discipline issued to Marc |
| 1  ):38 | 24 | Smith about that incident? |

David Jones - Primos                                    58

10:39    1          A.     On the morning of May 11th, he was suspended

10:50:48 2    and subsequently discharged for job abandonment.

10:50:52 3          Q.     So tell me about that discipline that was

10:50:54 4    issued on the morning of May 11th.

10:50:57 5          A.     Well, Mr. Jefferson administered that,

10:51:07 6    because he was at the mill.  And Marc was brought in.

10:51:11 7    And he was subsequently suspended and discharged at that

10:51:16 8    point in time for job abandonment.

10:51:17 9          Q.     But you consulted with Mr. Jefferson before

10:51:21 10   he issued the discipline to Mr. Smith?

10:51:24 11         A.     I think my consultation came with

10:51:26 12   Mr. Broderick.

10:51:27 13         Q.     When was that consultation?

10:51:28 14         A.     That was Sunday afternoon.

10:51:31 15         Q.     Tell me about that.

10:51:31 16         A.     I got a call from Mr. Broderick.  Here is

10:51:36 17   what transpired at the mill.  Marc left the mill

10:51:40 18   unattended, went home.  We tried to work with him and

10:51:43 19   say:  Hey, let us get somebody to replace you.  And he

10:51:47 20   didn't.  He left the mill.  So obviously, it was job

10:51:52 21   abandonment.

10:51:52 22         Q.     So what did you say?

10:51:56 23         A.     The suspension needed to take place and

2:01     24   discharge on Monday morning.  That was a weekend that he

Anthony Reporting
(302) 674-8884

David Jones - Primos                    59

| | | |
|---|---|---|
| 2:02 | 1 | was working.  So Mr. Smith came in that morning, and the |
| 10:52:08 | 2 | paperwork was administered to him at that point in time. |
| 10:52:11 | 3 | Q.    So you told Mr. Broderick that suspension |
| 10:52:16 | 4 | and discharge needed to take place on Monday morning? |
| 10:52:18 | 5 | A.    That's correct. |
| 10:52:24 | 6 | Q.    Why suspension and discharge?  Why not just |
| 10:52:27 | 7 | discharge? |
| 10:52:28 | 8 | A.    Well, suspension is a protocol.  We normally |
| 10:52:31 | 9 | spend and then discharge.  But the day he left his job, |
| 10:52:36 | 10 | he was actually discharged. |
| 10:52:39 | 11 | Q.    So you are saying that it is normal protocol |
| 10:52:41 | 12 | to suspend and then discharge? |
| 10:52:43 | 13 | A.    It's a normal protocol, be it an attendance |
| 10:52:47 | 14 | issue for persons who have reached their attendance max. |
| 10:52:54 | 15 | A person suspended, reached on a progressive |
| 10:52:57 | 16 | disciplinary, we suspend because anything can change |
| 10:53:01 | 17 | within a three-day period.  It allows the HR team and |
| 10:53:04 | 18 | the managers to make sure we have concrete evidence this |
| 10:53:08 | 19 | person did A, B, C, or D before you do a discharge.  It |
| 10:53:12 | 20 | is a protocol by Perdue, and we always wait three days. |
| 10:53:16 | 21 | But when a person leaves a work area and |
| 10:53:19 | 22 | leaves his job unattended and he's not been authorized, |
| 10:53:24 | 23 | it's truly job abandonment. |
| 3:26 | 24 | Q.    So what days was he suspended? |

David Jones - Primos                                        60

10:53:38   1          A.    Well, he was suspended that Monday, Tuesday,

10:53:41   2    and Wednesday.  And since there was a medical piece, he

10:53:48   3    was officially not terminated in the system until that

10:53:52   4    Friday.

10:53:53   5          Q.    What do you mean since there was a medical

10:53:54   6    piece?

10:53:54   7          A.    Because he was not at work and he did not

10:53:58   8    return to work on the 13th, he was under medical.

10:54:04   9          Q.    I don't understand what you mean.

10:54:06   10         A.    He was transported to the hospital on the

10:54:08   11   11th, and so he had to be cleared.  And at some point,

10:54:16   12   either on March 12th -- May 12th or 13th, I had a

10:54:20   13   conversation.  And he said he had been transported to

10:54:22   14   the hospital.  I told him he had to be cleared,

10:54:25   15   medically cleared in order to come back to work.  And he

10:54:28   16   was medically cleared, I believe, on that Thursday.  And

10:54:32   17   he was subsequently told he was terminated on that

10:54:35   18   Friday.

10:54:36   19         Q.    Why did he have to be medically cleared to

10:54:38   20   come back to work if he was being discharged?

10:54:40   21         A.    Well, he wasn't at work.  I mean I couldn't

10:54:43   22   call him in if he was not cleared to come back to work

10:54:46   23   to do a suspension or I mean to do a termination.

1   :56    24         Q.    During that period of time that he was

David Jones - Primos                    61

| | | |
|---|---|---|
| 4:59 | 1 | suspended, what did you do in relation to Marc Smith's |
| 10:55:05 | 2 | employment? |
| 10:55:07 | 3 | A.    I didn't do anything. |
| 10:55:09 | 4 | Q.    Well, you indicated that the reason why a |
| 10:55:12 | 5 | person is normally suspended and then discharged is |
| 10:55:18 | 6 | because the facts need to be confirmed or verified.  So |
| 10:55:21 | 7 | what did you do to confirm or verify the facts? |
| 10:55:24 | 8 | A.    After he was suspended and discharged on |
| 10:55:26 | 9 | that Monday or suspended on that Monday, the fact was he |
| 10:55:31 | 10 | left his job, left the mill running.  And a supervisor |
| 10:55:36 | 11 | had to be called in that Sunday in order to close the |
| 10:55:39 | 12 | mill down. |
| 10:55:40 | 13 | Q.    What did you do, if anything, to confirm |
| 10:55:44 | 14 | that that was the case? |
| 10:55:45 | 15 | A.    With Mr. Broderick and Mr. Jefferson, that |
| 10:55:47 | 16 | he truly abandoned his job on that Sunday. |
| 10:55:50 | 17 | Q.    How did you confirm that with them? |
| 10:55:51 | 18 | A.    I spoke with them, sir. |
| 10:55:53 | 19 | Q.    Did you speak with them personally or over |
| 10:55:55 | 20 | the telephone? |
| 10:55:56 | 21 | A.    Over the telephone. |
| 10:55:57 | 22 | Q.    When was that? |
| 10:55:58 | 23 | A.    It would had to have been sometime on the |
| 6:00 | 24 | 11th, sir. |

David Jones - Primos                    62

|  | | |
|---|---|---|
| :  ;:01 | 1 | Q.    And after you confirmed that with him, what |
| 10:56:17 | 2 | did you do then? |
| 10:56:23 | 3 | A.    Well, I had the facts.  My facts was he left |
| 10:56:27 | 4 | his job.  The supervisor came in and had to close the |
| 10:56:30 | 5 | mill down on his off day.  Those were the basic facts, |
| 10:56:35 | 6 | that he left the mill running. |
| 10:56:36 | 7 | Was he scheduled to work?  Yes.  What time |
| 10:56:38 | 8 | was he scheduled to work?  Whatever that time, seven |
| 10:56:43 | 9 | a.m. to 3:00 p.m., and he left the mill running. |
| 10:56:45 | 10 | Therefore, he left the job.  It was job abandonment.  I |
| 10:56:49 | 11 | had those facts from the supervisor.  And I believe I |
| 10:56:51 | 12 | had his -- I looked at his time card where he punched in |
| 10:56:56 | 13 | that morning and that afternoon and left that afternoon |
| 10:57:03 | 14 | on that Sunday. |
| 10:57:04 | 15 | Q.    And how did you get those time cards? |
| 10:57:07 | 16 | A.    It was sent to me. |
| 10:57:09 | 17 | Q.    Do you remember who sent them to you? |
| 10:57:11 | 18 | A.    Either Mr. Broderick or Mr. Jefferson. |
| 10:57:14 | 19 | Q.    And what did you do then? |
| 10:57:15 | 20 | A.    I had the facts. |
| 10:57:16 | 21 | Q.    And so what did you do?  I understand you |
| 10:57:19 | 22 | had the facts.  But what did you do then? |
| 10:57:20 | 23 | A.    Well, Mr. Smith on Friday, after he was |
| 1   7:25 | 24 | cleared, I called him and said:  Based on the facts that |

David Jones - Primos                                63

| | | |
|---|---|---|
| 7:28 | 1 | I have, you are being terminated for job abandonment. |
| 10:57:31 | 2 | Q.    You said you called him? |
| 10:57:32 | 3 | A.    I called him. |
| 10:57:34 | 4 | Q.    Where was he at the time you called him? |
| 10:57:37 | 5 | A.    I couldn't tell you where he was, sir.  At |
| 10:57:39 | 6 | that time I think I had his cell number. |
| 10:57:41 | 7 | Q.    Okay.  Why wasn't he at work? |
| 10:57:44 | 8 | A.    He had just gotten cleared to come back to |
| 10:57:49 | 9 | work that Thursday.  And before he was scheduled to come |
| 10:57:52 | 10 | in, I called him and told him he was terminated. |
| 10:57:54 | 11 | Q.    Why wasn't he scheduled to come in on |
| 10:57:57 | 12 | Friday? |
| 10:57:58 | 13 | A.    I didn't say he wasn't scheduled to come in. |
| 10:58:01 | 14 | Before he was scheduled to come in, I made the phone |
| 10:58:03 | 15 | call to him and told him he was terminated. |
| 10:58:06 | 16 | Q.    What time did you make that phone call? |
| 10:58:08 | 17 | A.    I can't recall. |
| 10:58:09 | 18 | Q.    Do you know what his normal report time was? |
| 10:58:12 | 19 | A.    If there were rotating shifts, he either |
| 10:58:15 | 20 | started at seven a.m. or three p.m. that afternoon.  I |
| 10:58:18 | 21 | couldn't tell you. |
| 10:58:19 | 22 | Q.    So you don't know whether you called him in |
| 10:58:22 | 23 | the morning or the afternoon? |
| 8:23 | 24 | A.    I can't tell you.  All I can tell you is I |

David Jones - Primos                                    64

| | | |
|---|---|---|
| 3:28 | 1 | called him. |
| 10:58:29 | 2 | Q. Did you call his cell phone number? |
| 10:58:32 | 3 | A. It's the only number that I would have had, |
| 10:58:34 | 4 | because he had called my cell phone, sir. |
| 10:58:37 | 5 | Q. What do you mean because he had called your |
| 10:58:40 | 6 | cell phone? |
| 10:58:41 | 7 | A. Because when I was in North Carolina -- They |
| 10:58:44 | 8 | have access to my cell number. I make myself |
| 10:58:47 | 9 | accessible. My number is usually on the boards. All |
| 10:58:49 | 10 | the associates have my cell number. I have the |
| 10:58:54 | 11 | capabilities of having my cell number. And while I was |
| 10:58:54 | 12 | away in North Carolina, he called me on my cell number. |
| 10:58:57 | 13 | Q. Can you tell me about that conversation you |
| 10:58:59 | 14 | had with Marc Smith on Friday? I guess it would have |
| 10:59:03 | 15 | been May 15th. |
| 10:59:03 | 16 | A. My conversations are very short when I |
| 10:59:06 | 17 | terminate someone, sir. Marc, you are terminated for |
| 10:59:10 | 18 | job abandonment on X date. Here is what you will be |
| 10:59:14 | 19 | receiving in the mail from Perdue, as far as COBRA is |
| 10:59:19 | 20 | concerned, in order to keep your insurance coverage if |
| 10:59:22 | 21 | you so desire. If you have a 401(k), you will have to |
| 10:59:27 | 22 | contact Wells Fargo specifically in that manner, end of |
| 10:59:32 | 23 | conversation. |
| 3:32 | 24 | Q. Did he say anything? |

David Jones - Primos                            68

| | | |
|---|---|---|
| : 3:45 | 1 | you that? |
| 11:03:45 | 2 | A.    Repeat your question. |
| 11:03:47 | 3 | Q.    When you had your conversation with Marc |
| 11:03:48 | 4 | on May 15th, do you remember him telling you that on |
| 11:03:52 | 5 | May 9th, before he left the feed mill, he had called |
| 11:03:55 | 6 | both Broderick and Jefferson and told them that he had |
| 11:03:58 | 7 | to leave? |
| 11:03:59 | 8 | A.    No.  I don't remember that. |
| 11:04:01 | 9 | Q.    Who made the determination to terminate Marc |
| 11:04:12 | 10 | Smith? |
| 11:04:13 | 11 | A.    I did. |
| 11:04:13 | 12 | Q.    Did you consult with anybody before you |
| 11:04:16 | 13 | made -- |
| 11:04:17 | 14 | A.    No, sir. |
| 11:04:18 | 15 | Q.    -- that decision? |
| 11:04:18 | 16 | A.    No, sir. |
| 11:04:19 | 17 | Q.    So you didn't consult with Mr. Broderick |
| 11:04:22 | 18 | before you made that decision? |
| 11:04:23 | 19 | A.    After I got the facts on the 11th on why he |
| 11:04:32 | 20 | left the mill, what time he left the mill, did he leave |
| 11:04:36 | 21 | the mill unattended, I had those facts already, sir. |
| 11:04:40 | 22 | Q.    But at the point you made that termination |
| 11:04:43 | 23 | decision, were you aware that Marc Smith had tried to |
| 1  :47 | 24 | call or tried to ask Broderick and Jefferson if he could |