IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARC E. SMITH, | * | C.A. No. 12-227-LPS-SRF |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| PERDUE FARMS INCORPORATED, | * | |
| a Maryland corporation, | * | |
| | * | |
| Defendant. | * | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER AND RODRIGUEZ, P.A.

BY:   NOEL E. PRIMOS, ESQUIRE
      Bar I.D. #3124
      414 South State Street
      P.O. Box 497
      Dover, DE  19903-0497
      (302) 674-0140
      Attorneys for Plaintiff

DATED:  April 11, 2013
NEP:pmw

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . .   ii

I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS  . .   1

II.  SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . .   1

III. STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . .   1

IV.  ARGUMENT   . . . . . . . . . . . . . . . . . . . . . . .   12

     A.   SUMMARY JUDGMENT STANDARD.  . . . . . . . . . . . .   12

     B.   PLAINTIFF HAS ESTABLISHED FOR PURPOSES OF SUMMARY
          JUDGMENT THAT HE WAS SUBJECTED TO A HOSTILE WORK
          ENVIRONMENT IN VIOLATION OF TITLE VII. . . . . . .   13

          1.   Plaintiff has established that he was
               subjected to severe and pervasive harassment
               based upon his sex.   . . . . . . . . . . . .   13

          2.   Plaintiff was subjected to severe and
               pervasive harassment based upon retaliation.   16

     C.   PLAINTIFF HAS ESTABLISHED FOR PURPOSES OF SUMMARY
          JUDGMENT THAT DEFENDANT RETALIATED AGAINST HIM IN
          VIOLATION OF TITLE VII.   . . . . . . . . . . . . .   18

V.   CONCLUSION   . . . . . . . . . . . . . . . . . . . . . .   20

<u>**TABLE OF AUTHORITIES**</u>

**PAGE**

<u>**CASES**</u>

<u>Bibby v. Philadelphia Coca Cola Bottling Co.</u>
260 F.3d 257 (3d Cir. 2001)  . . . . . . . . . . . . .  13

<u>Bishop v. Wood</u>
426 U.S. 341 (1976)  . . . . . . . . . . . . . . . .  12

<u>Celotex Corp. v. Catrett</u>
477 U.S. 317 (1986)  . . . . . . . . . . . . . . . .  12

<u>Cifarelli v. Village of Babylon</u>
93 F.3d 47 (2d Cir. 1996)  . . . . . . . . . . . . .  12

<u>Collins v. TRL, Inc.</u>
263 F.Supp. 2d 913 (M.D.Pa. 2003)  . . . . . . . . . .  14

<u>Harris v. Forklift Systems, Inc.</u>
510 U.S. 17 (1993)  . . . . . . . . . . . . . . . .  15

<u>Jensen v. Potter</u>
435 F.3d 444 (3d Cir. 2006)  . . . . . . . . . .  16-17, 19

<u>Johnson v. Hondo, Inc.</u>
125 F.3d 408 (7th Cir. 1997)  . . . . . . . . . . . .  14

<u>Mellor v. Atkinson Freight Line Corp.</u>
No. 11-5468, 2012 U.S. Dist. LEXIS 51429 (E.D.Pa.)  . .  14

<u>Meritor Savings Bank, FSB v. Vinson</u>
477 U.S. 57 (1986)  . . . . . . . . . . . . . . . .  15

<u>Oncale v. Sundowner Offshore Services, Inc.</u>
523 U.S. 75 (1998)  . . . . . . . . . . . . . . . .  13

<u>Robinson v. City of Pittsburgh</u>
120 F.3d 1286 (3d Cir. 1997)  . . . . . . . . . . . .  16

<u>United States v. Diebold</u>
369 U.S. 654 (1962)  . . . . . . . . . . . . . . . .  12

<u>**STATUTES AND OTHER AUTHORITIES**</u>

42 U.S.C. §2000e-2(a)  . . . . . . . . . . . . . . . .  16

Civil Rights Act of 1964  . . . . . . . . . . . . . . .  1

Fed.R.Civ.P. 56(c)  . . . . . . . . . . . . . . . . .  12

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed a complaint on February 24, 2012, and an amended complaint on April 12, 2012, both alleging retaliation and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.   Defendant filed answers to these complaints.   Following a period of discovery, Defendant filed a motion for summary judgment.   This is Plaintiff's answering brief in opposition to that motion.

## II.   SUMMARY OF ARGUMENT

1.   This Court may grant summary judgment only if, viewing all facts in a light most favorable to Plaintiff, there is no genuine issue as to any material fact.

2.   Defendant subjected Plaintiff to a hostile work environment based upon his sex and based upon retaliation for his complaints of sex discrimination.

3.   Defendant retaliated against Plaintiff for his complaints of sex discrimination.

## III.   STATEMENT OF FACTS

Plaintiff began employment at Defendant's feed mill in Bridgeville, Delaware on November 30, 2005, and was terminated on May 15, 2009.   His immediate supervisor was Tyson Jefferson. Jefferson's immediate supervisor was Chuck Broderick.

As Plaintiff began to experience direct sexual harassment and retaliation in 2009, he kept handwritten notes of his experiences.

(B4-B27).[1]  Later, Plaintiff's then-attorney took these notes and
compiled them into a chronology.   See Affidavit of Marc Smith
(B55-B70).[2]

During his employment, Plaintiff performed well as a panel
operator, and consistently received evaluations of either good or
above.  Plaintiff Dep. 100 (B43).

During the period of Plaintiff's employment, the work
environment at Defendant's Bridgeville location was permeated with
same-sex harassment.  For example, Clint Lewis, a dispatcher,
would take another employee, Vernon Russell, into an office, turn
the lights off, and "dry hump" Russell.   Quebral Affidavit ¶7
(B53);[3] Chron. ¶17 (B59).  This happened on a daily basis.  Quebral
Aff. ¶7 (B53).   In addition, Lewis would say to employees, "I'll
take you into the bathroom and f**k the s**t out of you."  Quebral
Aff. ¶8 (B53).  On a daily basis, Lewis would make comments to
Broderick and Jefferson about his alleged sexual exploits with
Russell.  Quebral Aff. ¶9 (B53).

---

[1]    Reference is to pages B4 to B27 of the Appendix to
Plaintiff's Memorandum in Opposition to Defendant's Motion for
Summary Judgment, which is being filed simultaneously with this
Memorandum.

[2]  References to specific paragraphs of the chronology will be
in the form "Chron. ¶___."

[3]    Alex Quebral was employed by Defendant at the
Bridgeville location from approximately December 2008 until July
2010.  Quebral Aff. ¶2 (B52).

Broderick began directing sexual harassment toward Plaintiff in February 2009.  Specifically, on February 16, 2009, Broderick came up behind Plaintiff, touched Plaintiff's hips, wiggled his (Broderick's) hips, and made grinding and humping motions.  When Plaintiff pushed Broderick away and asked what he was doing, Broderick said, "I know you like it."  Plaintiff did not complain about the incident because he was afraid he would lose his job.  Chron. ¶¶5-7 (B57).

On February 24, 2009, Broderick wrote a memo praising Plaintiff's performance and recommending Smith for a supervisory position.[4] (B1).

On or about March 13, 2009, Smith went to talk to Broderick about his job description.  He wanted to know why he, as a Utility Operator, had to perform Pellet Durability Index ("PDI") tests, when at other Perdue plants that task was performed by Quality Control.  Broderick said he would have to check into it and get back to him.  Chron. ¶¶9-10 (B58).  Contrary to Defendant's representations, during this first part of the conversation, Plaintiff was not arguing with Broderick, but simply having a discussion regarding the PDI issue.  Plaintiff Dep. 118, 122 (B44, B45).

As Smith was leaving, he asked Broderick what was for lunch.  Chron. ¶11 (B58).  This was not unusual, as Plaintiff had had conversations in the past with Broderick regarding health food.

---

[4]  As noted previously, Plaintiff had not yet complained regarding Broderick's harassment of him.

Plaintiff Dep. 129 (B46). Broderick responded, "I have a tube steak smothered in drawers for you." Smith became angry at the sexually harassing comment, and told Broderick that he was tired of this, and "you're a worthless piece of s**t boss." Chron. ¶11 (B58). The "argument" between Plaintiff and Broderick was over the tube steak comment, not the PDI issue.

Plaintiff immediately went upstairs and called HR at Defendant's main office. One of the employees said that they would get him help and that someone would call him back. As Plaintiff was on the phone, Jefferson came up and said, "Let's take a walk, so you don't do something stupid." Plaintiff told Jefferson it was too late. Shortly thereafter, Jefferson told Plaintiff to go home for the day. Chron. ¶13, 15 (B58, B59).

On his way home, Plaintiff received a call from David Jones, HR Manager. Plaintiff told Jones what happened with Broderick that day, what had happened with Broderick in February, and what Lewis had been doing with Russell. Chron. ¶16 (B59).

On March 17, 2009, Plaintiff was called into Broderick's office. Broderick and Jefferson were present, and Jones was on the phone. Nothing was discussed about Broderick's sexual harassment of Plaintiff or Lewis' conduct. Instead, Plaintiff was advised that he was being written up for cursing Broderick, and Plaintiff was presented with a disciplinary write up for "insubordination" and "inappropriate language." (B2). Plaintiff tried to write in the comments section of the document, "I turn [sic] in Chuck Broderick for sexual harr...." Broderick and

4

Jefferson pulled the form away from him and crossed out what he had written. Chron. ¶¶17-18 (B59-B60); B2. Later, Plaintiff sent a typed statement of complaint to Jim Perdue, Defendant's owner. Chron. ¶20 (B60); B3.

On March 17, 2009, Plaintiff called Jones and left a message asking why Jones had not addressed his sexual harassment complaint or interviewed any witnesses. Jones did not return the call. Chron. ¶22 (B60). Meanwhile, the sexual harassment in the work place continued. On March 17, 2009, Russell told the Plaintiff to get his knee pad ready, and Kenny Ross, another employee, yelled Plaintiff's name and said, "Blow me." Chron. ¶23 (B60).

On March 18, 2009, Louis Hudson, a co-worker, asked Plaintiff, "What's up girlfriend?" and looked him over. He then asked if Plaintiff was sore and said to Plaintiff, "Don't worry, I still love you." Chron. ¶24 (B60).

On March 20, 2009, Plaintiff told Russell that a co-worker was going to be mad because his new computer was bigger and better. Russell said, "That's not all that is big and better" as he pushed his mid-section out and laughed. Chron. ¶27 (B60-B61).

Following Plaintiff's complaints of sexual harassment, Quebral overheard Lewis stating that "they" were trying to get rid of Plaintiff. By "they," Quebral understood Lewis to be referring to Broderick and Jefferson. Quebral Aff. ¶10 (B53).

On March 23, 2009, Jones came to Bridgeville to perform an "investigation." Plaintiff discussed with Jones the February incident with Broderick, Broderick's March 13 sexual comment, and

5

the other sexual conduct at the Mill, including Lewis' humping of Russell. Jones told Plaintiff that Broderick had admitted making the "tube steak smothered in drawers" comment. Jones was hostile to Plaintiff during their meeting. Chron. ¶¶28-30 (B61).

On March 23, Jones also interviewed an employee named Erwin Hall. Jones' testimony at his deposition contradicted his notes regarding the Hall interview, and Jones gave conflicting accounts at his deposition of what his notes meant. Jones' notes of his interview with Hall show the following:

> Heard Mark [sic] say that you just grind on me & Mark [sic] said gone with that gay stuff.
> Stuff had been going on for some time - Gay Remarks.
> "Sweet Cheek" "Hey Baby"
> "Clint Lewis (7 years) & Chuck (4 yrs.)" - Worst Offenders

(B28). Jones claimed, incredibly, that even though "Clint Lewis and Chuck [Broderick]" were listed next to the term "Worst Offenders" in his notes of the Hall interview, Hall had never designated them as the worst offenders and had never even mentioned their names during the interview. Jones Dep. 95-97 (B33-B35).

Jones never interviewed Quebral during his "investigation." Quebral Aff. ¶12 (B54). Following the "investigation," and despite his notes regarding the Hall interview, Jones reported to Perdue that Plaintiff's charges of sexual harassment were unfounded. (B29).

Thereafter, Plaintiff continued to experience a hostile environment, much of it either initiated or condoned by Jefferson

6

and/or Broderick, and much of it directed toward Plaintiff because of his previous complaints. For example:

(1)   On April 3, 2009, Plaintiff observed a picture of a donkey and a woman making out that Jefferson had sent to co-worker Harry Vannicola's cell phone.[5]   Vannicola told Plaintiff that he would not turn Jefferson in to HR, and that if Plaintiff turned Jefferson in, Vannicola would deny it.   Vannicola then told Plaintiff to get on his knees and give Hall oral sex.   Chron. ¶36 (B62).

(2)   On April 13, 2009, four days after employees had been informed that sexual harassment training had been scheduled, Plaintiff observed that no one would speak to him, and co-workers Keith Hudson and Craig Dohner told Plaintiff that Hurdle Mitchell, Maintenance Supervisor, had told them not to talk to Plaintiff. Chron. ¶¶48, 50 (B64).

(3)   Immediately after the sexual harassment training on April 29, 2009, Vannicola and employee David Banks were looking at porn on a cell phone, and as Plaintiff walked by, Hudson said, "Watch out, Marc will turn us in."   Chron. ¶54 (B65).   After the sexual harassment training, Quebral also heard Hudson say, "Don't mess with Marc."   Quebral Aff. ¶11 (B53).

(4)   On April 30, 2009, Russell told Plaintiff that he (Russell) had to watch Plaintiff now because Plaintiff might turn

_____

[5]   On other occasions, Quebral had observed Jefferson sending messages to him and other employees through the cell phone depicting sexual relations between animals and human beings. Quebral Aff. ¶5 (B53).

him in for sexual harassment, and on May 4, 2009, Russell told Plaintiff to stay away from him because he did not want to be accused of sexual harassment. Chron. ¶¶56, 58 (B65).

(5)  On May 1, 2009, there was a problem with a truck being loaded backwards by the computer.  Broderick came up to fix the problem and was cursing, saying "G*d D**n," and using other profanity.  While staring at Plaintiff, Jefferson told Broderick that the cursing offended him and that he was going to HR and then laughed loudly. Chron. ¶57 (B65).

(6)  On May 8, 2009, Hudson was teasing Plaintiff on the walkie-talkie radio and kept telling him that the company truck was not available for him to take to Georgetown to pick up the chicken orders. Mitchell, although a supervisor, was present and did nothing to stop Hudson, and Jefferson was also present and did nothing to stop Hudson's harassment of Plaintiff.   Chron. ¶65 (B66).

Plaintiff continued to complain to Jones and Broderick about the hostile environment, including the following:

(1)  Plaintiff told Jones about Jefferson's sending the picture of the donkey and the woman to Vannicola's cell phone, and about Vannicola telling Plaintiff to give oral sex to Hall, but Jones did not want to hear about these matters.  Jones again told Plaintiff that Broderick had admitted making the "tube steak" comment, but Jones told Plaintiff that Plaintiff had taken the comment out of context. Chron. ¶37 (B62).

8

(2) On April 6, 2009, Plaintiff left messages for both Jones and Broderick asking them to do something about Vannicola's telling him to give Hall oral sex. Chron. ¶42 (B63).

(3) On April 7, 2009, Plaintiff went to Broderick and asked him if they were going to talk to Hall about the obscene donkey and woman picture and about Vannicola's telling Plaintiff to give Hall oral sex. Chron. ¶44 (B63).

(4) After Hudson harassed Plaintiff on May 8, 2009, Plaintiff called Jones and told him that offensive conduct was continuing at the mill and further told Jones that he would have to take the matter to the Delaware Department of Labor.[6]  Jones responded, "Do what you have to do." Chron. ¶66 (B66).

During this period, a co-worker, Robert Doughty, who had not complained about sexual harassment, was given preferential treatment over Plaintiff. For example:

(1) On April 4, 2009, Doughty had not made 100 tons of crumbles, as he was supposed to do by the end of his shift, and had not swept the area as required, but Broderick said nothing to Doughty. Chron. ¶39 (B62).

(2) On April 6, 2009, Jefferson told Plaintiff to take plastic off the bags, which had been present during the previous shift, but Jefferson had never told Doughty to remove the plastic from the bags, even though Jefferson had been present for about two hours of Doughty's shift. Chron. ¶41 (B63).

---

[6] At this point, Plaintiff had already filed a claim with the Delaware Department of Labor.

(3)  On April 22, 2009, Doughty did not have his steel toe shoes on, but neither Mitchell nor Jefferson said anything to him. Chron. ¶51 (B64).

(4)  On May 7, 2009, Doughty did not have his steel toe shoes on, and the area was not clean, but Broderick did nothing to Doughty. Chron. ¶61 (B65).

(5)  On May 8, 2009, Doughty did not have steel toe shoes on, but nothing was done about it.  Chron. ¶64 (B66).

By contrast, Jefferson held Plaintiff to a different standard than Doughty. *E.g.*, on April 7 and April 9, 2009, Plaintiff observed Jefferson snooping or walking around his area, and on April 9, 2009, Jefferson wrote Plaintiff up for not starting his inventory sheet. Chron. ¶¶43, 45, 47. (B62-B63).

On April 30, 2009, Jefferson stated in front of Plaintiff and Hall that it was a shame that Lewis has to get on his knees before he comes upstairs - conveying the idea that Lewis was giving Broderick oral sex. Chron. ¶55 (B65).

On May 9, 2009, Plaintiff's co-workers, Hudson and Dohner, were ridiculing and harassing him. Plaintiff called Broderick and complained regarding this treatment. As the harassment continued, Plaintiff experienced a panic attack and became light-headed and dizzy, rendering Plaintiff unable to operate heavy equipment, as required by his job duties. Plaintiff requested permission separately from Broderick and from Jefferson to leave work, but both of them refused. Chron. ¶¶67-74 (B67-B68).

As Plaintiff continued to be unable to work due to his illness, he again called both Broderick and Jefferson to request permission to leave, but neither Broderick nor Jefferson would answer his calls. Plaintiff then left messages for both Broderick and Jefferson that he was leaving, and he left work after completing approximately six hours of his shift. Chron. ¶¶75-76 (B68). Prior to leaving, Plaintiff made sure that he shut down the machines in the facility. Plaintiff Dep. 196-197 (B48-B49).

Thereafter, Broderick and Jefferson falsely informed Jones that Plaintiff had left the machines running when he departed the facility. Jones Dep. 61 (B31). The allegation that Plaintiff had left the machines running was ultimately determinative in the decision to terminate him. Jones Dep. 61, 62 (B31, B32); Jefferson Dep. 64 (B39).

Contrary to Defendant's representations, it is not undisputed that Jones made the decision to terminate Plaintiff. Jefferson testified that he made the decision to suspend Plaintiff pending termination; that he let Jones know what he was doing because Jones "had the last call on if [Plaintiff] kept his job or not"; and that ultimately Jefferson issued a suspension and then termination to Plaintiff. Jefferson Dep. 63, 65, 69 (B38, B40, B41).

Prior to his complaints of sexual harassment, Plaintiff had been allowed to leave work early when ill without discipline. Chron. ¶77 (B68). On the date in question, May 9, 2009, a co-

11

worker, Ritchie Oliphant, left work early and was not disciplined. Chron. ¶96 (B70).

On May 15, 2009, Jones did not appear for a scheduled meeting with Plaintiff.  Jones called Plaintiff later on May 15 and told Plaintiff that he was being terminated for the incidents of May 9. When Plaintiff attempted to explain that he had asked permission from Broderick and Jefferson to leave because he was feeling ill, Jones refused to listen.  Chron. ¶¶93-94 (B69-B70).

### IV.  ARGUMENT

#### A.  SUMMARY JUDGMENT STANDARD.

A court may enter summary judgment only if there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c)  In making this determination, the Court is to view all facts in the light most favorable to the non-moving party.  United States v. Diebold, 369 U.S. 654, 655 (1962).  For purposes of the motion, the non-moving party's version of the facts must be accepted, and all disputed matters must be resolved in his or her favor.  Bishop v. Wood, 426 U.S. 341 (1976).

The party moving for summary judgment has the burden of identifying evidence demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In determining whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences against the moving party.  Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

B.   **PLAINTIFF HAS ESTABLISHED FOR PURPOSES OF SUMMARY JUDGMENT THAT HE WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII.**

1.   **Plaintiff has established that he was subjected to severe and pervasive harassment based upon his sex.**

Defendant asserts that Plaintiff's hostile environment claim fails because he cannot establish that the harassment he experienced was directed at him because of his sex, and because he cannot establish that the harassment was severe and pervasive.

Citing <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75 (1998), and <u>Bibby v. Philadelphia Coca Cola Bottling Co.</u>, 260 F.3d 257 (3d Cir. 2001), Defendant points out that, in order to establish same-sex harassment, a plaintiff must show that the harassment constituted "'discrimination . . . because of . . . sex.'" <u>Bibby</u>, 260 F.3d at 264 (quoting <u>Oncale</u>, 523 U.S. at 81). One of the ways in which a plaintiff may show this is by producing "evidence that the harasser sexually desires the victim." <u>Bibby</u>, 260 F.2d at 262.

In this case, Broderick's behavior toward Plaintiff certainly constitutes evidence that Broderick sexually desired Plaintiff. The actions by Broderick of coming up behind Plaintiff, touching Plaintiff's hips, wiggling his (Broderick's) hips, and making grinding/humping motions, and then responding to Plaintiff's questioning of this activity with the words "I know you like it" indicates that Broderick sexually desired Plaintiff. Plaintiff perceived Broderick as sexually desiring him when Broderick touched him.  Plaintiff Dep. 218-219 (B50-B51).  Plaintiff also

13

believed that the actions of employees toward him generally showed that they were homosexual. Plaintiff Dep. 219 (B51).

Defendant cites a number of cases in support of its contention that certain sexually offensive conduct did not indicate that the harasser sexually desired the victim, but none of those cases are authoritative. Specifically, two of the cases are from other district courts within this circuit, and the other cases are from other circuits.

Regarding the two cases from other district courts within this circuit, both are clearly distinguishable because they did not involve an incident similar to that where Broderick touched Plaintiff's hips, wiggled his hips, made grinding and humping motions, and said "I know you like it." Mellor v. Atkinson Freight Line Corp., No. 11-5468, 2012 U.S. Dist. LEXIS 51429 (E.D.Pa.), dealt exclusively with verbal conduct -- there was no allegation that the harasser had touched the victim in any way. In Collins v. TRL, Inc., 263 F.Supp. 2d 913 (M.D.Pa. 2003), the alleged harasser had "reached for" the plaintiff on three occasions but actually touched him only once, and there was no grinding or humping of the plaintiff. Id. at 916. Similarly, in Johnson v. Hondo, Inc., 125 F.3d 408 (7th Cir. 1997), upon which Defendant relies heavily, although from another circuit, the alleged harasser brushed against the plaintiff but "never physically touched" him. Id. at 410, 411. More importantly, the alleged harasser in Johnson was a co-worker, not a supervisor, of the plaintiff. Id. at 410.

14

Defendant errs, moreover, in focusing only upon conduct directed specifically at Plaintiff in assessing Plaintiff's hostile environment claims.  As the Supreme Court has made clear, a hostile work environment in violation of Title VII exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  The Bridgeville feed mill was permeated with intimidation, ridicule, and insults directed by males toward other males because of the homosexual desires of the harassers.  For example, on an almost daily basis, Lewis was taking Russell into an office, turning the lights off, and "dry humping" him, and was bragging about this conduct to Jefferson and Broderick. Quebral Aff. at ¶¶7, 9 (B53); Chron. at ¶16 (B59).  Russell, Ross, Hudson, Vannicola, and Jefferson were asking Plaintiff to give themselves or others oral sex and/or discussing anal sex with him and/or talking about Lewis' giving Broderick oral sex.  Moreover, although Jones attempted to deny it in his deposition, his notes of his interview with Hall indicate that Broderick and Lewis were the "worst offenders" when it came to same-sex intimidation, ridicule, and insults at the Bridgeville feed mill.  (B28).

**2.   Plaintiff was subjected to severe and pervasive harassment based upon retaliation.**

Even were this Court to determine that Plaintiff has not established a hostile work environment based upon sex, Plaintiff can establish for purposes of summary judgment the existence of a hostile work environment based upon retaliation, which is independently actionable under Title VII.   In Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006), the Third Circuit recognized that a hostile work environment claim may be predicated upon retaliatory conduct in response to complaints of discrimination -- *i.e.*, "'[r]etaliatory conduct other than discharge or refusal to rehire' violates Title VII when it 'alters the employee's "compensation, terms, conditions, or privileges of employment" . . .'" *Id.* at 448 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) (quoting 42 U.S.C. §2000e-2(a))).   In this case, much of the abuse experienced by Plaintiff between his initial complaint of discrimination on March 13, 2009, and his termination on May 15, 2009, was obviously retaliatory in nature.   This would include not merely the written reprimand issued on March 17, 2009, and the final suspension and termination themselves, but other conduct including the following:

(1)   comments made by Russell, Ross, and Hudson on March 17 and 18, 2009, inviting or inferring homosexual activity by Plaintiff, Chron. ¶¶23, 24 (B60);

16

(2)   comments by Vannicola on  April 3, 2009, regarding a cell phone picture sent by Jefferson and inviting homosexual activity by Plaintiff toward Hall, Chron. ¶36 (B62);

(3)   differential treatment between Plaintiff and Doughty by Broderick and Jefferson on April 4, 6, 22 and May 7 and 8, 2009, Chron. ¶¶39, 41, 51, 61, and 64 (B62, B63, B64, B65, B66);

(4)   comments by Hudson after the sexual harassment training to "watch out, Marc will turn us in" and "don't mess with Marc," Chron. ¶54 (B65); Quebral Aff. ¶11 (B53);

(5)   abuse and ridicule of Plaintiff by Hudson and Dohner on May 8 and 9, 2009.

As the _Jensen_ court made clear, in order to show a hostile work environment based upon retaliation, a plaintiff "must prove that (1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." _Id._ at 449 (citations omitted).

Regarding the first factor, the _Jensen_ court noted two factors that go to proving this element:  "(1) the 'temporal proximity' between the protected activity and the alleged discrimination and (2) the existence of '"a pattern of antagonism in the intervening period."'" _Id._ at 450. (citations omitted)." In this case, the abuse by Defendant's agents, including Mitchell, Vannicola, Hudson, Russell, Ross, Jefferson, and Broderick, began

within a few days of Plaintiff's initial complaint and continued throughout the two-month period until his termination. Moreover, it was clearly related to Plaintiff's protected activity, as references were made to complaining to HR and Marc's "turning in" co-workers.

Regarding the second, third, and fourth factors, the conduct was severe[7] and pervasive[8]; it engendered panic attacks in Plaintiff, requiring him to leave work on at least two occasions and to be taken to a hospital on one (Chron ¶¶76, 89 (B68, B69)); and it would affect any reasonable person in Plaintiff's position. Regarding the fifth prong, employer liability, Plaintiff complained frequently to Jones and Broderick regarding the conduct, but to no avail. Chron. ¶¶37, 42, 66, 68 (B62, B63, B66, B67). Moreover, Broderick and Jefferson themselves were responsible for retaliatory conduct toward Plaintiff.

**C.  PLAINTIFF HAS ESTABLISHED FOR PURPOSES OF SUMMARY JUDGMENT THAT DEFENDANT RETALIATED AGAINST HIM IN VIOLATION OF TITLE VII.**

Plaintiff has shown at least four significant instances of retaliatory conduct that he experienced following his discrimination complaints:

(1)  The written reprimand on March 17, 2009;

---

[7]  See <u>Jensen</u>, 435 F.3d at 452 (supervisor berated plaintiff with retaliatory insults two to three times per week and made unspecified physical threats).

[8]  The comments and other conduct occurred frequently throughout the subject period.

(2)   The ongoing abusive and harassing conduct referenced in the previous section;

(3)   Differential treatment between Plaintiff and Doughty; and

(4)   The suspension and termination in May 2009.

Contrary to Defendant's arguments, Plaintiff's retaliation case does not rely solely upon timing, although the timing is compelling:  the written reprimand was issued four days after his initial complaint to Jones, and the abusive and harassing conduct began almost immediately and continued throughout the period leading up to his termination two months later, as did the differential treatment of Doughty.  Rather, there is additional evidence of a causal connection, including the following:

(1)   Broderick and Jefferson's refusal to allow Plaintiff to write comments regarding sexual harassment on the written reprimand;

(2)   The "pattern of antagonism" recognized as the supporting factor in Jensen, 435 F.3d at 450; and

(3)   The fact that both instances of discipline, i.e., the written reprimand and the suspension leading to termination, were patently unfair and based upon false information.

Regarding the first disciplinary incident, it is not the case, as Defendant claims, that Broderick could have **legitimately** terminated Plaintiff for "his insubordination and conduct on March 13."  Opening Memorandum at 18-19.  Construing the facts in a light most favorable to Plaintiff, Plaintiff was not insubordinate

19

about the PDI tests, and only cursed at Broderick after Broderick made an offensive, sexual harassing statement to him.  Regarding the suspension/termination incident, this discipline was based upon **false information** provided by Broderick and Jefferson to Jones.  Specifically, Broderick and Jefferson falsely informed Jones that Plaintiff had left the mill running when he had departed on May 9, and both Jones and Jefferson testified that the allegation that Plaintiff had left the mill running was a crucial factor in Plaintiff's termination.  Jones Dep. 61, 62 (B31, B32); Jefferson Dep. 64 (B39).

In addition, the differential treatment of another employee, and of Plaintiff himself on prior occasions, supports Plaintiff's claim that his termination was retaliatory.  Specifically, co-worker Ritchie Oliphant left the work place on May 9 and was not disciplined, and on prior occasions, Plaintiff had been allowed to leave work without discipline if he became sick during a shift. Chron. ¶96 (B70); Chron. ¶77 (B68).

### V.   CONCLUSION

For the reasons provided in this Answering Memorandum, Defendant's Motion for Summary Judgment should be denied.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____

        NOEL E. PRIMOS, ESQUIRE
        Bar I.D. #3124
        414 S. State Street
        P.O. Box 497
        Dover, DE   19903
        (302) 674-0140
DATED: 4-11-13          Attorneys for Plaintiff
NEP:pmw

20