# Exhibit 1

## In The Matter Of:

*Smith v.*
*Perdue Farms Incorporated*

---

*Marc Smith*
*November 27, 2012*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



**WILCOX & FETZER LTD.**

Original File 112712ms.es.txt

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARC SMITH,                    )
                               )
            Plaintiff,         )
                               )   Civil Action No.
v.                             )   1-27-LPS-SRF
                               )
PERDUE FARMS INCORPORATED,     )
                               )
            Defendant.         )


        Deposition of MARC SMITH taken pursuant
to notice at the law offices of Richards, Layton
& Finger, One Rodney Square, Wilmington,
Delaware, beginning at 9:15 a.m., on Tuesday,
November 27, 2012, before Eleanor J. Schwandt,
Registered Merit Reporter and Notary Public.


APPEARANCES:

        NOEL E. PRIMOS, ESQ.
        SCHMITTINGER & RODRIGUEZ, P.A.
          404 South State Street
          P. O. Box 497
          Dover, Delaware  19903-0497
          for the Plaintiff

        BROOKS R. AMIOT, ESQ.
        JACKSON LEWIS LLP
          2800 Quarry Lake Drive - Suite 200
          Baltimore, Maryland  21209
          for the Defendant


ALSO PRESENT:  CHARLES BRODERICK,
               Perdue Farms Incorporated


                WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1      Q.   You also signed Smith No. 9; is that

2   right --

3      A.   Yes.

4      Q.   -- there at the bottom above associate's

5   signature?

6      A.   Yes.

7      Q.   Whose signature is above yours?

8      A.   Mr. Broderick.

9      Q.   If you look at Exhibit No. 8, the

10  disciplinary action, dated March 13th, 2009,

11  whose signature is above yours?

12     A.   Chuck Broderick's.

13     Q.   Looking at Exhibit No. 9, the

14  disciplinary record, whose writing is crossed

15  out?

16     A.   That's my writing.

17     Q.   Who crossed it out?

18     A.   I did.

19     Q.   Why?

20     A.   No, no, I didn't cross it out.  He, Mr.

21  Broderick crossed it out.

22     Q.   Do you remember why?

23     A.   It was after I signed it, he crossed it

24  out, and I was turning it in for harassment or he



1    took it and -- I'm not sure actually.   But I

2    believe he took it from me and then crossed it

3    out.

4        Q.   Did he explain why?

5        A.   No.

6        Q.   Do you recall him explaining that the

7    comments section was for management, and that you

8    could write something out, up separately and

9    submit it?

10       A.   No, it was never discussed that I

11   recollect.

12       Q.   Did you see him cross this out?

13       A.   Yes.

14       Q.   And you had no conversation about why he

15   was crossing it out?

16       A.   I just assumed he was crossing it out

17   because it wasn't true from his point of view.

18       Q.   You did file a separate complaint on the

19   same day, right, alleging sexual harassment?

20       A.   In March, yes, I did.

21       Q.   This same day, March 17?

22       A.   Yes.

23       Q.   Wasn't it after this disciplinary record?

24       A.   No, this was before.   They got the call,



1    Q.  Why would you ask him what he was having

2  for lunch?

3    A.  Because he eats like really -- like

4  sardines and crazy stuff, health food stuff.

5    Q.  Tell me about the conversation regarding

6  PDI.

7    A.  I told him that the other managers and

8  the other QCs they all did it, in the other

9  mills, and I was wondering why we had to do it

10  through her.

11    Q.  Through Donna Brown?

12    A.  Or why we had to do it and Donna didn't

13  have to do it.

14    Q.  Weren't you upset about it?

15    A.  Yeah.

16    Q.  Did you have an altercation, did you have

17  an argument with Mr. Broderick about having to do

18  PDI?

19    A.  No.  I mean, that's what he wants to call

20  it, he can call it what he wants.

21    Q.  Take a look at Exhibit 8.  It is the

22  memo, the disciplinary memo.

23    A.  Oh, okay.

24    Q.  Why don't you read, not out loud, read to



1   had already called HR and you weren't going to do

2   the PDIs?

3       A.   No.

4       Q.   Do you recall Mr. Broderick telling you

5   to calm down and go back upstairs?

6       A.   No.

7       Q.   Did you ever scream, "You're a worthless

8   piece of shit" and storm off?

9       A.   No.

10      Q.   You deny saying "you're a worthless piece

11  of shit"?

12      A.   Yep.   Let me take that back.   After the

13  comment, yes.

14      Q.   After what comment?

15      A.   The "tube steak smothered in drawers"

16  comment.

17      Q.   Let's talk about that.   So as I

18  understand it, you have gone down to talk about

19  PDIs and whether you are supposed to perform this

20  function.   He walks out, out of his office after

21  you've had this conversation.   Is that when you

22  ask him about what is for lunch?

23      A.   Yeah.

24      Q.   Why did you ask him what is for lunch?



**Marc Smith**                                136

1      A.   Yes.

2      Q.   And what instance did you identify in

3  this March 17th communication to Mr. Perdue?

4      A.   What is that?

5      Q.   What did you tell Mr. Perdue in this

6  communication?

7      A.   I never got to talk to him.

8      Q.   I'm sorry.  What were you communicating

9  to Mr. Perdue in this statement?  Take a look at

10  it.

11     A.   That I needed help, I needed help because

12  they, they were writing me up for this situation,

13  when -- I was wrong for cussing, but it was after

14  the fact, and that I needed help because no one

15  was doing anything, and that I knew it had

16  further -- further retaliation would happen.

17     Q.   I thought you told me earlier you didn't

18  know why you were written up.

19     A.   Insubordination.

20     Q.   What was the insubordination?

21     A.   The cussing him.

22     Q.   All right.  So you understand that you

23  were written up because you cussed Mr. Broderick?

24     A.   Yes.  It was after the fact.

**Marc Smith**      141

1     Q.  All right.  You identified an incident a

2     few weeks ago where "he grinded up behind me like

3     a man would dance with a woman in a hip hop

4     club."

5     A.  Yes.

6     Q.  How did that affect you, when he grinded

7     up behind you?

8     A.  It upset me and made me mad.

9     Q.  Anything else?

10     A.  No.

11     Q.  All right.  Did you consider that

12     discrimination or harassment?

13     A.  Harassment.

14     Q.  Was it discrimination?

15     A.  I'm not sure.

16     Q.  So those are the only two things that you

17     communicated to Mr. Perdue, right, the tube steak

18     comment and that he was grinding up behind you?

19     A.  Yes.

20     (Smith Deposition Exhibit 11 was

21     marked for identification.)

22     Q.  Is this your handwriting, Mr. Smith?

23     A.  Yes.  That was sent too.

24     Q.  Was that a cover to your memo, the March



1     A.   I never said that.

2     Q.   Well, I asked you if you called HR after

3   the incident and you said no.

4               MR. PRIMOS:   I believe that's

5   incorrect.   But you can answer.

6     A.   I called them after the situation between

7   me and Chuck.

8     Q.   Okay.

9     A.   I went back up stairs.

10    Q.   Tell me what happened with that.   I

11  apologize for mischaracterizing what you said.

12  Tell me what happened.

13    A.   I just called them and explained the

14  situation.

15    Q.   Who did you talk to?

16    A.   I, I -- I'm not sure what lady I talked

17  to over there.

18    Q.   It was a woman?

19    A.   Yes.

20    Q.   At Georgetown?

21    A.   Yes.

22    Q.   Why did you call Georgetown?

23    A.   Well, that's the first step in the

24  service is you go up the ladder.



**Marc Smith**                                                     152

1       Q.   So the Georgetown HR covers the

2  Bridgeville facility?

3       A.   That's what I'm led to believe, yes.

4       Q.   What did you tell HR?

5       A.   About the situation on the 13th, and the

6  one in February.

7       Q.   What did you tell them?

8       A.   I told them about the tube steak

9  smothered in drawers and I told them about him

10  grinding up behind me.

11      Q.   Anything else?

12      A.   There may have been other things, but I

13  can't recall.

14      Q.   But those are the two things that you

15  remember as being most troubling?

16      A.   Yes.

17      Q.   All right.  Any other communications with

18  HR after the incident and before you talked to

19  Mr. Jones?

20      A.   There may have been.  I can't recall the

21  exact, if there was or not.

22      Q.   Can you remember, are there any other

23  incidents of misconduct that you recall happening

24  prior to March 23rd, 2009?



1              MR. PRIMOS:  Objection.  You mean

2    misconduct toward Mr. Smith or toward anyone at

3    the mill?

4              MR. AMIOT:  Toward Mr. Smith.

5              THE WITNESS:  I'm not sure, but I

6    know it intensified after that.

7    BY MR. AMIOT:

8        Q.   After March 23rd?

9        A.   Yes.

10       Q.   Do you remember saying, other than the

11   grinding or the tube sock --

12       A.   Tube steak.

13       Q.   -- tube steak comment prior to March

14   23rd?

15       A.   Nothing directed at me.

16       Q.   Nothing directed at you.  And you are

17   sure about that?

18       A.   I'm pretty sure.

19       Q.   You probably would have put it in your

20   communication to Mr. Perdue?

21       A.   I believe so.

22       Q.   Okay.  What did Mr. Jones do in response

23   to your meeting?

24       A.   Really nothing.  I know he actually got



**Marc Smith**                                        156

1      Q.   Do you remember the training session?

2      A.   Yes, I remember being there.  I believe

3  they showed a video or she went over some stuff.

4      Q.   Do you remember who was in your session?

5      A.   I believe Chuck was.  He may have been at

6  all of them.

7      Q.   Anybody else that you remember?

8      A.   A couple of them, I think the maintenance

9  men, some of the truck drivers I believe were

10 there too.

11     Q.   Did anybody talk about the training

12 afterwards?

13     A.   I'm not sure exactly.

14     Q.   How was it received?  How was the

15 training received by the employees?

16     A.   Not too well.

17     Q.   Okay.  How do you know that if there

18 weren't any communications or conversations?

19     A.   Well, I mean, the way they stopped doing

20 things around me for like that day, you know,

21 kind of looked at me and gave me that...

22     Q.   What do you mean?

23     A.   Like, look what you caused kind of deal.

24     Q.   Meaning that we had to have sexual



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

```
1    harassment training?

2       A.   Yeah.

3       Q.   Who did that?

4       A.   Just, my perception could be off, just

5    some of the truck drivers.

6       Q.   I mean, did you have any communications

7    or conversations with anybody specifically about

8    the training?

9       A.   No, not really, no.

10      Q.   So it is more of how you saw people?

11      A.   Yeah, my perspective, yes.

12      Q.   How they were looking at you?

13      A.   Yes.

14      Q.   What were they doing?

15      A.   I can give you an instance of, I walked

16   by a truck driver and they were I guess looking

17   at the pictures, at the phone and, oh, look, it

18   is Marc, watch out, Marc.

19              I guess something on the phone or

20   something along them lines, and they were kind

21   of, don't let Marc see it, he will turn you in,

22   is how I took it.

23      Q.   Did you think that was harassing?

24      A.   I think it was common, ignorant of them.
```



1    Q.   Rude?

2    A.   Yes.

3    Q.   Did you think it was harassing, sexually

4    harassing?

5    A.   No, I didn't see them make any statements

6    to me, really.

7    Q.   Do you recall any other incidents of

8    sexual harassment after that training?

9    A.   I have them all written down.   Yes.

10   Q.   What can you tell me?

11   A.   Not really from Mr. Broderick.   From some

12   of the other guys, pictures and stuff that were

13   shown to me.

14   Q.   Like what?

15   A.   Harry Vanicoli.   I don't know exactly how

16   you spell his last name.   V-A-N-I-C-O-L-A.   A

17   picture of a donkey and a woman.

18   Q.   What do you mean, a picture?

19   A.   Of a donkey and a woman having sex.

20   Q.   What was the picture?   Was he holding a

21   photograph?

22   A.   He had a phone and intentionally showing

23   me the picture.

24   Q.   Was it directed to you?



**Marc Smith** 159

1      A.   With everything going on, I don't know

2    why he would show it to me unless he was trying

3    to get something started.

4      Q.   What do you mean by that?  What was he

5    trying to get started?

6      A.   I guess he knows the situation that was

7    going on.

8      Q.   Which was what?

9      A.   Between me and Chuck, the harassment and

10   all that.

11     Q.   So what do you mean by if he showed you a

12   picture on his phone he was trying to get

13   something started?

14     A.   He tried to get something started

15   between -- something going, and he told me, I

16   believe, it was from Tyson Jefferson.

17     Q.   I still don't understand what you mean by

18   "trying to get something going."

19     A.   Trying to start trouble.

20     Q.   What would the trouble be if he shows you

21   a picture on a cell phone?

22     A.   Conflict.

23     Q.   What would the conflict be?

24     A.   I guess by, I know now, he would turn it

1  in.

2      Q.   Knowing you would turn it in?

3      A.   Yes, and tell what he did.

4      Q.   Why would he want to start that kind of

5  problem for himself?

6      A.   I have no idea.  Some people like misery.

7      Q.   But your testimony is he showed you this

8  picture because he wanted you to turn him in?

9      A.   Not him in.  He was telling me who sent

10  it to him.  I don't know what his intentions

11  were.  I believe that his intentions were that he

12  was trying to get something riled up.  Why would

13  he --

14      Q.   Well, I mean, you have already told me

15  you have seen a lot of pornography in your life?

16      A.   Yes.

17      Q.   How did seeing that picture affect you?

18      A.   Animal and a woman having sex.

19      Q.   How did it affect you?

20      A.   It is horrifying.

21      Q.   You were horrified?

22      A.   Yeah.

23      Q.   How did that play out the rest of your

24  day?



```
 1      A.  It is disgusting.

 2              Well, I turned it in, I believe, and

 3   it I guess caused a little havoc, I believe, that

 4   day.

 5      Q.  Do you think that was sexually harassing?

 6      A.  In some form, yes.

 7      Q.  In what form?

 8      A.  Well, he shouldn't be showing pictures

 9   like that at the workplace.

10      Q.  Why is that sexually harassing?

11              MR. PRIMOS:  Objection to the form.

12   You can answer.

13      A.  I think it is sexual -- you shouldn't be

14   showing naked pictures of anybody or anything at

15   work, in a work environment.

16      Q.  Okay.  But for you it is okay at home,

17   right?

18      A.  Yeah, what I do in the privacy of my home

19   is my own.

20      Q.  Do you think that was discriminatory?

21      A.  I'm not sure.

22      Q.  Well, listen, Mr. Smith, your claim is

23   that you were discriminated against, so I need to

24   understand what you found to be discriminating.
```



**Marc Smith** 162

```
1    Is that --
2        A.   I was offended by it, yes.
3        Q.   Did you feel discriminated against?
4        A.   At that point they were making -- I don't
5    want to say this.  They were intentionally trying
6    to -- I'm not sure.
7        Q.   I understand you are saying you felt it
8    was harassing.
9        A.   Yeah.
10       Q.   I understand that.  How was it
11   discriminatory?
12              MR. PRIMOS:   I'm just going to object
13   because the legal definition of sexual
14   discrimination --
15              MR. AMIOT:   Don't educate him.  Don't
16   educate him.
17              MR. PRIMOS:   I just don't understand
18   the point of your asking him a legal context.
19              MR. AMIOT:   If you have an objection,
20   that's fine, to a legal question, that's fine.
21   BY MR. AMIOT:
22       Q.   But I'm still allowed to understand why
23   you brought your case and on what basis.  Right.
24   Do you understand what claims you brought against
```



1    Perdue?

2        A.   Yes, sexual harassment and retaliation.

3        Q.   Do you believe you were discriminated

4    against as a man?

5        A.   I was offended by another man, yes.

6        Q.   I understand you believe you were

7    offended, and I understand you believe you were

8    sexually harassed.

9        A.   What is your call, what is your

10   definition of discrimination?

11       Q.   Not my job.

12       A.   Okay.

13       Q.   My question to you is, let me ask it this

14   way:  Do you believe that he showed you that

15   picture because you are a man?

16       A.   I'm not sure why he showed me the

17   picture.  I'm not -- I believe he was just trying

18   to get something started.

19       Q.   What do you understand the word

20   "discrimination" to mean?

21            MR. PRIMOS:  Objection, foundation.

22   You can answer.

23       A.   Causing offense to someone.

24       Q.   Is that it?



1      A.   I guess that's what I have.

2      Q.   Okay.   Any other incidents you can think

3   of?

4      A.   There was a whole slew of incidents that

5   I wrote down.

6      Q.   Anything you remember?   I mean, I'm

7   entitled to know what you know, not what your

8   lawyer prepared for you.

9      A.   Well, I know what I wrote down.   I can't

10  recall every little detail of everything.

11     Q.   Can you give me anything?

12     A.   One of the truck drivers telling me that

13  he loved me and all that crazy stuff.

14     Q.   Who did that?

15     A.   Louis Hudson.

16     Q.   Tell me about that.

17     A.   I'm not sure exactly what the -- just

18  exactly what he actually said.   I don't remember

19  all the little details.   But he was being -- how

20  I felt, it was like a man loving another man and

21  homosexual lifestyle.

22     Q.   Do you think he is gay?

23     A.   Actions speak louder than words

24  sometimes.   I don't know.



1     Q.   Did you ever joke with guys sexually?

2     A.   No.

3     Q.   It sounds like you had seen that at the

4   workplace?

5     A.   Oh, it was there.   It was just never

6   pointed at me until the end.

7     Q.   What do you mean?

8     A.   Until the latter part of my employment

9   there.

10     Q.   Okay.   So he said, "I love you"?   What

11   did he mean by that?

12           MR. PRIMOS:   You have to answer.

13     A.   I'm sorry.   Yes.

14     Q.   What was the context of the conversation?

15   What were you doing?

16     A.   I was doing my job.

17     Q.   How did that affect you?

18     A.   Well, it just offended me.   Why would he

19   want to tell me something like that.

20     Q.   Were you otherwise friends with this guy?

21     A.   I thought we were friends.

22     Q.   So if he said that to you, you instantly

23   took offense?

24     A.   By the way he said it.   I'm not sure



1   exactly, into detail what he exactly said.

2      Q.  What do you mean by that?

3      A.  Well, I didn't have -- I didn't have all

4   the papers that I had.  So I don't know exactly

5   what he said.  I have it written down.

6      Q.  You don't remember what he said unless

7   you look at --

8      A.  Not exactly what he said, no.

9      Q.  -- a document?

10     A.  I know about what, you know what I mean,

11  what it pertained to, a man messing with another

12  man.

13     Q.  That's how you took his response, this

14  guy you thought was a friend, or his comment?

15     A.  Yeah.  It was, it was wrong.

16     Q.  All right.  Anything else you can

17  remember?

18     A.  Not right offhand.

19     Q.  I'll give you as much time as you want to

20  think about because now is your time to tell me

21  everything that happened that you consider

22  offensive.

23     A.  I can't -- I'm just drawing a blank.

24     Q.  So while we are sitting here you have



1   told me everything you can remember that you

2   found offensive while you were employed at

3   Perdue?

4      A.   Yeah.  I can't remember every little

5   detail so I don't want to go into it.

6            MR. PRIMOS:  Just to clarify for the

7   record, were you referring to the period between

8   March and May?

9            MR. AMIOT:  Any period.  Any period.

10            MR. PRIMOS:  So you are referring to

11   incidents even directed at other people?

12            MR. AMIOT:  I'm sorry, just incidents

13   directed at you.

14            MR. PRIMOS:  Okay.

15            THE WITNESS:  I just can't recall

16   every incident.

17   BY MR. AMIOT:

18      Q.   Okay.  And now to Mr. Primos' point, do

19   you have any recollection of incidents not

20   involving you, that were directed to somebody

21   else?

22      A.   I watched guys dry hump each other.

23      Q.   What do you mean by that?

24      A.   They hump with their clothes on, they



**Marc Smith**                                        168

```
 1    would hump, humping motions.  I watched Vern and

 2    Clint Lewis, Vernon Russell and Clint Lewis in

 3    the office, they shut the light out and they

 4    would do it.  He would act like he was humping

 5    him.

 6        Q.   When did that happen?

 7        A.   It happened actually a lot.

 8        Q.   Were they directing that at you?

 9        A.   No.  They were just doing it.

10        Q.   How did you see it?

11        A.   They would start off, and then they would

12    shut the light off and shut the door.  The door

13    had a window on it, though, and light could get

14    in.

15        Q.   So they would turn the light off, shut

16    the door.  There is glass in the door?

17        A.   You can see right through the glass.

18        Q.   There is light outside and it is dark

19    inside, and you can still see inside?

20        A.   Vaguely, yeah.

21        Q.   Did you walk up to the door?

22        A.   No.

23        Q.   Did you laugh about it?

24        A.   I shook my head.
```



**Marc Smith**                                        169

1     Q.   How did that impact you?

2     A.   Crazy way men are acting against men.

3   You know what I mean, like they should be -- what

4   they should be doing with a woman.

5     Q.   Do you think that was discriminatory

6   against you?

7     A.   It should be against everyone that was

8   there.

9     Q.   Why?

10    A.   Because it is --

11    Q.   Well, I understand you found it

12  offensive.  Okay.  We've had that conversation.

13  Did you think they were directing it at you for

14  any reason?

15    A.   No.

16    Q.   Did you ever report that to anyone?

17    A.   No.

18    Q.   Why not?

19    A.   Because he was involved with the stuff

20  too.

21           MR. PRIMOS:   What do you mean?

22    A.   Chuck Broderick was involved with the

23  activity, some of the craziness that went on.

24    Q.   What do you mean?



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

**Marc Smith**                                    170

1   .    A.   Some of the man-on-man comments, the

2   man-on-man action, action that was going on, that

3   you would lead to believe that they were

4   homosexual in the way they acted and conducted

5   themselves.

6        Q.   Tell me about Chuck Broderick.

7        A.   Doing the same thing kind of.

8        Q.   What do you mean?

9        A.   Holding, humping and gyrating their hips.

10  Insane stuff.

11       Q.   Well, give me a specific detail.  When

12  did that happen with Chuck Broderick?  I mean you

13  told me about the bumping and grinding in

14  February.  Did it happen again?

15       A.   No.  He never did it to me again, no.

16       Q.   Okay.

17       A.   But to other people.  He would gyrate

18  behind them as you are standing there, and I

19  would be, like, that's crazy.

20       Q.   Is there anything else you can remember

21  that was inappropriate, whether it was directed

22  at you or anyone else?

23       A.   There was other stuff, but I just can't

24  remember it off the top of my head.



1      A.   Yes.

2      Q.   All right.   Keep that in front of you,

3  please.

4            (Smith Deposition Exhibit 16 was

5  marked for identification.)

6      Q.   There you go, Noel.

7            Do you recognize this document?

8      A.   Department of Labor document.

9      Q.   This is your charge of discrimination,

10 right?

11     A.   Yes.

12     Q.   It is dated what?

13     A.   Oh.   The 22nd.

14     Q.   Of April?

15     A.   Yes.

16     Q.   So this is more than a month after

17 Exhibit No. 15, which was the intake

18 questionnaire; is that right?

19     A.   Yes.

20     Q.   Is there a reason why you went back to

21 the Department of Labor on April 22nd?

22     A.   I believe the -- I went back with a

23 lawyer at that time.  I can't recall exactly, but

24 I believe I went back with Miss Stratton at the



1   time.

2       Q.   So the lawyer is Barbara Stratton?

3       A.   Barbara Stratton, yes.

4       Q.   Who prepared the charge of

5   discrimination, who prepared the typewritten part

6   of it?

7       A.   I am not sure if they had it prepared

8   there at the Department of Labor or if she did.

9   I believe it was the Department of Labor.

10      Q.   "She" being?

11      A.   Miss Stratton.

12      Q.   I take it you reviewed the document and

13  then signed it?

14      A.   Yes.

15      Q.   What are the allegations you raise in

16  this charge as of April 22nd, 2009?

17      A.   The grinding behind me, tube steak

18  smothered in drawers, the piece of crap comment,

19  reporting offensive behavior to Adrianna Mason

20  and David Jones, both human resources.

21      Q.   Stop right there.   Didn't you tell me

22  earlier that you didn't talk to David Jones?

23      A.   Yeah, but I told you also that I couldn't

24  recollect exactly what time I did talk to him.



**Marc Smith**                                      176

```
 1      Q.  So you have identified what we will call

 2  the grinding, humping, using your words, the tube

 3  steak smothered in drawers, again your words.

 4  What else?

 5      A.  And the Tyson and the sexual act.

 6      Q.  Donkey and a woman in a sexual act?

 7      A.  Yes, yes.  And then, well, that brings to

 8  mind the next one.  But Harry saying something

 9  about Erwin Hall -- I'll just read it.

10      Q.  Go ahead and read it.  You can read it.

11      A.  Vanicoli --

12      Q.  Vanicoli, V-A-N-I-C-O-L-I looks like.

13      A.  -- said he gave Erwin Hall, dispatcher,

14  oral sex.

15          MR. PRIMOS:  Okay.  I don't think

16  that's -- read exactly what it says.

17          THE WITNESS:  "Vanicoli then told

18  Charging Party" --

19  BY MR. AMIOT:

20      Q.  Slow down so she can --

21      A.  I'm sorry.

22          "Vanicoli then told Charging Party

23  that he should give oral sex to Erwin Hall,

24  Dispatcher," in charge --
```



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

**Marc Smith**                                    177

1       Q.   "And Charging Party."

2       A.   -- "again complained of harassment.

3    Respondent failed to take action on Charging

4    Party's harassment complaints until 4/09/09 when

5    it finally announced that it would provide sexual

6    harassment training for all employees."

7       Q.   Okay.  So as of April 22nd, 2009, you

8    have identified grinding and humping, tube steak

9    smothered in drawers, the photo that came from

10   Tyson to Mr. Vanicoli on his cell phone, and a

11   comment that you should give oral sex to Erwin

12   Hall?

13      A.   Yes.

14      Q.   Was there anything else that you left

15   out?

16      A.   Again, I can't remember everything.

17      Q.   Well, sir, at the time, though, April

18   22nd, 2009, this was probably pretty fresh in

19   your mind, right?

20      A.   Yes.

21      Q.   And you reviewed the document.  You were

22   with your lawyer.  You reviewed the document and

23   you signed it?

24      A.   Yes.



**Marc Smith**                                                    178

```
1        Q.   I mean, don't you think it was complete
2    at the time you signed it?
3        A.   Yeah, it should, yes.
4        Q.   And the purpose of identifying your
5    allegations was to inform the Department of Labor
6    what your complaints were; is that right?
7        A.   Yes.
8        Q.   And your intent was for the Department of
9    Labor to conduct an investigation?
10       A.   Yes.
11       Q.   You wanted the Department of Labor to
12   know what was going on?
13       A.   Yeah, I wanted them to correct the
14   problem.
15       Q.   Your lawyer, Barbara Stratton, was with
16   you at the time?
17       A.   Yeah, I believe she was.
18       Q.   Look at Exhibit No. 15, if you will.  Did
19   anyone assist you in filling out this document?
20       A.   I don't believe so.  I think I just did
21   it when I went there.
22       Q.   What did you mean that Mr. Broderick made
23   his tube steak comment and Mr. Vanicoli showed
24   you a text was meant to discredit your sexual
```



1   Department of Labor.

2      Q.  I understand that.  When was the

3   complaint to HR?

4      A.  I guess on the 13th is when I called them

5   and told them about the incident between me and

6   Chuck Broderick, and the other incidents happened

7   between I guess the days, 13th and 17th.

8      Q.  You are saying Vanicoli showed you a text

9   of a donkey and a woman --

10     A.  Yes.

11     Q.  -- to discredit your complaint?

12     A.  Not to discredit it, just -- that's not

13  why.  Okay.  Maybe this was written wrong and it

14  was signed wrong or it was wrong.

15     Q.  Okay.

16     A.  All right.  No one helped me fill it out

17  so it may have been wrong, how it is written

18  down.

19     Q.  All right.  Do you think Mr. Broderick

20  made the tube steak covered in drawers comment

21  because you are a man or because he was harassing

22  you?

23     A.  He said -- harassing me, I guess.  He had

24  something for me and it was a tube steak

1    smothered in drawers.

2        Q.   I'm asking you, do you think he did that

3    to harass you or because you are a man?

4        A.   I don't know.  Both.  He likes men maybe.

5    And he'd like to get me a tube steak smothered in

6    drawers.

7        Q.   What about the Vanicoli text, do you

8    think he showed you that because you are a man?

9        A.   I think he just showed it to get

10   something started, and he knew that would -- with

11   my -- everything that was going on between the

12   management and me, it would get it going, and it

13   did get it going.

14       Q.   What happened?

15       A.   Well, I turned -- I turned him in for it,

16   turned Tyson in for it.

17       Q.   Do you know what happened with that?

18       A.   I have no idea.  I heard at one time he

19   got written up.

20       Q.   How did you hear that?

21       A.   Just through the grapevine, I guess.

22       Q.   While you were employed at Perdue?

23       A.   Yes.

24       Q.   Looking at Exhibit No. 16, which is the



**Marc Smith**                                    190

1     A.   Was it the date?

2     Q.   Well, this is signed on March 17, so I'm

3 not sure that makes sense.

4     A.   I have no idea why.

5     Q.   The third page, the next page.  At the

6 top you admit that Chuck never touched you, just

7 that he was really close?

8     A.   Mm-hmm.

9     Q.   Is that right?

10    A.   Yes.

11    Q.   There is no physical touching?

12    A.   Yes.

13    Q.   Do you know when Perdue received the

14 charge of discrimination?

15    A.   I'm not really sure.  Just by what she

16 told me about the date it was sent out.

17    Q.   Who is "she"?

18    A.   Miss Stratton, sorry, told me that they

19 received it probably in early May.

20    Q.   But you have no evidence to show when

21 Perdue received it?

22    A.   No.

23    Q.   Just what your lawyer suggested may have

24 happened?



```
 1      A.   Yeah, yeah.   Yes.
 2              MR. AMIOT:   Why don't we take a lunch
 3  break.
 4              MR. PRIMOS:   Sure.
 5              (Lunch recess taken.)
 6  BY MR. AMIOT:
 7      Q.   Mr. Smith, let's talk about May 9th,
 8  2009.   Do you remember that day?
 9      A.   Yes.
10      Q.   Do you recall that Tyson assigned you to
11  work that day?
12      A.   Yes, I do.
13      Q.   That it was a Saturday?
14      A.   Yes.
15      Q.   And do you recall that you weren't happy
16  about working that Saturday?
17      A.   No, that's not the cause.   The cause was
18  Keith Hudson, and I forgot the other maintenance
19  guy, they were harassing me, messing, and I got
20  upset, like really upset, and I couldn't think
21  straight.   I was a little flustered, so I called
22  and tried to --
23      Q.   Let's slow down here.   My question was
24  just when you got assigned to work Saturday, in
```



**Marc Smith** 192

1   other words, when you were told you had to work

2   Saturday as utility operator, which was I

3   understand part of your job, you were upset about

4   it, weren't you?

5   A.   No.

6   Q.   You had to work on a Saturday?

7   A.   No.

8   Q.   During your shift was there a time when

9   the elevator got plugged and you had to ask the

10  maintenance guys to help you unplug it?

11  A.   I can't recall that.  I don't -- I'm not

12  sure.

13  Q.   You don't recall there being a machinery

14  malfunction on that day?

15  A.   No.   There is a lot of stuff that goes

16  wrong, lights and stuff.  I'm not sure.  It is

17  possible that, yes, it could have happened.

18  Q.   And the two maintenance employees you

19  just identified, who were they?

20  A.   Keith Hudson.  I forgot the other

21  gentleman's name.

22  Q.   You don't recall asking them to help you

23  unplug an elevator?

24  A.   No, I don't recall that.



1     Q.   Could it have happened?

2     A.   Yes, it could have.

3     Q.   Was Chuck Broderick working that day?

4     A.   No.

5     Q.   Do you know where he was?

6     A.   Probably home.

7     Q.   What is that?

8     A.   Probably home.

9     Q.   Do you recall that he was out of state at

10    his daughter's graduation?

11    A.   Yeah, North Carolina or South Carolina,

12    something along that lines.

13    Q.   So you recall that?

14    A.   Yes.

15    Q.   What about Tyson?

16    A.   Home.

17    Q.   Who else was working that day?

18    A.   Gene Wilder, I think that's his name.

19    Q.   Probably not Gene Wilder.

20         (Discussion off the record.)

21    Q.   Eugene Wilder?

22    A.   Yes.

23    Q.   Who else?

24    A.   Joe Malone.   Alex Quebral.   Starts with a



Marc Smith                          194

```
 1   Q, Quebral.
 2              MR. BRODERICK:  Q-U-E-B-R-A-L.
 3   Q-U-E-B-R-A-L.
 4      A.  And Keith Hudson, along with, I don't
 5   know why -- I can't remember, a young guy.
 6      Q.  Another maintenance employee?
 7      A.  Yeah.
 8      Q.  Keith Hudson and this other gentleman
 9   were the maintenance employees.  What did Alex
10   do?
11      A.  Alex was a -- him and Joe Malone were in
12   receiving.
13      Q.  In receiving?
14      A.  Yes.
15      Q.  Joe Malone was in receiving.  Where was
16   receiving compared to where you were in the panel
17   operator position?
18      A.  It is in the back of the mill.
19      Q.  Different part of the mill?
20      A.  Different part, yeah.
21      Q.  Eugene Wilder, what did he do?
22      A.  Dispatcher.
23      Q.  Dispatch.  Can you see him from the panel
24   operation area?
```



**Marc Smith**                                        195

1      A.   Yeah, I do if I turn my head, yeah.

2      Q.   What time did you start your shift?

3      A.   6:00 or 7:00, I believe.

4      Q.   In the morning?

5      A.   Yes.

6      Q.   I take it at some point you started

7   placing calls to Chuck and to Tyson?

8      A.   Tyson, and to one of the other panel

9   operators, see if they would come in early.

10     Q.   See if they would come in early?

11     A.   Yeah.

12     Q.   Who was the other panel operator you

13   called?

14     A.   I can't remember his name.  Chuck

15   Broderick might know.

16     Q.   Do you remember what time this was when

17   you started making these phone calls?

18     A.   10'ish, between 10:00, 11:00.  I'm not

19   sure exactly, the exact time.

20     Q.   10:00 or 11:00.  Tell me what happened.

21     A.   I was making calls to see if I could go

22   home.  I just -- I was stressed out.

23     Q.   You were stressed out?

24     A.   Stressed out, and I was just, was upset



**Marc Smith**                                    196

```
 1  and I just didn't think I should be at work.  I

 2  felt bad.

 3     Q.  Go ahead.

 4     A.  Oh.  And then I was calling to try to go

 5  home.  I didn't feel well.  So I got ahold of I

 6  believe Tyson.  And they said I couldn't leave.

 7  But I felt I wasn't in a position to run the

 8  machines.

 9     Q.  Okay.  When you say you were stressed

10  out, what were you stressed out about?

11     A.  Keith and the other guy were harassing

12  me.

13     Q.  What do you mean by harassing you?

14     A.  Giving me a hard time, and, about like

15  some of the stuff that was going on in the mill.

16     Q.  What were they saying?

17     A.  Actually, they were basically saying that

18  I was -- we had some comments back and forth.

19  I'm not sure exactly.  He said he was going to

20  come down and show me a real man, what a real man

21  was, I guess beat me up or something.  I never

22  seen him.

23     Q.  Okay.

24     A.  I ended up shutting the machines down,
```



**Marc Smith**                                    205

```
 1   BY MR. AMIOT:
 2      Q.  At some point were you told you were
 3   terminated?
 4      A.  Three-day suspension, and then supposed
 5   to meet with David Jones over in Georgetown, but
 6   he -- he never had me meet -- he never had a
 7   meeting.  He called me and told me I was no
 8   longer employed with Perdue Farms.
 9      Q.  Did he tell you why?
10      A.  Because I walked off the job.
11      Q.  What facts or evidence do you have to
12   establish that you were terminated for
13   complaining to human resources about sexual
14   harassment?
15      A.  All I have is what I have written down.
16      Q.  Tell me now, what do you have?
17      A.  Just what I've written down.  The order
18   of things that happened.  I complained, they
19   wrote me up.  I kept complaining, and they
20   finally, one thing led to another, and finally
21   they had grounds to terminate me.
22      Q.  And finally they had grounds to terminate
23   you?
24      A.  Yeah, or --
```



**Marc Smith**                                                    206

1      Q.   You admit you walked off the job, right?

2      A.   Yes.

3      Q.   And that's a terminable offense?

4      A.   Yes.

5      Q.   Other than the timing, which is really

6    what you are saying, the timing of events, do you

7    have any facts or evidence to establish that you

8    were discharged because you complained to human

9    resources?

10     A.   No.

11     Q.   Do you contend that Mr. Jones, human

12   resources manager for that facility, and others,

13   retaliated against you for complaining to him in

14   his capacity as a human resources manager?

15     A.   Somewhere along the line of that, yes.

16     Q.   What evidence or facts do you have to

17   establish that?

18     A.   Just the order of events.

19     Q.   That's all you have?

20     A.   Yes.

21     Q.   No comments?  No statements?  No written

22   communications?

23     A.   There is what I have written and the

24   letters that you've had and all that stuff.

```
 1      Q.   Meaning the sequence of events?

 2      A.   Yes.

 3      Q.   The timing of events?

 4      A.   Yes.

 5      Q.   But nothing else?

 6      A.   Nothing else.

 7               (Smith Deposition Exhibit 18 was

 8   marked for identification.)

 9      Q.   Do you recognize this document, Mr.

10   Smith?

11      A.   Yes.

12      Q.   It looks like you signed the document in

13   two places at the bottom; is that right?

14      A.   Yes.

15      Q.   And the date of that signature was August

16   3rd, 2009?

17      A.   Yes.

18      Q.   I think we have talked about this.  Just

19   to make sure I'm clear, it says, "The charge was

20   served on Respondent on approximately May 6,

21   2009."  Do you see that in the middle of the

22   paragraph, "Brief statement of allegations"?

23      A.   Where is that?

24      Q.   Second line under "Brief statement of
```



1    allegations," I'm sorry, third line.

2        A.   May 6.

3        Q.   Right.  Didn't you tell me that you came

4    up with that date because your lawyer told you

5    she thought that's when it would have been

6    served, in the mail?

7        A.   Yeah.  Yes.

8        Q.   Further down you identify an individual

9    by the name of Richie Oliphant?

10       A.   Yes.

11       Q.   Do you see that?  He was a driver, right?

12       A.   Yes.

13       Q.   He had a completely different job than

14   you?

15       A.   Yes.

16       Q.   Different supervisor?

17       A.   Yes.

18       Q.   Different hours?

19       A.   Yes.

20       Q.   Different responsibilities?

21       A.   Yes.

22       Q.   When did he leave the site?

23       A.   I don't know exactly when.

24       Q.   You say he left the site without



1    permission and without recourse.   When did that

2    happen?

3        A.   A little before 10:00 I believe,

4    somewhere around there.

5        Q.   On what day?

6        A.   May 9th.

7        Q.   The same way you walked off the job?

8        A.   Yes.

9        Q.   How do you know it was without

10   permission?

11       A.   He didn't call no one, do any of that.

12       Q.   How do you know?

13       A.   He just didn't.

14       Q.   How do you know?

15       A.   I, I don't know.

16       Q.   Okay.   How did you come up with this name

17   to make this allegation?

18       A.   Because I know Richie.

19       Q.   Well, you saw him leave?

20       A.   Yeah.

21       Q.   Do you know his hours?

22       A.   Well, at that time, yeah, their hours,

23   they had to come in and work -- well, it was a

24   Saturday.   They have a certain amount of hours



**Marc Smith**                                    210

1    they are supposed to work each day.  But he

2    didn't meet them hours.

3        Q.  You don't know whether he had permission

4    to leave?

5        A.  From what he said, no, he didn't.

6        Q.  When you say "without recourse," what

7    does that mean?

8        A.  I didn't use that word.  Where is that?

9        Q.  It says he "left the site without

10   permission and without recourse."

11       A.  I -- they typed that up.  I didn't.

12       Q.  Who prepared this document?

13       A.  Department of Labor or Miss Stratton.

14       Q.  Why did you file this charge of

15   discrimination?

16       A.  Retaliation.

17       Q.  What does that mean?  What did you mean

18   by that?

19       A.  Retaliation.  They retaliated for the

20   sequence of events that happened.

21       Q.  The timing of your discharge?

22       A.  Yes.

23       Q.  Compared to the timing of your

24   complaints?



```
 1      A.   Yes.

 2      Q.   Any other reason?

 3      A.   No.

 4      Q.   Do you recall if you went into the

 5   Department of Labor twice to file this charge or

 6   just once?

 7      A.   I went in on the 17th and then I came

 8   back again with Miss Stratton.

 9      Q.   With Miss Stratton?

10      A.   Yes.

11           MR. PRIMOS:   When you say "this

12   charge" you are referring to Exhibit 17?

13           THE WITNESS:   18.

14           MR. PRIMOS:   I mean 18.

15           MR. AMIOT:   18, yes.

16           THE WITNESS:   Miss Stratton was with

17   me on this one.

18   BY MR. AMIOT:

19      Q.   What happened on your first visit to the

20   Department of Labor in connection with this

21   retaliation charge?

22      A.   What do you mean?

23      Q.   What did you do on your first visit

24   there?
```



**Marc Smith**                    212

1      A.   I told them I was there.  They gave me

2   the forms to fill out and I filled them out.

3      Q.   Did you fill them out or did your lawyer?

4      A.   I filled them out the first time.  I

5   believe she did the second time.

6      Q.   Okay.

7      A.   I believe.

8           (Smith Deposition Exhibit 19 was

9   marked for identification.)

10     Q.   Have you seen this document, Mr. Smith?

11     A.   Yes.

12     Q.   Who prepared this chronology for you?

13     A.   Miss Stratton.

14     Q.   That's your lawyer?

15     A.   Yes.

16     Q.   She is your lawyer, rather.  When did

17  that occur?

18     A.   I'm not sure of the exact date.

19     Q.   Were you involved in the preparation of

20  this document?

21     A.   I gave her the documents that I had,

22  everything that I had, and she prepared it

23  herself.

24     Q.   Did you review it before it was



1    finalized?

2        A.   Yes.

3        Q.   Did you make any revisions to it?

4        A.   I believe I did here and there.  I'm not

5    sure exactly what they were at the time.

6        Q.   When did you first see it?

7        A.   It has been a long time.  Way over --

8        Q.   Well, if you went to the Department of

9    Labor to file a charge in August of 2009, does

10   that help you?

11       A.   Maybe the first of the year, maybe,

12   somewhere.  I'm not exactly sure what time she

13   sent the paper to me.

14       Q.   Wasn't this prepared in connection with

15   the filing of a retaliation charge?

16       A.   Yes.

17       Q.   Which was not until August, right?

18       A.   Yes.

19       Q.   Are you familiar with the contents?

20       A.   Not all of the -- I mean, I'm pretty sure

21   I know them if I read them and, you know what I

22   mean.

23       Q.   When was the last time you saw this

24   document?



**Marc Smith**                                    214

1      A.   I skimmed through it not too long ago.

2      Q.   In preparation for the deposition?

3      A.   Yes.

4      Q.   You admit as you are sitting here that it

5   has much more detail in it than anything else you

6   submitted to the Department of Labor, right?

7      A.   Yes.

8      Q.   Do you also admit that it contains

9   allegations of misconduct that were not before

10  raised before the Department of Labor?

11     A.   Yes, it has allegations that weren't

12  raised, yes.

13     Q.   Well, you told me earlier you wanted the

14  Department of Labor to investigate your concerns?

15     A.   Yes.

16     Q.   And that you wanted to tell them

17  everything you knew to investigate, and that you

18  did that, right?

19     A.   Yes.

20     Q.   Well, why is it that the Smith chronology

21  finally comes out in July or August of 2009 with

22  a lot more information in it?

23     A.   When I submitted it I thought that the

24  lawyer would, you know what I mean, since they



1    were working together they would see that.  It

2    was all together.

3        Q.  See what?

4        A.  See the stuff, the other evidence or the

5    other written documents would be added to it.

6        Q.  You read the forms and signed them,

7    right?

8        A.  Yes.

9        Q.  And you saw what was in there and what

10   wasn't in there?

11       A.  Yes.

12       Q.  And you admit that this chronology

13   contains a lot more information than any of those

14   prior documents that you submitted to the

15   Department of Labor?

16       A.  Yes.

17       Q.  Well, go ahead and look at the document.

18           Actually, before you look at that, we

19   took a break, we took a lunch break.  Have you

20   thought of any other incidents, whether directed

21   at you or anyone else, while you are sitting

22   here, before you start reading the words on these

23   pages?

24       A.  No, I haven't.



1     Q.   So the only way you will remember is by

2     looking at a chronology that your lawyer

3     prepared; is that right?

4     A.   Yes.

5     Q.   That's the only way you will remember

6     those other incidents?

7     A.   Yes, the exact incidents, yes.

8     Q.   And absent this chronology that your

9     lawyer prepared you wouldn't have any other way

10    of coming up with those incidents?

11    A.   I have stuff written at home, my own

12    documents of the stuff that I wrote down, stuff

13    that she used to put into this.

14    Q.   So you would either have to look at those

15    notes or this chronology?

16    A.   Yes.

17    Q.   Well, before we get into this, then, let

18    me, might as well get those into play.

19              (Smith Deposition Exhibit 20 was

20    marked for identification.)

21    Q.   Are these the notes and pieces of paper

22    you referenced earlier you submitted --

23    A.   Yeah.

24    Q.   -- to have your lawyer prepare the



1   chronology?

2       A.   Yes.

3       Q.   And the words of the pages on the

4   chronology are your lawyer's words, right?

5       A.   Yes.

6       Q.   Do these notes, and this is Exhibit 20,

7   and the chronology which is Exhibit 19, do those

8   two exhibits collectively capture all of the

9   misconduct you allege in this case?

10      A.   Yes.

11      Q.   There is nothing else out there other

12  than what is on these pages?

13      A.   Yes.   I mean, there is too many events to

14  actually -- yes, yes.

15      Q.   Is there anything that you know of in

16  these notes that is not in the chronology?

17      A.   No.

18      Q.   So everything that's in this Exhibit 20

19  should be in the chronology?

20      A.   Everything in here is in here.

21      Q.   Okay.

22      A.   Yes.

23      Q.   Let's go back to the chronology.   I

24  understand the chronology contains various



1    instances of misconduct, some directed at you and

2    some occurring, you know, just in your presence;

3    is that right?

4        A.   Yes.

5        Q.   Looking at the chronology and based on

6    what we have talked about today, are there any

7    allegations of harassment that you contend

8    occurred because you are a man?

9        A.   Yes, if they like men.

10       Q.   What do you mean "if they like men"?

11       A.   Well, because I'm a man, if they -- say

12   it again, I'm sorry.

13       Q.   Which instances of misconduct in this

14   chronology or in this case do you contend

15   occurred solely because you are a man?

16       A.   All right.  Well, if, if they are

17   interested in homosexual lifestyle and when they

18   came on to me or did things to me.

19       Q.   Who came on to you?

20       A.   Touching me is coming on to me.

21       Q.   You just pointed to Mr. Broderick.  I

22   thought you said he never touched you.

23       A.   He has touched me.

24       Q.   I thought you said he never touched you.



```
 1     A.   Never said that.   You read that earlier.
 2     Q.   So what you wrote was not correct, that
 3   he never touched you?
 4     A.   He has touched -- he has touched me
 5   before.
 6     Q.   All right.   Take me through the
 7   allegations you contend, tell me what instances
 8   of misconduct occurred because you are a man.
 9   You can use your chronology.   You can look
10   through it.
11     A.   Thinking I'm gay, he is thinking that I'm
12   gay, and he could do things like that.   Because
13   he, I guess --
14     Q.   I thought you told me at the beginning of
15   the deposition no one ever told you you were gay?
16     A.   They are gay and assuming -- they are gay
17   and what they do, their actions towards me.
18     Q.   How do you know they are gay?
19     A.   I don't know.   The way they act.   How do
20   you know they are not?
21     Q.   How do you know they are gay?   What facts
22   or evidence do you have to establish that any
23   person at your plant is gay?
24     A.   The way they talk.   The way they carry
```



**Marc Smith**                                        226

```
1       Q.   They very much are.

2            And looking at paragraph 36, let's

3    break it down, the fact Vanicoli showed you a

4    picture on a cell phone, how was that harassment

5    because you are a man?

6       A.   Well, I was actually pointing out the

7    bottom half.

8       Q.   So that first part is not because you are

9    a man?

10      A.   No, it was just to get things stirred up.

11      Q.   Okay.  Vanicoli told you to get on your

12   knees and give some other guy oral sex?

13      A.   Yes.

14      Q.   So who is gay in that scenario?

15      A.   I guess it would be me.

16      Q.   You are gay?

17      A.   Yes.

18      Q.   So now they are saying you are gay?

19      A.   Yes.

20      Q.   But Vanicoli is not gay and Hall is not

21   gay?

22      A.   Not that I know of.

23      Q.   And you are not gay?  You know you are

24   not gay?
```



**Marc Smith**                                        242

1  a liar?

2      A.   Yes.

3      Q.   Who do you contend discriminated against

4  you because you are a man?

5      A.   There is Chuck and Tyson.

6      Q.   How did Tyson discriminate against you

7  because you are a man?  I haven't heard him yet.

8      A.   Maybe it wasn't Tyson.  It wasn't Tyson.

9  It was just Chuck and some of the guys that told

10  me, Vanicoli about the blow job thing, the "blow

11  me" statement.  And...

12      Q.   Anybody else?

13      A.   It was either Vernon Russell or Kenny

14  Hudson told me to get my knee pads ready.

15      Q.   Why don't you look so you can tell me

16  specifically, look in your chronology.

17      A.   Vernon Russell, a co-worker, told Marc

18  Smith, or told me, to get his knee pads ready.

19  Kenny Ross, another one, said Marc's name and

20  said "blow me."

21      Q.   And you contend that the knee pad and

22  "blow me" comment is discrimination because you

23  are a man?

24      A.   Yeah.



**Marc Smith**                                      243

```
 1      Q.   In other words, two men making a comment
 2   to you, a man, you contend that's discriminatory?
 3      A.   Yeah, when they are telling me to do
 4   something with other men.
 5      Q.   And I think we have already talked about
 6   the fact that other than the comment "blow me" or
 7   knee pads, you have no evidence, no facts,
 8   nothing to show that anybody at that plant was
 9   gay?
10      A.   No.
11      Q.   Okay.  So we have Vernon Russell, we have
12   Chuck Broderick.  Anybody else?
13      A.   No.
14      Q.   That's it, Vernon Russell and Chuck
15   Broderick?
16      A.   Oh, the Louis Hudson.
17      Q.   What was that again?
18      A.   When he said he loved me, he still loved
19   me, girlfriend, and something about my butt being
20   sore.
21      Q.   And your allegation is he said that to
22   you because you're not gay?
23      A.   He said it to me because he presumed my
24   butt hole was sore because of having anal sex.
```



**Marc Smith**                                                    244

1      Q.   Why did he say it to you then?

2      A.   Ask him.  I don't know.

3      Q.   You are making the allegation.

4      A.   I don't know why he would say that.

5      Q.   You raised it in this case.  Why would he

6    say that to you?

7              MR. PRIMOS:  Objection, foundation.

8    You can answer if you are able to.

9      A.   I'm just going on...

10     Q.   Why is that comment, "I love you" or "is

11   your butt sore," why is that, when it is coming

12   from a man and being said to a man, why is that

13   discriminatory?

14     A.   Because they talked about the homosexual

15   stuff.  It is stuff that I have seen them do and

16   act and talk in front of each other.

17     Q.   So, in other words, he is gay?

18     A.   He acted -- the way he talks.

19     Q.   Meaning the comment that he made to you?

20     A.   Yes.

21     Q.   But other than that, you have no evidence

22   or facts whatsoever to establish this guy is gay?

23     A.   No.

24     Q.   Other than that single comment?

**Marc Smith**                                    245

1      A.   No.

2      Q.   And for Vernon Russell, nothing other

3    than that single comment about "blow me" and

4    "knee pads"?

5      A.   No.

6      Q.   And Chuck Broderick, nothing other than

7    the "tube steak" comment and the bump and grind?

8      A.   No.

9      Q.   That's the only evidence you have in this

10   case to establish that you were subjected to

11   misconduct because you are a man?

12     A.   Yes.

13     Q.   And that's the only evidence you have in

14   this case to establish that any of these three

15   individuals is gay?

16     A.   That's what I've written down, yes.

17     Q.   That's everything?

18     A.   Yes.

19     Q.   You mentioned Vanicoli when we first

20   started talking about those who discriminated

21   against you.   Did you mean to say Vanicoli?

22     A.   Yes.

23     Q.   How did he discriminate against you?

24     A.   Oh, he told me to give oral sex to Erwin

**Marc Smith**                                   246

```
 1   Hall.

 2       Q.   So who is gay in that scenario?

 3       A.   I guess I would be gay.

 4       Q.   So they are saying you are gay?

 5       A.   Yes.

 6       Q.   But you know you are not?

 7       A.   Yes.

 8       Q.   And it had nothing to do with Vanicoli

 9   being gay?

10       A.   No.

11       Q.   Right?  And since he said it about Erwin

12   Hall, it has nothing to do with Erwin Hall being

13   gay?

14       A.   No.

15       Q.   Just you?

16       A.   Yes.

17       Q.   All right.  Anybody else you want to

18   identify?

19       A.   No.

20       Q.   Can you identify everyone who retaliated

21   against you?

22       A.   Tyson Jefferson.

23       Q.   How was that?

24       A.   After I had turned him in for the picture
```



**Marc Smith**                                    247

1    of a woman and a donkey, he would come behind me

2    and check, he was in my area at all times trying

3    to find things wrong.

4        Q.   Like what?

5        A.   If the area wasn't swept up, if the bags

6    weren't counted.

7        Q.   Did he ever find a time when things

8    weren't done correctly?

9        A.   Not really.

10       Q.   So when would this have occurred?

11       A.   After I -- the picture, I turned him in.

12       Q.   Do you have any specific examples,

13   anything in the chronology, anything in your

14   notes?

15       A.   There are some bags that when you write

16   them, after you dump them, you write them down,

17   and they weren't written down.

18       Q.   And you got disciplined for that, right?

19       A.   Well, they tried to.  But David Jones got

20   rid of it.

21       Q.   But you didn't do the job you were

22   supposed to do?

23       A.   Yes.

24       Q.   Any other examples?



**Exhibit 2**



1

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  DISTRICT  OF  DELAWARE


MARC E. SMITH,                        )
      Plaintiff,                     )
                                     )
           v.                     )  C.A. No.
                                     )  12-227-LPS-SRF
PERDUE FARMS INCORPORATED,            )
      Defendant.                     )


           Deposition of **DAVID JONES**, taken
pursuant to notice, on Tuesday, July 24, 2012,
beginning at 9:30 a.m., in the law offices of
Schmittinger & Rodriguez, 54 The Green, Dover,
Delaware, reported by Cheryl A. Anthony, Court
Reporter.

APPEARANCES:

      NOEL E. PRIMOS, ESQUIRE
      SCHMITTINGER & RODRIGUEZ
      414 South State Street
      Dover, Delaware  19901
      Attorney for Plaintiff.

      BROOKS R. AMIOT, ESQUIRE
      JACKSON LEWIS, LLP
      2800 Quarry Lake Drive
      Suite 200
      Baltimore, Maryland  21209
      Attorney for Defendant.

David Jones - Primos                                    36

```
 0:59       1    that he turned Chuck Broderick in for sexual harassment

10:21:04     2    on March 13th?

10:21:05     3         A.    Very surprised.

10:21:06     4         Q.    So tell me about your meeting, your initial

10:21:08     5    meeting with Marc Smith at the feed mill regarding this

10:21:11     6    issue.

10:21:11     7         A.    I think Mr. Smith had given me a couple of

10:21:15     8    names that could substantiate his story.  I took those

10:21:21     9    names of those individuals.  And after I had that

10:21:26    10    conversation with Marc, I then addressed it with the two

10:21:33    11    individuals in a meeting.

10:21:35    12         Q.    Well, first of all, tell me about your

10:21:37    13    conversation with Marc.

10:21:37    14         A.    Well, my conversation with Marc, he really

10:21:44    15    wouldn't cooperate.  After he gave me the two names, he

10:21:49    16    shut down and said:  Hey, I have a lawyer.

10:21:52    17         Q.    So the very first thing you asked him for

10:21:56    18    was for the names of other people?

10:21:57    19         A.    No.  We talked about what he said and the

10:22:00    20    comments that he made here.  Tell me about this.  And at

10:22:05    21    this meeting, he said:  Well, I have witnesses.  Of

10:22:09    22    course, who are your witnesses?  He gave me the names of

10:22:11    23    those witnesses.

  2:12      24         Q.    What were the names of those people?
```

David Jones - Primos                                    37

```
2:14      1        A.      I believe Erwin Hall and George Williams.

10:22:25  2        Q.      Okay.  So he gave you the names of the

10:22:28  3   witnesses.  And then what happened?  What was said?

10:22:31  4        A.      And then right after that, he said there

10:22:35  5   were several incidents.  And I asked him about the

10:22:36  6   incidents.  And he wouldn't tell me.  You know, he

10:22:42  7   wouldn't tell me any particulars about any incidents.

10:22:44  8   He just said there were other incidents, and he wouldn't

10:22:47  9   tell me the incidents.  And then he said:  Look, I have

10:22:50  10  a lawyer.  Once he said he had a lawyer, I ended the

10:22:53  11  conversation.

10:22:53  12       Q.      Why?

10:22:54  13       A.      It was no need to continue the conversation.

10:22:58  14  He said he had a lawyer.  So therefore, I don't continue

10:23:02  15  conversations with individuals if they just told me they

10:23:06  16  have a lawyer.

10:23:06  17       Q.      And why is that?

10:23:07  18       A.      In my past years in the HR business, when

10:23:12  19  someone says, I have a lawyer, you just need to cease

10:23:15  20  and end the conversation at that point in time.

10:23:17  21       Q.      So finding out that someone has a lawyer

10:23:19  22  would cause you to end an investigation of a sexual

10:23:24  23  harassment complaint?

3:25      24       A.      I didn't say I ended the investigation.  I
```

David Jones - Primos                                38

3:27    1    didn't say I ended the investigation.

10:23:29    2         Q.    Did you ask Marc Smith who his lawyer was?

10:23:32    3         A.    No, sir, I did not.

10:23:33    4         Q.    Why?  Why didn't you?

10:23:35    5         A.    I have no need to know who his lawyer is.

10:23:39    6    That's not a question I thought I needed to ask.

10:23:41    7         Q.    Did you ask Marc Smith about this particular

10:23:44    8    incident on March 13th where Chuck Broderick said he had

10:23:49    9    a tube steak smothered in draws?

10:23:56    10        A.    No, I did not, because Mr. Smith would not

10:23:59    11   cooperate at that point.  He shut down and said:  I have

10:24:02    12   a lawyer.  So I ended the conversation, Mr. Primos.

10:24:06    13        Q.    And you didn't ask him about the incident a

10:24:08    14   few weeks before that, where Mr. Broderick came up

10:24:12    15   behind him, like a man would dance with a woman in a hip

10:24:17    16   hop club?  You didn't ask him about that incident

10:24:20    17   either?

10:24:20    18        A.    No.

10:24:20    19        Q.    Now, in his statement on March 17th, he says

10:24:33    20   in the very last sentence:  I will have no recourse but

10:24:37    21   to seek outside assistant.

10:24:40    22              But it is your testimony that he told you,

10:24:42    23   when you met with him, that he already had a lawyer?

1:45    24        A.    That's correct.

David Jones - Primos                                    39

4:55      1        Q.    So was it your decision to end the

10:24:57  2     conversation when you found out that Mr. Smith had a

10:24:59  3     lawyer?

10:25:00  4        A.    That's correct.

10:25:04  5        Q.    So it wasn't really him not cooperating.  It

10:25:07  6     was your decision to end the conversation, correct?

10:25:09  7        A.    Well, he just said:  I have a lawyer, and

10:25:12  8     that's all I'm saying.  So we ended the conversation.

10:25:18  9        Q.    So what did you do next in your

10:25:19  10    investigation?

10:25:19  11       A.    Well, I met with the two individuals that he

10:25:25  12    named, Erwin Hall and George Williams.  And I also met

10:25:31  13    with Chuck Broderick.

10:25:32  14       Q.    Okay.  Tell me about your conversation with

10:25:34  15    Erwin Hall.

10:25:35  16       A.    Well, Erwin Hall, there was a lot of stray

10:25:39  17    comments, remarks that was made, such as:  Hey, you

10:25:42  18    know, the guys always tease each other.

10:25:45  19       Q.    This was Erwin Hall saying this?

10:25:47  20       A.    This is Erwin Hall.  The guys always tease

10:25:50  21    each other.  He said they used the words, sweet cheeks,

10:25:55  22    hey baby, stray comments like that.  But that was the

10:26:01  23    gist of his comments of it.

5:03      24             I did ask him, was he a witness to this -- I

David Jones - Primos                              63

| | | |
|---|---|---|
| 7:28 | 1 | I have, you are being terminated for job abandonment. |
| 10:57:31 | 2 | Q.    You said you called him? |
| 10:57:32 | 3 | A.    I called him. |
| 10:57:34 | 4 | Q.    Where was he at the time you called him? |
| 10:57:37 | 5 | A.    I couldn't tell you where he was, sir.  At |
| 10:57:39 | 6 | that time I think I had his cell number. |
| 10:57:41 | 7 | Q.    Okay.  Why wasn't he at work? |
| 10:57:44 | 8 | A.    He had just gotten cleared to come back to |
| 10:57:49 | 9 | work that Thursday.  And before he was scheduled to come |
| 10:57:52 | 10 | in, I called him and told him he was terminated. |
| 10:57:54 | 11 | Q.    Why wasn't he scheduled to come in on |
| 10:57:57 | 12 | Friday? |
| 10:57:58 | 13 | A.    I didn't say he wasn't scheduled to come in. |
| 10:58:01 | 14 | Before he was scheduled to come in, I made the phone |
| 10:58:03 | 15 | call to him and told him he was terminated. |
| 10:58:06 | 16 | Q.    What time did you make that phone call? |
| 10:58:08 | 17 | A.    I can't recall. |
| 10:58:09 | 18 | Q.    Do you know what his normal report time was? |
| 10:58:12 | 19 | A.    If there were rotating shifts, he either |
| 10:58:15 | 20 | started at seven a.m. or three p.m. that afternoon.  I |
| 10:58:18 | 21 | couldn't tell you. |
| 10:58:19 | 22 | Q.    So you don't know whether you called him in |
| 10:58:22 | 23 | the morning or the afternoon? |
| 8:23 | 24 | A.    I can't tell you.  All I can tell you is I |

David Jones - Primos                                    64

```
  3:28      1    called him.
10:58:29    2         Q.    Did you call his cell phone number?
10:58:32    3         A.    It's the only number that I would have had,
10:58:34    4    because he had called my cell phone, sir.
10:58:37    5         Q.    What do you mean because he had called your
10:58:40    6    cell phone?
10:58:41    7         A.    Because when I was in North Carolina -- They
10:58:44    8    have access to my cell number.  I make myself
10:58:47    9    accessible.  My number is usually on the boards.  All
10:58:49   10    the associates have my cell number.  I have the
10:58:54   11    capabilities of having my cell number.  And while I was
10:58:54   12    away in North Carolina, he called me on my cell number.
10:58:57   13         Q.    Can you tell me about that conversation you
10:58:59   14    had with Marc Smith on Friday?  I guess it would have
10:59:03   15    been May 15th.
10:59:03   16         A.    My conversations are very short when I
10:59:06   17    terminate someone, sir.  Marc, you are terminated for
10:59:10   18    job abandonment on X date.  Here is what you will be
10:59:14   19    receiving in the mail from Perdue, as far as COBRA is
10:59:19   20    concerned, in order to keep your insurance coverage if
10:59:22   21    you so desire.  If you have a 401(k), you will have to
10:59:27   22    contact Wells Fargo specifically in that manner, end of
10:59:32   23    conversation.
  3:32     24         Q.    Did he say anything?
```

**Exhibit 3**

COPY                                           1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARC E. SMITH,                        )
     Plaintiff,                       )
                                      )
            v.                     ) C.A. No.
                                      ) 12-227-LPS-SRF
PERDUE FARMS INCORPORATED,            )
     Defendant.                       )
                                      )


          Deposition of **CHARLES W. BRODERICK**,
taken pursuant to notice, on Tuesday, July 24, 2012,
beginning at 2:20 p.m., in the law offices of
Schmittinger & Rodriguez, 54 The Green, Dover,
Delaware, reported by Cheryl A. Anthony, Court
Reporter.

APPEARANCES:

     NOEL E. PRIMOS, ESQUIRE
     SCHMITTINGER & RODRIGUEZ
     414 South State Street
     Dover, Delaware  19901
     Attorney for Plaintiff.

     BROOKS R. AMIOT, ESQUIRE
     JACKSON LEWIS, LLP
     2800 Quarry Lake Drive
     Suite 200
     Baltimore, Maryland  21209
     Attorney for Defendant.

ALSO PRESENT:

     MR. DAVID JONES

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

Charles Broderick - Primos                    31

3:54        1   Tuesday, the 17th, when Marc did?

14:53:56    2        A.    We gave him the written discipline.

14:54:02    3        Q.    When you say we, who is we?

14:54:04    4        A.    Myself and Tyson Jefferson; I had him there

14:54:07    5   as a witness.  I wrote that document, and there was an

14:54:10    6   attachment to it with my comments describing the

14:54:15    7   incident and why he was being disciplined.  And we gave

14:54:18    8   that to him.

14:54:20    9        Q.    Did Marc say anything at the time?

14:54:21   10        A.    Not that I'm aware of; I can't recall

14:54:28   11   anything specifically about what he would have said.

14:54:32   12        Q.    Do you remember Marc trying to write

14:54:34   13   something on the disciplinary form?

14:54:36   14        A.    Yes, I do.

14:54:36   15        Q.    Do you remember what it was that he tried to

14:54:39   16   write?

14:54:39   17        A.    He was trying to write:  I turned Chuck

14:54:43   18   Broderick in for sexual harassment.  And I scratched

14:54:47   19   through it, because that wasn't his form.  That wasn't

14:54:49   20   for him to be writing on.  That was management's

14:54:53   21   comments, not Marc Smith's comments.

14:54:53   22        Q.    Did that --

14:54:56   23        A.    That was -- Go ahead.

1    :57   24        Q.    Did that surprise you that he wrote that

Charles Broderick - Primos                    32

```
 5:01      1   down?
14:55:01    2          A.     Yes.
14:55:03    3          Q.     Did you ask him why he wrote down sexual
14:55:07    4   harassment?
14:55:07    5          A.     I was like:  Are you out of your mind?
14:55:09    6          Q.     What did he say?
14:55:10    7          A.     That's what he was doing.  You know, I don't
14:55:14    8   know.  I don't know what he was doing.
14:55:16    9          Q.     What do you mean that's what he was doing?
14:55:18   10          A.     He was going to turn me in for sexual
14:55:21   11   harassment.
  55:21    12          Q.     Was he saying, I already turned him in, or
14:55:25   13   I'm going to turn him in?
14:55:26   14          A.     I don't know.  I can't remember exactly what
14:55:30   15   he said.  But --
14:55:39   16          Q.     And so you scratched it out?
14:55:41   17          A.     That's correct.
14:55:42   18          Q.     And was he going to have an opportunity to
14:55:44   19   write it somewhere else?
14:55:45   20          A.     I gave him the opportunity to type it up on
14:55:48   21   one of our work stations upstairs, which he did, and I
14:55:51   22   sent it to David Jones.
14:55:54   23          Q.     You sent it directly to David Jones?
  5:56     24          A.     I'm pretty certain it was faxed to him from
```

Charles Broderick - Primos                      33

```
: 5:01      1    Hurdle Mitchell's fax machine.

14:56:05    2        Q.    Okay.  Did Mr. Jones participate in this

14:56:19    3    meeting that you and Tyson had by telephone?  This

14:56:24    4    meeting that you and Tyson had on the 13th, did

14:56:27    5    Mr. Jones participate in it by telephone?

14:56:29    6        A.    You know, I don't recall.

14:56:30    7        Q.    Mr. Broderick I'm going to show you a

14:56:45    8    document that has previously been marked as Exhibit 3.

14:56:50    9        A.    Uh-huh.

14:56:51   10        Q.    Is that your handwriting at the top?

14:56:51   11        A.    That's correct.

1  6:51    12        Q.    And did you also make the Xs there to

14:56:51   13    indicate --

14:56:54   14        A.    Yes, uh-huh.

14:56:55   15        Q.    Did you also write those words, see

14:56:57   16    attached?

14:56:57   17        A.    Yes, I did.

14:56:59   18        Q.    Why did you mark out the line next to,

14:57:03   19    extraordinary offense warranting a need for immediate

14:57:07   20    and serious disciplinary action?

14:57:10   21        A.    Because I was instructed to.

14:57:12   22        Q.    By whom?

14:57:12   23        A.    By David that I couldn't terminate him; that

1   :19    24    probably was -- The date on it is 3/13.  So it's likely
```

Charles Broderick - Primos                    61

```
  :  ::30    1   graduation, and I'll be damned if I was going to answer
 15:32:32    2   it.
 15:32:32    3        Q.    What did the text say?
 15:32:34    4        A.    I don't recall.  You know, I'm sorry.  But I
 15:32:37    5   don't recall what the text said Sunday.
 15:32:40    6        Q.    Did you have any conversations with David
 15:32:42    7   Jones on Sunday?
 15:32:43    8        A.    I don't recall.  I did have conversations
 15:32:45    9   with David Jones either Saturday or Sunday and possibly
 15:32:49   10   Monday morning.  But I don't recall exactly when and how
 15:32:51   11   many.
  ?  2:53   12        Q.    Well, without then determining when exactly
 15:32:55   13   they were, tell me about your conversations with David
 15:32:58   14   Jones.
 15:32:58   15        A.    Well, I let him know that Marc walked off
 15:33:02   16   the job.
 15:33:02   17        Q.    What did David say?
 15:33:03   18        A.    I'm assuming that David said:  When he comes
 15:33:05   19   in, suspend him and we will take the appropriate action.
 15:33:10   20        Q.    You are assuming he said that?
 15:33:11   21        A.    I don't know what he said then, I guess.  I
 15:33:14   22   know he said to suspend him, and he'll contact him when
 15:33:19   23   he's to return.  Whether that was Monday morning or
  :  ::27   24   Sunday afternoon, I would probably guess it was Monday.
```

Charles Broderick - Primos                    62

| | | |
|---|---|---|
| 33:30 | 1 | But I don't want to guess here.  But I didn't document |
| 15:33:37 | 2 | all of this, these conversations. |
| 15:33:40 | 3 | Q.     When did you return to Delaware? |
| 15:33:41 | 4 | A.     I returned to Delaware to work in Delaware |
| 15:33:46 | 5 | on Tuesday the -- it would have been the following day. |
| 15:33:52 | 6 | Q.     So you were not in Delaware on Monday when |
| 15:33:54 | 7 | Marc came back to work? |
| 15:33:56 | 8 | A.     No.  I was traveling back from North |
| 15:33:58 | 9 | Carolina. |
| 15:33:59 | 10 | Q.     Did you have any phone conversations with |
| 15:34:01 | 11 | anyone on Monday back at the mill? |
| 34:06 | 12 | A.     Yes, I did. |
| 15:34:06 | 13 | Q.     In particular, about Marc? |
| 15:34:07 | 14 | A.     Yes. |
| 15:34:08 | 15 | Q.     Did Marc himself call you from the mill? |
| 15:34:11 | 16 | A.     No. |
| 15:34:14 | 17 | Q.     So you don't recall Marc calling you and |
| 15:34:16 | 18 | asking you if he could go to the wellness center? |
| 15:34:18 | 19 | A.     No, I don't recall. |
| 15:34:19 | 20 | Q.     Who did you talk to? |
| 15:34:27 | 21 | A.     I talked to Tyson Jefferson and Hurdle |
| 15:34:29 | 22 | Mitchell. |
| 15:34:29 | 23 | Q.     Tell me about those conversations. |
| 34:31 | 24 | A.     After they suspended him and he was to leave |

Anthony Reporting
(302) 674-8884

Charles Broderick - Primos                          63

4:35       1    the property, he didn't leave.  He went out to his car,

15:34:38   2    and he was sitting in the back of his car.  And I

15:34:41   3    instructed them to go out and tell him to leave, that he

15:34:45   4    had to leave the property.

15:34:47   5              And they called me back.  And I'm not sure

15:34:50   6    if it was Hurdle or Tyson that called me back.  But he

15:34:54   7    said that he was having some chest pains, couldn't

15:34:57   8    breathe, or something to that effect, and he needed an

15:35:00   9    ambulance.

15:35:02  10              And basically, I told him to give him the

15:35:06  11    phone and let him call the ambulance if he wants.

15:09     12         Q.    So did they give him a phone?

15:35:11  13         A.    I think he used his own phone, and he called

15:35:16  14    the ambulance.

15:35:17  15         Q.    And as far as you know, the ambulance came

15:35:18  16    to get him?

15:35:19  17         A.    Yes, they did.

15:35:21  18         Q.    So what was your understanding of what was

15:35:24  19    going to happen to Marc, as far as discipline?

15:35:27  20         A.    At that point, my understanding was he was

15:35:29  21    going to be terminated.

15:35:31  22         Q.    But he wasn't terminated.  He was suspended,

15:35:34  23    correct?

5:34      24         A.    Suspended pending termination, but pretty

Charles Broderick - Primos                    64

5:38      1   much I felt like he would be terminated, yes.

15:35:40  2           Q.     But did anyone actually tell you that he was

15:35:44  3   going to be terminated?

15:35:46  4           A.     I don't recall.

15:35:46  5           Q.     Why did you have that feeling?  Why did you

15:35:49  6   feel --

15:35:49  7           A.     Well, because --

15:35:50  8           Q.     Well, let me finish.  Let me finish.  Why

15:35:52  9   did you feel that he was going to be terminated?

15:35:54  10          A.     Because that would have been standard

15:35:55  11  procedure for somebody walking off of the job.

35:58     12          Q.     Do you know who ultimately made the decision

15:36:04  13  to terminate him?

15:36:05  14          A.     That would be David Jones, HR.

15:36:08  15          Q.     Did you have any input into that?

15:36:11  16          A.     I may have talked to him.  But the decision

15:36:15  17  was -- The final decision remains with human resources.

15:36:19  18          Q.     Did you tell David Jones that you agreed

15:36:22  19  with that decision?

15:36:22  20          A.     Yes.

15:36:22  21          Q.     I'll show you a document that has been

15:36:47  22  marked as Jefferson Exhibit 3.

15:36:49  23          A.     Okay.  Thank you.

:6:54     24          Q.     Have you seen this document before?  Before