IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARC E. SMITH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civil Action No. 12-227-LPS-SRF
                                        )
PERDUE FARMS INCORPORATED,              )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this sexual harassment and retaliation action brought under

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), is defendant

Perdue Farms Incorporated's ("Perdue") motion for summary judgment, filed on February 28,

2013. (D.I. 42) For the following reasons, I recommend that the court grant Perdue's motion for

summary judgment.

### II.   BACKGROUND

Plaintiff Marc E. Smith ("Smith") was hired by Assistant Mill Manager Tyson Jefferson

("Jefferson") to begin working on November 30, 2005 at Perdue's Bridgeville, Delaware

location, where he was most recently employed as a utility operator. (D.I. 11 at ¶¶ 9-10; Pl. Dep.

88) During the course of Smith's employment, Jefferson was Smith's immediate supervisor, and

Jefferson's immediate supervisor was mill manager Chuck Broderick ("Broderick"). (D.I. 11 at

¶ 12) Jefferson and Broderick promoted Smith to the position of utility operator and gave him a

raise in 2008. (D.I. 44, Ex. 1 at 94-95, 98)

1

On February 16, 2009, Smith alleges that Broderick came up behind him and touched Smith's hips[1] while wiggling his own hips and making "grinding/humping motions." (D.I. 44, Ex. 15 at ¶ 5) When Smith pushed Broderick away and asked what he was doing, Broderick allegedly responded, "I know you like it." (*Id.*) Smith did not notify human resources or anyone else at Perdue of this incident out of fear of retaliation. (*Id.* at ¶ 7) On February 24, 2009, Smith requested a letter of recommendation for a supervisory position from Broderick, and Broderick agreed to write the letter, giving Smith a positive recommendation. (D.I. 44, Ex. 1 at 97; Ex. 2)

On March 13, 2009, a coworker informed Smith that the Pellet Durability Index ("PDI") tests he had been performing since 2005 should instead be the responsibility of a quality control employee. (D.I. 44, Ex. 1 at 92-93, 114-15) Smith disagreed and went to Broderick's office to complain. (*Id.* at 118, 122-23) Broderick ultimately agreed to investigate the PDI testing issue. (*Id.* at 122, 125-26) Smith alleges that, following this exchange, he asked Broderick what was for lunch, to which Broderick responded, "I have a tube steak smothered in drawers for you." (*Id.* at 128-29, 137-38) Smith responded with inappropriate language.[2] (D.I. 44, Ex. 9) Smith alleges that he immediately went upstairs and called human resources, and was informed that someone would call him back. (D.I. 50 at B58) Following this incident, Jefferson met with Smith and told him to go home, and Smith alleges that David Jones, the corporate live production human resources manager, called Smith on his way home to discuss the alleged harassment Smith had experienced. (*Id.* at B59)

---

[1] The evidence on the record is inconsistent with regard to whether touching occurred. *Compare* D.I. 44, Ex. 1 at 190 *with* D.I. 44, Ex. 15 at ¶¶ 5-7. Smith later characterized Broderick's conduct as "hip hop" dancing. (D.I. 44, Ex. 9; Ex. 1 at 141)

[2] Smith called Broderick "a worthless piece of s**t." (D.I. 44, Ex. 6; Ex. 1 at 128)

2

Broderick subsequently prepared a Memo to File, citing Smith's insubordination for the use of inappropriate language. (D.I. 44, Ex. 5 at 27-28, 31-32; Ex. 3 at 35; Ex. 6) Smith signed the Memo to File and a Disciplinary Record noting his discipline when he returned to work on March 17, 2009. (D.I. 44, Ex. 1 at 133; Exs. 6 & 7) He also attempted to write a statement on the disciplinary form complaining that Broderick's conduct was sexual harassment. (D.I. 44, Ex. 3 at 31-32) Broderick scratched out the statement on the disciplinary form, but gave Smith an opportunity to prepare and fax a letter to Jim Perdue, the Chairman of Perdue, to share his complaints about Broderick's alleged conduct. (D.I. 44, Ex. 1 at 133-35; Ex. 3 at 32-33; Ex. 9) The letter was forwarded to Jones, who called Smith to set up a meeting to address the contents of the letter. (D.I. 44, Ex. 8 at 31-35)

On March 23, 2009, Jones met with Smith at the Bridgeville facility to investigate Smith's allegations. (D.I. 44, Ex. 1 at 142-44; Ex. 8 at 36-39) Smith initially gave Jones the names of witnesses who could substantiate his allegations. Smith described the "hip hop" dancing and tube steak allegations, but subsequently refused to talk to Jones because he claimed that he had hired an attorney who instructed him not to speak to anyone. (D.I. 44, Ex. 1 at 144-45; Ex. 8 at 36-40) After meeting with Jones, Smith prepared a typewritten letter to Jim Perdue thanking him for investigating his complaint. (D.I. 44, Ex. 1 at 147-48)

Jones subsequently interviewed Broderick, as well as Erwin Hall and George Williams, who had been named by Smith as witnesses to the incident with Broderick. (D.I. 44, Ex. 8 at 39) The interviews with Hall and Williams revealed that it was common for male employees to tease each other, but neither had witnessed anything inappropriate between Smith and Broderick. (D.I. 44, Ex. 8 at 39-41) In his interview with Jones, Broderick denied Smith's allegations, but acknowledged that he used the term "tube steak" in reference to a hot dog from the vending

3

machine, and without mentioning "smothered in drawers," when Smith inquired about lunch. (D.I. 44, Ex. 8 at 12, 41-43) Based on the investigation, Jones concluded that there was no evidence of discrimination. (D.I. 44, Ex. 10; Ex. 8 at 51-52)

On April 3, 2009, Smith claims that coworker Harry Vannicoli allegedly showed him a picture of a donkey and a woman engaged in a sexual act,[3] after which Vannicoli instructed Smith to perform oral sex on coworker Erwin Hall. (D.I. 44, Ex. 1 at 158-59, 176-77) Smith reported the picture and Perdue disciplined Jefferson, who had originally sent the text message containing the offending picture to Vannicoli. (*Id.*; Ex. 5 at 44-46) On April 9, 2009, Jones scheduled a facility-wide sexual harassment training session for April 29, 2009. (D.I. 44, Ex. 1 at 154; Ex. 11)

Smith filed charges of sexual harassment and retaliation with the Delaware Department of Labor ("DDOL") on April 22, 2009. (D.I. 44, Ex. 14; Ex. 1 at 174-79) In the charge of discrimination, Smith alleged that Broderick made grinding/humping motions while standing behind Smith, he subsequently made the "tube steak smothered in drawers" comment, Jefferson sent a photo of a donkey and a woman in a sexual act to co-worker Harry Vannicoli, who showed it to Smith, and Vannicoli encouraged Smith to perform oral sex on Hall. (D.I. 44, Ex. 14) Perdue was served with the charges between May 6 and May 11, 2009. (*Id.*)

On May 9, 2009, Smith alleges that his coworkers ridiculed and harassed him, and refused to help him with malfunctioning machinery. (D.I. 44, Ex. 1 at 192-96, 234; Ex. 5 at 56-57; Ex. 3 at 55-56) Smith called Broderick to complain, and became stressed as a result of the continued harassment. (*Id.*) Believing that he should not operate the heavy equipment in his

---

[3] At his deposition and in his opposing brief, Smith characterizes the act depicted as "making out." (D.I. 49 at 7; D.I. 44, Ex. 1 at 173-74)

condition, he requested permission from Broderick and Jefferson to leave work early. (*Id.*) Neither Broderick nor Jefferson gave Smith permission to leave. (D.I. 44, Ex. 1 at 196-98; Ex. 5 at 56-60; Ex. 3 at 57) Smith left work despite the lack of permission. (*Id.*) Although Smith testified that he shut the machines down before exiting, a maintenance worker testified that Smith left the machines running. (D.I. 44, Ex. 1 at 196-97; Ex. 3 at 56-60) Broderick instructed Jefferson to go to the facility and complete Smith's responsibilities to prevent further loss of production. (*Id.*; Ex. 5 at 61; Ex. 8 at 61-62)

Broderick informed Jones by telephone that Smith had walked off the job without permission. (D.I. 44, Ex. 3 at 60-66; Ex. 8 at 56-57) Jones recommended issuing a three-day suspension pending termination on May 11, 2009. (D.I. 44, Ex. 8 at 58-60) When Smith returned to work on May 11, 2009, he claimed that he experienced another panic attack. (D.I. 44, Ex. 1 at 199-200) Jefferson informed Smith that he was being written up for leaving early on May 9, 2009 and asked him to leave the premises. Smith called human resources complaining that Jefferson refused to take him to the medical center. (D.I. 44, Ex. 1 at 199-204) Smith was instructed to call 911. (D.I. 44, Ex. 1 at 199) Smith called 911 and requested an ambulance, and he was taken to the emergency room. (*Id.*)

Jones confirmed that Smith had abandoned the job by speaking with Broderick and Jefferson and by reviewing Smith's time card. (D.I. 44, Ex. 8 at 61-63) Based on this investigation, Jones decided that termination was appropriate. (*Id.* at 68) Jones terminated Smith later that week for insubordination because Smith walked off the job without permission on May 9, 2009. (D.I. 44, Ex. 1 at 205; Ex. 8 at 63) Smith believes that Richie Oliphant ("Oliphant"), an allegedly similarly situated employee of Perdue, left work early without

5

permission on or about May 9, 2009, and has not suffered any discipline.  (D.I. 44, Ex. 1 at 208-10)

In July or August 2009, Smith and his former attorney prepared a document constituting a chronology of the alleged harassment suffered by Smith during his employment at Perdue. (D.I. 44, Ex. 1 at 212-14; Ex. 15)  The chronology contained several allegations not previously mentioned in his April 22, 2009 DDOL Charge of Discrimination or in his internal complaints at Perdue.  (*Id.*)  Perdue disputes these allegations, but claims that even if the court accepts them as true, Perdue should still prevail on its motion for summary judgment.  (D.I. 43 at 9)

The chronology adds new allegations.  First, Smith alleges that a coworker named Clint Lewis went into an office with Russell, closed the door, turned the lights off, and provocatively rubbed up against one another, with their clothes on, on an almost daily basis.  (D.I. 44, Ex. 15 at ¶ 16)  Smith claims that this conduct was never directed at him, but he witnessed it by looking through a window in the door,[4] although he did not report it.  (D.I. 44, Ex. 1 at 167-69)  Next,

_____

[4] Smith includes this alleged conduct, which he describes as "dry humping," as evidence that he was sexually harassed and retaliated against in a workplace "permeated" with same sex desires. (D.I. 49 at 15)  However, according to Smith's deposition, he did not turn away from watching, creating a contrary impression that he was a prurient observer:

A: It happened actually a lot.

Q: Were they directing that at you?

A: No.  They were just doing it.

Q: How did you see it?

A: They would start off, and then they would shut the light off and shut the door.  The door had a window on it, though, and light could get in.

Q: So they would turn the light off, shut the door.  There is glass in the door?

A: You can see right through the glass.

Smith claims that on March 17, 2009, Russell told Smith to "get his knee pad[s] ready," while Kenny Ross, another coworker, yelled Smith's name and said, "blow me." (D.I. 44, Ex. 15 at ¶ 23) Also, on March 18, 2009, Smith alleges that Louis Hudson asked him, "What's up, girlfriend?" and looked him over. (D.I. 44, Ex. 15 at ¶ 24) He then asked if Smith was sore, supposedly from anal sex, and said, "Don't worry, I still love you." (*Id.*; Ex. 1 at 165) Finally, on March 20, 2009, Smith alleges that he told Russell that a coworker would be mad at him because Smith's new computer was bigger and better. Russell allegedly responded, "that's not all that is big and better," as he pushed his mid-section out and laughed. (D.I. 44, Ex. 15 at ¶ 27)

Smith initiated the instant harassment and retaliation action against Perdue by filing a complaint in this court on February 24, 2012. (D.I. 1) Smith filed an amended complaint on April 12, 2012, alleging causes of action for retaliation and hostile work environment under Title VII. (D.I. 11 at ¶¶ 35-40)

## III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986)). Pursuant to Rule 56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

(D.I. 44, Ex. 1 at 168)

for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 460–61 (3d Cir.1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris,* 550 U.S. 372, 380 (2007); *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. at 322.

## IV. DISCUSSION

### A. Sexual Harassment

To establish a claim for hostile work environment under Title VII, a plaintiff must establish that: (1) he suffered intentional discrimination because of his sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination

8

would detrimentally affect a reasonable person of the same sex in that position; and (5) *respondeat superior* liability. *See Weston v. Pennsylvania*, 251 F.3d 420, 425-26 (3d Cir. 2001), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In the present matter, the parties' dispute centers on the first and second prongs.

## 1. Discrimination because of gender

Title VII prohibits discrimination "because of . . . sex" in the "terms" or "conditions" of employment. 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has cautioned that Title VII is not "a general civility code for the American workplace," and instead, the focus in a sexual harassment claim is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). "In other words, the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012).

Title VII provides a cause of action for same-sex sexual harassment in addition to harassment involving members of different genders. *Oncale*, 523 U.S. at 79. In *Oncale*, the Supreme Court reasoned that it is not the sex of the harasser or the victim that is important to a sexual harassment claim, but rather, whether the victim can "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discriminat[ion] . . . because of . . . sex." *Id.* at 81 (internal quotations omitted). Whereas the court may reasonably infer that the harasser is acting because of the victim's sex in cases involving members of different genders, the inferences are not always so clear when the harasser and the victim are of the same sex. *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001).

9

In *Oncale*, the Supreme Court ruled that a trier of fact may infer that same-sex harassment occurred because of sex when the plaintiff can produce (1) "credible evidence that the harasser was homosexual," (2) evidence that "make[s] it clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace," or (3) "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Wasek*, 682 F.3d at 467-68. In the present matter, the parties dispute only whether Smith has produced sufficient evidence to show that the harassers sexually desired him.

In support of its motion for summary judgment, Perdue contends that there is no record evidence and no allegation in the amended complaint to establish or suggest that Smith's claims of same sex harassment meet any of the criteria set forth in the Third Circuit's decision in *Bibby v. Philadelphia Coca Cola Bottling Co.* (D.I. 43 at 11) According to Perdue, Smith's speculation that his harassers might be homosexual is insufficient for Smith's sexual harassment claim to survive summary judgment. (*Id.* at 12) In response, Smith dismisses the cases cited by Perdue as non-authoritative and distinguishes them as not involving physical contact. (D.I. 49 at 14) Smith further alleges that other male-to-male harassment in the workplace not directed specifically at Smith establishes that a severe and pervasive discriminatory atmosphere existed in the workplace. (*Id.* at 15)

I recommend that the court grant summary judgment in favor of Perdue with respect to Smith's claim for sexual harassment. Smith does not allege in his amended complaint that his harassers' alleged conduct was the result of sexual desire, and alleged male-to-male harassment not directed at Smith does nothing to show that Smith was targeted because of his gender. Moreover, Smith fails to present evidence to sufficiently establish that the alleged harassers were homosexual, relying solely on speculative statements from his own deposition testimony. When

10

asked at his deposition whether he thought that his harassers were homosexual, Smith

consistently replied in an equivocal manner:

> Q: Looking at the chronology and based on what we have talked about today, are there any allegations of harassment that you contend occurred because you are a man?
> A: Yes, if they like men.
> . . .
> Q: Which instances of misconduct in this chronology or in this case do you contend occurred solely because you are a man?
> A: All right.  Well, if, if they are interested in homosexual lifestyle and when they came on to me or did things to me.
> . . .
> A: They are gay and assuming – they are gay and what they do, their actions towards me.
> Q: How do you know they are gay?
> A: I don't know.  The way they act.  How do you know they are not?
> Q: How do you know they are gay?  What facts or evidence do you have to establish that any person at your plant is gay?
> A: The way they talk.  The way they carry themselves.
> Q: I need to know exactly what you are talking about.
> A: The dry humping each other.
> Q: Was that directed at you?
> A: No.
> Q: What else?
> A: The grinding up behind me.  The telling me that I need to give someone else oral sex.
> Q: Does that mean somebody is gay?
> A: Yeah.
> . . .
> Q: Other than the fact of the statements that you allege in this case, do you have any evidence that anyone at the facility is gay?
> A: No.
> Q: Other than the fact of the statements that you allege in this case, do you have any evidence that anyone was trying to come on to you?
> A: No, just what I have admitted.

(D.I. 44, Ex. 1 at 218-22)  Other portions of Smith's deposition transcript reflect a similar pattern

of speculation and equivocation regarding each individual Smith accuses of harassing behavior.[5]

---

[5] Illustratively, Smith accuses Russell of being both a womanizer and a homosexual during the course of his deposition.  (D.I. 44, Ex. 1 at 104, 245)

(*Id.* at 243-46)  Smith fails to satisfy the requirements for opposing summary judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 56(c)(1).  Perdue supports its motion with the affidavits of Tyson Jefferson, Clint Lewis, Vernon Russell, Louis Hudson, and Erwin Hall, attesting that they are not homosexual and are not sexually attracted to Smith.  (D.I. 44, Exs. 13, 16-19)  Consequently, the burden shifts to Smith to refute these allegations with sworn testimony or declarations.  The only affidavit submitted by Smith is that of Alex Quebral, which fails to establish that any homosexual overtures were ever directed to Smith.  (D.I. 45)

Although Smith claims that a reasonable jury could infer that the alleged harassers were motivated by a sexual desire for Smith based on the alleged conduct, such inferences have been routinely rejected by courts in similar cases.  *See Vandeventer v. Wabash Nat'l Corp.*, 887 F. Supp. 1178, 1181 n.2 (N.D. Ind. 1995) (holding that even when taunts and expletives have a sexual component, there can be no sexual harassment unless the harasser was aiming expletives at the victim because of the victim's maleness); *Collins v. TRL, Inc.*, 263 F. Supp. 2d 913, 919-21 (M.D. Pa. 2003) (concluding that a reasonable jury could not find that the alleged harasser acted out of sexual desire where plaintiff himself could not say that the actions were motivated by a desire to have sex with him).  The Sixth Circuit has held that "[a] single speculative statement in a deposition cannot be the first link in the 'chain of inference' that *Oncale* recognizes may follow from the harasser's non-heterosexuality.  *Oncale* requires 'credible evidence' of the harasser's sexual orientation in order to draw inferences based on it." *Wasek*, 682 F.3d at 468 (rejecting plaintiff's speculation that alleged harasser was possibly bisexual where conduct included grabbing plaintiff's buttocks, poking him in the rear with various objects, and making comments such as "you've got a pretty mouth" and "you know you like it sweetheart").

As illustrated by the cases described below, explicitly sexual conduct, without more, is not necessarily sufficient to constitute an expression of sexual desire for purposes of establishing a claim for same-sex sexual harassment. In *Collins v. TRL, Inc.*, the court granted summary judgment in favor of the defendant because the plaintiff failed to offer sufficient proof of the alleged harasser's sexual desire. 263 F. Supp. 2d 913, 919-21 (M.D. Pa. 2003). As in the present case, the record indicated that the plaintiff did not know if the harasser was homosexual. *Id.* The alleged conduct included the harasser asking the plaintiff if he was homosexual, reaching for the plaintiff's groin area while saying, "got wood?" and saying "You ought to put them lips where they belong" while grabbing his crotch when the plaintiff was whistling. *Id.*; *see also Beseau v. Fire Dist. No. 1 of Johnson County, Kansas*, 2006 WL 2795716, at *4 (D. Kan. 2006) (granting summary judgment for failure to show credible evidence of the alleged harasser's sexual desire, where actions included crude, sexual jokes, jumping into bed with the plaintiff for a few seconds, telling plaintiff he must "work out" with his right hand, and touching plaintiff on the shoulder seductively while asking plaintiff if he was homophobic); *Humphries v. Consol. Grain & Barge Co.*, 412 F. Supp. 2d 763, 768-69 (S.D. Ohio 2005) (dismissing case on summary judgment for failure to show credible evidence of alleged harasser's sexual desire, where the plaintiff found multiple pictures of nude males in his work area and on his time card and experienced name calling and sexually charged comments). The Sixth Circuit reached the same result in *King v. Super Service, Inc.*, in which the plaintiff complained of name calling relating to homosexuality, repeated assertions from coworkers that the plaintiff wanted to perform oral sex on them, and some related physical abuse. 68 F. App'x 659, 660 (6th Cir. 2003). The conduct described in the above-referenced cases is comparable to the "tubesteak"

13

comment, the grinding and humping gestures, the references to oral sex, and the "sore" and "bigger and better" comments that Smith experienced in the present matter.

Courts that have analyzed claims of same-sex harassment consistently observe that the typical atmosphere in all-male workplaces often gives rise to vulgarity and sexually explicit conduct that bears no actual relation to sexual desire. The same is true in the present case, as the record reflects that sexual and other inappropriate language were "not uncommon" in the workplace. (D.I. 44, Ex. 13 at ¶ 7; Ex. 12 at ¶ 6; Ex. 18 at ¶ 5; Ex. 16 at ¶ 7; Ex. 19 at ¶ 6) The Seventh Circuit described this reality as follows:

> Most unfortunately, expressions such as "[f**k me]," "kiss my [a**]," and "[s**k my d**k]," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference – even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expression of animosity or juvenile provocation.

*Johnson v. Hondo, Inc.*, 125 F.3d 408, 410-13 (7th Cir. 1997). In light of the foregoing authority, this case fits squarely within the Supreme Court's caution against overregulating ordinary socialization in the workplace, which includes male-on-male horseplay or intersexual flirtation:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale*, 523 U.S. at 81.

Given the sparse jurisprudence on same sex harassment in this jurisdiction, the court must analyze the context of the statements or conduct to determine when such behaviors are actionable

14

under Title VII, or when they amount to crude sophomoric taunting not uncommon in locker rooms and predominantly male workplaces.  Smith attempts to distinguish the case law cited by Perdue based on a lack of physical contact when the vulgarities were uttered.  However, the court notes that *Wasek* involved repeated instances of an alleged harasser poking the plaintiff's backside with an assortment of long, cylindrical objects.  682 F.3d at 467-68; *see also Beseau*, 2006 WL 2795716, at *4 (alleged harasser jumped into bed with the plaintiff and touched the plaintiff on the shoulder seductively).  This conduct could be characterized as equally, if not more, invasive and sexually suggestive than Smith's claim that Broderick touched his hips.

Furthermore, Smith cites no case law, from this jurisdiction or any other, in support of his argument that the evidence on the record in the present case is sufficient to establish the alleged harassers' sexual desire for purposes of surviving summary judgment.  Instead, Smith turns to the severity and pervasiveness of the conduct, which is a separate requirement.

## 2.   Severity and pervasiveness of conduct

Because Smith has failed to meet the first element of his sexual harassment claim, the court need not reach the additional requirement that the conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment."[6] *Oncale*, 523 U.S. at 81.  Even if the court were to determine that Smith has established a genuine issue of material fact indicating that he was discriminated against because of his gender, his claim cannot survive summary judgment.

---

[6] The complained-of conduct consists primarily of jokes, taunts and gestures, with only one incident of minor physical contact alleged.  The law is well-established that "[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

As a preliminary matter, Smith's retaliation theory of the claim for hostile work environment does not appear in the pleadings.  "District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour."  *Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 176 (3d Cir. 2007); *see also Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the responsive papers" to a motion for summary judgment).  Moreover, the authority Smith relies on in support of this theory, *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), is no longer controlling.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-67 (2006) (declining to read Title VII's antiretaliation provision and antidiscrimination provision coterminously).

## B.    Retaliation

To establish a *prima facie* claim for retaliation under Title VII, Smith must show:  (1) that he engaged in a protected activity; (2) that Perdue took an adverse employment action after or contemporaneous with the protected activity; and (3) the protected activity and the adverse employment action were causally linked.  *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Weston*, 251 F.3d at 430; *see also Wellman v. Dupont Dow Elastomers, L.L.C.*, 414 F. App'x 386, 389 (3d Cir. 2011).  A causal link between protected activity and adverse action may be inferred from an unusually suggestive temporal proximity between the two events, an intervening pattern of antagonism following the protected conduct, or the proffered evidence examined as a whole.  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

Once Smith establishes a *prima facie* case of retaliation, Perdue has the burden to "articulate some legitimate, nondiscriminatory reason" for terminating Smith.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (internal quotation and citation omitted).  The

burden then shifts back to Smith to establish that there is sufficient evidence for a reasonable

factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The Third Circuit has stated that "temporal proximity between the employee's protected

activity and the alleged retaliatory action may satisfy the causal link element of a prima facie

retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." *Shaner*

*v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotation and citation omitted). However,

temporal proximity alone is not always sufficient to overcome a defendant's allegations of

pretext. *See Andes v. N.J. City Univ.*, 419 F. App'x 230, 234 (3d Cir. 2011) (concluding that

district court erred in focusing exclusively on temporal proximity when it found no causal

connection between the protected activity and the alleged retaliatory conduct); *Kachmar v.*

*SunGard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 2011) ("It is important to emphasize that it is

causation, not temporal proximity, that is an element of plaintiff's prima facie case, and temporal

proximity merely provides an evidentiary basis from which an inference can be drawn.").

The United States Supreme Court recently clarified that "Title VII retaliation claims must

be proved according to traditional principles of but-for causation," which "requires proof that the

unlawful retaliation would not have occurred in the absence of the alleged wrongful action or

actions of the employer." *Univ. of Tex. S. Med. Ctr. v. Nassar*, ---- U.S. ----, 133 S. Ct. 2517,

2533 (June 24, 2013). The Supreme Court expressed concern that a "lessened causation standard

would make it far more difficult to dismiss dubious claims at the summary judgment stage,"

which would be "inconsistent with the structure and operation of Title VII." *Id.* at 2532. Under

this standard, an employee establishes pretext by showing that the adverse action would not have

occurred "but for" the employer's retaliatory reason for the action. *Id.* at 2533-34. Therefore,

Smith's protected activity must be the "but-for" cause of Perdue's alleged retaliatory action

under the causation prong of the *prima facie* case. As the Second Circuit recently explained,

> "[B]ut-for" causation does not require proof that retaliation was the only cause of
> the employer's action, but only that the adverse action would not have occurred in
> the absence of the retaliatory motive . . . . A plaintiff may prove that retaliation
> was a but-for cause of an adverse employment action by demonstrating
> weaknesses, implausibilities, inconsistencies, or contradictions in the employer's
> proffered legitimate, nonretaliatory reasons for its action. From such
> discrepancies, a reasonable juror could conclude that the explanations were a
> pretext for a prohibited reason.

*Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (internal citations omitted).

The parties in the present case dispute only the third factor regarding whether a causal

connection exists between the protected activity and the adverse employment action. In support

of its motion for summary judgment, Perdue alleges that Smith cannot show any causal

connection between the protected activity and his discharge, particularly because he admits to

engaging in the misconduct that Perdue maintains is the sole reason for his discharge. (D.I. 43 at

18) According to Perdue, the temporal proximity of his termination to the protected conduct,

approximately two months, was not unusually suggestive enough to allow a reasonable jury to

infer retaliatory motive. (*Id.* at 18-19) Moreover, Perdue contends that Smith does not allege a

claim of retaliation against Jones, who was the sole decision-maker with respect to Smith's

termination, and Smith fails to identify a similarly situated employee to show differential

treatment. (*Id.* at 19)

In response, Smith alleges that he experienced at least four significant instances of

retaliatory conduct following his discrimination complaints, including (1) the written reprimand

on March 17, 2009; (2) the ongoing harassing conduct previously discussed in connection with

Smith's claim of a hostile work environment; (3) differential treatment between Smith and Doughty; and (4) Smith's suspension and termination in May 2009. (D.I. 49 at 18-19)  Smith maintains that the timing of the events is compelling because the written reprimand was issued four days after his initial complaint to Jones, and the abusive conduct began almost immediately thereafter and continued throughout the period leading up to his termination.  (*Id.* at 19)  Smith further alleges that he was terminated based on false information provided by Broderick and Jefferson, and avers that he had not left the mill running when he left on May 9, 2009.  (*Id.* at 20)

The court concludes that no reasonable juror could find that Smith's complaints of harassment were the but-for cause of his termination.  Smith first complained of the alleged conduct on March 13, 2009 in a telephone conversation with Jones, but he was not terminated until May 15, 2009, more than two months later.  This lapse of time is too great to establish retaliation based on temporal proximity alone. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (concluding that a temporal proximity of ten days is not sufficient to establish retaliatory motive unless accompanied by other evidence of wrongdoing).

The written reprimand Smith received on March 17, 2009 does not support his retaliation claim because there is no evidence on the record to suggest that either Broderick or Jefferson was aware of Smith's alleged conversation with Jones on March 13, 2009 when Broderick prepared the Memo to File and Disciplinary Record on the same date. (D.I. 44 at Exs. 6 & 7)  Moreover, it is undisputed that Smith used inappropriate language constituting insubordination on March 13, 2009, and that this conduct provided the basis for the written reprimand.  (*Id.*)

The harassing conduct Smith experienced between his protected conduct and his termination is also insufficient to sustain his retaliation claim because that conduct was not

19

perpetrated by Broderick, Jefferson, Jones, or any other individual who played a role in the

determination to terminate Smith's employment.  Although the picture Vannicola showed Smith

was originally sent by Jefferson, there is no evidence on the record that Jefferson intended this

picture to reach Smith.  Moreover, Jefferson was disciplined for sending the picture after Smith

complained about it.  (D.I. 44, Ex. 13 at ¶ 6)  The remainder of the conduct consists primarily of

jokes, taunts and gestures, which lack sufficient severity or connection to Smith's engagement in

protected activity to constitute a pattern of antagonism.  *See Dudley v. Washington Metro. Area*

*Transit Auth.*, 924 F. Supp. 2d 141, 181 (D.D.C. 2013).

Smith has also failed to establish that coworker Robert Doughty is a valid comparator.[7]

Nothing in the record suggests that Doughty left the workplace without permission, and Smith

alleges no facts that would indicate that management was aware of the offenses Doughty

allegedly committed, such as failing to wear steel toe boots and keeping his area clean.  For these

reasons, Doughty is not a valid comparator.

Job abandonment is a terminable offense, and there is no dispute that Smith left his job

after expressly being told that he did not have permission to do so.  No reasonable jury could

conclude that Smith's employment would not have been terminated had he not complained of

sexual harassment in the workplace.

## IV.   CONCLUSION

For the foregoing reasons, I recommend that the court grant Perdue's motion for

summary judgment.  (D.I. 42)

---

[7] Robert Doughty was not mentioned in Smith's amended complaint.  (D.I. 11)

20

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: April 11, 2014

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

21